ROBERT E. OPERA – California State Bar No. 101182
ropera@wcghlaw.com
**WINTHROP COUCHOT**
**GOLUBOW HOLLANDER, LLP**
1301 Dove Street, Suite 500
Newport Beach, CA 92660
Telephone: (949) 720-4100/Facsimile: (949) 720-4111

STEPHEN R. HARRIS – Nevada State Bar No. 001463
steve@harrislawreno.com
**HARRIS LAW PRACTICE LLC**
6151 Lakeside Drive, Suite 2100
Reno, NV 89511
Telephone: (775) 786-7600

[Proposed] General Insolvency Counsel
for Debtor and Debtor-in-Possession

### UNITED STATES BANKRUPTCY COURT

### DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>X-TREME BULLETS, INC., a Nevada corporation,<br><br>    Debtor and<br>    Debtor-in-Possession. | Case No. 18-50609-btb<br><br>Chapter 11 Proceeding<br><br>**DEBTOR'S MOTION FOR ORDER AUTHORIZING JOINT ADMINISTRATION OF RELATED CHAPTER 11 CASES; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>[11 U.S.C. § 105; Fed. R. Bankr. P. 1015; LR 1015(g) and 3001(c)]<br><br>DATE:   OST PENDING<br>TIME:   OST PENDING<br>EST. TIME FOR HEARING:<br>PLACE:    Courtroom 2 (5th Floor)<br>              C. Clifton Young Federal Bldg.<br>              300 Booth Street<br>              Reno, NV 89509 |

X-Treme Bullets, Inc., a Nevada Corporation, the debtor and debtor-in-possession in the above-captioned Chapter 11 proceeding ("Debtor"), by and through its proposed counsel ROBERT E. OPERA, ESQ. of WINTHROP COUCHOT GOLUBOW HOLLANDER, LLP and STEPHEN R. HARRIS, ESQ. of HARRIS LAW PRACTICE LLC, hereby files is *Motion for Order Authorizing Joint Administration of Related Chapter 11 Cases* ("Motion"). Pursuant to the Motion, the Debtor moves the Court for an order:

A. Authorizing the joint administration of its Chapter 11 case with the related Chapter 11 cases of:

1. Howell Munitions & Technology, Inc., Case No. 18-50610-btb;
2. Clearwater Bullet, Inc., Case No. 18-50613-btb;
3. AmmoLoad Worldwide, Inc., Case No. 18-50611-btb;
4. Howell Machine, Inc., Case No. 18-50614-btb;
5. Freedom Munitions, LLC, Case No. 18-50615-btb;
6. Lewis-Clark Ammunition and Components, LLC, Case No. 18-50616-btb; and
7. Components Exchange, LLC, Case No. 18-50617-btb (collectively, including the Debtor, the "Related Debtors"):

B. Authorizing the Related Debtors to use a single docket for administrative matters, and the filing, lodging and docketing of pleadings and orders, **but** with the express understanding that claims must be filed only in the case to which a claim relates, and such filing will not constitute the filing of a claim in any other jointly administered case for the Related Debtors;

C. Authorizing the Related Debtors to combine notices to creditors and parties in interest;

D. Authorizing the Related Debtors to schedule joint hearings;

E. Authorizing the Related Debtors to provide joint financial reporting;

F. Authorizing joint and several liability of the estates of the Related Debtors for administrative expenses and the consolidated billing of professional fees;

G. Authorizing joint handling of other administrative matters for the Related Debtors;

1   H.   Authorizing the use of the captions attached as Exhibit "1" to the Declaration of David C. Howell (the "Howell Declaration") filed separately in support hereof; and

I.   Granting such further relief as the Court deems just and proper.

The Related Debtors are in the business of manufacturing and selling small arms ammunition components, assembling ammunition, custom building ammunition manufacturing equipment, and repairing and refurbishing existing ammunition manufacturing equipment. The Related Debtors sell ammunition from company-owned brands, which they manufacture in-house, as well as ammunition from third-party brands, which they source as finished goods. The Related Debtors operate a production facility in Carson City, Nevada and operate four facilities in Idaho, including three production facilities and one distribution center.

As will be demonstrated hereinbelow, joint administration of the Related Debtors' cases is in the best interests of the Related Debtors and the Related Debtors' creditors. Joint administration of the Related Debtors will allow the Related Debtors to benefit from increased efficiency because they will not be required to review and prepare or separately respond to similar applications, motions, complaints, and other pleadings or papers that would otherwise be filed in the separate cases. Joint administration will potentially save the Related Debtors' estates thousands of dollars in administrative fees and costs, as well as save this Court numerous hours in setting and hearing matters and in reviewing several separate sets of virtually identical pleadings. Moreover, since creditors and parties-in-interest will receive notice of the joint administration of the Related Debtors' cases, and the Court's files for each of the Related Debtors' cases will disclose the joint administration of the cases, creditors and parties-in-interest will have ample notice of the joint administration of the cases and, accordingly, no prejudice to any creditor or party-in-interest will be caused by the joint administration of the cases.

The Related Debtors do <u>not</u> request substantive consolidation of their cases at this time. Nothing contained in this Motion is intended to compel substantive consolidation of the assets of the Related Debtors' respective estates or to modify the Related Debtors' ownership interests in their assets. Since the Related Debtors request at this time only joint administration of these cases, no substantive rights will be prejudiced by the relief requested herein, and no conflicts will

result therefrom. In the event that a substantive consolidation of the assets and liabilities of some or all of the Related Debtors' estates is warranted, the Related Debtors will bring a separate motion requesting such relief.

This Motion is based on the attached Memorandum of Points and Authorities, the Howell Declaration, and all pleadings, papers and records on file with the Court, and such other evidence, oral or documentary, as may be presented to the Court with respect to this Motion.

DATED: June 8, 2018

**WINTHROP COUCHOT GOLUBOW HOLLANDER, LLP**

Robert E. Opera

-and-

**HARRIS LAW PRACTICE LLC**

By: /s/ Stephen R. Harris
Stephen R. Harris
[Proposed] General Insolvency Counsel for Debtor and Debtor-in-Possession

# I.

# STATEMENT OF FACTS

### A. General Description of the Related Debtors.

David C. Howell ("Mr. Howell") is the principal of each of the Related Debtors. Mr. Howell owns 95% of the issued and outstanding shares of stock in Howell Munitions & Technology, Inc. ("HMT"). HMT, in turn, is the sole shareholder of the following Related Debtors: X-Treme Bullets, Inc. ("X-Treme"); Clearwater Bullet, Inc. ("Clearwater"); Ammo Load Worldwide, Inc. ("ALW"); and Howell Machine. HMT owns 100% of the membership interests in Freedom Munitions, LLC ("Freedom"). Mr. Howell owns 100% of the membership interests in Lewis-Clark Ammunition Components, LLC ("LCAC"), and 90% of the membership interests in Components Exchange, LLC ("Components Exchange").

A description of each of the Related Debtors and its operations is set forth hereinbelow.

1. HMT. HMT is the parent company of Related Debtors X-Treme, Clearwater, ALW, Howell Machine and Freedom. While Related Debtors X-Treme, Clearwater, ALW, Howell Machine and Freedom are legal entities separate from HMT, such Related Debtors have operated at all times on a consolidated basis.

2. X-Treme. X-Treme is a Nevada corporation located in Carson City, Nevada. X-Treme is in the business of manufacturing bullets. X-Treme's bullets are sold to wholesale customers and to online customers via the xtremebullets.com website. X-Treme operates from two buildings located in Carson City, Nevada, both of which are leased by HMT, and one of which is owned by Mr. Howell.

3. Clearwater. Clearwater is in the business of manufacturing bullets. Clearwater's bullets are sold to wholesale customers and to online customers via the xtremebullets.com website. Clearwater operates from a facility located in Lewiston, Idaho which is leased by HMT from Mr. Howell.

4. ALW. ALW is in the business of manufacturing ammoload machines and other machines for resale to third-party customers. ALW operates in Lewiston, Idaho from buildings leased by HMT from Mr. Howell.

5. <u>Howell Machine</u>. Howell Machine is in the business of fabricating parts that are used to build the ammoload machines manufactured by ALW and to maintain the other machinery and equipment owned by the other Related Debtors. Howell Machine shares with ALW facilities in Lewiston, Idaho leased by HMT from Mr. Howell.

6. <u>Freedom</u>. Freedom is in the business of selling ammunition. Freedom sells its products online via the freedommunitions.com website. Freedom also had a retail location in Houston, Texas that sold ammunition, but that location recently was closed.

7. <u>LCAC</u>. LCAC is an Idaho limited liability company, but no longer conducts business operations. LCAC still owns machinery and equipment.

8. <u>Components Exchange</u>. Components Exchange manufactures and assembles ammunition, and sells its ammunition and components to wholesale, original equipment manufacturers and online customers via its ammovalley.com and reloadingvalley.com websites. Components Exchange operates in Peck, Idaho from buildings leased from Mr. Howell.

**B.    Related Debtors' Financial Difficulties.**

In 2016, the Related Debtors started having financial difficulties. The causes of the Related Debtors' financial difficulties include the following:

1. <u>Expansion of Operations</u>. In 2016, the Related Debtors were expanding rapidly with the purchase of two case manufacturing machines and the building of supplemental machines to complete the case manufacturing process. The Related Debtors also were building ammoloading machines and other machines to enhance operations. The substantial cash outlays made by the Related Debtors in this regard proved to be a strain on the Related Debtors' liquidity

2. <u>Decline in Ammunition Marketplace</u>. In 2016, the Related Debtors built up inventory in anticipation that Hillary Clinton would win the presidential election in 2016 (i.e., purchases of guns and ammunition generally increase during the administrations of Democratic presidents based upon some gun owners' concerns that Democratic administrations will impose stricter gun control laws). Other ammunition manufacturers similarly built increased inventories in anticipation of Ms. Clinton's winning the 2016 presidential election. When President Trump

was elected, the demand for ammunition in the marketplace decreased significantly. With an oversupply of ammunition in the marketplace, the price of ammunition declined significantly.

3. <u>Employment of New President</u>. In January 2017, the Related Debtors hired Jansen Jones to serve as the president of the Related Debtors. Mr. Jones proved to be an unsatisfactory president. Mr. Jones resigned on or about February 18, 2018.

Thus, commencing in 2016, and in 2017, the Related Debtors were overburdened with debt based upon a ramping up of the Related Debtors' operations, had too much manufacturing capacity, and faced a declining market and declining prices for their ammunition products. As a result, in 2017, the Related Debtors were unprofitable and experienced significant cash flow difficulties.

### C. **Disputes with the Bank.**

Zions First National Bank ("Bank") is the primary pre-petition secured lender for all Related Debtors except Components Exchange. On or about November 19, 2014, the Bank advanced a revolving loan and four term loans to all Related Debtors (except Components Exchange), to two-non debtor entities, Twin River Contract Loading, Inc. and Big Canyon Environmental, LLC, and to Mr. Howell (collectively, "Borrowers"). On or about July 27, 2015, the Bank advanced a fifth term loan to the Borrowers. Components Exchange was <u>not</u> a borrower under any of such loans, but, on or about August 31, 2016, Components Exchange granted to the Bank a security interest encumbering its assets in order to provide additional collateral to the Bank Components Exchange is evaluating the possible avoidability of such security interest as a fraudulent transfer under Section 548 of the Bankruptcy Code.

In 2016, the Borrowers failed to comply with certain financial covenants contained in the Bank loan agreements. Moreover, the revolving loan became due on July 27, 2016, and the Bank declined to extend the revolving loan. The Bank alleges an outstanding balance owed by the Borrowers in the approximate amount of $16.7 million.

The Borrowers acted diligently to address their financial difficulties. In 2017, the Borrowers downsized their businesses. The Borrowers liquidated a significant amount of their inventory in order to generate cash. The Borrowers also undertook two significant reductions in

their workforces, and reduced other operating expenses, in order to attempt to return to profitability.

In addition, in 2017, the Borrowers worked with Cascadia Capital to raise debt or equity funding. However, since the ammunition market was oversaturated with supply and prices in the ammunition market were depressed, the only proposals that were obtained from potential funding sources were deemed to be unsatisfactory.

In or about April 2018, the relationship between the Borrowers and the Bank deteriorated. In or about April 2018, the Bank demanded that Mr. Howell step aside as president or managing member of the Borrowers, and that a chief restructuring officer be appointed to manage the business of the Borrowers. The Bank rejected a proposed chief restructuring officer proposed by the Borrowers, and required that the Borrowers consent to the appointment of the chief restructuring officer dictated by the Bank, or the Bank would pursue its legal remedies against the Borrowers. Based upon the Bank's threats, the Borrowers believed that they had no choice but to employ the chief restructuring officer demanded by the Bank, and so, on or about April 20, 2018, the Borrowers executed that Chief Restructuring Officer Agreement ("CRO Agreement") required by the Bank. In accordance with the provisions of the CRO Agreement, Mr. Howell agreed to step aside as president or managing member of the Borrowers, and CFO Solutions LLC was appointed to act as chief restructuring officer of the Borrowers ("Bank-Appointed CRO").

The Related Debtors believe that the CRO Agreement is extraordinarily overreaching and reflects a wrongful attempt by the Bank to exercise control over the Borrowers. The Related Debtors believe that the Bank-Appointed CRO is a financial consultant, and that, upon the Bank-Appointed CRO's appointment, the Bank-Appointed CRO had no knowledge of the Related Debtors, the Related Debtors' business operations or the Related Debtors' industry. Nevertheless, the Bank-Appointed CRO took also immediately after his appointment acts to change dramatically the Related Debtors' operations, such as by closing business operations, terminating employees and pursuing sales of assets, without evaluating adequately the consequences of such acts on the Related Debtors' enterprise value. Notwithstanding the Bank-Appointed CRO's lack of any meaningful knowledge of the Related Debtors' business or the Related Debtors' industry,

the Bank-Appointed CRO has not employed Mr. Howell, nor even consulted in any meaningful manner with Mr. Howell regarding the operations of the Related Debtors despite the fact that Mr. Howell founded the Related Debtors and has a substantial amount of knowledge regarding the financial affairs of the Related Debtors and the Related Debtors' industry.

The acts taken by the Bank-Appointed CRO have impaired substantially the operations of the Related Debtors and have devalued the assets of the Related Debtors. The Bank-Appointed CRO has alienated major customers of the Related Debtors and key employees of the Related Debtors. In effect, the Bank-Appointed CRO has acted to liquidate, in a negligent and imprudent manner, the Related Debtors' assets for the benefit of the Bank-Appointed CRO's "benefactor" in this case, the Bank, to the detriment of the Related Debtors and the Related Debtors' other creditors.

### D.  Replacement of Bank-Appointed CRO.

By reason of the negligent and ill-advised acts taken by the Bank-Appointed CRO, substantial damage has been done to the operations of the Related Debtors. The Related Debtors believe that, if the Bank-Appointed CRO were allowed to continue to manage the Related Debtors' financial affairs, the viability of the Related Debtors would be impaired greatly, if not destroyed, with substantial and irrevocable injury being caused to the Related Debtors and their creditors.

The Related Debtors believe that the Bank-Appointed CRO and the Bank, acting in concert, took control of the Related Debtors and were acting to liquidate the Related Debtors' assets for substantially less than the value of the Related Debtors' assets, for the benefit of the Bank, but to the severe detriment of the Related Debtors and the Related Debtors' other creditors. Accordingly, in order to protect and preserve the value of the Related Debtors' assets for the benefit of the Related Debtors' creditors, on June 7, 2018, the Related Debtors terminated the employment of the Bank-Appointed CRO and reappointed former senior management, led by Mr. Howell as president of the corporate Related Debtors and Mr. Howell as managing member of the limited liability company Related Debtors.

In addition, the Related Debtors have engaged J. Michael Issa of GlassRatner Advisory & Capital Group, LLC, a very experienced financial turnaround expert with knowledge of the Related Debtors' industry, as Chief Restructuring Officer to manage the Related Debtors' reorganizations and to administer the Related Debtors' Chapter 11 cases. Mr. Issa has served as a financial consultant or advisor or in other capacities in more than 100 Chapter 11 cases and has acted as a chief restructuring officer or as a trustee in a number of Chapter 11 cases. He is very capable of leading the Related Debtors' efforts to reorganize their financial affairs for the benefit of all of the Related Debtors' creditors.

## II.

## THE COURT HAS THE AUTHORITY TO
## ORDER JOINT ADMINISTRATION OF THE RELATED DEBTORS' CASES

The Related Debtors' cases present the classic situation for joint administration. Mr. Howell owns 95% of the issued and outstanding shares of stock in HMT, which is the sole shareholder and parent company of X-Treme, Clearwater, ALW, and Howell Machine and the owner of 100% of the membership interests in Freedom. Mr. Howell also owns 100% of the membership interests in LCAC, and 90% of the membership interests in Components Exchange.

It is anticipated that numerous similar, if not identical, applications, motions and orders will be involved in each of the Related Debtors' cases. To a great extent, for each set of pleadings to be filed in the Related Debtors' cases, the only material differences between each pleading will be in the captions; since substantive matters affecting one estate typically will affect the other estate. Without joint administration, separate pleadings must be filed in each matter, and unnecessary duplication will need to be done at substantial cost to the estates -- all without any additional benefit to creditors or interest holders. Joint administration will avoid wasting resources that would result through duplication of effort if the cases involving the Related Debtors were to proceed separately. The creditors of each of the Related Debtors stand to benefit from the increased efficiency of administration anticipated through joint administration because they will not be required to review and separately respond to substantially similar applications, motions, complaints and other pleadings that would otherwise be filed in separate cases.

Joint administration will permit each of the Related Debtors to respond more efficiently to the demands of their creditors, and will reduce attorneys' fees, copying costs, mailing costs and other costs of administering the cases.

Joint administration also will avoid imposing upon this Court and the Clerk's Office the administrative burdens and inefficiencies that would be associated with the filing of separate substantially similar or identical pleadings that would need to be filed in each of the Related Debtors' cases absent joint administration of these cases. Joint administration will promote, then, an efficient use of judicial resources.

Finally, the Related Debtors request authority for joint liability for administrative professional fees and expenses. All fees and expenses could be charged to the main case and only one joint fee application need be filed by any professional. Joint administration will substantially reduce the costs of administering the Related Debtors' cases and will serve to eliminate the inefficiency created by maintaining separate dockets and billings.

LR 1015(g) and Rule 1015 of the Federal Rules of Bankruptcy Procedure provides for the joint administration of related bankruptcy cases. Rule 1015 provides, in pertinent part as follows:

> (b) CASES INVOLVING TWO OR MORE RELATED DEBTORS. **If … two or more petitions are pending in the same court by** or against … (2) a partnership and one or more of its general partners, or (3) two or more general partners, or (4) **a debtor and an affiliate, the court may order a joint administration of the estates.** …

Fed.R.Bankr.P. 1015(b).[1]

The legislative history of Rule 1015 provides that:

> **Joint administration as distinguished from consolidation may include combining the estates by using a single docket for the matters occurring in the administration, including the listing of filed claims, the combining of notices to creditors of the different estates, and the joint handling of other purely administrative matters that may aid in expediting the cases and rendering the process less costly.**

See, 1983 Advisory Committee Note to Fed. R. Bankr. P. 1015(b).

---

[1] "The term 'affiliate' is defined in section 101 of the Bankruptcy Code, and includes parents and subsidiaries of a debtor, as well as certain entities that operate or are operated by a debtor." Collier on Bankruptcy, ¶ 1015.03 (16th ed. rev. 2014).

The noted treatise on bankruptcy law, Collier on Bankruptcy, provides as follows:

> Federal Rule of Bankruptcy Procedure 1015(b) permits the court to order joint administration of cases pending against related entities. These include … a debtor and an affiliate." The term "affiliate" is defined in section 101 of the Bankruptcy Code, and includes parents and subsidiaries of a debtor, as well as certain entities that operate or are operated by a debtor.
>
> In each of these situations, the affairs of the related debtors may be sufficiently intertwined to make joint administration more efficient and economical than separate administration. Typically, an order for joint administration will mean the appointment of a single trustee or, in a chapter 11 case, a single creditors' committee, rather than a trustee and committee for each related case. **Obviously, this can lead to substantial efficiencies and savings of estate funds.** …

Collier on Bankruptcy, ¶ 1015.03 (emphasis added).

The purpose of joint administration is to allow pleadings that would likely be filed in each case to be filed under one number. See, In re N.S. Garrott & Sons, 63 B.R.189, 191 (Bankr. E.D. Ark. 1986). Joint administration does not constitute substantive consolidation. As noted in N.S. Garrott & Sons:

> Whether or not a case is jointly administered has nothing to do with the rights creditors have against each estate, nor the rights and liabilities of one estate to the other. A substantive consolidation means that the assets of the two estates are combined and the liabilities are combined creating, in effect, one debtor.

Id. at 191. See also, David G. Epstein, et al., Bankruptcy, § 2-4 (1992) ("Joint administration does not affect the substantive rights of creditors and other interested parties. In joint administration, unlike substantive consolidation, the estate of each debtor is kept separate and distinct and inter-entity claims survive. The creditors of each jointly administered entity may look only to the assets of their debtor.").

As set forth in Collier on Bankruptcy, an order authorizing joint administration contemplates the following relief:

(1) combining the estates by using a single docket for administrative matters, including a listing of claims filed, and the filing, lodging and docketing of pleadings and orders;
(2) the combining of notices to creditors and parties in interest;
(3) the scheduling of hearings;
(4) financial reporting by the Debtors;
(5) the joint and several liability of the estates for administrative expenses; and
(6) the joint handling of other administrative matters.

See, Collier on Bankruptcy, Forms 8.92-1, 8.92-4, and 8.92-5, reprinted in Collier on Bankruptcy 16th ed. rev. (2014).

In addition, Section 105 of the Bankruptcy Code provides that a bankruptcy court may issue any order "that is necessary or appropriate to carry out the provisions of this title." Pursuant to Section 105, then, a court may issue an order that will enhance the efficient administration of a debtor's case, such as the joint administration of related Chapter 11 cases.

## III.

## CONCLUSION

WHEREFORE, based upon the foregoing, the Related Debtors pray that the Court enter an order granting the relief requested herein and such further relief as the Court deems just and proper.

DATED: June 8, 2018                    Respectfully submitted,

**WINTHROP COUCHOT
GOLUBOW HOLLANDER, LLP**

Robert E. Opera

-and-

**HARRIS LAW PRACTICE LLC**

/s/ Stephen R. Harris
By:_____
     Stephen R. Harris
[Proposed] General Insolvency Counsel for
Debtor and Debtor-in-Possession