ROBERT E. OPERA – California State Bar No. 101182
ropera@wcghlaw.com
**WINTHROP COUCHOT**
**GOLUBOW HOLLANDER, LLP**
1301 Dove Street, Suite 500
Newport Beach, CA 92660
Telephone: (949) 720-4100
Facsimile: (949) 720-4111

STEPHEN R. HARRIS – Nevada State Bar No. 001463
steve@harrislawreno.com
**HARRIS LAW PRACTICE LLC**
6151 Lakeside Drive, Suite 2100
Reno, NV 89511
Telephone: (775) 786-7600

[Proposed] General Insolvency Counsel
for Debtors and Debtors-in-Possession

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>☐ X-TREME BULLETS, INC.,<br>☐ AMMO LOAD WORLDWIDE, INC.,<br>☐ CLEARWATER BULLET, INC.,<br>☐ FREEDOM MUNITIONS, LLC,<br>☐ HOWELL MACHINE, INC.,<br>☐ HOWELL MUNITIONS &<br>  TECHNOLOGY, INC.,<br>☐ LEWIS-CLARK AMMUNITION AND<br>  COMPONENTS, LLC,<br>☐ COMPONENTS EXCHANGE, LLC, an<br>☒ All Debtors.<br>    Debtors and<br>    Debtors-in-Possession. | Jointly Administered under<br>Case No. 18-50609-btb with<br><br>Case Nos. 18-50610-btb; 18-50611-btb;<br>18-50613-btb; 18-50614-btb; 18-50615-btb;<br>18-50616-btb; and 18-50617-btb<br><br>Chapter 11 Proceedings<br><br>**DEBTORS' <u>EMERGENCY</u> MOTION FOR ORDER AUTHORIZING USE OF ANY CASH COLLATERAL OF SECURED CLAIMANTS; MEMORANUDM OF POINTS AND AUTHORITIES IN SUPPORT OF THE MOTION**<br><br>**[DECLARATIONS OF DAVID HOWELL AND J. MICHAEL ISSA IN SUPPORT OF MOTION FILED CONCURRENTLY HEREWITH]**<br><br>DATE:        June 14, 2018<br>TIME:        2:00 p.m.<br>EST. TIME FOR HEARING: 15 minutes<br>PLACE:      Courtroom 2 (5th Floor)<br>                C. Clifton Young Federal Bldg.<br>                300 Booth Street<br>                Reno, NV 89509 |

234103

X-Treme Bullets Inc., a Nevada corporation; Ammo Load Worldwide, Inc., an Idaho corporation; Clearwater Bullet, Inc., an Idaho corporation; Freedom Munitions, LLC, an Idaho limited liability company; Howell Machine, Inc., an Idaho corporation; Howell Munitions & Technology, Inc., an Idaho corporation; Lewis-Clark Ammunition Components, LLC, a Idaho limited liability company (collectively, the "HMT Debtors"); and Components Exchange, LLC, an Idaho limited liability company ("Components" and, together with the HMT Debtors, the "Debtors"), by and through their proposed counsel ROBERT E. OPERA, ESQ. of WINTHROP COUCHOT GOLUBOW HOLLANDER, LLP and STEPHEN R. HARRIS, ESQ. of HARRIS LAW PRACTICE LLC, hereby move the Court, on an emergency basis, for an order (i) authorizing the Debtors to use any "cash collateral," as such term is defined in Section 363(a) of the Bankruptcy Code, of the secured claimants in these cases, including, but not limited to, any cash collateral of the Debtors' primary pre-petition secured lender, Zions First National Bank ("Bank"), and to grant to the Bank and to any such other secured claimants (together with the Bank, collectively, "Secured Claimants") post-petition replacement liens as and for adequate protection of the Debtors' use of any cash collateral of the Secured Claimants, in accordance with the terms and conditions set forth herein; and (ii) setting a final hearing on this Motion.

Good cause exists to grant the relief requested by this Motion. As set forth in detail in the Declaration of David Howell filed concurrently herewith ("Howell Declaration"), the Debtors require immediate access to any cash collateral in order to ensure that the Debtors have funds sufficient to pay their accruing operating expenses and thereby preserve the value of their estates for the benefit of the Debtors' creditors. Absent immediate access to cash collateral, the Debtors will not be able to pay their accruing operating expenses, including payroll expenses associated with the Debtors' employees, and the Debtors will be required to terminate their business operations and convert their Chapter 11 cases to ones under Chapter 7 of the Bankruptcy Code, with a resulting substantial loss in the value of the Debtors' estates, to the severe detriment of the Debtors and the Debtors' creditors.

In accordance with the provisions of Rule 4001(b) of the Federal Rules of Bankruptcy Procedure, the following is a statement of the relief requested by the Debtors herein.

1      •     The following Secured Claimants may assert an interest in cash collateral:  the

2            Bank; and, possibly, Integrity Bank, which assert a lien junior to the Bank's liens.

3      •     The Debtors seek the use of any cash collateral to pay the expenses of operating

4            their businesses, including to pay payroll obligations and purchase inventory.

5      •     The terms of the Debtors' proposal for the use of any cash collateral are set forth

6            at pages 19-22 hereof.

7      •     The Debtors propose to provide replacement liens to any Secured Claimant

8            having a valid interest in cash collateral in accordance with the provisions set

9            forth in pages 20-21 hereof.  The Debtors believe that the proposed replacement

10           liens provide adequate protection to the Secured Claimants, as described in pages

11           24-34 hereof.  Moreover, the Debtors believe that any interests of Secured

12           Claimants in cash collateral is adequately protected by an ample equity cushion,

13           as described in pages 35-37 hereof.

14         This Motion is made and based upon the foregoing allegations and representations, the

15     Memorandum of Points and Authorities attached hereto and the Howell Declaration and the

16     Declaration of J. Michael Issa ("Issa Declaration") filed concurrently herewith, and upon such

17     other evidence, both oral and documentary, that may be submitted to the Court at or before the

18     time of the hearing on this Motion.

19         WHEREFORE, the Debtors request that this Court enter an order:

20     1.     Finding that the Secured Claimants' interests in any cash collateral are adequately

21           protected;

22     2.     Authorizing, on an interim basis pending a final hearing on notice to creditors,

23           the Debtors' immediate use of any cash collateral of the Bank and any other

24           Secured Claimants pursuant to the terms and conditions contained in this Motion;

25     3.     Setting a final hearing on this Motion in accordance with the requirements of the

26           Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules; and

27

28

MAINDOCS-#234103-v2-Howell-Debtor_s_Emergency_Motion

1        4.    Granting to the Debtors such other and further relief as may be just and

2    appropriate under the facts and circumstances of these cases.

3

4    Dated:  June 13, 2018               WINTHROP COUCHOT
                            GOBUBOW HOLLANDER, LLP

5

6                                By:  _/s/ Robert E. Opera_____

7                                    Robert E. Opera
                                Peter W. Lianides

8                                    Andrew B. Levin
                            [Proposed] General Insolvency Counsel
                            for Debtors and Debtors-in-Possession

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### INTRODUCTION

The Debtors are in the business of manufacturing and selling small arms ammunition components and assembling ammunition. The Debtors also custom build ammunition manufacturing equipment, and repair and refurbish existing ammunition manufacturing equipment. The Debtors sell ammunition from company-owned brands, which they manufacture in-house, as well as ammunition from third-party manufacturers, which they source as finished goods. The Debtors manufacture ammunition using raw materials from outside suppliers, but make most bullets and cases at their facilities.

The Debtors operate four facilities in Idaho, including three production facilities and one distribution center, and operate a production facility in Carson City, Nevada. The Debtors also operated a retail ammunition store located in Houston, Texas.

In 2016, the Debtors, together with two non-debtor affiliates, Twin River Contract Loading, Inc. and Big Canyon Environmental, LLC, generated, on a consolidated basis, approximately $104,671,762 in net sales. In 2017, the Debtors and such other affiliates generated, on a consolidated basis, approximately $74,624,745 in net sales. As of mid-April 2018, the Debtors employed approximately 150 employees. The Debtors continue to operate their businesses, and it is the Debtors' objective by these Chapter 11 cases to reorganize their financial affairs for the benefit of their creditors.[1]

The Debtors need immediate access to cash collateral in order to operate their businesses. The Debtors need cash collateral in order to purchase inventory necessary to manufacture their products and to pay for the costs associated with selling their products. Moreover, the Debtors' payroll obligations must be funded by the Debtors by June 18, 2018 so that the next payroll obligations to employees can be paid by June 20, 2018. Without immediate access to cash collateral, the Debtors will not be able to pay their employees, resulting in a loss of employees

---

[1] Twin River Contract Loading, Inc. did not file for Chapter 11 relief because the value of the business is questionable. Big Canyon Environmental, LLC did not file for Chapter 11 relief because it no longer conducts any business operations and it has no present intention to resume operations.

MAINDOCS-#234103-v2-Howell-Debtor_s_Emergency_Motion

1    necessary to the Debtors' businesses, and the Debtors' businesses will grind to a halt, resulting in

2    the loss of enterprise value of the Debtors' businesses and the destruction of millions of dollars in

3    value. Authorizing the Debtors' immediate use of cash collateral, therefore, is essential to the

4    Debtors' efforts to reorganize their financial affairs for the benefit of the Debtors' creditors.

5                                                            II.

6                                            **STATEMENT OF FACTS**

7        A.    **General Description of the Debtors.**

8            David Howell ("Mr. Howell") is the principal of each of the Debtors. Mr. Howell founded

9    Debtor Howell Machine, Inc. approximately 29 years ago.

10           On January 1, 2014, Mr. Howell caused Howell Munitions & Technology, Inc. ("HMT")

11   to be formed. Mr. Howell owns 95% of the issued and outstanding shares of stock in HMT.

12   HMT, in turn, is the sole shareholder of the following Debtors: X-Treme Bullets, Inc. ("X-

13   Treme"); Clearwater Bullet, Inc. ("Clearwater"); Ammo Load Worldwide, Inc. ("ALW"); and

14   Howell Machine, Inc. ("Howell Machine"). HMT is the sole member of Debtor Freedom

15   Munitions, LLC ("Freedom"). Mr. Howell owns 100% of the membership interests in Debtor

16   Lewis-Clark Ammunition Components, LLC ("LCAC"). Mr. Howell owns 90% of the

17   membership interests in Components Exchange, LLC ("Components Exchange").

18           A description of each Debtor and its operations is set forth hereinbelow.

19       1.    **HMT.** HMT is the parent company of Debtors X-Treme, Clearwater, ALW,

20               Howell Machine and Freedom. While Debtors X-Treme, Clearwater, ALW,

21               Howell Machine, Freedom and LCAC are legal entities separate from HMT, HMT

22               and these Debtors have operated at all times on a consolidated basis.

23       2.    **X-Treme.** X-Treme is a Nevada corporation located in Carson City, Nevada. An

24               affiliate of Mr. Howell purchased the assets of X-Treme in or about 2009. X-

25               Treme is in the business of manufacturing bullets. X-Treme's bullets are sold to

26               wholesale customers and to online customers via the xtremebullets.com website.

27               X-Treme operates from two buildings located in Carson City, Nevada, both of

28               which are leased by HMT. Mr. Howell is the owner of one of such buildings.

                                                            6

3. **Clearwater.** Clearwater is an Idaho corporation located in Lewiston, Idaho. Clearwater was founded by Mr. Howell in or about 2008. Clearwater is in the business of manufacturing bullets. Clearwater's bullets are sold to wholesale customers and to online customers via the xtremebullets.com website. Clearwater operates from a facility located in Lewiston, Idaho which is leased by HMT from Mr. Howell.

4. **ALW.** ALW is an Idaho corporation located in Lewiston, Idaho. Howell Machine purchased the assets of ALW in or about 2003. ALW is in the business of manufacturing ammoload machines and other machines for resale to third-party customers. ALW operates in Lewiston, Idaho from buildings leased by HMT from Mr. Howell.

5. **Howell Machine.** Howell Machine is an Idaho corporation. Mr. Howell founded Howell Machine in or about 1989. Howell Machine is in the business of fabricating parts that are used to build the ammoload machines manufactured by ALW and to maintain the other machinery and equipment owned by the other Debtors. Howell Machine shares with ALW facilities in Lewiston, Idaho leased by HMT from Mr. Howell.

6. **Freedom.** Freedom is an Idaho limited liability company located in Lewiston, Idaho. Mr. Howell founded Freedom in or about 2011. Freedom is in the business of selling ammunition. Freedom sells its products online via the freedommunitions.com website. Freedom also had a retail location in Houston, Texas that sold ammunition, but that location recently was closed.

7. **LCAC.** LCAC is an Idaho limited liability company. LCAC was in the business of manufacturing shell cases, but no longer conducts business operations. LCAC still owns machinery and equipment with a value in excess of $1.0 million.

8. **Components Exchange.** Components Exchange is an Idaho limited liability company located in Peck, Idaho. Components Exchange is in the business of manufacturing and assembling ammunition. Components Exchange's ammunition

7

is sold to wholesale and online customers via its ammovalley.com and reloadingvalley.com websites. Components Exchange operates from production facilities located in Peck, Idaho which is leased from Mr. Howell, and operates a distribution facility located in Lewiston, Idaho. Components Exchange holds a federal license to manufacture ammunition.

Components Exchange's operations largely have been maintained separately from the other Debtors.

**B.    Financial Performance of the Debtors.**

The Debtors, together with non-debtors, Twin River Contract Loading, Inc. ("Twin River") and Big Canyon Environmental, LLC ("Big Canyon"), prepare financial statements on a consolidated basis ("Consolidated Companies").[2] The Consolidated Companies' net sales for the past several years are as follows:

1.    2015 -- $85,811,134.

2.    2016 -- $104,671,762.

3.    2017 -- $74,624,745.

4.    January 1, 2018 - April 30, 2018 -- $18,405,000.

The Consolidated Companies' consolidated operations were profitable in 2016, but were unprofitable in 2017.

The Debtors' assets consist primarily of the following: cash; accounts receivable; inventory; machinery and equipment; office equipment, furniture and fixtures; and vehicles. The Consolidated Companies' audited consolidated balance sheets state that, as of December 31, 2016, the Consolidated Companies had $46,564,877 in total assets.[3] The Consolidated Companies' internally-prepared consolidated balance sheet states that, as of December 31, 2017, the Consolidated Companies had assets with an aggregate value of approximately $30,108,985. The

---

[2] Information contained herein regarding the financial affairs of the Consolidated Companies for 2015 and 2016 are derived from the audited consolidated financial statements for the Consolidated Companies. The financial information for the Consolidated Companies for 2017 and for 2018 derives from unaudited, internally-prepared financial statements.

[3] This calculation of value of the Consolidated Companies' assets is based upon the net value of the Consolidated Companies accounts receivable and inventory and upon the cost value of the Consolidated Companies' property and equipment, taking into account accumulated depreciation.

MAINDOCS-#234103-v2-Howell-Debtor_s_Emergency_Motion

1    difference between the December 31, 2016 and the December 31, 2017 asset valuations relates

2    primarily to additional accumulated depreciation on property and equipment of the Consolidated

3    Companies and the Consolidated Companies' maintaining almost $10.0 million less in inventory

4    on December 31, 2017 than on December 31, 2016.

5         As set forth in the Howell Declaration, the Debtors estimate that the current aggregate fair

6    market value of the assets of the Debtors and the other Consolidated Companies is approximately

7    $27,651,000.  This calculation does <u>not</u> include real property collateral pledged in favor of the

8    Bank by Mr. Howell, as described hereinbelow.

9    **C.    <u>Secured Claims Asserted Against the Debtors</u>.**

10   The following secured claims have been asserted against the Debtors.

11        1.    **<u>The Bank's Secured Claims</u>.**  The Bank is the Debtors' primary pre-

12   petition secured lender.  On or about November 19, 2014, the Bank advanced a revolving

13   loan ("Revolving Loan") and four term loans to the Debtors (other than Components

14   Exchange), Twin River, Big Canyon and to Mr. Howell (collectively, "Borrowers").  On or

15   about July 27, 2015, the Bank advanced a fifth term loan to the Borrowers.  Components

16   Exchange was <u>not</u> a borrower under any of such loans.  Information regarding the

17   Revolving Loan and the five term loans ("Term Loans") advanced by the Bank

18   (collectively, "Loans") and the Bank's loan and security agreements, as amended,

19   associated therewith (collectively, "Loan Agreements") is as follows:

20        a.    <u>Loan 1</u> (as amended on July 27, 2015) -- a revolving loan in the

21   original principal amount of as much as $9,000,000.  This loan matured on July 27,

22   2016.

23        b.    <u>Loan 2</u> -- a term loan in the original principal amount of $1,640,000,

24   amortized on a 20-year basis, with a maturity date of November 1, 2024.

25        c.    <u>Loan 3</u> -- a term loan in the original principal amount of $545,000,

26   amortized on a 20-year basis, with a maturity date of November 1, 2024.

27        d.    <u>Loan 4</u> -- a term loan in the original principal amount of $4,815,000,

28   amortized over 5 years, with a maturity date of November 1, 2019.

MAINDOCS-#234103-v2-Howell-Debtor_s_Emergency_Motion

e.  Loan 5 -- a term loan in the original principal amount of $2,000,000, amortized over 5 years, with a maturity date of November 1, 2019.

f.  Loan 6 (made July 27, 2015) -- a term loan in the original principal amount of $5,000,000, amortized over 5 years, with a maturity date of July 27, 2020.

Mr. Howell, as a co-borrower under the Loans, individually has provided to the Bank additional collateral for the Loans. He has executed in favor of the Bank deeds of trust encumbering those commercial real properties commonly known as 4093 Lucky Lane, Lewiston, Idaho and 153 Southport Avenue, Lewiston, Idaho. Mr. Howell believes that the aggregate net value of such collateral is approximately $3.5 - 4.0 million.

On or about August 31, 2016, Components Exchange granted to the Bank a security interest encumbering assets of Components Exchange in order to provide to the Bank additional collateral for the Loans. Components Exchange is not a borrower under any of the Loans. Components Exchange is evaluating the avoidability of the Bank's security interest encumbering Components Exchange's assets as a possible fraudulent conveyance under Section 548 of the Bankruptcy Code.

The Debtors believe that the Bank asserts, as of the date of the filing of the Debtors' Chapter 11 petitions ("Petition Date"), secured claims in the aggregate amount of approximately $16.7 million against the Borrowers. The Debtors believe further that the Bank asserts that the Loans are secured by substantially all of the assets of the Debtors (including cash collateral) and substantially all of the assets of Borrowers Twin River and Big Canyon, and, in the case of Mr. Howell, real property collateral. The Debtors believe that, at present, the Bank asserts that it has the following collateral for the Loans:

| Grantor | Net Aggregate Fair Market Value of Collateral (Est.) |
|---------|------------------------------------------------------|
| Debtors | $24.0 million |
| Twin River | $3.361 million |
| Big Canyon | $290,000 |
| Mr. Howell | $3.5 - 4.0 million |

MAINDOCS-#234103-v2-Howell-Debtor_s_Emergency_Motion

|  | Total Value of Collateral: | $31,351,000 to 31,651,000 |

2.    **Other Secured Claimants.**  The Debtors have conducted lien searches in order to determine the secured claims asserted against each of the Debtors.  Based upon such lien searches, the Debtors believe that additional secured claims may be asserted by the following secured claimants:

| Debtor | Secured Claimant | (Alleged) Collateral |
| --- | --- | --- |
| a.  Clearwater | the Bank | All Personal Property Assets |
| b.  Components Exchange | the Bank | All Personal Property Assets |
|  | Toyota Industries | Forklifts |
| c.  ALW | the Bank | All Personal Property Assets |
| d.  LCAC | the Bank | All Personal Property Assets |
| e.  X-Treme | the Bank | All Personal Property Assets |
|  | the Bank | Certain Identified Machinery |
|  | Wells Fargo Bank, N.A. | Forklifts; Lift-Trucks |
|  | Corporate Capital Services, Inc. | Carbonate/Sulfate Removal System |
| f.  Freedom | the Bank | All Personal Property Assets |
|  | NMHG Financial Services, Inc. | Equipment[4] |
|  | Integrity Bank, SSB | Inventory, accounts, equipment, chattel paper, furniture and general intangibles and additions and replacements thereto[5] |
| g.  Howell Machine | the Bank | All Personal Property Assets |
|  | NMHG Financial Services, Inc. | All Equipment of Howell Machine |
|  | Financial Servicing, LLC | Shoretel Phone System |
|  | Canon Financial Services, Inc. | All Equipment from Canon Financial Leased or Acquired by |

---

[4] This Secured Claimant's UCC-1 financing statements lapsed in April 2018.
[5] Integrity Bank asserts a claim in the amount of approximately $200,000.  Integrity Bank's UCC-1 financing statement was filed on September 19, 2017, and, accordingly, Integrity Bank's asserted security interest is junior to the Bank's asserted security interest.

| | | | |
|---|---|---|---|
| | | | Howell Machine |
| h. HMT | | the Bank | All Personal Property Assets |
| | | Wells Fargo Bank, N.A. | Lift Trucks; Forklifts |
| | | Corporate Capital Services, Inc. | Certain Identified Equipment |
| | | Integrity Bank, SSB | Inventory, accounts, equipment, chattel paper, furniture and general intangibles and additions and replacements thereto[6] |
| | | Toyota Industries Commercial Finance, Inc. | Forklift |
| | | WCP Solutions | Certain Identified Equipment |

The Debtors believe that, apart from the Bank and Integrity Bank, none of such creditors asserts a valid, unavoidable security interest encumbering cash collateral of the Debtors.

The Debtors note that, on or about January 12, 2017, the Alcohol and Tobacco Tax and Trade Bureau ("ATB") recorded a federal tax lien against the assets of non-debtor Twin River. The ATB's claim arises from Twin River's failure to pay to the ATB excise taxes associated with Twin River's manufacture of ammunition. Twin River filed a federal excise tax return with the ATB and was the company that failed to pay excise taxes to the ATB. The Debtors believe that they have no liability to the ATB.

**D.    Debtors' Financial Difficulties.**

In 2016, the Debtors started having financial difficulties. The causes of the Debtors' financial difficulties include the following:

1.    **Expansion of Operations.** In 2016, the Debtors were expanding rapidly with the purchase of two case manufacturing machines and the building of supplemental machines to complete the case manufacturing process. The Debtors also were building ammoloading machines and other machines to enhance operations. The substantial cash outlays made by the Debtors in this regard proved to be a strain on the Debtors' liquidity

2.    **Decline in Ammunition Marketplace.** In 2016, the Debtors built up

---

[6] Integrity Bank asserts a claim in the amount of approximately $200,000. Integrity Bank's UCC-1 Financial Statement was filed on September 19, 2017, and, accordingly, Integrity Bank's asserted security interest is junior to the Bank's asserted security interest.

12

1    inventory in anticipation that Hillary Clinton would win the presidential election in 2016

2    (i.e., purchases of guns and ammunition generally increase during the administrations of

3    Democratic presidents based upon some gun owners' concerns that Democratic

4    administrations will impose stricter gun control laws).  Other ammunition manufacturers

5    similarly built increased inventories in anticipation of Ms. Clinton's winning the 2016

6    presidential election.  When President Trump was elected, the demand for ammunition in

7    the marketplace decreased significantly.  With an oversupply of ammunition in the

8    marketplace, the price of ammunition declined significantly.

9         3.       **Debtors' Employment of New President.**  In about January 2017, the

10    Debtors hired Jansen Jones to serve as the president of the Debtors.  Mr. Jones proved to

11    be an unsatisfactory president.  Mr. Jones resigned on or about February 18, 2018.

12         Thus, commencing in 2016, the Debtors were overburdened with debt based upon a

13    ramping up of the Debtors' operations, had too much manufacturing capacity, and faced a

14    declining market and declining prices for their ammunition products.  As a result, in 2017, the

15    Debtors were unprofitable and experienced significant cash flow difficulties.

16    E.    **Disputes with the Bank.**

17         In 2016, the Borrowers failed to comply with certain financial covenants contained in the

18    Loan Agreements.  Moreover, the Revolving Loan became due on July 27, 2016, and the Bank

19    declined to extend the Revolving Loan.

20         The Borrowers acted diligently to address their financial difficulties.  In 2017, the

21    Borrowers downsized their businesses.  The Borrowers liquidated a significant amount of their

22    inventory in order to generate cash.  The Borrowers also undertook two significant reductions in

23    their workforces, and reduced other operating expenses, in order to attempt to return to

24    profitability.

25         In addition, in 2017, the Borrowers retained Cascadia Capital LLC to raise funding for the

26    Borrowers.  However, since the ammunition market was oversaturated with supply and prices in

27    the ammunition market were depressed, the only proposals that were obtained from potential

28    funding sources were deemed to be unsatisfactory.

1    The Borrowers continued to pay all accruing payments on the five Term Loans with the

2  Bank, and to pay interest only payments with respect to the Revolving Loan, until February 2018.

3    In or about April 2018, the relationship between the Borrowers and the Bank deteriorated.

4  In or about April 2018, the Bank demanded that Mr. Howell step aside as president of the

5  corporate Borrowers and as managing member of the limited liability company Borrowers, and

6  that a chief restructuring officer be appointed to manage the businesses of the Borrowers.  The

7  Bank rejected a proposed chief restructuring officer proposed by the Borrowers, and required that

8  the Borrowers consent to the appointment of the chief restructuring officer dictated by the Bank,

9  or the Bank would pursue its legal remedies against the Borrowers.  Based upon the Bank's

10  threats, the Borrowers believed that they had no choice but to employ the chief restructuring

11  officer demanded by the Bank, and so, on or about April 20, 2018, the Borrowers executed that

12  Chief Restructuring Officer Agreement ("CRO Agreement") required by the Bank, a copy of

13  which is attached as Exhibit "1" to the Howell Declaration.  In accordance with the provisions of

14  the CRO Agreement, Mr. Howell agreed to step aside as president of the corporate Borrowers and

15  as managing member of the limited liability company Borrowers, and CFO Solutions LLC was

16  appointed to act as chief restructuring officer of the Borrowers ("Bank-Appointed CRO").

17    The Debtors believe that the CRO Agreement is extraordinarily overreaching and reflects a

18  wrongful attempt by the Bank to exercise control over the Borrowers.  Material provisions of the

19  CRO Agreement include the following:

20    1.    The Bank-Appointed CRO performs his duties "subject to the oversight of [the

21      Bank] and with the advice of an advisory board (the "Advisory Board")."

22    2.    The Bank appoints itself to serve as a member on the Advisory Board.

23    3.    The Bank-Appointed CRO has full authority to operate the business of the

24      Borrowers.  The Advisory Board has no authority to approve or disapprove

25      decisions made or actions taken by the Bank-Appointed CRO.

26    4.    The Bank-Appointed CRO and his team ("Bank-Appointed CRO Team") has the

27      authority to sell assets of the Borrowers only with the consent of the Bank.

28

14

5.    The Bank-Appointed CRO is authorized to provide to the Bank periodic reports as the Bank deems appropriate.

6.    The Bank-Appointed CRO Team is required to assist the Borrowers in restructuring efforts that the Borrowers (controlled by the Bank-Appointed CRO) and "[the Bank] may request from time to time."

7.    The Bank-Appointed CRO Team's services are subject to change as may be agreed upon by the Bank.

8.    The Bank-Appointed CRO Team was provided with extremely broad indemnification rights and exculpation for any loss or damage caused by their acts.

9.    The CRO Agreement may not be terminated without notice absent the prior written consent of the Bank, in accordance with the provisions of the CRO Agreement.

**F.    The Bank-Appointed CRO Took Acts Contrary to the Interests of the Debtors and the Debtors' Creditors.**

The Debtors believe that the Bank-Appointed CRO is a financial consultant, and that, upon the Bank-Appointed CRO's appointment, the Bank-Appointed CRO had **no** knowledge of the Debtors, the Debtors' business operations or the Debtors' industry. Nevertheless, the Bank-Appointed CRO took, almost immediately after his appointment, acts to change dramatically the Debtors' operations, such as by closing business operations, terminating employees and pursuing liquidation sales of assets, without evaluating adequately the consequences of such acts on the Debtors' enterprise value. Notwithstanding the Bank-Appointed CRO's lack of any significant knowledge of the Debtors' business or the Debtors' industry, the Bank-Appointed CRO chose not to employ Mr. Howell, nor even to consult in any meaningful manner with Mr. Howell regarding the operations of the Debtors despite the fact that Mr. Howell founded the Debtors and has a substantial amount of knowledge regarding the financial affairs of the Debtors and the Debtors' industry.

The Bank-Appointed CRO took, among others, the following acts that have caused substantial damage to the Debtors:

1        **1.**    **Closing of X-Treme.**  The Bank-Appointed CRO closed the operations of

2    X-Treme in Carson City, Nevada and terminated all of X-Treme's employees with no

3    severance payments.  X-Treme was a long-standing enterprise with historically high

4    quality products and a very solid reputation in the ammunition industry.  The Debtors

5    believe that the closing of X-Treme was unnecessary and very unwise.  The closing of X-

6    Treme caused a substantial loss in value of X-Treme, to the severe detriment of the

7    Debtors' creditors.  The Debtors are acting to rehire the X-Treme employees and to revive

8    X-Treme's operations in Carson City, Nevada.

9        **2.**    **Closing of Components Exchange.**  The Bank-Appointed CRO closed the

10    operations of Components Exchange, causing substantial damage to Components

11    Exchange, as well as alienating one of the largest customers of the other Debtors.

12    Components Exchange was materially current in paying its accruing obligations to its trade

13    creditors.  Closing Components Exchange caused a very substantial loss of necessary cash

14    flow for the Debtors.

15        **3.**    **Fire Sale of Assets.**  The Bank-Appointed CRO has pursued a sale of assets

16    of Debtors for a price substantially below the fair market value of such assets.

17        **4.**    **Insufficient Inventory for Operations.**  The Bank-Appointed CRO has not

18    purchased inventory sufficient for the Debtors' ongoing operations.  As a result of the

19    Bank-Appointed CRO's maintaining inadequate inventory, and conducting of "going out

20    of business" type sales, there has been a significant erosion of the Debtors' customer base.

21        **5.**    **Closing of Freedom's Retail Operations.**  The Bank-Appointed CRO

22    closed Freedom's retail ammunition store located in Houston, Texas without making any

23    efforts to market that store, notwithstanding the fact that there was a potential buyer for

24    that store.  The closing of that store resulted in a loss of the value of that store and the

25    leasehold improvements associated therewith.

26        **6.**    **Exacerbating of Cash Flow Problems.**  The Debtors believe that the

27    Bank-Appointed CRO has turned over to the Bank collections of the Debtors' receivables,

28    exacerbating the cash flow problems for the Debtors.

7.   **Closing of Operations of Twin River.**  The Bank-Appointed CRO closed the ammopack and assembly operations of Twin River, causing a substantial devaluation of Twin River and substantial disruption and damage to the online sales channel of Freedom.

8.   **Failure to Protect the Debtors from ATB Levies.**  Periodic payments were being made to the ATB in order to try to induce the ATB to forbear from levying on the ATB's tax lien.  However, the Bank-Appointed CRO stopped making payments to the ATB.  As a result, the ATB commenced giving notice to the Debtors' account debtors to make payments to the ATB, rather than to the Debtors, and, on or about June 6, 2018, the ATB levied upon the Debtors' bank accounts.  These actions taken by the ATB threatened the viability of the Debtors' businesses.  These Chapter 11 cases were filed, in part, to obtain a stay of the ATB's collection actions and thereby protect the Debtors' operations and preserve the value of the Debtors' assets.

These extraordinarily ill-advised acts taken by the Bank-Appointed CRO have impaired substantially the operations of the Debtors and have devalued the assets of the Debtors.  The Bank-Appointed CRO has alienated major customers of the Debtors and key employees of the Debtors.  **In effect, the Bank-Appointed CRO has acted to liquidate, on a "fire sale" basis, the Debtors' assets for the sole benefit of the Bank-Appointed CRO's "benefactor" in this case, the Bank, to the severe detriment of the Debtors and the Debtors' other creditors.**

G.   **Replacement of Bank-Appointed CRO.**

By reason of the ill-advised acts taken by the Bank-Appointed CRO, substantial damage has been done to the operations of the Debtors.  **The Debtors believe that, if the Bank-Appointed CRO were allowed to continue to manage the Debtors' financial affairs, the viability of the Debtors would be destroyed, with substantial and irrevocable injury being caused to the Debtors and their creditors.**

The Debtors believe that the Bank-Appointed CRO and the Bank, acting in concert, **took control of the Debtors and were acting to liquidate the Debtors' assets for substantially less than the value of the Debtors' assets, for the benefit of the Bank, but to the severe detriment**

1    **of the Debtors and the Debtors' other creditors**.  As set forth in the Howell Declaration, the

2    Debtors believe that the Bank-Appointed CRO could not be allowed to continue to impair

3    substantially the operations of the Debtors and the value of the Debtors' assets.  Accordingly, in

4    order to protect and preserve the value of the Debtors' assets for the benefit of all of the Debtors'

5    creditors, on June 7, 2018, the Debtors terminated the employment of the Bank-Appointed CRO,

6    and former senior management, led by Mr. Howell as president of the corporate Debtors and Mr.

7    Howell as managing member of the limited liability company Debtors, resumed control of the

8    Debtors.

9        On June 8, 2018, the Debtors filed petitions for relief under Chapter 11 of the Bankruptcy

10   Code commencing these cases.  It is the Debtors' current intention to attempt to reorganize their

11   financial affairs for the benefit of the Debtors' creditors.

12       The Debtors intend to file, on or about June 12, 2018, a motion to reject, under Section 365

13   of the Bankruptcy Code, the CRO Agreement as burdensome and as detrimental to the Debtors'

14   efforts to reorganize their financial affairs, to preserve the value of the estates of the Debtors and

15   to maximize the recovery of the Debtors' creditors.

16       **H.    Appointment of J. Michael Issa as CRO**.

17       The Debtors believe that the acts taken by the Bank-Appointed CRO have caused

18   substantial damage to the Debtors' businesses and have been contrary to the interests of the

19   Debtors and the Debtors' creditors (other than the Bank) and, consequently, that they had no

20   choice but to terminate the employment of the Bank-Appointed CRO.  The Debtors do desire,

21   however, to obtain professional and effective assistance in managing the Debtors' financial affairs

22   during their Chapter 11 cases.  Accordingly, on June 7, 2018, the Debtors engaged J. Michael Issa

23   ("Mr. Issa") of GlassRatner Advisory & Capital Group LLC ("GlassRatner") to act as Chief

24   Restructuring Officer of the Debtors in these Chapter 11 cases.  The Debtors intend to file

25   promptly a motion for authority to engage Mr. Issa as their Chief Restructuring Officer.

26       As set forth in the Issa Declaration, Mr. Issa is a principal of GlassRatner.  GlassRatner is a

27   financial advisory services firm with offices located throughout the country.  Mr. Issa is a

28   Certified Public Accountant and has more than 30 years' experience in bankruptcy consulting,

debt and financial restructuring and forensic accounting.  Mr. Issa has been involved in more than 100 bankruptcy cases in a variety of capacities, including liquidating trustee, interim CEO, responsible officer and financial advisor.  Mr. Issa has served as a chief restructuring officer in a number of Chapter 11 cases, and has served as a court-appointed liquidating trustee and a Chapter 11 trustee.  Mr. Issa also has knowledge of the gun and ammunition industry, having served as the financial advisor for the acquisition of Turner's Outdoorsman, a multi-unit gun store chain generating over $100.0 million in annual revenues.  A true and correct copy of Mr. Issa's resume is attached as Exhibit "1" to the Issa Declaration.

As Chief Restructuring Officer of the Debtors, Mr. Issa will provide, in part, the following services to the Debtors:

    1.    Management of the financial affairs of the Debtors;

    2.    Supervision of the administration of the Debtors' Chapter 11 cases, including the preparation of the Debtors' Schedules of Assets and Liabilities and Statements of Financial Affairs and the financial reporting required by the Office of the United States Trustee;

    3.    Assistance to the Debtors' counsel in the negotiation, formulation, confirmation and implementation of a Chapter 11 plan or plans; and

    4.    Performance of the services typical of a chief restructuring officer in a Chapter 11 case.

In Mr. Issa's capacity as Chief Restructuring Officer, he will effectively act as the chief executive officer of the corporate Debtors and as a manager of the limited liability company Debtors.

The proposed engagement of Mr. Issa as Chief Restructuring Officer in the Debtors' cases will help to ensure that the Debtors' cases are administered effectively, in compliance with the requirements imposed upon debtors-in-possession, and for the benefit of the entire creditor body.

**I.**    **Debtors' Cash Collateral Proposal.**

The Debtors hereby propose to use any cash collateral of the Bank, and any cash collateral of any other Secured Claimant, in accordance with the terms and conditions set forth herein.

19

1.      **Budgets.**  As stated hereinabove, the Debtors, other than Components Exchange, operated on a consolidated basis.  Components Exchange generally has operated separately from the other Debtors.  Accordingly, separate cash flow projections of the post-petition operations of Components Exchange and the other Debtors have been prepared by the Debtors.  The cash flow projection for Components Exchange ("Components Exchange Budget") is attached as Exhibit "2" to the Howell Declaration, and the consolidated cash flow projection for the other Debtors ("Consolidated Budget") is attached as Exhibit "3" to the Howell Declaration. (the Components Exchange Budget and the Consolidated Budget are referred to herein, collectively, as "the Budgets").

Components Exchange will be authorized to make the expenditures provided for by the Components Exchange  Budget, and the other Debtors will be authorized to make the expenditures provided for in the Consolidated Budget and to exceed the amounts set forth in their respective Budgets by as much as 15% of budgeted total; however, if actual receipts exceed budgeted receipts, then expenditures may exceed the amount of the budgeted expenditures set forth in their respective Budgets in proportion to the increase in actual receipts from budgeted receipts.  Any expenditures in excess of this authorization will require the written approval of the Bank, or further order of the Court after appropriate notice.  Budget savings in any month under the Consolidated Budget or under the Components Exchange Budget may be carried over and used by the applicable Debtors in subsequent months (i.e., to account for changes in the timing of expenditures by the Debtors).  After the expiration of the term of the Budgets, the Debtors will be able to obtain use of any cash collateral by filing and serving amended Budgets; if no objection to the terms of an amended Budget is filed within ten (10) days after the service of such Budget, such Budget will be deemed to have been approved.

2.      **Replacement Liens.**  The Bank asserts a first-priority lien encumbering cash collateral of the Debtors.  Based upon the Debtors' review of the lien searches performed by the Debtors, the Debtors' evaluation of such liens and the Debtors' knowledge of their financial affairs, the Debtors believe that, apart from the Bank and

MAINDOCS-#234103-v2-Howell-Debtor_s_Emergency_Motion

Integrity Bank (a holder of a junior-priority lien), no other Secured Claimant asserts any valid interest in cash collateral.

As and for additional adequate protection of the Debtors' use of any cash collateral, the Bank and any other Secured Claimant asserting an interest in cash collateral will be granted replacement liens in the Debtors' post-petition cash, accounts receivable and inventory, and the proceeds of each of the foregoing, to the same extent and <u>priority</u> as any duly perfected and unavoidable liens in cash collateral held by the Bank and any such other Secured Claimant as of the Petition Date, limited to the amount of any cash collateral of the Bank and any such other Secured Claimant as of the Petition Date, to the extent that any cash collateral of the Bank and any such other Secured Claimant is actually used by the Debtors.

3.    **Reservation of Rights.** All rights of the Debtors, any Official Unsecured Creditors' Committee that may be appointed in the Debtors' cases (the "Committee") and all other parties-in-interest will be reserved to object to the validity, priority and extent of the Secured Claimants' liens, if any, encumbering the Debtors' assets.

In addition, the Debtors reserve the right at any time to seek use of cash collateral on terms different from those proposed herein upon appropriate notice to the Bank and any other Secured Claimant asserting a valid interest in cash collateral and to other parties-in-interest.

4.    **Financial Reporting.** The Debtors will provide to the Bank and any other Secured Claimant asserting a valid interest in cash collateral all monthly operating reports required to be submitted to the Office of the United States Trustee, and monthly cash flow reports, broken down by the expense line items contained in the Budgets, within 25 days after the end of each monthly period after the Petition Date.

5.    **Final Hearing on this Motion.** The Debtors request that the Court set a final hearing on this Motion for the earliest possible date in accordance with the requirements of the Local Bankruptcy Rules and the Federal Rules of Bankruptcy

MAINDOCS-#234103-v2-Howell-Debtor_s_Emergency_Motion

1    Procedure.  The Debtors reserve the right to seek, at the final hearing on this Motion, use

2    of cash collateral different from that set forth herein.

3    As discussed hereinbelow, the Debtors respectfully submit that the Debtors' cash collateral

4    proposal is fair, provides adequate protection of any interests of the Bank and any other Secured

5    Claimants in cash collateral, and will enable the Debtors to continue their business operations, to

6    the benefit of the Debtors, the Secured Claimants, and the Debtors' other creditors.

### III.

### THE SECURED CLAIMANTS DO NOT HAVE AN INTEREST IN

### REVENUES GENERATED FROM POST-PETITION SERVICES

10    Pursuant to Section 552 of the Bankruptcy Code, a secured creditor's pre-petition liens will

11    not extend to property generated by a debtor post-petition or acquired by a debtor post-petition,

12    unless such property constitutes "proceeds" of their pre-petition collateral.  11 U.S.C. § 552(a).[7]

13    See also, In re Texas Tri-Collar, Inc., 29 B.R. 724, 726-27 (Bankr.W.D.La. 1983) (pursuant to

14    Section 552, a creditor's pre-petition blanket lien does not extend to post-petition receivables);[8] In

15    re Delbridge, 61 B.R. 484 (Bankr.E.D.Mich. 1986) (pre-petition security interest in accounts

16    receivables does not extend to post-petition receivables by operation of § 552); In re Big Hook

17    Land & Cattle Co., 81 B.R. 1001, 1003 (Bankr.D.Mont. 1988) (post-petition increases in cattle

---

[7]  Section 552(a) provides as follows:

(a) Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.

11 U.S.C. § 552(a).

[8]  The Texas Tri-Collar court stated as follows:

"Given the fact that this security agreement was entered into by [the debtor] before the commencement of the case, and considering that the receivables generated by [the debtor] after the filing of the petition are "property acquired by the estate or by the debtor after the commencement of the case", the lien resulting from the assignment by [the debtor] to First National is rendered ineffective as to postpetition receivables by operation of section 552(a). [¶]

. . . Since accounts receivable generated after commencement of the case are in no way proceeds, product, offspring, rents or profits of prepetition accounts receivable, First National's security interest, pursuant to the Assignment and Pledge of Accounts Receivable, does not extend to postpetition receivables under section 552(b). [¶]

For the foregoing reasons, the court is of the opinion that the Assignment and Pledge of Accounts Receivable executed by [the debtor] and First National prior to the commencement of the case does not extend to accounts receivable generated by [the debtor] after the filing of its petition for relief under Chapter 11 of the Bankruptcy Code."

29 B.R. at 726-727.

MAINDOCS-#234103-v2-Howell-Debtor_s_Emergency_Motion

1  herd through calf crop are not subject to lien resulting from after-acquired property clause in

2  security agreement and are therefore cut off by § 552(a)); In re Transp. Design & Technology,

3  Inc., 48 B.R. 635, 641 (Bankr.S.D.Cal. 1985) (patent issued to debtor after filing of petition does

4  not constitute proceeds of pre-petition patent; it was instead after-acquired property and operation

5  of § 552(a) cuts off creditor's interest); In re Hamilton, 18 B.R. 868, 871 (Bankr.Colo. 1982)

6  (crops planted after petition are after-acquired property and § 552(a) cuts off lien).

7        In this regard, the noted treatise on bankruptcy law, Collier on Bankruptcy, states as

8  follows:

      It must be emphasized that subsection (b)(1) creates an exception for proceeds,
      products, offspring or profits generated by prepetition collateral, and **not** for
      **"after-acquired" property obtained by the debtor or the estate postpetition.**

12  5 Collier on Bankruptcy ¶ 552.02 (16th 2018) (emphasis added) citing 124 Cong. Rec. H11,097–

13  11,098 (daily ed. Sept. 28, 1978); S17,414 (daily ed. Oct. 6, 1978) ("Proceeds coverage, but not

14  after acquired property clauses, are valid under title 11"), reprinted in App. Pts. 4(f)(i), 4(f)(iii).

15        Here, although the Bank asserts liens against substantially all of the assets of the Debtors,

16  and on the proceeds generated from this collateral, it is important to recognize that a part of the

17  Debtors' post-petition income will derive from post-petition services rendered by the Debtors,

18  such as the following:  performing testing, and developing data, regarding ammunition

19  performance for for hire customers; repairing ammunition manufacturing equipment for

20  customers; and providing customer service, particularly to consumer customers.  The Debtors'

21  post-petition cash collections, to the extent that they are generated from post-petition services,

22  constitute after-acquired property pursuant to Section 552(a) of the Bankruptcy Code, that is not

23  subject to any of the exceptions provided for in Section  552(b) of the Bankruptcy Code.[9]  See, In

24

25  [9]  Section 552(b)(2) of the Bankruptcy Code states as follows:

26        Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, and notwithstanding
      section 546(b) of this title, if the debtor and an entity entered into a security agreement before the
      commencement of the case and if the security interest created by such security agreement extends to property

27        of the debtor acquired before the commencement of the case and to amounts paid as rents of such property or
      the fees, charges, accounts or other payments for the use occupancy of rooms and other public facilities in

28        hotels, motels, or other lodging properties, then such security interest extends to such rents and such fees,
      charges, accounts or other payments acquired by the estate after the commencement of the case to the extent
      provided in such security agreement, except to the extent that the court, after notice and a hearing and based

1   re Bering Trader, Inc., 944 F. 2d 500, 502 (9th Cir. 1991); In re Zeeway Corp.  71 B.R. 210,

2   211 (9th Cir.BAP 1987) ("We analogize to the income generated by a restaurant or retail store,

3   which although produced in part by the use of the real property upon which business is conducted,

4   the income is not proceeds of the property but the result of the services provided by the

5   business."); In re Skagit Pacific Corp.  316 B.R. 330, 336 (9th Cir.BAP 2004) ("Furthermore,

6   revenue generated by the operation of a debtor's business, post-petition, is not considered

7   proceeds if such revenue represents compensation for goods and services rendered by the debtor

8   in its everyday business performance."); In re Everett Home Town Limited, 146 B.R. 453, 456

9   (Bankr. D. Ariz. 1992) (cart fees, greens fees and restaurant revenues are not cash collateral); In

10   re McKim, 217 B.R. 97, 98 (Bankr. D. R.I. 1998) (green fees are not cash collateral).

11   Accordingly, the Debtors' adequate protection burden extends only to the value attributable to the

12   accounts receivable and the cash on hand as of the Petition Date, and to proceeds generated from

13   the use of inventory on hand as of the Petition Date.  The Debtors reserve hereby the right to

14   assert that any assets that derive from post-petition services rendered by the Debtors do not

15   constitute any cash collateral of the Secured Claimants.  As set forth in the Budgets, sufficient

16   replacement collateral will be generated through the Debtors' post-petition operations in order to

17   provide to the Secured Claimants adequate protection of any interests that they may have therein.

18                                                      IV.

19          **THE DEBTORS SHOULD BE AUTHORIZED TO USE ANY CASH**

20    **COLLATERAL OF THE SECURED CLAIMANTS PURSUANT TO 11 U.S.C. § 363**

21          The provisions of Section 363(c)(2) of the Bankruptcy Code govern a debtor's use of cash

22   collateral.  Section 363(c)(2) provides, in pertinent part, as follows:

23
                    The trustee [or debtor in possession] may not use, sell or
24                  lease cash collateral.... unless:
                    (A)     each entity that has an interest in such cash collateral
25                          consents; or
26                  (B)     the court, after notice and a hearing, authorizes such
                            use, sale, or lease in accordance with the provisions of this section.
27

28
          on the equities of the case, orders otherwise.
11 U.S.C. § 552(b)(2).

1   11 U.S.C. § 363(c)(2).

2       Therefore, a court may authorize a debtor's use of a creditor's cash collateral in the

3   absence of creditor consent.  See, 11 U.S.C. § 363(e).

4       Section 363(e) of the Bankruptcy Code provides that, upon the request of an entity that has

5   an interest in property proposed to be used by the debtor, the court may prohibit or condition such

6   use "as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).

7   The Bankruptcy Code clearly delineates the party which bears the burden of proof on the

8   relevant cash collateral issues:

9       (1)   the trustee [or debtor in possession] has the burden of proof on the issue of

10            adequate protection; and

11      (2)   the entity asserting an interest in property has the burden of proof on the issue of

12            the validity, priority, or extent of such interest.

13  11 U.S.C. § 363(o).

14      Therefore, this Court may authorize the Debtors' use of any cash collateral of the Secured

15  Claimants upon determining that the interests of the Secured Claimants in the cash collateral will

16  be adequately protected.  In re McCombs Properties VI, Ltd., 88 B.R. 261 (Bankr. C.D. Cal.

17  1988).

18      A.    **The Adequate Protection Burden.**

19      In the case, United Savings v. Timbers of Inwood Forest, 484 U.S. 365, 108 S.Ct. 626

20  (1988), the United States Supreme Court analyzed and quantified the parameters of the "interest

21  in property," referenced in Sections 361, 362(d)(1), and 363(e), which the Bankruptcy Code

22  undertakes to protect, where required, through adequate protection.  This analysis led the Supreme

23  Court in Timbers to the conclusion that the "interest in property" referenced in the above sections

24  of the Bankruptcy Code means, and is limited to, the "value of the Collateral."  Timbers, 108

25  S.Ct. at 630.  Therefore under the Timbers analysis, the adequate protection provisions in the

26  Bankruptcy Code protect a secured creditor only from a potential **diminution in the value of that**

27  **creditor's collateral** during the post-petition period.  Id.

28

1    The "value" oriented adequate protection analysis adopted by the Supreme Court in the

2    Timbers case has been closely adhered to by the courts which have subsequently had occasion to

3    address this issue.  See e.g., In re Ledgemere Land Corp., 116 B.R. 338, 343 (Bankr. D. Mass.

4    1990) (so long as the receivables being collected and used by the debtor are being replaced by

5    sufficient new receivables in which the creditor is granted a security interest, the creditor is

6    adequately protected);  In re Johnson, 90 B.R. 973, 978 (Bankr. D. Minn. 1988) (secured creditor

7    is not impaired and is not entitled to receive adequate protection payments where value of

8    collateral does not decline); In re Century Inv. Fund, VII Ltd. Partnership, 96 B.R. 884, 887

9    (Bankr. E.D. Wis. 1989) (where value of collateral appears to be stable, secured creditor is not

10   entitled to adequate protection payments); In re Kessler, 86 B.R. 134, 136 (Bankr. C.D. Ill. 1988)

11   (under Timbers, movants are not entitled to adequate protection payments, as there was no

12   showing that property was depreciating in value).

13       In In re Elmore, 94 B.R. 670, 677 (Bankr. C.D. Cal. 1988), the court held that:

14       [T]he Court finds that the property is not depreciating in value.  In consequence,
         the Court finds that Lomas [Secured Creditor] is adequately protected by the value

15       of its collateral... The right to receive payments is a simple contract right, that
         supports only a claim in the bankruptcy case.  There is no other adequate protection

16       to which Lomas is entitled under the Bankruptcy Code.

17   Elmore, supra, 94 B.R. at 677 (citation omitted).

18       In In re McCombs, the court held that:

19       The analysis of the Supreme Court in Timbers is instructive here.  The phrase
         "interest in property" in § 363(e) means the value of the collateral.  That is the

20       interest that I am required to protect.  If that value is likely to diminish during the
         time of the use, adequate protection must be provided by the Debtor.

21

22   McCombs, supra, 88 B.R. at 266 (emphasis added).  Accord, In re Delta Resources, Inc., 54 F.3d

23   722, 730 (11th Cir.), cert. denied, 64 U.S.L.W. 3348 (1995); In re Westchase I L.P., 126 B.R. 692,

24   694-95 (W.D.N.C. 1991).

25       Under the strict value-oriented analysis adopted by the Supreme Court in Timbers (and

26   adhered to by the well-reasoned cases cited above), **the adequate protection inquiry under**

27   **Section 363(e) is limited to determining whether the debtor's use of a secured creditor's cash**

28   **collateral will reduce the value of the creditor's collateral base.  If the debtor can establish that**

1    the proposed use of the collateral will not cause a decline in the value of the collateral, then court

2    authorization of such use is appropriate.

3    Not infrequently, a secured creditor will contend that it somehow has a right to be paid

4    adequate protection payments, post-petition, even where no decline in the value of the collateral is

5    either occurring or anticipated. The Supreme Court in Timbers expressly rejected this very

6    contention stating:

7    It is obvious (since §§ 361 and 362(d)(1) do not entitle the secured creditor to
     immediate payment of the principal of his collateral) that this "realization" is to

8    "result" not at once, but only upon completion of the reorganization. It is then that
     he must be assured "realization … of the indubitable equivalent" of his collateral.

9

10   Timbers, 108 S.Ct. at 633.

11   Accordingly, the only relevant inquiry is whether the secured creditor's collateral itself is

12   depreciating in value *post-petition*. Stated otherwise, a secured creditor is not entitled to adequate

13   protection payments where its collateral is not depreciating in value post-petition. See, In re Delta

14   Resources, Inc., 54 F.3d at 730 ("**interest in property which must be adequately protected**

15   **encompasses the decline in the value of the collateral only,** rather than perpetuating the ratio of

16   the collateral to the debt.") (emphasis added).

17   The Timbers adequate protection analysis was further explained in the Ninth Circuit

18   Bankruptcy Appellate Panel ("BAP") decision, In re The Preserve, LLC, 2010 WL 6259971 (9th

19   Cir. BAP 2010). In The Preserve, the debtor's primary asset was undeveloped land. In The

20   Preserve, the secured creditor moved for relief from stay based, in part, upon a lack of adequate

21   protection under Section 362(d)(1). The bankruptcy court denied the secured creditor's motion for

22   relief from stay. The BAP affirmed the bankruptcy court's decision, concluding there was no

23   competent evidence of *post-petition* depreciation, and that the decline in value of the secured

24   creditor's collateral likely occurred prior to, or contemporaneously with, the filing of the petition,

25   as a result of a depressed real estate market. The BAP held as follows:

26   "Adequate protection is provided to safeguard the creditor against
     depreciation in the value of its collateral *during the reorganization process*. If

27   the value of the collateral decreases, the creditor is entitled to cash payments so
     that the value of its interest in the collateral remains constant." *First Fed. OWB*

28   *Cal. v. Weinstein (In re Weinstein)*, 227 B.R. 284, 296 (9th Cir.BAP1998)
     (citations omitted).

27

We previously have held that adequate protection payments are intended to compensate a secured creditor only for losses occasioned by the imposition of the automatic stay. *See Paccom Leasing Corp. v. Deico Elects., Inc. (In re Deico Elects., Inc.),* 139 B.R. 945, 947 (9th Cir.BAP 1992). Because the bankruptcy court did not find when the value of the Property declined, but concluded that any decline in the value of the Property could have occurred before or at about the time of the petition date, the Property value did not necessarily decline in value during or as a result of the bankruptcy process.

*** In finding that the decline in value of the Property, albeit substantial, was attributable to general economic conditions, and that the decline possibly predated or was contemporaneous with the filing of the bankruptcy petition, the bankruptcy court evinced a clear understanding of the applicable legal rule as set forth in *In re Deico Elects., Inc.*

*** In these circumstances, the bankruptcy court did not err when it determined that PCF's interest in the Property was adequately protected. Accordingly, the bankruptcy court did not abuse its discretion when it denied the § 362(d)(1) claim for relief in the RFS Motion.

In re The Preserve, LLC, 2010 WL 6259971, *8-9 (9th Cir.BAP 2010) (emphasis added).

The law, then, is clear: **no** adequate protection payments are required unless there is a decline post-petition in the value of the secured creditor's collateral which actually impairs the creditor's secured claim. As set forth in detail below, and as evidenced by the Howell Declaration, the Debtors' proposal to use any cash collateral of the Secured Claimants provides adequate protection to the Secured Claimants.

B. **The Debtors Have Satisfied Their Adequate Protection Burden.**

The Debtors' proposed use of any cash collateral of the Secured Claimants provides to the Secured Claimants adequate protection of any interests which they may have in cash collateral.

1. **The Secured Claimants' Interests Are Adequately Protected by the Proposed Replacement Liens.** Under the Debtors' cash collateral proposal, the Secured Claimants' interests in any cash collateral will be adequately protected from a diminution in value through replacement liens granted to the Secured Claimants and through the maintenance and preservation of the Debtors' businesses.

Under the Debtors' proposal, the Secured Claimants will be granted a post-petition replacement lien on cash, accounts receivable, inventory, and proceeds acquired and/or generated with any cash collateral with a value equal to the amount of any pre-petition cash collateral expended by the Debtors. For example, if the Debtors use $100,000 of pre-

1   petition cash collateral, the Secured Claimants will be granted a lien, to the extent of

2   $100,000, in the proceeds of the cash collateral.

3        Although the replacement liens will, in concept, ensure the preservation of the

4   Secured Claimants' interests in any cash collateral, in reality, the liens will perform this

5   function only if the Debtors, in fact, generate at least one dollar of value for every dollar of

6   cash collateral expended. The evidence which addresses this issue is contained in the

7   Howell Declaration and specifically the Components Exchange Budget and in the

8   Consolidated Budget, which are attached, respectively, as Exhibits "2" and "3" to the

9   Howell Declaration. The Budgets indicate that the Debtors will operate on a cash flow

10  positive basis during the budgeted period, and that their assets will increase in value

11  during such period.

12       The Debtors believe that the projections of their business operations as set forth in

13  the Budgets are reasonable. As set forth in the Howell Declaration, the business

14  assumptions underlying the operations projected in the Budgets are reasonable and are

15  essentially in accordance with the Debtors' historical experience, as adjusted to take into

16  account recent or projected events (e.g., the cost-cutting measures implemented and to be

17  implemented by the Debtors). Accordingly, the Debtors believe that the Budgets establish

18  that the proposed replacement liens being granted to the Secured Claimants will

19  adequately protect the Secured Claimants' alleged interests.

20       In summary, the Howell Declaration provides evidence to establish that the

21  Debtors' use of any cash collateral of the Secured Claimants will result in an increase in

22  the estates' collateral pool, thereby adequately protecting the Secured Claimants' interests

23  in any cash collateral.

24       **2.      The Secured Claimants Are Adequately Protected by the Maintenance**

25  **and Preservation of the Debtors' Businesses.** To determine the sufficiency of adequate

26  protection, a bankruptcy court should: (i) establish the value of the secured creditor's

27  interest; (ii) identify the risk, if any, to the value of the secured creditor's cash collateral

28  resulting from the debtor's request for the use of the cash collateral; and (iii) determine

whether the debtor's adequate protection proposal protects the value of the cash collateral as nearly as possible against risk to that value consistent with the concept of indubitable equivalence. McCombs, supra, 86 B.R. at 267 (quoting In re Martin, 761 F.2d 472 (8th Cir. 1985)).

To establish the value of a secured creditor's interest, the bankruptcy court must consider the purpose of the valuation, and the proposed disposition or use of the secured property. See, 11 U.S.C. § 506(a). "One of the primary factors to be considered in valuation is whether the subject property is to be used and retained by the debtor or whether the property is to be disposed of." In re Kidsstop of America, Inc., 64 B.R. 397, 401 (M.D. Fla. 1986).

Here, any cash collateral consists of, among other things, the collections generated by the operations of the Debtors' businesses. The value of any such cash collateral will depend, in part, upon the preservation of the Debtors as going concerns. It follows that the risk to this going concern value of cash collateral (which risk is required to be identified by a court in the McCombs test above) consists of any cessation in the Debtors' business operations. See, In re Glasstream Boats, Inc., 110 B.R. 611, 612 (M.D. Ga. 1990) (it was in the best interest of both the debtor-in-possession and the creditor that the debtor "continue in its operation as a manufacturing facility" and that "denial of this motion would result in another shut down of the assembly line, which the court doesn't feel is in the best interest of either party."); In re Cann & Saul Steel Co., 76 B.R. 479, 483 (E.D. Pa. 1987) (continued operation of manufacturer debtor was in the best interest of secured creditor in that it was likely that the secured creditor would realize more funds than it would by requiring the debtor to cease operations); In re Stein, 19 B.R. 458, 460 (Bankr. E.D. Pa. 1982) (the bankruptcy court allowed a debtor to use cash collateral where the secured party had no equity cushion for protection, finding that the use of the cash collateral was necessary to the continued operations of the debtor, and that the creditor's "secured position can only be enhanced by the continued operation of the [debtor's business]"); In re Pine Lake Village Apartment Co., 16 B.R. 750, 756 (Bankr. S.D.N.Y.

1982) (debtor permitted to use cash collateral generated from rental income to preserve the value of real property which also secured creditor's claim); In re Karl A. Neise, Inc., 16 B.R. 600, 602 (Bankr. S.D. Fla. 1981) (marginally secured creditor adequately protected by lien in post-petition property acquired by debtors; debtors can use cash collateral "in the normal operation of their business").

When cash collateral is used to maintain and enhance the value of the debtor's underlying business, including the secured creditor' collateral, the projected retention and increase of value is itself a form of adequate protection and justifies the use of the cash collateral. VWI Props., LLC v. Mt. Olive Hospitality, LLC, Case No. 13-3395, 2014 WL1309953 (D.N.J. Mar. 31, 2014). Where courts have analyzed the same types of collateral that are relevant in the instant cases, they have found that adequate protection can be provided for the use of proceeds of accounts receivables where the debtor is using the proceeds to generate new inventory and accounts. Therefore, "[t]he use of the Bank's cash collateral . . . is an element of the Banks's adequate protection." Mt. Olive at *4 (quoting Banks Life Ins. Co. v. Alyucan Interstate Corp., 12 B.R. 803 (Bankr. D. Utah 1981)).

In assessing adequate protection for accounts receivable and inventory, which by their nature change in value, courts have held that "the concept [of adequate protection] consists of stability in collateral value rather than any particular level of value." In re Dynaco, 162 B.R. 389 (Bankr. D.N.H. 1993) (quoting In re T.H.B. Corp., 85 Bankr. 192, 194 (Bankr. D.Mass. 1988)). A secured creditor with liens on "soft collateral" (including cash and accounts receivables) is considered to be adequately protected where the debtor's business operations are projected to maintain more or less the same level of soft collateral, and even if that level undergoes cyclical fluctuations. Id. at 397 ("A secured creditor who takes a blanket lien on soft collateral has to know that the collateral will fluctuate in its level.") Moreover, where the debtor is using accounts receivable to generate new inventory, thus creating new value for a secured creditor, an equity cushion is not necessary to provide adequate protection in the cash collateral. For example, in Dynaco,

MAINDOCS-#234103-v2-Howell-Debtor_s_Emergency_Motion

the court held that, where the value of soft collateral is stable, the Bankruptcy Code "does not require that the secured claimant be protected by an 'equity cushion' on an overall basis with regard to all collateral securing its loans." Id. at 398. The stability of the collateral and the fact that it is being used to preserve the debtor's estate and the secured creditor's overall collateral package itself constitutes adequate protection. Id.

As discussed at length in the Howell Declaration, even a temporary cessation of the Debtors' ability to operate their businesses, caused by any lack of access to any cash collateral, will result in a substantial diminution of the Secured Claimants' collateral, as customers will turn to competitors of the Debtors for their ammunition needs. In contrast, maintenance of the Debtors' ongoing operations will preserve the value of the Secured Claimants' interests in any cash collateral as nearly as possible against any risk to that value, thus providing adequate protection.

In addition, the Debtors note that, in order to promote a successful reorganization of their financial affairs, they have engaged, subject to the approval of the Court, Mr. Issa to serve as Chief Restructuring Officer of the Debtors. Mr. Issa has about 30 years' experience providing turnaround consulting services to financially-distressed companies and to Chapter 11 debtors, and has played key roles in many successful Chapter 11 reorganizations. Mr. Issa's involvement as Chief Restructuring Officer to lead the Debtors' efforts to reorganize their financial affairs will serve to enhance the prospects for a successful reorganization of the Debtors.

Thus, the Court should find and determine that the Debtors' adequate protection proposal provides adequate protection of any cash collateral of the Secured Claimants, and, hence, should authorize the Debtors' use of any cash collateral in accordance with the terms and conditions set forth herein.

MAINDOCS-#234103-v2-Howell-Debtor_s_Emergency_Motion

## V.

## THE DEBTORS SHOULD BE AUTHORIZED TO USE CASH COLLATERAL

## IN ORDER TO PROMOTE A SUCCESSFUL REORGANIZATION

In In re O'Conner, 808 F.2d 1393 (10th Cir. 1987), the Tenth Circuit Court of Appeals recognized that the ultimate goal of Chapter 11 proceedings is to enhance the prospects of reorganization. In this regard, the Tenth Circuit stated as follows:

> [T]he Debtors' efforts are not only to be encouraged, but also their efforts during the administration of the proceeding are to be measured in light of that quest. Because the ultimate benefit to be achieved by a successful reorganization inures to all the creditors of the estate, a fair opportunity must be given to the Debtors to achieve that end...
>
> In order to encourage the Debtor's efforts in the formative period prior to the proposal of a reorganization, the court must be flexible in applying the adequate protection standard.

Id. at 1397-98 (emphasis added); Accord, In re Dynaco Corp., 162 B.R. at 395 ("[T]he court will generally permit the business operations to continue, at least to the point of plan formulation, if the debtors make a solid evidentiary showing to support their projections..."); In re Heatron, Inc., 6 B.R. 493, 496 (Bankr. W.D. Mo. 1980) ("At the beginning of the reorganization process the Court must work with less evidence than might be desirable and should resolve issues in favor of the reorganization where the evidence is conflicting.").

Here, a determination to grant to the Debtors' use of any cash collateral will help promote the Debtors' successful reorganization, as it will allow the Debtors to continue, uninterrupted, the normal operations of their businesses. The Debtors' efforts to successfully reorganize their financial affairs, in turn, will be to the ultimate benefit of the Secured Claimants, by preserving and enhancing the value of their alleged secured interests. In Cann & Saul, supra, the court found the debtor's prospects for a successful reorganization to be a major factor in determination of adequate protection:

> It is far more significant in the weight of considerations as to whether a creditor is "adequately protected" to analyze debtor's prospects for a successful reorganization in Chapter 11. If these prospects are strong... then the measure of the secured creditor's adequate protection is the probability that the debtor will be able to propose an effective plan.

76 B.R. at 485 (emphasis added).

33

1    In Cann & Saul, the debtor (a steel manufacturer that had been in business for almost a

2    century) had been losing money each year for a period of at least four years prior to the filing of

3    its Chapter 11 petition.  However, the court found that the debtor had strong potential for

4    reorganization, given such factors as the debtor's production of high quality product, the debtor's

5    stability and good public image, and the debtor's acceptance of changes necessary for maintaining

6    its labor force.  Id. at 487-88.

7        Similarly here, the Debtors have a strong potential for a successful reorganization.  The

8    Debtors have been in business for as many as 29 years.  The Debtors' businesses generally have

9    been successful, have a good reputation in their industry, and possess a good customer base.  In

10   2016, the Debtors, together with Twin River and Big Canyon, generated over $100.0 million in

11   net sales.  The Debtors' management has extensive experience in the Debtors' industry and has

12   made, and is committed to continuing to make, changes necessary to enhance the reorganization

13   of the Debtors.  Furthermore, subject to the approval of the Court, the Debtors have employed

14   Mr. Issa and GlassRatner to assist in the Debtors' efforts to recognize their financial affairs.  The

15   Debtors' efforts to reorganize, therefore, will contribute to the adequate protection of the Secured

16   Claimants' interests, and support authorizing the Debtors' use of any cash collateral.

17       If the Debtors are denied use of cash collateral, in all likelihood they will be forced to

18   close their businesses and to cease operations.  Such a cessation of operations, even temporarily,

19   would cause irreparable damage to the Debtors' businesses in the form of customer defections,

20   employee attrition, lost revenues and loss of goodwill.  If the Debtors were permanently

21   prohibited from using cash collateral, they would be forced to close operations, and their assets

22   would need to be liquidated, yielding proceeds totaling a fraction of what the Debtors could

23   generate by continuing operations and reorganizing their financial affairs.  Rather than force the

24   Debtors and their creditors to such a result at this very early stage of the cases, the Court should

25   permit the Debtors to use any cash collateral in order to preserve their ability to reorganize.  See,

26   In re George Ruggiere Chrysler-Plymouth, Inc. 727 F.2d 1017, 1019 (11th Cir. 1984) ("Without

27   the availability of cash to meet daily operating expenses such as rent, payroll, utilities, etc., the

28   congressional policy favoring rehabilitation over economic failure would be frustrated.");

MAINDOCS-#234103-v2-Howell-Debtor_s_Emergency_Motion

1    <u>Dynaco</u>, 162 B.R. at 396 (finding that the alternative to the debtor's use of cash collateral – forced

2    termination of its businesses – would doom any reorganization and any chance to maximize

3    values for <u>all</u> creditors).

### VI.

### THE SECURED CLAIMANTS' INTERESTS ARE ADEQUATELY
### PROTECTED BY AN AMPLE EQUITY CUSHION

7         It is settled law that, if the value of the assets securing a creditor's claim exceeds those

8    claims by a <u>reasonable amount,</u> then the lender is deemed to be adequately protected.  <u>In re</u>

9    <u>Mellor,</u> 734 F. 2d 1396, 1400 (9th Cir. 1984) ("In fact, it has been held that the existence of an

10   equity cushion standing alone, can provide adequate protection."); <u>In re Dunes Casino Hotel,</u> 69

11   B.R. 784, 795 (Bankr. D.N.J. 1986) ("[i]f the concept of adequate protection is deemed to protect

12   the value of the creditor's lien from depreciation, the existence of the substantial equity cushion in

13   this case provides such protection."); <u>In re C.B.G. Ltd.,</u> 150 B.R. 570, 573 (Bankr. M.D. Pa. 1992)

14   ("According to the well-researched case of <u>In re McKillips,</u> [81 B.R. 454 (Bankr. N.D. Ill. 1987)],

15   case law almost uniformly concludes that : (1) an equity cushion of twenty percent (20%) or

16   **[CHECK QUOTE]** constitutes adequate protection . . .");  <u>Baybank-Middlesex v. Ralar</u>

17   <u>Distributors, Inc.,</u> 69 F. 3d 1200, 1203 (1st Cir. 1995) ("A sufficient equity cushion is itself a

18   recognized form of adequate protection."); <u>In re McCombs Properties VI, Ltd.,</u> 88 B.R. 261, 266

19   (Bankr. C.D. Cal. 1988) (". . . an equity cushion is an acceptable method of adequate protection

20   even though the approach is not specifically mentioned in §361.").

21         Case law confirms that an equity cushion of ten percent (10%) or more is generally

22   considered to be adequate protection.  <u>See,</u> <u>In re Boodrow,</u> 126 F.3d 43, 53 (2d Cir. 1997) (equity

23   cushion of 10% constitutes adequate protection; <u>In re Mellor,</u> 234 F.2d at 1400 (20% equity

24   cushion found sufficient adequate protection by itself); <u>In re Kost,</u> 102 B.R. 829, 831

25   (Bankr.D.Wyo. 1989) ("Case law has almost uniformly held that an equity cushion of 20% or

26   more constitutes adequate protection"); <u>In re McKillips,</u> 81 B.R. 454, 458 (N.D.Ill. 1987) (equity

27   cushion of 20% or more almost always constitutes adequate protection) (collecting cases); <u>In re</u>

28   <u>Helionetics,</u> 70 B.R. 433, 440 (Bankr.C.D.Cal. 1987) (20% equity cushion is adequate); <u>In re</u>

MAINDOCS-#234103-v2-Howell-Debtor_s_Emergency_Motion

1   Hawaiian Pacific Industries, 17 B.R. 670 (Bankr.D.Ha. 1982) (15% equity interest is adequate); In

2   re Pitts, 2 B.R. 476 (Bankr.C.D.Cal.1979) (15% equity cushion is adequate); In re McGowan, 6

3   B.R. 241, 243 (Bankr.E.D.Pa. 1980) (10% equity cushion is adequate); In re Schlichter, 22 B.R.

4   666 (Bankr.E.D.Pa. 1982) (12% equity cushion is adequate; In re Carson, 34 B.R. 502, 506 (D.

5   Kan. 1983) (11% equity cushion is adequate); In re Rogers Development Corp, 2 B.R. 679, 685

6   (20% equity cushion is adequate, even where  the debtors had no equity in the property).

7           Thus, the first analytical step is to determine whether there is an equity cushion to protect

8   a creditor's lien.  An equity cushion constitutes an *independent* basis for adequate protection.

9   Mellor, supra.  Thus, even if a collateral base is declining (which it is not in this case), a debtor

10  still would be entitled to use cash collateral where there is a sufficient equity cushion because the

11  equity cushion is an independent form of adequate protection.

12          Here, the Bank enjoys a substantial equity cushion.

13          A substantial portion of the Debtors' income derives from online sales.  Online businesses

14  typically may sell at 1 X revenues.  See, Howell Declaration.  The Debtors have not yet been able

15  to assess adequately the damage done to the Debtors' businesses by the acts taken by the Bank-

16  Appointed CRO, such as by the closing of X-Treme's and Components Exchange's operations.

17  To be conservative, therefore, the Debtors believe that a fair estimate of the valuation of the

18  Debtors' businesses at this time would be about 0.67 to 0.75 X the Debtors' revenues.  Using a

19  projected revenue rate of $55.0 million this year, the Debtors believe that a fair enterprise

20  valuation of the Debtors' businesses at this time would be in a range of about $36.85 million to

21  $41.25 million.

22          The Bank asserts claims against the Borrowers in the aggregate amount of approximately

23  $16.7 million.  Based upon the market sale values set forth above, it is clear that the Bank enjoys

24  a substantial equity cushion protecting its interest.

25          In addition, without regard to a market-driven enterprise value of the Borrowers'

26  businesses, the value of the collateral pledged to the Bank by the Borrowers provides ample

27  protection of the Bank's interests.  As set forth in paragraph II(C)(1) hereof, the Bank asserts

28  interests in the following collateral:

| Grantor | Net Fair Market Value of Collateral (Est.)[1] |
|---------|-----------------------------------------------|
| Debtors | $24.0 million |
| Twin River | $3,361,000 |
| Big Canyon | $290,000 |
| Mr. Howell | $3.5 – $4.0 million |
| **Total:** | $31,151,000 to $31,651,000 |

Accordingly, there is an estimated aggregate net fair market value of approximately $31,151,000 to $31,651,000 in collateral to secure repayment of the Bank's $16.7 million secured claim. The Bank enjoys, therefore, an equity cushion of approximately 86.5% to 89.5% taking into account only the value of the collateral pledged to the Bank (and not enterprise value). Under the Ninth Circuit's decision in the Mellor case, and under the other well-reasoned cases cited above, such an equity cushion provides adequate protection of any interest of the Bank in cash collateral.

## VII.

## GOOD CAUSE EXISTS FOR HEARING THIS
## MOTION ON AN EMERGENCY BASIS

In recognition of the fact that Section 363(c) of the Bankruptcy Code operates to deprive a debtor of the use of critical operating capital as of the filing of the debtor's Chapter 11 petition, Congress specifically provided in Section 363(c)(3) that a hearing on cash collateral "shall be scheduled in accordance with the needs of the debtor." Accordingly, the Bankruptcy Code expressly anticipates and authorizes expedited hearings on the issue of cash collateral use. See, 11 U.S.C. § 363 (c)(3).

Similarly, the Ninth Circuit Court of Appeals has recognized that immediate interim relief may be crucial to the success of a corporate reorganization:

MAINDOCS-#234103-v2-Howell-Debtor_s_Emergency_Motion

1        <u>We realize that 'in certain circumstances, the entire reorganization effort may be</u>
<u>thwarted if emergency leave is withheld'</u> and that reorganization under the

2   Bankruptcy Code 'is a perilous process, seldom more so than at the outset of the
proceedings when the debtor is often without sufficient cash flow to fund

3   essential business operations.'  It is for this reason that Congress specified that
hearings concerning the use of cash collateral 'shall be scheduled in accordance

4   with the needs of the debtor.'

5   <u>In re Center Wholesale, Inc.</u>, 759 F.2d 1440, 1449 n.21 (9th Cir. 1985) (emphasis added) (citations

6   omitted).  <u>See also, In re Sullivan Ford Sales</u>, 2 B.R. 350, 355 (Bankr. D.Me. 1980).

7        Pursuant to Rule 4001(b) of the Federal Rules of Bankruptcy Procedure, a final hearing on

8   a motion to use cash collateral may not be commenced earlier than 14 days after service of such

9   motion.  A bankruptcy court, however, is authorized to conduct an expedited hearing prior to the

10  expiration of such 14-day period and to authorize the use of cash collateral to the extent necessary

11  to avoid immediate and irreparable harm to the Debtor's estate.  F.R.B.P. Rule 4001(b)(2).

12       Rule 4001(b) of the Local Bankruptcy Rules also provides for an expedited hearing for

13  authorization to use cash collateral, upon the showing that "the immediate and irreparable harm

14  . will result if the request is not granted.  <u>See</u>, LR 4001(b)(2)(A).

15       As set forth in the Howell Declaration, the Debtors must have the immediate use of any

16  cash collateral to meet payroll obligations (which must be paid by June 18, 2018), to meet the

17  daily costs and expenses of operating their businesses, to promptly pay their vendors, and to

18  acquire goods and services to keep their businesses operating.  Any delay in the Debtors' ability

19  to meet one or more of the aforementioned operating needs could deprive the Debtors of their

20  ability to successfully reorganize their financial affairs.

21       Without use of cash collateral, the Debtors will have no ability to operate their businesses.

22  Without access to cash collateral, the Debtors' entire restructuring may be jeopardized to the

23  significant detriment of the Debtors' estates, their creditors and all of their constituents.  In light

24  of the foregoing, the Debtors submit that they have satisfied the requirements of Bankruptcy

25  Rule 4001(b) to support immediate cash collateral availability pending the entry of the final order

26  of the Court.  Accordingly, to prevent the immediate and irreparable harm that will inure to the

27  Debtors' estates, creditors and parties-in-interest absent Court approval of this Motion, the

28  Debtors respectfully request that the Court grant the relief requested herein and authorize the

MAINDOCS-#234103-v2-Howell-Debtor_s_Emergency_Motion

1  immediate use of cash collateral pursuant to the terms and conditions set forth herein and in

2  accordance with the Budgets.

3                                                   VIII.

4      **THE COURT SHOULD SCHEDULE A FINAL HEARING ON THIS**

5          **MOTION AS SOON AS POSSIBLE IN ACCORDANCE WITH**

6              **THE REQUIREMENTS OF THE BANKRUPTCY RULES**

7          By this Motion, the Debtors request that the Court schedule a final hearing on this Motion

8  as soon as possible in accordance with the requirements of the Federal Rules of Bankruptcy

9  Procedure and the Local Bankruptcy Rules.

10         Rule 4001 of the Federal Rules of Bankruptcy Procedure provides that the Court may

11  commence a final hearing on this Motion no earlier than fourteen (14) days after service of the

12  Motion. The Debtors need to obtain as promptly as possible approval of the final use of cash

13  collateral in order to assure the Debtors' employees and vendors that the Debtors will be able to

14  pay, during the course of these cases, their ordinary operating expenses including, without

15  limitation, payroll and the expenses of maintenance and operation of their businesses.  A final

16  hearing on this Motion should be held as soon as possible after the expiration of the fourteen (14)

17  day period provided for by Rule 4001 of the Federal Rules of Bankruptcy Procedure in order to

18  prevent the substantial damage to the Debtors' businesses which would result from any loss of

19  support of the Debtors' customers, employees and vendors caused by a lack of confidence that the

20  Debtors will have the ability to use cash collateral during their cases.

21                                                   IX.

22      **THE NOTICE OF THIS MOTION PROPOSED TO BE GIVEN TO**

23      **CREDITORS AND OTHER PARTIES-IN-INTEREST IS APPROPRIATE**

24      **UNDER THE FACTS AND CIRCUMSTANCES OF THE DEBTORS' CASES**

25          As of the filing of this Motion, no trustee, examiner or Committee has been appointed in

26  the Debtors' Chapter 11 cases.  In accordance with the provisions of Rule 4001(b)(1) of the

27  Federal Rules of Bankruptcy Procedure, notice of this Motion has been given via electronic

28  delivery or overnight mail to the Office of the United States Trustee, to the Bank and the Bank's

1  counsel, Integrity Bank, Components Exchange's twenty (20) largest general unsecured, non-

2  insider creditors, and to the other Debtors' twenty largest general unsecured, non-insider creditors.

3      Because of the exigencies of the Debtors' cases and the irreparable harm to the Debtors,

4  their Chapter 11 estates, and all parties-in-interest that will ensue if the relief requested herein is

5  not granted, the Debtors submit that no further notice need be given.  No previous motion for the

6  relief sought herein has been made to this or to any other court.

7                                              **X.**

8                                     **CONCLUSION**

9      Based upon the foregoing, the Debtors respectfully request that this Court enter its order:

10     1.    Finding that the Secured Claimants' interests in any cash collateral are adequately

11           protected;

12     2.    Authorizing, on an interim basis pending final hearing on notice to creditors, the

13           Debtors' immediate use of any cash collateral of the Secured Claimants pursuant to

14           the terms and conditions contained in this Motion;

15     3.    Setting a final hearing on this Motion; and

16     4.    Granting to the Debtors such other and further relief as the Court may deem just

17           and proper under the facts and circumstances of these cases.

18  DATED:  June 13, 2018           **WINTHROP COUCHOT**
                                    **GOLUBOW HOLLANDER, LLP**

19

20                                  By:  /s/ Robert E. Opera

21                                       Robert E. Opera
                                         [Proposed] General Insolvency Counsel for
22                                       Debtors and Debtors-in-Possession

23

24

25

26

27

28

40