1  ANDREW B. LEVIN – California State Bar No. 290209
   *Pro Hac Vice pending*
2  alevin@wcghlaw.com
   **WINTHROP COUCHOT**
3  **GOLUBOW HOLLANDER, LLP**
   1301 Dove Street, Suite 500
4  Newport Beach, CA 92660
   Telephone: (949) 720-4100
5  Facsimile: (949) 720-4111

6  STEPHEN R. HARRIS – Nevada State Bar No. 001463
   steve@harrislawreno.com
7  **HARRIS LAW PRACTICE LLC**
   6151 Lakeside Drive, Suite 2100
8  Reno, NV 89511
   Telephone: (775) 786-7600
9

10  [Proposed] General Insolvency Counsel
    for Debtors and Debtors-in-Possession
11            **UNITED STATES BANKRUPTCY COURT**

12              **DISTRICT OF NEVADA**

13  In re:                                    Jointly Administered under
                                              Case No. 18-50609-btb with
14  ☒ X-TREME BULLETS, INC.,
                                              Case Nos. 18-50610-btb; 18-50611-btb;
15  ☒ AMMO LOAD WORLDWIDE, INC.,              18-50613-btb; 18-50614-btb; 18-50615-btb;
    ☒ CLEARWATER BULLET, INC.,                18-50616-btb; and 18-50617-btb
16  ☒ FREEDOM MUNITIONS, LLC,
    ☒ HOWELL MACHINE, INC.,                   Chapter 11 Proceedings
17  ☒ HOWELL MUNITIONS &
      TECHNOLOGY, INC.,                       **DEBTORS' EMERGENCY MOTION FOR**
18  ☒ LEWIS-CLARK AMMUNITION AND              **ORDER AUTHORIZING THE DEBTORS**
      COMPONENTS, LLC,                        **TO CONDUCT BUSINESS IN THE**
19  ☐ COMPONENTS EXCHANGE, LLC, an            **ORDINARY COURSE; RETAIN EXISTING**
    ☐ All Debtors.                            **CASH MANAGEMENT SYSTEM; HONOR**
20                                            **CUSTOMER OBLIGATONS; AND PAY**
                  Debtors and                 **PREPETITION TAXES**
21                Debtors-in-Possession.
                                              **[DECLARATIONS OF DAVID C. HOWELL**
22                                            **AND J. MICHAEL ISSA IN SUPPORT OF**
                                              **MOTION FILED CONCURRENTLY**
23                                            **HEREWITH]**

24                                            DATE:
                                              TIME:
25                                            ESTIMATED TIME FOR HEARING:
                                              PLACE:  Courtroom 2 (5th Floor)
26                                                      C. Clifton Young Federal Bldg.
                                                        300 Booth Street
27                                                      Reno, NV 89509
28

234164

1    TO THE HONORABLE BRUCE T. BEESLEY, UNITED STATES

2    BANKRUPTCY JUDGE, AND PARTIES-IN-INTEREST:

3         X-Treme Bullets Inc., a Nevada corporation, Ammo Load Worldwide, Inc., an Idaho

4    corporation, Clearwater Bullet, Inc., an Idaho corporation, Freedom Munitions, LLC, an Idaho

5    limited liability company, Howell Machine, Inc., an Idaho corporation, Lewis-Clark Ammunition

6    Components, LLC, an Idaho limited liability company,  and Howell Munitions & Technology,

7    Inc., an Idaho corporation ("HMT"), debtors and debtors-in-possession herein (collectively, the

8    "Debtors"), hereby move the Court, on an emergency basis, for an order authorizing the Debtors

9    to conduct their business in the ordinary course consistent with their pre-petition business practice.

10   In this regard, the Debtors request specifically that the Debtors be authorized, but not required, to

11   (i) continue use of their pre-petition cash management system and to maintain one existing pre-

12   petition bank account for a period of forty-five (45) days; (ii) pay post-petition expenses incurred

13   in the ordinary course, (iii) continue to honor and comply with prepetition customer obligations,

14   such as customer credits/returns, warranties, and gift cards (collectively, the "Customer

15   Obligations"), and (iv) pay prepetition payroll and sales taxes incurred by the Debtors in the

16   normal operation of  their businesses ("Taxes") that are payable to various governmental taxing

17   authorities (collectively, the "Governmental Authorities"), in the ordinary course of business.

18        Good cause exists to grant the relief requested hereby on an emergency basis in that,

19   without such relief, the Debtors will not be able to operate their business in the ordinary course.

20        1.      The retention and continued use of a certain bank account and authority to pay

21             post-petition expenses incurred in the ordinary course is necessary to ensure the continued

22             efficient operation of the Debtors' business.  Forcing the Debtors to close this account

23             would lead to disruption in the Debtors' operations and could impair the Debtors' ability

24             to preserve their going concern value and maximize value for creditors of the estates.

25        2.      If the Debtors were not authorized to honor their Customer Obligations, their

26             customers likely would not remain loyal to the Debtors, resulting in a loss of business.

27             Authorizing the Debtors to honor their Customer Obligations will allow the Debtor to

28             retain their customer base.

-2-

234164

1    Authorizing the Debtors to honor their Customer Obligations will allow the Debtor to

2    retain their customer base.

3         3.     Timely payment of the Taxes in the ordinary course is necessary to allow the

4    Debtor to continue operations during the Debtors' Chapter 11 cases and to avoid the

5    accrual of unnecessary interest and other penalties.

6         This Motion is made and based upon the above representations and allegations, the

7    Memorandum of Points and Authorities, and the Declaration of David Howell ("Howell

8    Declaration") and the Declaration of J. Michael Issa filed concurrently herewith, and upon such

9    other evidence, both oral and documentary, that may be submitted to the Court at or prior to the

10   hearing on this Motion.

11        **WHEREFORE**, the Debtors prays that the Court enter an order granting the relief

12   requested above, and such additional and further relief as the Court deems just and proper.

13   DATED: June 13, 2018                      **WINTHROP COUCHOT**
                                               **GOLUBOW HOLLANDER, LLP**
14

15

16                                             By: _____
                                                        Andrew B. Levin
17                                             [Proposed] General Insolvency Counsel for
                                               Debtors and Debtors-in-Possession
18

19

20

21

22

23

24

25

26

27

28

-3-

234164

## MEMORANDUM OF POINTS AND AUTHORITIES

### I

### FACTUAL BACKGROUND

**A.    General Description of the Debtors.**

David C. Howell ("Mr. Howell") is the principal of each of the Related Debtors. Mr. Howell owns 95% of the issued and outstanding shares of stock in Howell Munitions & Technology, Inc. ("HMT"). HMT, in turn, is the sole shareholder of the following Debtors: X-Treme Bullets, Inc. ("X-Treme"); Clearwater Bullet, Inc. ("Clearwater"); Ammo Load Worldwide, Inc. ("ALW"); and Howell Machine. HMT owns 100% of the membership interests in Freedom Munitions, LLC ("Freedom"). Mr. Howell owns 100% of the membership interests in Lewis-Clark Ammunition Components, LLC ("LCAC").

A description of each of the Related Debtors and its operations is set forth hereinbelow.

1.    HMT. HMT is the parent company of Debtors X-Treme, Clearwater, ALW, Howell Machine and Freedom. While Debtors X-Treme, Clearwater, ALW, Howell Machine, LCAC, and Freedom are legal entities separate from HMT, such Debtors have operated at all times on a consolidated basis.

2.    X-Treme. X-Treme is a Nevada corporation located in Carson City, Nevada. X-Treme is in the business of manufacturing bullets. X-Treme's bullets are sold to wholesale customers and to online customers via the xtremebullets.com website. X-Treme operates from two buildings located in Carson City, Nevada, both of which are leased by HMT, and one of which is owned by Mr. Howell.

3.    Clearwater. Clearwater is in the business of manufacturing bullets. Clearwater's bullets are sold to wholesale customers and to online customers via the xtremebullets.com website. Clearwater operates from a facility located in Lewiston, Idaho which is leased by HMT from Mr. Howell.

4.    ALW. ALW is in the business of manufacturing ammoload machines and other machines for resale to third-party customers. ALW operates in Lewiston, Idaho from buildings leased by HMT from Mr. Howell.

-4-

234164

1   5.   Howell Machine.  Howell Machine is in the business of fabricating parts that are

2   used to build the ammoload machines manufactured by ALW and to maintain the other

3   machinery and equipment owned by the other Debtors.  Howell Machine shares with ALW

4   facilities in Lewiston, Idaho leased by HMT from Mr. Howell.

5   6.   Freedom.  Freedom is in the business of selling ammunition.  Freedom sells its

6   products online via the freedommunitions.com website.  Freedom also had a retail location

7   in Houston, Texas that sold ammunition, but that location recently was closed.

8   7.   LCAC.  LCAC is an Idaho limited liability company, but no longer conducts

9   business operations.  LCAC still owns machinery and equipment.

10   **B.   The Debtors' Centralized Cash Management System.**

11   The Debtors use one cash management system to administer all receipts obtained by the

12   Debtors and all disbursements made by the Debtors in connection with the operation of their

13   businesses.  All cash collected from revenues generated by the Debtors is earned by HMT and

14   deposited into one checking account held by HMT.  Cash is realized through a combination of

15   checks, collection on credit card receipts, and collections on accounts receivables.  Payroll and all

16   other expenses incurred by the Debtors are paid from this one checking account.  HMT pays all

17   expenses because HMT is the party that contracts with, and is indebted to, third parties for the

18   operation of the Debtors' businesses.  In addition to this checking account, HMT also maintains

19   one savings account, which has been used to cover certain accrued liabilities, and one

20   environmental escrow account to cover certain environmental liabilities.  No other bank accounts

21   are held or maintained by any of the other Debtors. [1]

22   **C.   The Debtors' Customer Obligations.**

23   The Debtors offer certain warranties to their customers for their products.  In addition, the

24   Freedom honors "brass credits" by which customers can send in spent bullet casings in turn for

25   credit which may be redeemed by customers in exchange for Freedom's products.  Moreover,

26

27   [1] Debtor Components Exchange, LLC ("Components") operated, and intends at this time to continue to operate, its

28   business separate and apart from the other Debtors and, accordingly, the relief sought hereby will not affect in any manner Components's post-petition operations.

occasionally, customers return products, for which the Debtors will issue credit. The Debtors estimate that there are approximately $121,000 in Customer Obligations outstanding, comprised of approximately $16,221 in product refunds and $105,000 in outstanding "brass credits." The Debtors further estimate that Customer Obligations going forward will equal approximately $36,400 to $42,300 on a monthly basis, comprised of warranty obligations will equal approximately $2,000 to $2,500 on a monthly basis, $29,000 in "brass credits, and $5,400 to $10,800 in product refunds.

### D.    The Debtors' Prepetition Tax Obligations.

In the ordinary course of business, the Debtors incur Taxes payable to Governmental Authorities, comprised of sales taxes on goods that the Debtors sell and payroll taxes. In the aggregate, the Debtors estimate that approximately $120,000 in prepetition Taxes will be owed.

### E.    Need for Relief Requested by the Motion.

By this Motion, the Debtors request that HMT be authorized to (i) continue to use the existing cash management system to operate the Debtors' businesses in the ordinary course, (ii) pay any post-petition ordinary course obligations of the Debtors, (iii) continue to honor and comply with Customer Obligations, and (iv) pay prepetition Taxes incurred by the Debtors in the normal operation of their businesses that are payable to various Governmental Authorities, in the ordinary course of business.

In particular, the Debtors propose that the one checking account be kept open for a period of not more than forty-five (45) days to allow HMT time to establish a new debtor in possession merchant account with the following conditions: (i) the existing merchant/checking account will be frozen for purposes of all check writing abilities; (ii) the merchant/checking account will remain open for all deposits during this time frame; and (iii) the existing checking account will allow HMT to transfer funds held in this account to a debtor in possession account to be opened by HMT, from which post-petition checks may be written. The Debtors believe that such relief is critical to the successful reorganization of the Debtors' financial affairs. The Debtors need cash to survive, are very concerned that closing this merchant account will cause significant delay and disruption in their ability to generate cash for their operations, which is necessary to pay ordinary

234164

1   course obligations.  Any failure by the Debtors to pay ordinary course obligations will produce

2   substantial disruption and damage to the Debtors' business operations, resulting in a substantial

3   impairment of, or even a destruction of, the Debtors' enterprise value, to the detriment of the

4   Debtors and their creditors.

5        The Debtors also request the authority to honor the Customer Obligations.   Failure to

6   honor these obligations would detrimentally affect customer loyalty, damaging the Debtors' sales

7   and going concern value.  The Customer Obligations are obligations to customers that the Debtors

8   must have the ability to honor in order to preserve customer confidence and support.  Any

9   disruption to the Debtors' ability to honor these customer obligations may result in a loss of

10  business, which will in turn result in further decline in the Debtors' revenues.

11       In addition, the Debtors request authority to pay prepetition Taxes that the Debtors collect,

12  withhold and incur in connection with the normal operation of their businesses.  These monies

13  collected prepetition for Taxes are not property of the Debtors' estates, and must, for that reason,

14  be turned over to the Governmental Authorities.  Moreover, the Debtors seek to pay prepetition

15  Taxes to forestall Governmental Authorities from taking actions that might interfere with the

16  Debtors' successful administration of their Chapter 11 cases.  Any such business disruptions

17  would likely negatively impact these cases.

18                                     **II**

19  **THIS COURT SHOULD AUTHORIZE THE DEBTORS TO CONTINUE TO CONDUCT**

20              **THEIR BUSINESS IN THE ORDINARY COURSE**

21       Section 363(c)(1) of the Bankruptcy Code provides that a debtor, without notice or court

22  approval, may enter into transactions within the "ordinary course" of the debtor's business.[2]

23  Consequently, operations in the ordinary course of a debtor's business do not require bankruptcy

24  court approval.

25

26  _____

    [2] Section 363(c)(1) provides, in pertinent part, that:

27      [i]f the business of the debtor is authorized to be operated under section … 1108 … and unless the
    court orders otherwise, the trustee may enter into transactions, including the sale or lease of

28  property of the estate, in the ordinary course of business, without notice or a hearing, and may use
    property of the estate in the ordinary course of business without notice or a hearing.

234164

1    Although the Bankruptcy Code does not define the term, "ordinary course of business," the

2    Ninth Circuit Court of Appeals has determined that a transaction that meets both a "horizontal

3    dimension" test and a "vertical dimension" test of "ordinariness" is a transaction within a debtor's

4    "ordinary course of business." In re Dant & Russell, 853 F.2d 700, 703-06 (9th Cir. 1988).

5    **A.    The "Horizontal Dimension" Test.**

6    The "horizontal dimension" test applies an industry-wide perspective to a transaction and

7    involves a comparison of the debtor's business to other like businesses, and a determination of

8    whether the transaction is of a type that other similar businesses would engage in as "ordinary

9    business." Dant & Russell, 853 F.2d at 704. As Collier on Bankruptcy explains:

> [t]he horizontal dimension test looks to similarly situated businesses and determines whether the transaction at issue is one that would normally be entered into by similar businesses. In effect, this test is aimed at determining whether the transaction is abnormal or unusual, in which case it is probably not in the ordinary course of business, or whether it is a reasonably common type of transaction. Significantly, a transaction may be considered reasonably common even if it does not occur frequently, provided that it is an ordinary type of transaction within the business and the industry.[3]

15    Under the "horizontal dimension" test, therefore, a transaction is in the "ordinary course"

16    of a debtor's business if it is a reasonably common type of transaction within the debtor's business

17    and the debtor's industry.

18    **B.    The "Vertical Dimension" Test.**

19    The "vertical dimension" test examines a transaction from the viewpoint of a hypothetical

20    creditor, focusing on the creditor's "reasonable expectations" of the type of transactions that the

21    debtor is likely to enter into in the "ordinary course" of its business. Dant & Russell, 853 F.2d at

22    705. In utilizing the vertical dimension test, a bankruptcy court must look to the nature of the

23    debtor's pre-petition business as compared to its post-petition business. Id. Collier on

24    Bankruptcy explains:

> [t]he vertical dimension test reviews the transaction from the perspective of creditors, asking whether the transaction is one that creditors would reasonably expect the debtor or trustee to enter into. This test measures the types of risks that creditors impliedly agreed

[3] Collier on Bankruptcy, 15th Ed Revised, ¶363.03[1][a] (2001).

-8-

234164

1    to when they extended credit to the debtor, and determines whether
     the transaction at issue is within the range of risks reasonably
2    expected by creditors. ... [T]ransactions of a type that the debtor
     commonly engaged in, or which the debtor might have reasonably
     been expected to engage in [pre-petition], are likely to be within the
3    ordinary course of business after the commencement of a case.[4]

4    Therefore, under the "vertical dimension" test, a transaction is in the ordinary course of a

5    debtor's business if the transaction is one that creditors reasonably would expect the debtor to

6    enter into.

7    **C.    The Debtors' Ongoing Businesses Satisfy Both The "Horizontal" And**

8    **"Vertical" Dimension Tests And Should, Therefore, Be Deemed To Be**

9    **"Ordinary Course" Transactions.**

10    In this case, the evidence supports unequivocally the conclusion that the Debtors' ongoing

11    operations meet both the "horizontal" and "vertical" dimension tests articulated by the Ninth

12    Circuit.  Accordingly, such operations should be considered to be in the "ordinary course" of the

13    Debtors' business.

14    1.    Horizontal Dimension Test.  HMT provides all of the administrative and

15    management services necessary for the operation of the Debtors' businesses, including

16    billing and collecting all funds generated by the Debtors' businesses, and then uses such

17    funds to pay the expenses necessary to sustain the Debtors' operations.  HMT believes

18    that its management of the Debtors' business satisfies the "horizontal dimension" test

19    articulated by the Ninth Circuit.

20    2.    Vertical Dimension Test.  All creditors in these cases are well aware of

21    HMT's  being the contracting and indebted party for the Debtors' business transactions.

22    HMT deals directly with, and contracts with, the vendors, suppliers, service companies

23    and lessors that provide goods and services to the Debtors' businesses.  The creditors in

24    this case are direct creditors of HMT.  HMT collects all payments made for goods and

25    services provided by the Debtors.  By this Motion, the Debtors seek an order of the Court

26    authorizing HMT to operate post-petition the Debtors' businesses consistent with

27

28    [4] Collier on Bankruptcy, 15th Ed Revised, ¶363.03[1][b] (2001).

-9-

234164

1    historical practice.  HMT intends to continue to operate post-petition in the same manner

2    as it did pre-petition.  The manner of the Debtors' post-petition operations, then, will be

3    virtually identical to the manner of the Debtors' pre-petition operations.  There should be

4    no question that all creditors should reasonably have expected that, when they extended

5    credit to the Debtors, the Debtors would continue to operate in the same manner as they

6    always have done so.

7        Based upon the foregoing, the Debtors respectfully submit that this Court should

8    authorize the Debtors to conduct post-petition ongoing business operations consistent with their

9    historical dealings, as transactions in the ordinary course of the Debtors' businesses, pursuant to

10    the provisions of Section 363(c)(1) of the Bankruptcy Code.

11        **D.    <u>Alternatively, the Debtors Provide Hereby Notice To Creditors Of the</u>**

12            **<u>Debtors' Intention to Operate in the Ordinary Course, Which Notice Is</u>**

13            **<u>Sufficient To Satisfy The Requirements Of Section 363(b).</u>**

14        To the extent that the Debtors' proposed post-petition operations are characterized as

15    <u>outside</u> the "ordinary course" of the Debtors' operations, the Debtors recognize that such

16    operations require the approval of this Court.  <u>See</u>, 11 U.S.C. § 363(b) (requiring "notice and a

17    hearing" prior to the "use, sale or lease" of property of the estate outside the ordinary course of

18    business).  <u>See also</u>, <u>In re Crystal Apparel, Inc.</u>, 220 B.R. 816, 829 (Bankr. S.D.N.Y. 1998) (noting

19    that "[a] Chapter 11 debtor in possession's transactions other than those in the ordinary course of

20    business must be authorized by the court after notice and a hearing").

21        The purpose of imposing on a debtor the requirement to obtain court approval for a

22    transaction outside the ordinary course of the debtor's business is simply to provide to creditors,

23    who have an interest in maximizing realization from assets of the estate, an opportunity to review

24    the terms of the transaction and to object thereto if they deem the transaction not to be in their

25    best interest.  <u>In re Crystal Apparel</u>, 220 B.R. at 830 (citing <u>In re Caldor</u>, 193 B.R. 182, 186

26    (Bankr. S.D.N.Y. 1996)).  Thus, the standard for approval of a transaction not in the ordinary

27    course of business is <u>whether creditors have had an opportunity to review the proposed</u>

28    <u>transaction</u>, and to afford those creditors an opportunity to be heard in the event that those

-10-

234164

1   creditors believe that the transaction is not in their best interests. In re James A. Phillips, Inc., 29

2   B.R. 391, 394 (S.D.N.Y. 1983) ("[T]he apparent purpose of requiring notice only where the use

3   of property is extraordinary is to assure interested persons of an opportunity to be heard

4   concerning transactions different from those that might be expected to take place so long as the

5   debtor-in-possession is allowed to continue normal business operations...").

6          In this case, as discussed above, HMT believes that its providing post-petition

7   management services consistent with its historical practices constitutes business conducted in the

8   "ordinary course" of the Debtors' operations. However, in an abundance of caution, the Debtors

9   have provided hereby to their primary creditors notice of such proposed post-petition operations.

10   The Debtors submit that this notice is sufficient to meet the "notice and hearing" requirements of

11   Section 363(b) in the event that this Court should determine that such operations are not within

12   the ordinary course of the Debtors' business operations.

13          The continued providing of HMT's management services is an exercise of HMT's sound

14   business judgment. See, e.g., In re Copy Crafters Quickprinting, Inc., 92 B.R. 973, 983 (Bankr.

15   N.D.N.Y. 1988); In re Industrial Valley Refrig. And Air Cond. Supplies, Inc., 77 B.R. 15, 21

16   (Bankr. E.D. Pa. 1987) (in the commonly considered context of the sale of business assets under

17   section 363(b), noting that a "sound business judgment" must justify the transaction). See also In

18   re Levinson Steel Co., 117 B.R. 194, 196 (W.D. Pa. 1990) (approving severance pay plan as

19   "necessary incentive for continued employment" by certain of the debtor's employees).   Any

20   significant disruption in HMT's continued providing of management services to the Debtors

21   would be tantamount to a termination of the Debtors' businesses.   Accordingly, with the notice

22   given to creditors set forth above, this Court should approve the Debtors' ongoing operations as

23   described herein.

24                                              III

25   **THE DEBTORS' MAINTENANCE AND CONTINUED USE OF THE**

26   **EXISTING PRE-PETITION CASH MANAGEMENT SYSTEM IS**

27   **IN THE BEST INTERESTS OF THE ESTATES**

28   It is customary in complex cases for bankruptcy courts to enter orders approving the

234164

1    continued use of pre-existing cash management systems.  The benefits of permitting debtors to

2    continue the use of their pre-existing cash management system is clear.  The potentially

3    devastating effect on debtors of having to completely revamp their management and financial

4    structure in order to operate within a "standard" Chapter 11 cash management system is equally

5    clear.  Because these considerations are so clear, few (if any) requests for approval of existing

6    cash management systems are ever contested.  As such, there is little published authority on the

7    subject.

8            Virtually all references to court orders authorizing the continued use of centralized cash

9    management systems are found in opinions regarding collateral proceedings, rather than in

10   reported decisions approving or disapproving the use of a particular system.  See, e.g., In re

11   HSSI, Inc., 176 B.R. 809 (Bankr. N.D. Ill. 1995), rev'd on other grounds and remanded, 193

12   B.R. 851 (N.D. Ill. 1996) (U.S. Trustee motion for payment of statutory fees; refers to previously

13   approved centralized cash management system); In re Interco, Inc., 130 B.R. 301 (Bankr. E.D.

14   Mo. 1991) (court declined to clarify order authorizing maintenance of existing cash management

15   systems and continued use of certain existing bank accounts; investment and deposit guidelines

16   and certain business forms); In re FRG, Inc., 107 B.R. 461, 465 (Bankr. S.D.N.Y. 1989) (order

17   on motion to transfer venue; refers to "Application for Order Authorizing Debtors to Continue

18   Prepetition Cash Management Systems"); In re Family Health Services, Inc., 104 B.R. 279, 281

19   (Bankr. C.D. Cal. 1989) rev'd on other grounds 143 B.R. 232 (C.D.Cal. 1992) (order on motion

20   to dismiss; refers to debtor's consolidated "cash management system"); rev'd on other grounds

21   and remanded, 143 B.R. 232 (C.D. Cal. 1992).  The continued, post-petition use of cash

22   management systems employed in the ordinary course of a debtor's pre-petition business has

23   been approved as a routine matter in unreported decisions in a number of other large and

24   complex Chapter 11 cases.[5]  Bankruptcy courts routinely permit debtors to utilize their existing

25

26   [5]  See, e.g., In re Abrasive Indus., Inc., No. 94-135-HSB (Bankr. D. Del Feb. 22, 1994) (order approving continued
     post-petition use of debtor's existing pre-petition cash management system and granting other related relief); In re
27   Gantos, Inc., No. SG 93-85478 (Bankr. W.D. Mich. Nov. 12, 1993); In re Rax Restaurants, Inc., No. 2-92-08584
     (Bankr. S.D. Ohio Nov. 24, 1992); In re Phar-Mor, Inc., Nos. 92-41599 through 92-41614 (Bankr. N.D. Ohio Aug.
28   18, 1992); In re Trans World Airlines, Inc., No. 92-115 (Bankr. D. Del. Jan. 31, 1992); In re Federated Dep't Stores,
     Inc., No. 1-90-00130 (Bankr. S.D. Ohio Jan. 15, 1990).

1    bank accounts under such circumstances, finding that such relief is entirely consistent with

2    applicable provisions of the Bankruptcy Code.[6]

3         In this case, good cause exists to authorize the Debtors' continued use of their pre-petition

4    cash management system.  Requiring HMT to immediately close its checking account is likely to

5    delay HMT's receipt of cash collections, which could impair materially the Debtors' ability to

6    operate and, hence, reorganize.  Maintaining the Debtors' existing cash management system is not

7    only the most efficient means by which the Debtors can run their businesses, but is necessary to

8    prevent disruption, and perhaps severe  and irreparable damage, to the Debtors' operations.

9    Accordingly, the Debtors request hereby authority to continue to utilize their existing cash

10   management system.

11                                         **IV**

12                   **THIS COURT SHOULD WAIVE THE REQUIREMENT**

13                      **OF SECTION 345(b) IN THIS CASE**

14   Section 345(b) of the Bankruptcy Code states as follows:

15        (b)    Except with respect to a deposit or investment that is insured or
     guaranteed by the United States or by a department, agency, or instrumentality
16   of the United States or backed by the full faith and credit of the United States,
     the trustee shall require from an entity with which such money is deposited or
17   invested--

18        (1)    a bond--
               (A)    in favor of the United States;
19             (B)    secured by the undertaking of a corporate surety
     approved by the United States trustee for the district in which
20   the case is pending; and
               (C)    conditioned on--
21                   (i)    a proper accounting for all money so
     deposited or invested and for any return on such money;
22                   (ii)    prompt repayment of such money and
     return; and

23

24

---

25   [6] See, e.g., In re CSC Indus., Inc. and In re Copperweld Steel Co., Nos. 93-41898 and 93-41899 (Bankr. N.D. Ohio
     Nov. 22, 1993) (order approving continued post-petition use of debtor's existing bank accounts and granting other
26   related relief); In re Herman's Sporting Goods, Inc., No. 83-31529 (Bankr. D.N.J. Mar. 15, 1993) (order approving
     continued post-petition use of debtor's existing bank accounts and granting other related relief); In re Trans World
27   Airlines, Inc., No. 92-115 (Bankr. D. Del. Jan 31, 1992) (order approving continued post-petition use of debtor's
     existing bank accounts and granting other related relief); In re Coleco Indus., Inc., No. 88-B-11505 (PBA) (Bankr.
28   S.D.N.Y. July 11, 1988) (order authorizing maintenance of bank accounts and continued use of business forms and
     directing payment of payroll checks).

> (iii)    faithful performance of duties as a depository; or
> (2)    the deposit of securities of the kind specified in section 9303 of title 31; unless the court for cause orders otherwise.

Pursuant to Section 345(b) of the Bankruptcy Code, unless a court for cause orders otherwise, a bank at which a debtor-in-possession's funds are deposited must provide a bond or a deposit of securities to back such deposit to the extent that such deposit is not insured or guaranteed by the United States.  In this case HMT maintains its deposit accounts at Zions First National Bank ("Zions").  The Debtors believe that, if Zions is required to deposit securities to back the daily cash balances maintained at Zions, Zions will charge to HMT substantial fees.  The Debtors believe that bearing this expense is unnecessary given the financial strength of Zions. Based thereon, the Debtors request, on behalf of Zions, a waiver of Section 345(b) so that the estates will save the significant expense associated with complying with the requirements thereof.

**V**

## THE DEBTORS SHOULD BE AUTHORIZED TO HONOR CUTOMER OBLIGATIONS

### A.    Honoring Customer Commitments Falls Within the Ordinary Course of Business.

The Bankruptcy Code contemplates that a debtor in possession will continue business as usual in the ordinary course of its business.  Unless the Bankruptcy Court orders otherwise, Section 1108 of the Bankruptcy Code authorizes a debtor in possession to "operate the debtor's business," and Section 363 states that "[i]f the business of the debtor is authorized to be operated under section . . . 1108 . . . and unless the court orders otherwise, the [debtor in possession] may enter into transactions . . . in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice and a hearing." 11 U.S.C. § 363(c)(1). As the Ninth Circuit Court of Appeals recognized:

> The touchstone of "ordinariness is . . . the interested parties' reasonable expectations of what transactions the debtor in possession is likely to enter in the course of it business.  So long as the transactions conducted are consistent with these expectations, creditors have no right to notice and hearing . . .

In re Dant & Russell, Inc., 853 F.2d 700, 705 (9th Cir. 1988).

The Debtors submit that the Customer Obligations are not only within the ordinary course

-14-

234164

of business, but indeed expected and relied upon by the Debtors' customers and are customary for the industries in which the Debtors operate. The value of the Debtors' brands are dependent upon the loyalty and confidence of the customers that buy their products. Continued support of the Debtors' customers is absolutely essential to the Debtors' ability to preserve and maximize the going concern value of their estates. The Debtors further submit that the relief requested in this Motion is typical and similar to that approved in other recent chapter 11 cases in the Central District of California and elsewhere.

B.     **Honoring Customer Obligations is Authorized Under Section 105(a) of the Bankruptcy Code.**

Section 105(a) of title 11 of the Bankruptcy Code empowers this Court to issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code. 11 U.S.C. § 105. "The basic purpose of Section 105 is to assure the bankruptcy courts power to take whatever action is appropriate or necessary in aid of the exercise of their jurisdiction." 2 Collier on Bankruptcy ¶ 105.01 (16th ed. rev. 2018). Essentially, Section 105(a) codifies the bankruptcy court's inherent equitable powers. See In re Feit & Drexler, Inc., 760 F.2d 406 (2d Cir. 1985).

"While such prepetition customer programs are unique to each debtor and depend greatly on the industry or type of business in which the debtor engages, they commonly include warranties, rebates, discounts, gift certificates, and royalties." See First-Day Orders (Payment of Critical Vendors; Abuses of DIP Financing; Cash Management Orders as De Facto Consolidation), 092002 ABI-CLE 21 (2002) (citing In re Crown Books, Corp., Case No. 98-1575 (RRM) (D. Del. July 15, 1995)) (court authorized debtor to honor returns and gift certificates); In re Bill's Dollar Stores, Inc., Case No. 93-808 (Bankr. D. Del. July 12, 1993) (court authorized debtor to honor prepetition obligations to customers); In re Federated Dep't Stores, Inc., Nos. 1-90-00130 through 1-90-00196, 1990 Bankr. LEXIS 102, at *1 (Bankr. S.D. Ohio Jan. 15, 1990) (court authorized debtor to treat deposits or prepetition payments on goods and services in same manner as prior to bankruptcy).

In In re Delia*s, Inc., 2014 WL 7210276 (Bankr.S.D.N.Y. 2014), the bankruptcy court

234164

1  granted the debtor's motion to continue to honor prepetition obligations owed to customers on

2  account of gift cards, gift certificates, certain returns, refunds, and exchanges.  The Delia*s court

3  authorized the debtors to pay all chargebacks along with the other fees related to credit card

4  processing, and to continue its customer programs and credit card processing as the debtors

5  deemed appropriate, in their discretion.  Id.

6       The Debtors estimate that the cost of honoring Customer Obligations should range from

7  $36,400 to $42,300 per month.  The Debtors contemplate that they will be able to honor the

8  Customer Obligations in the ordinary course.  If the Debtors determine at any time that honoring

9  the Customer Obligations is overly burdensome, the Debtors will discontinue honoring the

10  Customer Obligations.

11       Here, the Debtors believe that the business exigencies of their Chapter 11 cases warrant

12  this Court's exercise of its equitable power in a manner consistent with the provisions of the

13  Bankruptcy Code.  Should the Debtors be unable to honor the Customer Obligations, they will

14  lose customer confidence and support, and therefore lose revenues, which will significantly affect

15  the Debtors' ability to successfully complete these Chapter 11 cases.  For the benefit of their

16  customers, the Debtors must continue to conduct business as usual, which requires that the

17  Debtors be able to honor the Customer Obligations.

18                                        VI

19  **THE DEBTORS SHOULD BE AUTHORIZED TO PAY PREPETITION TAXES**

20       A.    **The Taxes May Be Asserted as Priority Claims.**

21       The Debtors believe that the Taxes will be treated as unsecured priority claims under

22  Section 507(a)(8) of the Bankruptcy Code, which generally includes taxes that are required to be

23  collected and withheld by the Debtors. 11 U.S.C. § 507(a)(8)(B), (C) and (E).  Pursuant to

24  Section 1129 of the Bankruptcy Code, priority claims must be paid under any plan of

25  reorganization. 11 U.S.C. § 1129(a)(9).  Additionally, priority taxes must be paid in the order of

26  priority no less favorable than the treatment given to the most favored general unsecured claims.

27  See 11 U.S.C. § 1129(a)(9)(C)(iii).  Thus, the relief requested herein would affect only the timing

28  of payment of the Taxes as priority obligations and will not prejudice the rights of other creditors.

-16-

234164

**B.    Taxes May Not Be Property of the Debtors' Estates.**

The Taxes constitute so-called "trust fund" taxes that are collected from third parties and held in trust for payment to applicable Governmental Authorities. See, e.g., In re Shank, 792 F.2d 829, 830 (9th Cir. 1986) (sales tax required by state law to be collected by sellers for their customers is a trust fund tax); DeChiaro v. New York State Tax Comm'n, 760 F.2d 432, 433-34 (2nd Cir. 1985) (sales taxes are trust fund taxes); In re Hilaire, 135 B.R. 186, 191-92 (D. Mass. 1991) (sales tax is a trust fund tax). To the extent that these "trust fund" taxes are collected, they are not property of the Debtors' estates under Section 541(d) of the Bankruptcy Code, and should be turned over to the appropriate authority when due. See Begier v. IRS, 496 U.S. 53, 59-62 (1990) (withholding taxes are property held by a debtor in trust for another, and as such, do not constitute property of the estate); In re Al Copeland Enterprises, Inc., 991 F.2d 233, 235 (5th Cir. 1993) (state sales tax revenues were held subject to trust for the state and were not property of the estate).

**C.    Payment of Taxes is Necessary to Preserve the Debtors' Businesses.**

The Debtors need to pay the Taxes in order to preserve and sustain their ongoing business operations. The Debtors could incur, and could be obligated to pay, potentially significant penalties if the Debtors do not timely satisfy their ongoing tax obligations.

There is ample precedent authorizing the Debtors to pay the Taxes. Authority for such payments may be found in Sections 1107(a) and 1108 of the Bankruptcy Code, which vest a debtor in possession with authority to continue operating its business. Sometimes this duty and the concomitant fiduciary duty to maximize estate value may be fulfilled only through the pre-plan payment of certain unsecured claims. See, e.g., In re Mirant Corp., 296 B.R. 427, 429 (Bankr. N.D. Tex. 2003); In re CoServ. L.L.C., 273 B.R. 487, 498 (Bankr. N.D. Tex. 2002).

Further, as noted hereinabove, Section 105(a) of the Bankruptcy Code provides that "(t)he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." The Debtors submit that authorizing payment of the Taxes is a proper exercise of the Court's equitable powers under the circumstances.

234164

1    out the provisions of this title." The Debtors submit that authorizing payment of the Taxes is a

2    proper exercise of the Court's equitable powers under the circumstances.

3

4                                                    VI

5              **THE NOTICE GIVEN OF THIS MOTION IS APPROPRIATE**

6           **UNDER THE FACTS AND CIRCUMSTANCES OF THESE CASES**

7              The Debtors have served a copy of the Motion on the Debtors' primary secured creditor,

8    Zions, Integrity Bank, the creditors holding the 20 largest general unsecured claims against the

9    Debtors' estates and the Office of the United States Trustee. The Debtors respectfully submit

10   that such notice is appropriate and comports with the requirements of the Federal Rules of

11   Bankruptcy Procedure ("FRBP") and the Local Bankruptcy Rules ("LBR"). See, Rule 2002 of

12   the FRBP; Rule 9006(c) of the FRBP; Rule 9006 of the LBR.

13                                                   VII

14                                          **CONCLUSION**

15             Based upon the foregoing, the Debtors respectfully request that the Court enter its order

16   granting the relief requested herein, and granting such other and further relief as is just and

17   appropriate under the circumstances of this case.

18   DATED: June 13, 2018                  **WINTHROP COUCHOT**
                                           **GOLUBOW HOLLANDER, LLP**
19

20                                         By:_____

21                                                  Andrew B. Levin
                                           [Proposed] General Insolvency Counsel for
22                                         Debtors and Debtors-in-Possession

23

24

25

26

27

28

                                                   -18-