LOUIS M. BUBALA III, ESQ.
Nevada Bar No. 8974
KAEMPFER CROWELL
50 West Liberty Street, Suite 700
Reno, Nevada 89501
Telephone: (775) 852-3900
Facsimile: (775) 327-2011
Email: lbubala@kcnvlaw.com

Attorneys for Matthew R. McKinlay and
Valerie Grindle

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>☐ X-TREME BULLETS, INC.,<br>    a Nevada corporation,<br>☐ AMMO LOAD WORLDWIDE, INC.,<br>    an Idaho corporation,<br>☐ CLEARWATER BULLET, INC.,<br>    an Idaho corporation,<br>☐ FREEDOM MUNITIONS, LLC,<br>    an Idaho limited liability company,<br>☐ HOWELL MACHINE, INC.,<br>    an Idaho corporation,<br>☐ HOWELL MUNITIONS &<br>    TECHNOLOGY, INC., an Idaho<br>    corporation,<br>☐ LEWIS-CLARK AMMUNITION AND<br>    COMPONENTS, LLC,<br>    an Idaho limited liability company,<br>☐ COMPONENTS EXCHANGE, LLC,<br>    an Idaho limited liability company,<br>☒ All Debtors<br><br>            Debtors and<br>            Debtors-in-Possession. | Jointly Administered under<br>Case No.: 18-50609-btb (**LEAD**) with<br><br>Case Nos. 18-50610-btb; 18-50611-btb;<br>18-50613-btb; 18-50614-btb; 18-50615-btb;<br>18-50616-btb; and 18-50617-btb<br><br>Chapter 11 Proceedings<br><br><br>**MOTION FOR APPROVAL OF<br>CUSTODIAN'S REPORT AND<br>ACCOUNTING (11 U.S.C. § 543(b)(2);<br>FRBP Rule 6002)**<br><br><br>Hearing Date: August 21, 2018<br>Hearing Time: 2:00 p.m. |

Matthew R. McKinlay, Chief Restructuring Officer ("CRO") and Valerie Grindle, Assistant Chief Restructuring Officer ("Assistant CRO"), hereby move the Court for an order pursuant to 11 U.S.C. § 543(b)(2) and Federal Rules of Bankruptcy Procedure, Rule 6002: (1) approving the Custodian's Report and Accounting attached as Exhibit 3 (the "Custodian's

Report") to the Declaration of Matthew R. McKinlay filed herewith; and (2) discharging the CRO and Assistant CRO (collectively, the "CROs") from liability incident to their engagement and as Custodian following commencement of the Chapter 11 case.

## I. INTRODUCTION

Mr. McKinlay and Ms. Grindle were appointed CRO and Assistant CRO on April 23, 2018 with the full knowledge, consent, authorization and approval of David Howell, Howell Munitions & Technology, and the affiliates (the collective debtors, "HMT Entities"). Their engagement was documented in an engagement (the "CRO Agreement") signed that day by Mr. McKinlay, Ms. Grindle, Mr. Howell, the HMT Entities, and debtors' secured lender, Zions Bank. The HMT entities were in extreme financial crisis and owed over $33 million to creditors. Following their engagement, the CROs preserved and benefited the estate and its creditors by performing substantial services for the HMT Entities, including but not limited to, taking possession of and managing the HMT Entities and their operations. On June 7, 2018, Mr. Howell used unauthorized force to displace the CROs from the business premises in violation of the CRO Agreement. Mr. Howell, then filed Chapter 11 cases on behalf of the HMT Entities although he had no authority to do so under the CRO Agreement. Although the CRO Agreement has never been properly terminated, the CROs are "custodians" as defined by the Bankruptcy Code and now file this Motion of Approval of Custodian's Report and Accounting.

## II. JURISDICTION

The Court has jurisdiction over this matter pursuant to the general grant of jurisdiction of 28 U.S.C. § 1334. The matter is a core proceeding as defined by 28 U.S.C. § 157(b)(2). The relief requested is approval of the Custodian's Report under 11 U.S.C. § 543(b)(2). Opposition to the Motion is controlled by Bankruptcy Rule 9014. Service is provided pursuant to Local Bankruptcy Rule 9014-1.

KAEMPFER CROWELL
50 West Liberty Street, Suite 700
Reno, Nevada 89501

## III.    MEMORANDUM OF POINTS AND AUTHORITIES

A "custodian" is defined broadly under the Bankruptcy Code (the "Code") and includes a "trustee, receiver, or agent under applicable law, or under a contract, that is appointed or authorized to take charge of property of the debtor … for the purpose of general administration of such property for the benefit of the debtor's creditors." 11 U.S.C. § 101(11).  The CROs were appointed and authorized by all parties to the CRO Agreement to take charge and administer debtors' property for the benefit of creditors.  The "categories of custodians are descriptive rather than exhaustive. Congress defined the term broadly to include third parties who have taken charge of the debtor's assets for the benefit of creditors." Matter of Cash Currency Exchange, Inc. 762 F.2d 542, 553 (7th Cir. 1985).  Under the CRO Agreement the CROs were "custodians" for the HMT Entities as defined by the Code.  Accordingly, the compensation of the CROs and their counsel for prepetition services is entitled to administrative priority under 11 U.S.C. § 503(b)(3)(E) and (b)(4). [1]

11 U.S.C. § 543.  "Turnover of property by a custodian," states in pertinent part:

(b) A custodian shall –
(1)   deliver to the trustee any property of the debtor held by or transferred to such custodian, or proceeds, product, offspring, rents, or profits of such property, that is in such custodian's possession, custody, or control on the date that such custodian acquires knowledge of the commencement of the case; and
(2)   file an accounting of any property of the debtor, or proceeds, product, offspring, rents, or profits of such property that, at any time, came into the possession, custody, or control of such custodian.

Federal Rules of Bankruptcy Procedure ("FRBP"), Rule 6002, provides:

(a) *Accounting required.*  Any custodian required by the Code to deliver property in the custodian's possession or control to the trustee shall promptly file and transmit to the United States trustee a report and account with respect to the property of the estate and the administration thereof.
(b) *Examination of administration.*  On the filing and transmittal of the report and account required by subdivision (a) of this rule and after an examination has

---

[1] A superseded custodian's postpetition services and expenses are also compensable under section 543(c)(2). The CROs and counsel for the CROs will be filing a separate Motion for Allowance and Payment of Administrative Claim (11 U.S.C. §§ 503(b)(3)(E), 503(b)(4), 543(c)(2)) for fees and expenses incurred post-petition.

> been made into the superseded administration, after notice and hearing, the court shall determine the propriety of the administration, including the reasonableness of the disbursements.

"[Rule 6002] prescribes the procedure to be followed by a custodian who under § 543 of the Code is required to deliver property to the trustee and to account for its disposition. The examination under subdivision (b) may be initiated (1) on the motion of the custodian required to account under subdivision (a) for an approval of his account *and discharge thereon.*"

1983 Advisory Committee Notes to Rule 6002 (emphasis added).

### IV.    FACTUAL BACKGROUND

The Debtors jointly and severally owe secured creditor Z.B., N.A. dba Zions First National Bank ("Zions") over $17.5 million based on six separate promissory notes which are all in default and have been for over one and one-half years. Zions contends its loans are secured by properly perfected security interests in all of Debtors' personal property assets. The obligations owed to Zions, including principal, accrued interest, fees, costs and legal expenses, have been unconditionally guaranteed by Mr. Howell, the principal of the Debtors.

In addition to the debts owed to Zions, the Debtors are also indebted to numerous other creditors, suppliers, and vendors, including the U.S. Government Alcohol Tobacco Tax and Trade Bureau ("TTB") which has asserted a claim of approximately $6.1 million for unpaid excise taxes and filed a Notice of Levy against debtor Howell Munitions & Technology ("HMT").

Beginning in March of 2018, Zions entered into negotiations with Mr. Howell, HMT and nine other entities (all collectively, the "HMT Entities") about a potential appointment of a receiver, or the potential retention by the HMT Entities of a Chief Restructuring Officer. *See* Declaration of Mark Siegel ("Siegel Decl." at ¶ 23 (Dkt. #49)). The HMT Entities were represented by counsel throughout these negotiations. *Id.* Zions and the HMT Affiliates agreed

to have the CROs retained by the HMT Entities, and proposed potential CROs were interviewed by the parties. *Id.* The HMT Entities and Zions agreed on the retention of Mr. McKinlay as the CRO and negotiations on the terms of a CRO Agreement were held. *Id.* The CROs, the HMT Entities, and Zions were all represented by counsel in negotiating the terms of the CRO Agreement. *Id.*

On April 23, 2018 the CRO Agreement among the HMT Entities, Zions and the CROs was executed. *See* Declaration of Matthew R. McKinlay in Support of Motion for Approval of Custodian's Report and Accounting ("McKinlay Decl." at ¶ 4). Among other things, the CRO Agreement specifically provides that Mr. Howell resigned as an officer of the Debtors and that neither Mr. Howell nor the Debtors could terminate the CRO Agreement without first obtaining Zion's written consent or a court order authorizing the termination. McKinlay Decl.; Exhibit 2.

From April 23, 2018, Mr. McKinlay and Ms. Grindle served as CROs of the HMT Entities pursuant to the CRO Agreement. The CROs were appointed with the full knowledge, consent and approval of Mr. Howell and the HMT Entities. *See* McKinlay Decl. at ¶ 5, Exh. 2.)

The CROs retained the services of Sussman Shank LLP, and Jeffrey C. Misley as their counsel, to represent the CROs. McKinlay Decl. at ¶ 16.

Following the execution of the CRO Agreement, the CROs were the sole officers and sole custodians of the company's assets and records. The CROs preserved and benefitted the estate and its creditors by performing substantial services for the HMT Entities, including, but not limited to: (1) taking possession of and managing the HMT Entities and their operations, including payment of vendors, payroll, retaining employees, managing inventories, and negotiating with vendors for continued deliveries on term and COD bases; (2) negotiating for the sale of certain assets; (3) conducting an analysis of the company's finances, valuation and operations; and (4) administering the assets of the companies and various matters brought to the

CROs' attention by the Debtor's management and staff. McKinlay Decl. at ¶ 9.

Actions taken by the CROs are set forth in detail in the Custodian's Report filed herewith. Those actions include but are not limited to the following:

A. **Initial data gathering by the CROs.** Upon execution of the CRO Agreement the CROs requested historical and current financial information and held meetings with numerous parties, including Mr. Howell, Debtors' management team, key vendors and suppliers, and other financial consultants and experts, as well as Zions, the Debtors' largest secured creditor. At the time of the CROs' engagement, management provided a set of financials recapping their performance for the twelve month period ending December 2017, the first three months of 2018, and shortly thereafter the first four months of 2018. These financials demonstrated significant losses from operations as well as other challenges. McKinlay Decl. at ¶ 10A.

B. **Financial analysis.** A review of company operations determined HMT was insolvent, both on a cash flow and balance sheet basis. The analysis showed that the HMT Entities did not have sufficient cash or liquidity to fund debt service, payroll at its current run rate, facility rents, and a number of other significant accrued liabilities to critical suppliers, such as its lead supplier and federal excise taxing agencies. The CROs determined that several divisions of the company were significantly underperforming, bleeding cash, and operating at significant losses. A discussion of the underperforming divisions of the company is included in the Custodian's Report. *See* McKinlay Decl. at ¶ 10B, Exh. 3.

C. **Valuation analysis** (liquidation vs. going concern). The CROs determined that the company would generate significantly less on a liquidation basis (net of liquidation costs) than as a going concern. However, the CROs determined that significant and immediate actions needed to be taken to enable the company to continue as a going concern. These actions included shuttering or moth-balling non-performing business units, selling non-performing assets, cutting expenses, canceling non-profitable agreements, restructuring trade debt, and right sizing the core businesses. Only by taking these actions were the companies capable of being reorganized. However, the CROs recognized that while such an approach might be possible, implementation of any restructuring was highly dependent upon numerous factors, including but not limited to, obtaining the cooperation and forbearance of vendors, suppliers, Zions, Mr. Howell, and the TTB. McKinlay Decl. at ¶ 10C.

D. **Operational Analysis.** The CROs learned that HMT operated twin bullet manufacturing sites, one in Lewiston, Idaho and the other in Carson City, Nevada. Although the demand for the company's products was only about one –half what it was two years ago, upon the CROs' arrival HMT was still operating both facilities at significant cost; HMT was paying rents, employing staff, insuring assets and purchasing raw materials for two facilities when only one facility was needed to manufacture products to meet current and further demand. *See* McKinlay Decl. at ¶ 10D.

E. **Howell Mismanagement.** The CROs observed that company management (Mr. Howell) was unwilling or unable to make the hard decisions necessary to restructure the business. Among other things, the CROs observed that internal

1  controls were weak or nonexistent, expense management was weak and the
2  company did not operate against a budget, and offered sponsorship programs
3  to various shooting clubs and other entities with little or no benefit to the
4  companies. Lease agreements for real property between the company (as
5  lessee/sublessee) and Mr. Howell (as lessor/sublessor) were not negotiated at
6  arms' length and favored Mr. Howell personally. The CROs further observed
7  that HMT paid for benefits and provided administrative services to
8  unaffiliated entities such as DAJO Inc. without consideration or written
9  agreements. The CROs reviewed agreements that obligated Components
10 Exchange and HMT to produce product at cost, with little or no economic
11 value to the companies. Moreover, Mr. Howell appeared to transfer assets to
12 himself personally in the form of rents, salaries, and distributions at the
13 expense of creditors, and the HMT Entities engaged in numerous and
14 pervasive non-arms' length financial transactions among each other and with
15 friendly suppliers and customers. *See* McKinlay Decl. at ¶ 10E, Exh. 3.

16 F. **Reduction of Cash Expenditures**. The CROs took steps to reduce
17 expenditures, including the moth-balling and shuttering of non-performing
18 businesses in an orderly fashion to preserve value. This included the moth-
19 balling of the redundant bullet manufacturing site in Carson City, Nevada, and
20 the closing of the Houston retail store due to deep and continuous losses.
21 Strict internal controls were implemented and the CROs were active in the
22 renegotiation of payment and/or forbearance terms with key suppliers and
23 creditors. All disbursements were restricted to "critical" expenditures
24 necessary to keep the doors open. *See* McKinlay Decl. at ¶ 10F.

G. **Sales of Assets.** The CROs, in consultation with the management team, identified excess and non-critical assets to be sold to generate cash. Negotiations were commenced with several prospective purchasers of assets, but stalled upon the issuance of a Notice of Levy by TTB against HMT seeking collection of unpaid federal excise taxes. *See* McKinlay Decl. at ¶ 10G.

H. **Operational Actions**. The CROs worked with the management team to begin developing a sales and marketing plan for the remaining profitable lines of business. The CROs focused on stabilizing the workforce during the turbulent activities to the extent possible. The history of layoffs along with the lack of clear strategic direction by prior executive leadership had impaired employees' confidence in the companies. In response to the resignations of the two remaining employees in the IT Department, the CROs quickly hired one replacement. In addition, when the accounting and finance department was reduced from 6 to 2 employees in a matter of weeks through resignations including the Director of Finance and Risk Management, the CROs brought in another Advanced CRO consultant to ensure continuity of the accounting and finance functions. *See* McKinlay Decl. at ¶ 10H.

I. **Payments to CROs and Counsel**. The CROs through CFO Solutions, LLC and Sussman Shank, LLP, as counsel for the CROs, performed services which greatly benefitted the HMT Entities, and received payment for such prepetition services in accordance with the agreed terms of retention and at agreed hourly rates. A detailed listing of services provided and payments for such services and expenses is included in Exhibits 5 and 6 to the Declaration

of Matthew R. Mr. McKinlay filed herewith. All payments to CFO Solutions, LLC on behalf of the CROs and Sussman Shank LLP were made in accordance with the agreed terms of retention. The most recent payments made to the CROs and Sussman Shank LLP were received by the CROs and Sussman Shank LLP on June 8, 2018. *See* McKinlay Decl. at ¶ 10I; Exhs. 5 and 6. CFO Solutions, LLC CROs continue to hold a retainer of $25,000 on behalf of the CROs, which will be applied to the CRO's final billing per the terms of the CRO Agreement. The funds will not be applied until there is a court order approving the post-petition administrative fees and/or a modification of the automatic stay for their application.

J. **Howell Interference**. Mr. Howell interfered with and took numerous actions after the CRO Agreement was executed, that were counter-productive to efforts to restructure existing operations. Such actions undermined efforts to restructure operations and were in violation of the terms of the CRO Agreement. The actions taken by Mr. Howell undermined the process with certain HMT employees, vendors and customers. *See* McKinlay Decl. ¶10I, Exh. 3. The CROs reserve any and all rights and claims against Mr. Howell, all other parties to the CRO Agreement and <u>all third parties</u> who tortuously interfered with the CROs and the CRO Agreement in violation of its terms.[1]

On June 7, 2018 Mr. Howell used unauthorized force to displace the CROs from the

---

[1] In addition to reserving all claims and rights against Mr. Howell individually and all other parties to the CRO Agreement, the CROs reserve all rights and claims against all third parties who participated in the unauthorized physical removal of the CROs and/or otherwise interfered with the CRO Agreement, including but not limited to, Steven Howell, Angela Smith, J. Michael Issa, Glass Ratner & Capital Advisory and Capital Group LLC, and others for claims including, but not limited to, tortious interference with contract, wrongful interference with economic relationships, and intentional interference with a prospective economic advantage.

principal place of business for the Debtor's business enterprise in Lewiston, Idaho. Immediately thereafter, Mr. Howell filed the above captioned bankruptcy cases in Nevada without legal authority to do so, and without the consent or knowledge of the CRO, all in violation of the terms of the CRO Agreement. Since then, the CROs have not had access to the HMT Entities' books and records, assets and facilities, and Mr. Howell instructed his staff to stop taking direction from the CROs. McKinlay Decl. at ¶ 11.

## V. TURNOVER OF ASSETS TO DEBTORS AND CUSTODIAN'S REPORT

The CROs have been denied access to the books and records of the Debtors following the unauthorized removal of the CROs from the business premises. By letter dated June 21, 2018 the CROs complied with 11 U.S.C. § 543(b)(1) and turned over the few remaining assets in their possession to HMT. *See* McKinlay Decl. Exh. 4. Because the CROs have been denied access to the business premises and the books and records, the Custodian's Report is limited in scope and has been prepared by the CROs using the limited financial information currently available to them. The financial records available to the Custodian indicate that during 2017, the HMT Entities lost $(9.8) million in net income on $74.6 million in net sales, reported total assets of $30.1 million and total liabilities of $33.2 million on a book basis. Year-to-date through April 2018, the HMT Entities lost $(1.4) million on $18.4 million in net sales. Total assets had declined to $29.2 million and total liabilities had increased to $33.6 million. Total trade accounts payables as of June 7, 2018 for the HMT Entities totaled $7.5 million across 250 creditors. Of the total, $7.2 million was aged beyond the credit terms. *See* McKinlay Decl. at ¶14, Exh. 3.

**Conclusion**

WHEREFORE, the CROs request that the Custodian's Report filed herewith be approved, and that an order be entered determining that (1) the CROs administration was proper and that all disbursements including disbursements made to the CROs and counsel were

1  reasonable, and (2) the CROs are discharged from all liability incident to their offices as CROs

2  and as Custodian following commencement of the Chapter 11 cases.

3  DATED: July 18, 2018

4  KAEMPFER CROWELL

5  By:  */s/ Louis M. Bubala III*
   LOUIS M. BUBALA III, ESQ.
6  Nevada Bar No. 8974
   50 West Liberty Street, Suite 700
7  Reno, NV  89501
   Attorneys for Matthew R. McKinlay and
8  Valerie Grindle