# EXHIBIT 1

## TO SALE ORDER

**ASSET PURCHASE AGREEMENT**

**by and among**

**KASH CA, INC.,**

**and**

**X-TREME BULLETS, INC.,**

**AMMO LOAD WORLDWIDE, INC.,**

**CLEARWATER BULLET, INC.,**

**FREEDOM MUNITIONS, LLC,**

**HOWELL MACHINE, INC.,**

**HOWELL MUNITIONS & TECHNOLOGY, INC.,**

**LEWIS-CLARK AMMUNITION COMPONENTS, LLC, and**

**COMPONENTS EXCHANGE, LLC**

**Dated as of August ___, 2019**

TABLE OF CONTENTS

**Page**

ARTICLE I. DEFINITIONS ........................................................................................ 8

    1.1    Definitions..................................................................................................... 8

    1.2    Interpretations ............................................................................................ 17

ARTICLE II. PURCHASE AND SALE OF THE PURCHASED ASSETS;  ASSUMPTION
        OF ASSUMED LIABILITIES ................................................................ 18

    2.1    Purchase and Sale of the Purchased Assets ............................................. 18

    2.2    Excluded Assets ......................................................................................... 20

    2.3    Assumption of Liabilities........................................................................... 22

    2.4    Excluded Liabilities ................................................................................... 22

    2.5    Post-Closing Liabilities.............................................................................. 25

    2.6    Assumption/Rejection of Certain Contracts ............................................. 25

ARTICLE III. CONSIDERATION ............................................................................ 26

    3.1    Consideration ............................................................................................. 26

    3.2    Payment of Purchase Price......................................................................... 27

ARTICLE IV. CLOSING AND TERMINATION....................................................... 29

    4.1    Closing ....................................................................................................... 29

    4.2    Closing Deliveries by Sellers..................................................................... 29

    4.3    Closing Deliveries by Purchaser................................................................ 30

    4.4    Termination of Agreement.......................................................................... 31

    4.5    Effect of Termination ................................................................................. 32

    4.6    Extension; Waiver...................................................................................... 33

ARTICLE V. REPRESENTATIONS AND WARRANTIES OF SELLERS.............. 33

    5.1    Organization and Qualification of Sellers................................................. 34

    5.2    Authorization of Sellers ............................................................................. 34

5.3    No Inconsistent Obligations of Sellers ........................................................ 34

5.4    No Conflicts; No Additional Consents; Sellers' Compliance with Law ............. 34

5.5    No Brokers or Finders by Reason of Sellers' Acts ................................................ 35

5.6    Title to Purchased Assets ........................................................................... 35

5.7    No Litigation Affecting Sellers ................................................................... 35

5.8    Permits ......................................................................................................... 35

5.9    Labor Matters ............................................................................................. 36

5.10   Environmental Matters ............................................................................... 36

5.11   No Other Representations or Warranties ...................................................... 36

ARTICLE VI. REPRESENTATIONS AND WARRANTIES OF PURCHASER ...................... 36

6.1    Organization and Qualification of Purchaser ............................................. 36

6.2    Authority of Purchaser ............................................................................... 36

6.3    No Inconsistent Obligations of Purchaser .................................................. 37

6.4    No Conflicts; No Additional Consents; Purchaser's Compliance with Law ........ 37

6.5    No Brokers or Finders by Reason of Purchaser's Acts ................................. 38

6.6    Adequate Assurance of Future Performance Regarding Assigned Contracts ...... 38

6.7    No Litigation Affecting Purchaser .............................................................. 38

6.8    Investigation ............................................................................................... 38

6.9    Purchaser's Financial Condition ................................................................. 38

6.10   Not an Insider .............................................................................................. 38

ARTICLE VII. EMPLOYEES ............................................................................................ 38

ARTICLE VIII. BANKRUPTCY COURT MATTERS ........................................................ 39

8.1    Approval of Break-Up Fee and Bid Protections ......................................... 39

8.2    Competing Bid and Other Matters .............................................................. 39

8.3    Sale Order ................................................................................................... 40

DOCS 127753-000001/3730237.9

8.4    Contracts ................................................................................................ 40

8.5    Bankruptcy Filings................................................................................. 40

8.6    Sale Free and Clear ............................................................................... 40

ARTICLE IX. COVENANTS AND AGREEMENTS............................................................ 40

9.1    Conduct of Business of Sellers ............................................................. 40

9.2    Access to Information ............................................................................ 41

9.3    Reasonable Efforts; Cooperation .......................................................... 41

9.4    Further Assurances................................................................................ 42

9.5    Notification of Certain Matters ............................................................. 42

9.6    Confidentiality ...................................................................................... 42

9.7    Preservation of Records ........................................................................ 43

9.8    Notice of Material Adverse Effect......................................................... 43

9.9    Casualty Loss ........................................................................................ 43

9.10    No Successor Liability........................................................................... 43

9.11    Change of Name .................................................................................... 44

9.12    Receivables ........................................................................................... 44

9.13    Government Approvals........................................................................... 44

9.14    No Opposition to Foreclosure of Assets of Twin River and Big Canyon ............ 44

9.15    Compromise of Claims .......................................................................... 45

9.16    Cash Collateral...................................................................................... 45

9.17    Determination of No Environmental Liability........................................ 45

9.18    Adequate Assurance of Future Performance Regarding Assigned Contracts ...... 45

9.19    Purchaser's Acquisition of Pre-Petition Financing Obligations ............ 45

9.20    Payment of Payables Owed to Seller ..................................................... 46

9.21    Cooperation Regarding Disposition of TTB Adversary Action ............. 46

DOCS 127753-000001/3730237.9

ARTICLE X. CONDITIONS TO CLOSING.................................................................. 46

   10.1  Conditions Precedent to the Obligations of Purchaser and Sellers...................... 46

   10.2  Conditions Precedent to the Obligations of Sellers ............................................ 46

   10.3  Conditions Precedent to the Obligations of Purchaser ....................................... 47

ARTICLE XI. TAXES.............................................................................................. 48

   11.1  Certain Taxes ..................................................................................................... 48

   11.2  Purchase Price Allocation and Withholding Price............................................... 48

   11.3  Cooperation on Tax Matters .............................................................................. 48

ARTICLE XII. POST-CLOSING OBLIGATIONS .................................................... 49

   12.1  Sellers' Post-Closing Assurances ...................................................................... 49

   12.2  Proration............................................................................................................. 49

   12.3  Purchaser's Post-Closing Assurances ............................................................... 49

   12.4  Post-Closing Payment of Collections or Recoveries ......................................... 49

   12.5  Indemnification Regarding Operating Approvals................................................. 50

ARTICLE XIII. MISCELLANEOUS ......................................................................... 49

   13.1  Payment of Expenses ........................................................................................ 49

   13.2  No Survival of Representations and Warranties; Survival of Post-Closing
        Covenants........................................................................................................... 49

   13.3  Entire Agreement; Amendments; Waivers ......................................................... 50

   13.4  Execution of Agreement; Counterparts; Electronic Signatures ........................... 50

   13.5  Governing Law ................................................................................................... 50

   13.6  Jurisdiction, Waiver of Jury Trial ........................................................................ 50

   13.7  Notices ............................................................................................................... 51

   13.8  Binding Effect; Assignment................................................................................. 52

   13.9  Severability ........................................................................................................ 52

DOCS 127753-00001/3730237.9

13.10   Bulk Sales Laws ..................................................................................... 52

13.11   Access and Right to Use .......................................................................... 52

13.12   Authorized Execution .............................................................................. 52

13.13   Attorneys' Fees and Costs ...................................................................... 53

13.14   Free and Voluntary Act ........................................................................... 53

13.15   No Construction against any Party; Headings for Convenience Only ................. 53

13.16   Reliance on Representations ..................................................................... 53

13.17   Solicitation ............................................................................................ 53

DOCS 127753-000001/3730237.9

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this **"Agreement"**), is made and entered into as of August ___, 2019, (**"Agreement Date"**), by and among Kash CA, Inc., an Idaho corporation (**"Purchaser"**), on one hand, and **X-TREME BULLETS, INC. ("X-Treme"), AMMO LOAD WORLDWIDE, INC. ("ALW"), CLEARWATER BULLET, INC. ("Clearwater"), FREEDOM MUNITIONS, LLC ("Freedom"), HOWELL MACHINE, INC. ("Howell Machine"), HOWELL MUNITIONS & TECHNOLOGY, INC. ("HMT"), LEWIS-CLARK AMMUNITION COMPONENTS, LLC ("LCAC"), and COMPONENTS EXCHANGE, LLC ("Components")** (collectively, **"Sellers"** and each, a **"Seller"**), on the other hand. Purchaser and the Sellers are referred to herein, collectively as the **"Parties"** and each, a **"Party."** Unless otherwise defined herein, capitalized terms contained herein shall have the meanings set forth in Article I hereof.

## RECITALS

A.    X-Treme is an Idaho corporation. X-Treme was in the business of manufacturing bullets, but has suspended such operations.

B.    ALW is an Idaho corporation. ALW is in the business of manufacturing ammoload machines and other machines for resale to third-party customers.

C.    Clearwater is an Idaho corporation. Clearwater is in the business of manufacturing bullets.

D.    Freedom is an Idaho limited liability company. Freedom is in the business of selling ammunition.

E.    Howell Machine is an Idaho corporation. Howell Machine is in the business of fabricating parts used to build the ammoload machines manufactured by ALW and to maintain the other machinery and equipment owned by the other Sellers.

F.    HMT is the parent company of X-Treme, Clearwater, ALW, Howell Machine and Freedom. While X-Treme, Clearwater, ALW, Howell Machine, Freedom and LCAC are legal entities separate from HMT, HMT and such Sellers have operated at all times on a consolidated basis.

G.    LCAC is an Idaho limited liability company. LCAC was in the business of manufacturing shell cases, but no longer conducts business operations. LCAC owns items of machinery and equipment.

H.    Components is an Idaho limited liability company. Components is in the business of manufacturing and assembling ammunition. Components manufactures and assembles ammunition for HMT and is paid for labor and overhead to perform such service.

I.    On June 8, 2018, each Seller filed in the United States Bankruptcy Court for the District of Nevada (**"Bankruptcy Court"**) a petition for relief under Chapter 11 of the United

States Bankruptcy Code ("**Bankruptcy Code**"). By order of the Bankruptcy Court, the Sellers' Chapter 11 cases have been jointly administered under lead case number 18-50609BTB.

> J.       In accordance with the provisions of sections 1107 and 1108 of the Bankruptcy Code, each Seller manages its assets and properties as a "debtor-in-possession" under the jurisdiction of the Bankruptcy Court. The Sellers' financial affairs are being managed by J. Michael Issa, the Sellers' Chief Restructuring Officer ("**CRO**").

> K.       Purchaser is an Idaho corporation. Purchaser has been formed for the purpose of acquiring the assets and properties of Sellers and then operating a business of producing and selling ammunition and components.

> L.       Pursuant to the provisions of sections 105, 363 and 365 of the Bankruptcy Code, Purchaser desires to purchase from Sellers, and Sellers desire to sell and to assign to Purchaser, all of Sellers' right, title and interest in and to the assets described in Section 2.1 of this Agreement, in accordance with the terms and conditions set forth herein ("**Transaction**").

> **NOW, THEREFORE**, in consideration of the foregoing Recitals and the mutual representations, warranties, covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the Parties, the Parties intending to be legally bound hereby agree as follows:

**AGREEMENT**

**ARTICLE I.**
**DEFINITIONS**

> 1.1     **Definitions**.   As used herein, the following terms shall have the following meanings:

> (a)       "**Accounts Receivable**" shall have the meaning set forth in Section 2.1(e) hereof.

> (b)       "**Additional Assigned Contract**" shall have the meaning set forth in Section 2.6(c) hereof.

> (c)       "**Advanced CFO Parties**" shall have the meaning set forth in Section 4.4(b) hereof.

> (d)       "**Agreement**" shall have the meaning set forth in the preamble hereof.

> (e)       "**Allocation**" shall have the meaning set forth in Section 11.2 hereof.

> (f)       "**Alternative Transaction**" means the approval by the Bankruptcy Court of a sale or sales of a material portion of the Purchased Assets to a Person (other than Purchaser) who is the Prevailing Bidder at an Auction.

DOCS 127753-000001/3730237.9

(g)      **"ALW"** shall have the meaning set forth in the preamble hereof.

(h)      **"Ancillary Document"** means any certificate, agreement, instrument or other document to be executed and delivered by a Party in connection with the Transactions contemplated by the Agreement.

(i)      **"Assigned Contracts"** shall have the meaning set forth in Section 2.1(c) hereof.

(j)      **"Assignment and Assumption Agreement"** shall have the meaning set forth in Section 4.2(b) hereof.

(k)      **"Assumed Liabilities"** shall have the meaning set forth in Section 2.3 hereof.

(l)      **"Auction"** means an auction of Sellers' assets, properties and interests, including the Purchased Assets, set pursuant to the terms and conditions of the Bidding Procedures Order.

(m)      **"Avoidance Claims"** shall have the meaning set forth in Section 2.2(l) hereof.

(n)      **"Bankruptcy Cases"** means, collectively, the Chapter 11 bankruptcy cases filed by Sellers on the Petition Date.

(o)      **"Bankruptcy Code"** shall have the meaning set forth in Recital I hereof.

(p)      **"Bankruptcy Court"** shall have the meaning set forth in Recital I hereof.

(q)      **"Bankruptcy Rules"** means the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules of the Bankruptcy Court.

(r)      **"Benefit Plan"** means (i) all "employee benefit plans" (as such term is defined in Section 3(3) of ERISA), including all employee benefit plans which are "pension plans" (as such term is defined in Section 3(2) of ERISA) and any other employee benefit arrangements or payroll practices (including severance pay, vacation pay, awards, salary continuation for disability, sick leave, death benefit, hospitalization, welfare benefit, group or individual health, dental, medical, life, insurance, fringe benefit, deferred compensation, profit sharing, retirement, retiree medical, supplemental retirement, bonus or other incentive compensation, stock purchase, equity-based, stock option, stock appreciation rights, restricted stock and phantom stock arrangements or policies), and (ii) all other employment, termination, bonus, severance, change in control, collective bargaining or other similar plans, programs, contracts, or arrangements (whether written or unwritten), in each case, maintained, contributed to, or required to be contributed to by a Seller or any affiliate of a Seller for the benefit of any current or former employee, director, officer or independent contractor of a Seller or under which a Seller or any affiliate of a Seller has any liability.

(s)      **"Bid Protections"** shall have the meaning set forth in Section 8.1 hereof.

(t)    **"Bidding Procedures Motion"** shall have the meaning set forth in Section 8.2(a) hereof.

(u)    **"Bidding Procedures Order"** means an order of the Bankruptcy Court approving the Bidding Procedures Motion, as such order may be amended or modified.

(v)    **"Big Canyon"** means Big Canyon Environmental, LLC.

(w)    **"Bill of Sale"** shall have the meaning set forth in Section 4.2(a) hereof.

(x)    **"Break-Up Fee"** shall have the meaning set forth in Section 8.1 hereof.

(y)    **"Business"** means, collectively, the businesses operated by Sellers, as described in Recitals A-H hereof.

(z)    **"Business Day"** means any day other than a Saturday, Sunday or a day when banking institutions are authorized by law to close in the State of Idaho.

(aa)    **"Cash and Cash Equivalents"** means all of Sellers' cash (including petty cash and checks received prior to the close of business on the Closing Date), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, security entitlements, securities accounts, commodity contracts, commodity accounts, government securities and any other cash equivalents, whether on hand, in transit, in banks or other financial institutions, or otherwise held.

(bb)    **"CERCLA"** means the Comprehensive Environmental Response,

Compensation, and Liability Act of 1980, as amended.

(cc)    **"Claim"** has the meaning given to that term in Section 101(5) of the Bankruptcy Code.

(dd)    **"Clearwater"** shall have the meaning set forth in the preamble hereof.

(ee)    **"Closing"** shall have the meaning set forth in Section 4.1 hereof.

(ff)    **"Closing Date"** means the date on which the Closing occurs.

(gg)    **"Code"** means the United States Internal Revenue Code of 1986, as the same may be amended from time to time.

(hh)    **"Committee"** shall have the meaning set forth in Section 2.1(v) hereof.

(ii)    **"Competing Bid"** shall have the meaning set forth in Section 8.2(b) hereof.

(jj)    **"Components"** shall have the meaning set forth in the preamble hereof.

(kk)    **"Credit Bid"** has the meaning set forth in Section 3.1(a) hereof.

DOCS 127753-000001/3730237.9

(ll)     **"CRO"** shall have the meaning set forth in the Recital J hereof.

(mm)     **"Cure Amounts"** shall have the meaning set forth in Section 2.4(q) hereof.

(nn)     **"Encumbrance"** means any liens, security interests, encumbrances, adverse rights, trusts, Claims, pledges, covenants, easements, restrictions, indentures, loan agreements, instruments, contracts, leases, licenses, options, rights of first refusal, rights of offset, rights of recovery, judgments, orders and decrees of any court or foreign or domestic Governmental Body, claims for reimbursement, contribution, indemnity or exoneration, assignment, debts, charges, suits, rights of recovery, interests, alter-ego, successor liability, tax and other liabilities (including probate liabilities), and causes of action, to the fullest extent of the law, in each case whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, or known or unknown, whether imposed by agreement, understanding, Law, equity or otherwise, or any other interest of any nature whatsoever of, on or with respect to any property or property interest.

(oo)     **"Environmental Law"** means each federal, state, local and foreign Law and regulation relating to pollution, protection or preservation of human health or the environment, including ambient air, surface water, ground water, land surface or subsurface strata, and natural resources, and including each Law and regulation relating to emissions, discharges, releases or threatened releases of Materials of Environmental Concern, or otherwise relating to the manufacturing, processing, distribution, use, treatment, generation, storage, containment (whether above ground or underground), disposal, transport or handling of Materials of Environmental Concern, or the preservation of the environment or mitigation of adverse effects thereon and each Law and regulation with regard to record keeping, notification, disclosure and reporting requirements respecting Materials of Environmental Concern.  As used above, the term "release" shall have the meaning set forth in CERCLA.

(pp)     **"Environmental Liability"** means all liabilities arising from any actual or threatened impairment, impact or damage to the environment, health or safety, or any actual or threatened failure to comply with Environmental Law, in connection with the ownership or operation by Sellers of the Business or the Purchased Assets prior to close of business on the Closing Date, including liabilities related to: (i) the transportation, storage, use, arrangement for disposal or disposal of hazardous materials; (ii) the release of hazardous materials, including migration onto or from the real properties where the Business is located; (iii) any other pollution or contamination of the surface, substrata, soil, air, ground water, surface water or marine environments; (iv) any other obligations imposed under Environmental Law including all applicable permits; (v) orders, notices to comply, notices of violation, alleged noncompliance and inspection reports; and (vi) all obligations with respect to personal injury, property damage, wrongful death and other damages and losses arising under applicable Law as a result of any of the matters identified in subsections (i)-(v) of this section.

(qq)     **"ERISA"** means the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time, and the regulations promulgated thereunder.

11

(rr)    **"Excluded Assets"** shall have the meaning set forth in <u>Section 2.2</u> hereof.

(ss)    **"Excluded Liabilities"** shall have the meaning set forth in <u>Section 2.4</u> hereof.

(tt)    **"Final Order"** shall mean an order of the Bankruptcy Court as to which the time for appeal shall have expired and as to which no appeal shall then be pending, or in the event that an appeal has been filed, such order shall have been affirmed by the highest court to which such order was appealed and the time to take any further appeal shall have expired.

(uu)    **"Freedom"** shall have the meaning set forth in the preamble hereof.

(vv)    **"Governmental Body"** means any government, quasi-governmental entity, or other governmental or regulatory body, agency or political subdivision thereof of any nature, whether foreign, federal, state or local, or any agency, branch, department, official, entity, instrumentality or authority thereof, or any court or arbitrator (public or private) of applicable jurisdiction.

(ww)    **"Government Taking"** shall have the meaning set forth in <u>Section 9.9</u> hereof.

(xx)    **"HMT"** shall have the meaning set forth in the preamble hereof.

(yy)    **"Howell Machine"** shall have the meaning set forth in the preamble hereof.

(zz)    **"Installment Payments"** shall have the meaning set forth in <u>Section 3.2(b)</u> hereof.

(aaa)    **"Intellectual Property"** means all intellectual property and proprietary rights of any kind, including the following: (i) trademarks, service marks, trade names, slogans, logos, designs, symbols, trade dress, internet domain names, uniform resource identifiers, rights in design, brand names, any fictitious names, d/b/a's or similar filings related thereto, or any variant of any of them, and other similar designations of source or origin, together with all goodwill, registrations and applications related to the foregoing; (ii) copyrights and copyrightable subject matter (including any registration and applications for any of the foregoing); (iii) trade secrets and other confidential or proprietary business information (including manufacturing and production processes and techniques, research and development information, technology, intangibles, drawings, specifications, designs, plans, proposals, technical data, financial, marketing and business data, pricing and cost information, business and marketing plans, customer and supplier lists and information), know how, proprietary processes, formulae, algorithms, models, industrial property rights, and methodologies; (iv) computer software, computer programs, and databases (whether in source code, object code or other form); and (v) all rights to sue for past, present and future infringement, misappropriation, dilution or other violation of any of the foregoing and all remedies at law or equity associated therewith.

(bbb)    **"Interim Operating Agreement"** shall have the meaning set forth in <u>Section 4.2(g)</u> hereof.

(ccc)    **"Inventory"** means all inventory (including finished goods, supplies, raw materials, work in progress, spare, replacement and component parts) related to the Business maintained or held by, stored by or on behalf of, or in transit to, any Seller.

(ddd)    **"IRS"** means the Internal Revenue Service.

(eee)    **"Knowledge"** means the actual knowledge of a natural person, or, with respect to a Person that is not a natural person, the actual knowledge of the officers or management of such Person.

(fff)    **"Law"** means any federal, state, local, municipal, foreign, international, multinational law or other law, statute, constitution, principle of common law, resolution, ordinance, code, edict, decree, rule, regulation, ruling or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body, including Environmental Laws.

(ggg)    **"LCAC"** shall have the meaning set forth in the preamble hereof.

(hhh)    **"Losses"** shall have the meaning set forth in Section 12.4 hereof.

(iii)    **"Material Adverse Effect"** means any event, change, occurrence or state of facts that is reasonably likely to have, individually or in the aggregate, from and after the Agreement Date a material adverse effect on the assets, Business, properties, financial condition or results of operations of Sellers, taken as a whole; provided, however, that in no event shall any of the following, alone or in combination, be deemed to constitute, or be taken into account, in determining whether there would be a Material Adverse Effect: (i) changes in the United States economy or capital markets in general but that do not have a disproportionate effect on Sellers relative to other participants in the industry in which Sellers conduct the Business; (ii) changes that affect generally the industry in which Sellers operate but that do not have a disproportionate effect on the Sellers relative to other participants in the industry in which the Sellers conduct their respective businesses; (iii) changes after the Agreement Date in any applicable Law; (iv) the commencement of the Bankruptcy Cases and the administration of the Bankruptcy Cases, including Sellers' inability to pay certain obligations as a result of the filing of the Bankruptcy Cases, provided that there is no material negative financial impact upon Sellers' Business from and after the Agreement Date; (v) any actions taken or proposed to be taken by Purchaser or any of its affiliates; (vi) Sellers' transfer and delivery to Purchaser on the Closing Date of an aggregate amount of at least $9,000,000 in gross Accounts Receivable (calculated without regard to collectability of Accounts Receivable) and in Inventory (calculated at cost without regard to saleability of Inventory); or (vii) any effect resulting from the public announcement of this Agreement, compliance with terms of this Agreement or the consummation of the Transactions contemplated by this Agreement. Notwithstanding the foregoing, a Government Taking shall, in any and all events, be deemed to constitute a "Material Adverse Effect" as defined hereunder and for all purposes of this Agreement, including Purchaser's right to terminate this Agreement.

(jjj)    **"Materials of Environmental Concern"** means pollutants, contaminants, or hazardous substances (as such terms are defined under CERCLA), pesticides (as such term is defined under the Federal Insecticide, Fungicide and Rodenticide Act), chemicals,

radioactive or toxic substances, materials and wastes, petroleum and petroleum products, asbestos and asbestos-containing materials, polychlorinated biphenyls, lead and lead-based paints and materials, and radon, or any other material (or article containing such material) listed or subject to regulation under any Law, Regulation, Order, permit, or directive due to its potential, directly or indirectly, to harm the environment or the health of humans or other living beings.

(kkk)    "**Mission Bank**" means Mission Bank, located at 1500 Palma Drive, Suite 211 Ventura, CA 93003.

(lll)    "**Note**" shall have the meaning set forth in <u>Section 3.2(b)</u> hereof.

(mmm)    "**Operating Approvals**" shall have the meaning set forth in <u>Section 4.2(g)</u> hereof.

(nnn)    "**Ordinary Course of Business**" means the ordinary and usual course of normal day-to-day operations of the Business consistent with past practice.

(ooo)    "**Organizational Documents**" means, with respect to a Party (i) if a corporation, the articles or certificate of incorporation and bylaws, (ii) if a limited liability company, the articles or certificate of organization or formation and any limited liability company or operating agreement, (iii) if another type of Person, all other charter and similar documents adopted or filed in connection with the creation, formation or organization of such Person, and (iv) all amendments or supplements to any of the foregoing.

(ppp)    "**Outside Back-Up Date**" shall have the meaning set forth in <u>Section 8.2(c)</u> hereof.

(qqq)    "**Outside Closing Date**" shall have the meaning set forth in <u>Section 4.4(g)</u> hereof.

(rrr)    "**Parties**" or "**Party**" shall have the meaning set forth in the preamble hereof.

(sss)    "**Permits**" shall have the meaning set forth in <u>Section 2.1(j)</u> hereof.

(ttt)    "**Permitted Encumbrances**" means each of the following Encumbrances: (i) Encumbrances for utilities and current Taxes not yet due and payable or being contested in good faith, but only to the extent set forth on <u>Schedule 1.1(ttt)</u> hereto; (ii) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the Purchased Assets which do not, individually or in the aggregate, adversely affect the operation of the Business and any use or occurrence of leased real property assigned to Purchaser hereunder or materially detract from the value of such leased real property; (iii) applicable zoning Laws, building codes, land use restrictions and other similar restrictions imposed by Law impacting Sellers' Business; (iv) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens incurred in the Ordinary Course of Business, but only to the extent set forth on <u>Schedule 1.1(ttt)</u> hereto; and (v) such other Encumbrances or title exceptions as Purchaser may approve in writing in its sole and absolute discretion.

(uuu)    **"Person"** means an individual, corporation, partnership, limited liability company, joint venture, association, trust or Governmental Body.

(vvv)    **"Petition Date"** means the date on which each Seller commenced its Bankruptcy Case by the filing of a Chapter 11 petition.

(www)    **"Pre-Petition Financing Obligations"** means all obligations and indebtedness owed under that certain Business Loan Agreement (Asset Based), dated as of May 22, 2014 (as amended, restated, supplemented or otherwise modified from time to time), among the "Borrower" and the "Lender," as such terms are defined in the Business Loan Agreement (Asset Based), and under the promissory notes, security agreements and other agreements, instruments and documents executed in connection therewith, in an aggregate amount in excess of $17,000,000.

(xxx)    **"Prevailing Bidder"** shall have the meaning set forth in Section 8.2(c) hereof.

(yyy)    **"Purchase Deposit"** shall have the meaning set forth in Section 3.2(a) hereof.

(zzz)    **"Purchase Price"** shall have the meaning set forth in Section 3.1 hereof.

(aaaa)   **"Purchased Assets"** shall have the meaning set forth in Section 2.1 hereof.

(bbbb)   **"Purchaser"** shall have the meaning set forth in the preamble hereof.

(cccc)   **"Purchaser Party Payables"** shall have the meaning set forth in Section 9.20 hereof.

(dddd)   **"Purchaser's Subordination Agreement"** shall have the meaning set forth in Section 3.2(e) hereof.

(eeee)   **"Representative"** of a Person means such Person's subsidiaries and the officers, directors, shareholders, managers, employees, advisors, representatives (including its legal counsel and its accountants) and agents and other representatives of such Person or its subsidiaries.

(ffff)   **"Sale Hearing"** means the hearing to approve this Agreement at which Sellers will seek entry of the Sale Order.

(gggg)   **"Sale Motion"** shall have the meaning set forth in Section 8.2(a) hereof.

(hhhh)   **"Sale Order"** shall have the meaning set forth in Section 8.3 hereof.

(iiii)   **"Security Agreement"** shall have the meaning set forth in Section 3.2(b) hereof.

DOCS 127753-000001/3730237.9

(jjjj)  "**Segregated Account Cash**" shall have the meaning set forth in Section 2.2(o) hereof.

(kkkk)  "**Sellers**" or "**Seller**" shall have the meaning set forth in the preamble hereof.

(llll)  "**Sellers' Subordination Agreement**" shall have the meaning set forth in Section 3.2(b) hereof.

(mmmm)  "**Settlement Agreements**" shall have the meaning set forth in Section 10.3(b) hereof.

(nnnn)  "**Settlement Motion**" shall have the meaning set forth in Section 9.15 hereof.

(oooo)  "**Settlement Order**" shall have the meaning set forth in Section 9.15 hereof.

(pppp)  "**Tax**" mean any and all federal, state, provincial, local, foreign or other taxes including income, gross receipts, sales, value added, use, production, ad valorem, transfer, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, capital, production, recapture, net worth, surplus, customs, duties, levies, surtaxes or other taxes, fees, assessments, reassessments or charges of any kind whatsoever, together with any interest, additions, installments or penalties with respect thereto and any interest in respect of such additions or penalties.

(qqqq)  "**Transaction**" shall have the meaning set forth in Recital L hereof.

(rrrr)  "**Transferred Employee**" means an employee of a Seller as of the Closing Date who is employed by Purchaser after the Closing Date.

(ssss)  "**TTB**" means the Department of the Treasury Alcohol and Tobacco Tax and Trade Bureau.

(tttt)  "**TTB Adversary Action**" means Adversary Case No. 18-05010 by Zions against HMT and the TTB.

(uuuu)  "**TTB Claim**" means Proof of Claim No. 52 filed by the TTB in the HMT Bankruptcy, Case No. 18-50609 on December 3, 2018.

(vvvv)  "**TTB Claim Objection**" shall have the meaning set forth in Section 9.21 hereof.

(wwww)"**TTB Levied Funds**" means approximately $832,000 in funds on deposit in an account of HMT at Zions that the TTB claims to have a valid and enforceable competing

claim and lien senior to the Pre-Petition Financing Obligations, and that the TTB levied on or about June 4, 2018.

(xxxx)    **"Twin River"** means Twin River Contract Loading, Inc., an affiliate of HMT.

(yyyy)    **"Twin River/Big Canyon Foreclosure"** shall have the meaning set forth in Section 9.14 hereof.

(zzzz)    **"WARN Act"** means the United States Worker Adjustment and Retraining Notification Act, as the same may be amended from time to time, and the rules and regulations promulgated thereunder.

(aaaaa)    **"X-Treme"** shall have the meaning set forth in the preamble hereof.

(bbbbb)    **"Zions"** shall have the meaning set forth in Section 9.15 hereof.

(ccccc)    **"Zions Note Purchase Agreement"** means that certain Loan Sale Agreement dated August 6, 2019, between Zions and Purchaser, by which Zions will sell, assign and convey to Purchaser, and Purchaser will acquire from Zions, the Pre-Petition Financing Obligations and all Encumbrances related thereto.

1.2    **Interpretations**.  Unless otherwise indicated herein to the contrary:

(a)    When a reference is made in this Agreement to an Article, Section or Schedule, such reference shall be to an Article, Section or Schedule of this Agreement.

(b)    The words "include," "includes" or "including" and other words or phrases of similar import, when used in this Agreement, shall be deemed to be followed by the words "without limitation."

(c)    The words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement.

(d)    The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms.  Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of names and pronouns shall include the plural and vice versa.

(e)    All terms defined in this Agreement have their defined meanings set forth herein when used in any document made or delivered pursuant hereto, unless otherwise defined therein.

(f)    References to any statute shall be deemed to refer to such statute as amended from time to time and to any rules or regulations promulgated thereunder.  References to any contract, including this Agreement, are to that contract as amended, modified or supplemented from time to time in accordance with the terms hereof and thereof, as applicable.  References

DOCS 127753-000001/3730237.9

herein to a Person are also to its successors and permitted assigns.  Any reference herein to a Governmental Body shall be deemed to include reference to any successor thereto.  References from or through any date means, unless otherwise specified, from and including or through and including such date, respectively.

**ARTICLE II.**
**PURCHASE AND SALE OF THE PURCHASED ASSETS;**
**ASSUMPTION OF ASSUMED LIABILITIES**

2.1    **Purchase and Sale of the Purchased Assets**.  Pursuant to sections 105, 363 and 365 of the Bankruptcy Code and on the terms and subject to the conditions set forth herein (including Article X hereof), on the Closing, Sellers shall sell, transfer, assign, convey and deliver to Purchaser, and Purchaser shall purchase, acquire and accept from Sellers, all of Sellers' right, title and interest in, to and with respect to all assets of each Seller free and clear of all liens or Encumbrances (other than Permitted Encumbrances), including all claims based on any theory that Purchaser is a successor, transferee or continuation of Sellers or the Business, including the following, but excluding the Excluded Assets (collectively, **"Purchased Assets"**), as of the Closing:

(a)    all of Sellers' properties, rights, and assets of every kind and description, wherever situated or located, real, personal or mixed, tangible or intangible, contingent, owned, leased, or licensed, whether reflected on the books and records of Sellers, as the same exist as of the date of execution of this Agreement and shall exist in all material respects on the Closing Date;

(b)    **[Intentionally Omitted.]**

(c)    to the extent assignable pursuant to Section 365 of the Bankruptcy Code, all rights under those executory contracts and unexpired leases listed on Schedule 2.1(c) hereof (**"Assigned Contracts"**) or as otherwise designated as an Additional Assigned Contract; provided that Purchaser shall have the right upon written notice given to Sellers at any time prior to the Closing to designate any Assigned Contract as an Excluded Asset, whereupon any Assigned Contract so designated shall conclusively be deemed an Excluded Asset for all purposes hereof and Sellers shall not be required to assume and assign such Assigned Contract, and Purchaser shall not be obligated to accept or assume such Assigned Contract or to bear or pay any Cure Amount associated therewith.

(d)    all rights to pre-paid expenses and all similar assets or properties of Sellers, attributable to or based upon the period through the Closing Date;

(e)    to the extent related to the Business, all trade and non-trade accounts receivable, notes receivable and negotiable instruments of Sellers (**"Accounts Receivable"**);

(f)    all documents relating to the Purchased Assets or Assumed Liabilities, including customer and supplier lists; provided, however, that Sellers shall have the right to retain copies thereof at Sellers' expense except as restricted under Law;

(g)     all tangible and intangible assets of Sellers including all passwords, keys, administrative and technical account access, website or Internet domain names and social media accounts;

(h)     any chattel paper owned or held by Sellers relating to the Business or the Purchased Assets;

(i)     any electronic, financial account or lock/safety-deposit boxes to which account debtors of the Sellers remit payment relating to the Business or the Purchased Assets, to the extent transferable;

(j)     all city, county, state, federal or other Governmental Body permits ("**Permits**"), licenses or certifications relating to the Business or the Purchased Assets, and all pending applications therefor, to the extent transferrable under applicable Law;

(k)     to the extent transferrable, all express or implied warranties, indemnities, and guarantees against third parties relating to the Purchased Assets (including, for the avoidance of doubt, those arising under, or otherwise relating to, the Assigned Contracts) or Assumed Liabilities, including rights under vendors' and manufacturers' warranties, indemnities, and guarantees;

(l)     all of the Intellectual Property, including all of Sellers' accrued, unaccrued, existing or contingent claims and causes of action as of the date of execution of this Agreement against any Persons related to Intellectual Property, regardless of whether such claims and causes of action have been asserted by Sellers (including any claims for infringement of Intellectual Property owned by Sellers);

(m)     all general intangible assets and rights of Sellers, including all goodwill;

(n)     all Inventory, wherever located and whether obsolete or carried on the Sellers' books of account, in each case with any transferable warranty and service rights of the applicable Seller with respect to such Purchased Assets to the extent owned by or in any way benefitting Sellers;

(o)     Sellers' books and records and other documents, and without limiting the foregoing, each of the following: financial, accounting and other books and records, correspondence, and all customer sales, marketing, advertising, packaging and promotional materials, files, data, software (whether written, recorded or stored on disk, film, tape or other media, and including all computerized data), drawings, engineering and manufacturing data and other technical information and data, and all other business and other records; provided, however, that Sellers shall have the right to retain copies of all of the foregoing at Sellers' expense;

(p)     to the extent transferable and solely to the extent included as an Assigned Contract or otherwise designated as an Additional Assigned Contract, all rights and obligations under or arising out of all insurance policies relating to the Business or any of the Purchased Assets or Assumed Liabilities (if not transferrable, all of Sellers' right, title and interest to indemnification and/or defense shall be assigned to Purchaser), except only for any refunds or rebates owed to Sellers thereunder;

(q)     all fixed assets and other personal property and interests related to the Business or Purchased Assets, wherever located, including all vehicles, tools, parts and supplies, fuel, machinery, equipment, furniture, furnishings, appliances, fixtures, office equipment and supplies, computer hardware and related documentation, stored data, communication equipment, trade fixtures and leasehold improvements, in each case with any freely transferable warranty and service rights of the applicable Seller with respect to such Purchased Assets;

(r)     to the extent owned by Sellers, all telephone numbers, fax numbers and email addresses of the Sellers;

(s)     all software related to the Business that is owned by Sellers;

(t)     to the extent transferable, all records (personnel or other) of any of Sellers' employees, contractors and/or agents;

(u)     the Segregated Account Cash; and

(v)     copies of Sellers' cancelled checks (provided, however, that Purchaser shall make copies of such checks available to the Official Committee of Unsecured Creditors ("**Committee**"), or any post-confirmation trustee or agent appointed in the Bankruptcy Cases, for purposes of evaluating and prosecuting avoidance claims and causes of action excluded from the sale under Section 2.2(l)).

2.2     **Excluded Assets**.  Notwithstanding anything to the contrary in this Agreement (including any provision of Section 2.1 hereof), in no event shall Sellers be deemed to sell, transfer, assign or convey, and Sellers shall retain all right, title and interest to, in and with respect of the following assets, properties, interests and rights of Sellers (collectively, "**Excluded Assets**"):

(a)     any asset of Sellers that otherwise would constitute a Purchased Asset but for the fact that it is sold or otherwise disposed of in the Ordinary Course of Business of Sellers and in conformity with the terms and conditions of this Agreement, including the sale of Inventory by a Seller in the Ordinary Course of Business, during the time from the Agreement Date until the Closing Date, or Purchaser otherwise agrees in writing to such disposition in Purchaser's sole and absolute discretion;

(b)     copies of any and all information not relating to the Business that is stored on Sellers' computer systems, data networks or servers;

(c)     all executory contracts, unexpired leases and other agreements of Sellers other than the Assigned Contracts;

(d)     all personnel records of Sellers' employees and related documents that Sellers are required by Law to retain and are prohibited by Law from providing a copy thereof to Purchaser;

(e)     Sellers' Organizational Documents, corporate charter, minute and stock record books, and corporate seal;

(f)     all shares of capital stock or other equity interests issued by Sellers or securities convertible into, exchangeable or exercisable for any such shares of capital stock or other equity interests;

(g)     all rights to insurance or tax or assessment refunds or rebates, and all similar assets or properties of Sellers, attributable to or based upon the period through the Closing Date, and any claims for such refunds, rebates, or similar payments;

(h)     all Permits and governmental licenses, rights, registrations, variances, waivers, consents, authorizations, approvals, contracts or agreements which (i) require the consent of any party other than a Seller for the transfer or assignment thereof to Purchaser, and (ii) the Bankruptcy Court does not authorize Sellers to transfer or to assign to Purchaser;

(i)     any warranty, indemnity, guaranty, right of set-off, right of contribution, right of recoupment, counter claim, cross-claim, defense or similar claim or cause of action, solely to the extent relating to or attributable to an Excluded Asset or Excluded Liability, whether or not such claim or cause of action is the subject of an action pending as of the Closing Date;

(j)     all insurance policies of Sellers, to the extent insuring any Excluded Asset or Excluded Liability, and all rights, claims, refunds, recoveries, payments from or proceeds of insurance policies relating to any Excluded Asset of Excluded Liability;

(k)     any directors' and officers' insurance policies of Sellers and all rights, claims, refunds, recoveries, payments from or proceeds thereof, including any such claims against David C. Howell;

(l)     all preference, fraudulent transfer, or other avoidance claims and causes of action of any Seller under the Bankruptcy Code, including all such claims and causes of actions arising under sections 510, 544, 545, 547, 548, 549 and/or 550 of the Bankruptcy Code, or based upon applicable non-bankruptcy law, and any similar claim or cause of action to recover property on behalf of the bankruptcy estate of a Seller, or to avoid an Encumbrance or transfer (collectively, "**Avoidance Claims**"). For the avoidance of doubt, the Avoidance Claims do not include any such claims or causes of action of any kind or nature involving or against the Purchaser or Zions, all of which, to the extent any existed, shall have been released and waived by Sellers in connection with Settlement Agreements among the Purchaser and Sellers and among Zions and Sellers;

(m)     any asset or property that otherwise would be a Purchased Asset that Purchaser elects specifically not to acquire from Sellers as set forth in Schedule 2.2 (m) hereof;

(n)     all Benefit Plans (including all assets, trusts, insurance policies and administration service contracts related thereto);

(o)     all Cash and Cash Equivalents plus any proceeds, products or issues of any Excluded Asset, including any recoveries received by a Seller on account of an Avoidance Claim, as referenced in Section 2.2(l) hereof, provided, however, that all Cash on deposit in a segregated account (account no. 979309242 at Zions), constituting rent payments made by Sellers and subject to an assignment of rents claim asserted by Zions (in the amount of approximately

$172,123 as of the Agreement Date) (the **"Segregated Account Cash"**), shall not be deemed to be an Excluded Asset but shall be a Purchased Asset to be conveyed to Purchaser at the Closing;

        (p)     the TTB Levied Funds; and

        (q)     Sellers' rights under this Agreement, including the Purchase Price payable hereunder, and under any Ancillary Document, or any other agreement between Sellers and Purchaser entered into on or after the Agreement Date.

        2.3    **Assumption of Liabilities**.  On the terms and subject to the conditions set forth in this Agreement, effective as of the Closing, Purchaser shall assume from Sellers (and pay, perform, discharge or otherwise satisfy in accordance with their respective terms), and the Sellers shall irrevocably convey, transfer, delegate and assign to Purchaser, the following liabilities and only the following liabilities (other than the Excluded Liabilities, collectively, the **"Assumed Liabilities"**):

        (a)     all liabilities arising from the ownership or use of the Purchased Assets (including the Assigned Contracts), relating solely to periods occurring after the Closing, and excluding any liabilities to the extent relating to Sellers' ownership or use of the Purchased Assets prior to the Closing or relating to any services that were sold or provided by Sellers prior to the Closing Date;

        (b)     open purchase orders, for which the Account Receivable related thereto has not been collected by Sellers, arising out of the conduct of the Business solely to the extent set forth on Schedule 2.3(b).  Schedule 2.3(b) shall be provided to Purchaser no later than three (3) Business Days prior to the Closing and an updated Schedule 2.3(b) showing open purchase orders as of the Closing Date shall be provided to Purchaser within seven (7) Business Days after the Closing Date;

        (c)     all liabilities relating to, or in respect of vacation days, sick days or other paid time-off, that is earned or accrued by, or with respect to, Transferred Employees as of the Closing Date (such liabilities, as of the Agreement Date, are solely to the extent set forth in Schedule 2.3(c) hereof);

        (d)     subject to Purchaser's right to exclude Assigned Contracts from the Purchased Assets as provided in Section 2.1(c) above, all Cure Amounts under the Assigned Contracts, solely to the extent such Cure Amounts are set forth in Schedule 2.1(c) hereof; provided that any excess of the actual Cure Amounts under the Assigned Contracts over the amounts set forth in Schedule 2.1(c) shall conclusively be deemed Excluded Liabilities hereunder as provided in Sections 2.4(o) and (q) below and shall be paid by Sellers to the relevant third parties concurrently with the assignment of such Assigned Contracts to Purchaser at the Closing.

        The assumption by Purchaser of the Assumed Liabilities shall not, in any way, enlarge the rights of any third parties relating thereto.

        2.4    **Excluded Liabilities**.  Notwithstanding any provision in this Agreement to the contrary, Purchaser is assuming only the Assumed Liabilities and is not assuming, and shall not be deemed to have assumed, any other liabilities of Sellers of whatever nature (whether arising

prior to, at the time of, or subsequent to Closing), whether absolute, accrued, contingent or otherwise, whether due or to become due, and whether known or unknown or currently existing or hereafter arising or matured or unmatured, direct or indirect, and, except for the Assumed Liabilities, Sellers shall be solely and exclusively liable for any and all such liabilities, including those relating to, arising out of or in connection with the operation of the Business or use and ownership of the Purchased Assets at any time prior to the Closing Date, including those liabilities of Sellers set forth below (collectively, "**Excluded Liabilities**"):

(a)    liabilities under any contract, including any Assigned Contract or Additional Assigned Contract other than the Cure Amounts solely to the extent set forth in Schedule 2.1(c) hereof, to the extent such liabilities arise as a result of a breach or violation of, or other default under, such contract occurring prior to, as of, or as a result of the Closing;

(b)    all liabilities relating to or otherwise arising, whether before, on or after the Closing, out of, or in connection with, any of the Excluded Assets;

(c)    all accounts payable (except to the extent an Assumed Liability pursuant to Section 2.3 hereof);

(d)    any and all liabilities with respect to borrowed money;

(e)    all guarantees of third party obligations and reimbursement obligations to guarantors of Sellers' obligations or under letters of credit;

(f)    any and all liabilities in respect of contracts, leases or other agreements that are not Assigned Contracts;

(g)    except as set forth expressly to the contrary in Section 2.3(c) hereof, all liabilities with respect to compensation, severance or benefits of any nature owed to any current or former employee, officer, director, member, partner or independent contractor of a Seller or any affiliate of a Seller (or any beneficiary or dependent of any such individual), whether employed by Purchaser or any of its affiliates after the Closing, or any other employee, including Transferred Employee Claim(s), that arises out of or relates to events or conditions occurring on or before the Closing Date;

(h)    drafts or checks outstanding at the Closing (except to the extent an Assumed Liability pursuant to Section 2.3 hereof);

(i)    all liabilities for fees, costs and expenses that have been incurred or that are incurred or owed by Sellers in connection with this Agreement or the administration of the Bankruptcy Cases (including all fees and expenses of professionals engaged by Sellers and the Committee or any other statutory committee appointed in the Bankruptcy Cases) and administrative expenses and priority claims accrued through the Closing Date and post-closing administrative wind-down expenses of the bankrupt estates pursuant to the Bankruptcy Code and all costs and expenses incurred in connection therewith, including (i) the negotiation, execution and consummation of the Transactions contemplated under this Agreement and each of the Ancillary Documents, (ii) the preparation and submission of any filing or notice required to be made or given in connection with any of the Transactions contemplated by this Agreement, and

the obtaining of any consent required to be obtained in connection with any of such Transactions; and (iii) the consummation of the Transactions contemplated by this Agreement, including any retention bonuses, "success" fees, change of control payments and any other payment obligations of Sellers payable as a result of the consummation of the Transactions contemplated by this Agreement and the Ancillary Documents;

(j)    all liabilities related to the WARN Act, to the extent applicable, with respect to separation of employment of any employees of Sellers prior to or on the Closing Date;

(k)    all liabilities of any Seller to its directors with respect to director and/or other board fees and/or reimbursable expenses pursuant to such Seller's Organizational Documents or applicable Law;

(l)    all liabilities of any Seller to its equity holders respecting dividends, distributions in liquidation, redemptions of interests, option payments or otherwise;

(m)    all liabilities arising out of or relating to any business or property formerly owned or operated by Sellers, any affiliate of Seller or predecessor thereof, but not presently owned and operated by Sellers;

(n)    all liabilities relating to claims, actions, suits, arbitrations, litigation matters, proceedings or investigations (in each case whether involving private Persons, Governmental Bodies or otherwise) involving, against, or affecting any Purchased Asset, the Business, Sellers, or any assets or properties of Sellers, whether commenced, filed, initiated, or threatened before or after the Closing, provided that such claim, action, suit, arbitration, litigation matter, proceeding or investigation relates to facts, events, or circumstances arising or occurring before the Closing;

(o)    except for Cure Amounts and any other liability under an Assigned Contract or other Assumed Liability, all obligations of Sellers arising and to be performed prior to the Closing Date arising from or related to the Business or the Purchased Assets;

(p)    all Environmental Liabilities;

(q)    all liabilities and obligations of a Seller under an Assigned Contract as of the Closing Date, including any and all cure amounts required to be paid pursuant to Section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contract ("**Cure Amounts**"); provided, however, that Purchaser shall be obligated to pay, and shall pay at the Closing, the Cure Amounts set forth in Schedule 2.1(c) hereof;

(r)    all liabilities of Sellers or their predecessors arising out of any contract, agreement, Permit, or lease that is not transferred to Purchaser as part of the Purchased Assets or, is not transferred to Purchaser because of any failure to obtain any consent required for such transfer;

(s)    except only to the extent listed as a Permitted Encumbrance as set forth on Schedule 1.1(ttt), any and all liabilities of Sellers for any Taxes, any Taxes attributable to the Purchased Assets or the operation of the Business for any period prior to the Closing Date; and

      (t)      any claims or liabilities not expressly acknowledged and accepted as an Assumed Liability as set forth herein.

    2.5    **Post-Closing Liabilities**.  Purchaser acknowledges that Purchaser shall be responsible for all Assumed Liabilities and, except for the Excluded Liabilities, for all liabilities and obligations first arising after the Closing and relating to Purchaser's ownership or use of, or right to use, the Purchased Assets after the Closing Date, including, without limitation, all Taxes arising out of or related to the Purchased Assets or the operation or conduct of the Business acquired pursuant to this Agreement for all Tax periods beginning on or after the Closing Date.

    2.6    **Assumption/Rejection of Certain Contracts**.

      (a)      On the Closing Date, Sellers shall assume, and shall assign to Purchaser the Assigned Contracts.

      (b)      Schedule 2.1(c) identifies the Assigned Contracts. Up to thirty (30) days prior to the first date set for the Sale Hearing, Purchaser may, in its sole discretion, add any contract, lease or other agreement as an Assigned Contract to be assumed and assigned to Purchaser on the Closing Date by amending Schedule 2.1(c), and Sellers shall file in the Bankruptcy Court a motion to assume and assign to Purchaser any such Assigned Contract and at the Closing shall assume and assign to, and Purchaser shall accept the assignment of and assume, such Assigned Contract. In advance of the third Business Day prior to the Auction, Purchaser may, in its sole discretion, designate a contract, lease or other agreement for removal from Schedule 2.1(c) by amending Schedule 2.1(c) by delivering written notice thereof to Sellers; in connection with the Closing, the applicable Seller may move to reject any such contract, lease or other agreement as of the Closing Date; provided, however, that Purchaser shall not designate for removal any "Real Property Lease" identified on Schedule 2.1(c).

      (c)      Within thirty (30) days after the Closing Date, with respect to any contract, lease or other agreement that was neither an Assigned Contract nor rejected by a Seller ("**Additional Assigned Contract**"), Purchaser may, in its sole discretion, designate such Additional Assigned Contract as an Assigned Contract by providing written notice to Sellers, specifying the Additional Assigned Contract to be assumed by Sellers and assigned to Purchaser. Within ten (10) days after the delivery of any such notice by Purchaser, the applicable Seller shall file in the Bankruptcy Court a motion to assign such Additional Assigned Contract to Purchaser, and such Seller shall use its commercially reasonable efforts to assume and assign to Purchaser such Additional Assigned Contract in accordance with the requirements of the Bankruptcy Code and Bankruptcy Rules. Sellers hereby provide no warranty of any nature whatsoever regarding whether the Bankruptcy Court will enter an order authorizing the assumption and assignment to Purchaser of any such Additional Assigned Contract. If the Bankruptcy Court authorizes a Seller to assume and assign to Purchaser an Additional Assigned Contract, Purchaser shall accept the assignment of such Additional Assigned Contract and assume any and all liabilities and obligations arising thereunder after the Closing Date and pay any and all Cure Amounts associated with the assumption and assignment thereof. In the event that Purchaser does not provide within thirty (30) days after the Closing Date a written notice to Sellers to add an Additional Assigned Contract, any right that Purchaser may have to designate any contract, lease or agreement as an Additional Assigned Contract automatically shall terminate, and no Seller shall have any obligation to assign

any such additional contract, lease or other agreement to Purchaser hereunder. Sellers shall have the absolute and unconditional right to reject, as of the Closing Date, any contract, lease or other agreement that is not designated timely an Assigned Contract under Schedule 2.1(c) hereof.

(d)    Pursuant to the Sale Motion (or as necessary in one or more separate motions), Sellers shall request that, by virtue of Sellers' providing not less than fourteen (14) days' prior notice of their intent to assume and assign any Assigned Contract, the Bankruptcy Court deem any nondebtor party to such Assigned Contract that does not file an objection with the Bankruptcy Court during such notice period to have given any required consent to the assumption of such Assigned Contract by the applicable Seller and assignment thereof to Purchaser.

(e)    Sellers shall use their commercially reasonable efforts to obtain from the Bankruptcy Court an order authorizing Sellers to assign the Assigned Contracts to Purchaser on the terms set forth in this Section 2.6. To the extent that any consent that is required to assign to Purchaser any Assigned Contract is not obtained as of the Closing, upon the written request of Purchaser, Sellers shall use, with respect to each such Assigned Contract, from and after the Closing and for a period not to exceed sixty (60) days after the Closing, commercially reasonable efforts to cooperate in any reasonable and lawful arrangement designed to provide to Purchaser the benefits under such Assigned Contract, provided that Sellers shall not be required to incur any material expense or cost with respect thereto. Purchaser shall reasonably cooperate with Sellers in order to enable Sellers to provide to Purchaser the benefits contemplated by this Section 2.6(e).

(f)    Notwithstanding the foregoing, a contract, lease or other agreement shall not be an Assigned Contract hereunder and shall not be assigned to, or assumed by, Purchaser to the extent that (i) such contract requires a consent of any Governmental Body or other third party (other than, and in addition to, that of the Bankruptcy Court) in order to permit the transfer to Purchaser of Sellers' rights under such contract, lease or other agreement and no such consent has been obtained prior to the Closing, and (ii) the Bankruptcy Court does not approve the assumption and assignment of such contract, lease or other agreement. In addition, a Permit shall not be assigned to, or assumed by, Purchaser to the extent that such Permit requires a consent of any Governmental Body or other third party (other than, and in addition to, that of the Bankruptcy Court) in order to permit the transfer to Purchaser of Sellers' rights under such Permit, and no such consent has been obtained prior to the Closing.

## ARTICLE III.
## CONSIDERATION

3.1    **Consideration**. Subject to the provisions of Section 3.2 hereof, the purchase price to be paid by Purchaser for the Purchased Assets (collectively, the **"Purchase Price"**) shall be:

(a)    $8,800,000, which shall be satisfied in the form of a credit bid of Purchaser (the **"Credit Bid"**), pursuant to such Credit Bid rights of Purchaser approved pursuant to the Settlement Order, of such amount of the Pre-Petition Financing Obligations outstanding as of the Closing Date, or such greater amount of the Pre-Petition Financing Obligations at Auction to be determined by Purchaser in the exercise of its sole and absolute discretion, in accordance with Section 363(k) of the Bankruptcy Code;

    (b)    $3,000,000, payable pursuant to the provisions of Section 3.2 hereof;

    (c)    in accordance with the provisions of Section 3.2(e) hereof, a release, termination or extinguishment of any Encumbrance that Purchaser may have with regard to any Excluded Asset (including the TTB Levied Funds), as a result of any acquisition by Purchaser of the Pre-Petition Financing Obligations and related Encumbrances pursuant to the Zions Note Purchase Agreement, such that Sellers may retain such Excluded Asset free and clear of any such Encumbrance of Purchaser as of the Closing; and

    (d)    the assumption by Purchaser of the Assumed Liabilities.

    3.2    **Payment of Purchase Price**.  Subject to the provisions of Section 3.2(e) hereof, in addition to Purchaser's Credit Bid as set forth in Section 3.1(a) and assumption of the Assumed Liabilities as set forth in Section 3.1(d) hereof, Purchaser shall pay the cash portion of the Purchase Price to be paid hereunder to Sellers as follows:

    (a)    On the Agreement Date, Purchaser shall pay to Sellers a cash deposit in the amount of $125,000 ("**Purchase Deposit**").  The Purchase Deposit shall be held in the trust account of Sellers' general insolvency counsel, Winthrop Couchot Golubow Hollander, LLP, pending the Closing Date and, prior to any Closing, shall be disbursed only in accordance with the terms and conditions of this Agreement, either with the written consent of Purchaser or upon the entry of an order of the Bankruptcy Court authorizing the disposition thereof.  At the Closing, the Purchase Deposit shall be distributed to Sellers.

    (b)    At the Closing, Purchaser shall execute in favor of, or for the benefit of, Sellers a promissory note ("**Note**") in the original principal amount of $2,875,000.  The Note shall provide for installment payments ("**Installment Payments**") each in the amount of $179,687.50, commencing, and payable on, the first day of the ninth (9th) full calendar month following the Closing and continuing on a quarterly basis, and payable on, the first day of each third full calendar month thereafter for a total of sixteen (16) Installment Payments.  The Note shall accrue interest at the rate of five percent (5%) per annum, but the interest charges shall be waived and forgiven by Sellers if each Installment Payment is paid timely by Purchaser.  The Note shall be secured by a duly perfected, binding and enforceable second-priority blanket lien encumbering all Purchased Assets and all replacements, proceeds and issues thereof, in accordance with the terms and conditions of a Security Agreement ("**Security Agreement**"), on terms and conditions acceptable to Sellers which acceptance shall not be unreasonably withheld by Sellers, and subordinated to a first-priority blanket lien encumbering all Purchased Assets and all replacements, proceeds and issues thereof in favor of Mission Bank, in accordance with the terms and conditions of a subordination agreement by and between Sellers and Mission Bank (the "**Sellers' Subordination Agreement**").  Purchaser acknowledges and agrees, for and on behalf of itself and its affiliates, that in the event Purchaser, either directly or indirectly through one or more of its affiliates, acquires the first-priority lien position of Mission Bank encumbering the Purchased Assets (and any replacements, proceeds and issues thereof), Purchaser or such acquiring affiliate(s) shall not foreclose on the Purchased Assets (or any replacements, proceeds and issues thereof) unless and until the Note payable to Sellers has been satisfied in full.

(c)     At the Closing, Purchaser shall release, terminate or extinguish any Encumbrances that Purchaser may have with regard to any Excluded Asset, including the TTB Levied Funds. The TTB Levied Funds may then be disbursed to and paid to Sellers, in Cash by wire transfer of immediately available funds, to an account and in a manner to be designated by Sellers in their sole and absolute discretion, subject only to any valid and enforceable competing claim of the TTB senior to the Pre-Petition Financing.

(d)     The Purchase Deposit, all Installment Payments, and any and all other payments to be made by Purchaser to or for the benefit of Sellers hereunder, shall be paid to Sellers by wire transfer of immediately available funds, to an account and in a manner to be designated by Sellers in the exercise of their sole and absolute discretion.

(e)     Assuming Purchaser is the Prevailing Bidder at the Auction and has at least $3,000,000 in Pre-Petition Financing Obligations remaining to subordinate (following the reconveyance, release and/or extinguishment of any Encumbrances that Purchaser may have with regard to any Excluded Asset, as contemplated below), then, in accordance with a comprehensive resolution of the claims asserted against Sellers by Zions pursuant to the Settlement Agreement between Sellers and Zions contemplated by this Agreement, Purchaser's acquisition from Zions of the Pre-Petition Financing Obligations and related Encumbrances pursuant to the Zions Note Purchase Agreement, the acknowledgment pursuant to the Settlement Agreement between Sellers and Purchaser contemplated by this Agreement of Purchaser's right to Credit Bid any or all of the amount of the Pre-Petition Financing Obligations that Purchaser may acquire from Zions pursuant to the Zions Note Purchase Agreement that may be outstanding as of the Closing Date, and without waiving or otherwise limiting Purchaser's rights as against the assets, properties and interests of Twin River and Big Canyon, including but not limited to the Twin River/Big Canyon Foreclosure, and in furtherance of the Transaction contemplated by this Agreement, Purchaser shall subordinate for the benefit of designated creditors of Sellers, amounts of the Pre-Petition Financing Obligations in excess of the any Credit Bid made by Purchaser in order to effectuate the payments that Purchaser will make to or for the benefit of Sellers pursuant to this Agreement, and shall reconvey, release and extinguish any Encumbrances that Purchaser may have with regard to any Excluded Asset, for the benefit of designated creditors of Sellers, strictly pursuant to a subordination agreement ("**Purchaser's Subordination Agreement**") on terms and conditions mutually acceptable to Sellers and Purchaser. The Purchaser's Subordination Agreement shall provide, in part, as follows:

(i)     Purchaser shall subordinate from the Pre-Petition Financing Obligations and related Encumbrances, amounts required to pay all Installment Payments and any and all other payments to be made hereunder by Purchaser to Sellers or designated creditors of Sellers, in accordance with the terms and conditions of the Purchaser's Subordination Agreement.

(ii)     As of the Closing Date, Purchaser shall reconvey, release and extinguish any Encumbrance that Purchaser may have with regard to any Excluded Asset (including with regard to the TTB Levied Funds), in accordance with the terms and conditions of this Agreement and Purchaser's Subordination Agreement.

(iii)    As of the Closing Date and subject to Purchaser's rights as against the assets, properties and interests of Twin River and Big Canyon, including but not limited to the Twin River/Big Canyon Foreclosure, Purchaser shall subordinate, in favor of designated creditors of Sellers, any balance of the Pre-Petition Financing Obligations remaining after Purchaser's Credit Bid made at Auction pursuant to Section 3.1 of this Agreement, in accordance with the terms and conditions of the Purchaser's Subordination Agreement.

Sellers shall submit to the Bankruptcy Court a copy of the Purchaser's Subordination Agreement in connection with the filing and service of the Sale Motion.

## ARTICLE IV.
## CLOSING AND TERMINATION

4.1    **Closing**. The closing of the purchase and sale of the Purchased Assets, the payment of the Purchase Price (including the satisfaction thereof in part through application of the Credit Bid), the assumption of the Assumed Liabilities and the consummation of the other Transactions contemplated by this Agreement (the "**Closing**") shall occur within two (2) Business Days following the satisfaction or waiver of all conditions set forth in Article X of this Agreement (other than those conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions). The Closing shall take place at the office of Winthrop Couchot Golubow Hollander, LLP, or at such other place or in such other manner as the Parties may agree. Unless otherwise agreed by the Parties in writing, the Closing shall be deemed effective and all right, title and interest of each of the Sellers in the Purchased Assets to be acquired by Purchaser hereunder shall be deemed to have passed to Purchaser, and the assumption of all of the Assumed Liabilities shall be deemed to have occurred, as of 5:00 p.m. Pacific Time on the Closing Date.

4.2    **Closing Deliveries by Sellers**. At or prior to the Closing, Sellers shall deliver to Purchaser:

(a)    a bill of sale, in a form and content reasonably acceptable to the Parties (the "**Bill of Sale**"), duly executed by each Seller;

(b)    one or more assignment and assumption agreements, in a form and content reasonably acceptable to the Parties (the "**Assignment and Assumption Agreement**"), duly executed by Sellers;

(c)    a file-stamped copy of the Sale Order, which shall not, prior to the Closing, have been modified or amended in any manner that has not been approved by Purchaser which approval shall not be unreasonably withheld by Purchaser;

(d)    a copy of the resolutions adopted by the Board of Directors or similar governing body of each Seller evidencing the authorization of the execution and delivery of this Agreement and the consummation of the Transactions contemplated hereby, certified by an authorized officer of each Seller;

(e)    the Sellers' Subordination Agreement, duly executed by Sellers;

(f)	possession of the Purchased Assets;

(g)	if requested by Purchaser, an agreement in a form reasonably satisfactory to Purchaser and Sellers (the **"Interim Operating Agreement"**) and duly-executed by Sellers pursuant to which Sellers allow Purchaser to use and operate under, to the extent permitted by applicable law, Sellers' Permits and governmental licenses, rights, registrations, variances, waivers, consents, authorizations, and approvals relating to the Business (collectively, **"Operating Approvals"**) which are not being transferred, assigned and conveyed to Purchaser at the Closing until such time as either Purchaser has obtained the Operating Approvals directly from the relevant governmental entities or other parties, or the Operating Approvals can lawfully be transferred, conveyed or assigned to Purchaser; provided that, in no event shall Sellers be required to allow Purchaser to use the Operating Approvals for a period greater than one hundred twenty (120) days after the Closing Date; and

(h)	fully-executed copies of the Settlement Agreements; and

(i)	such other Ancillary Documents as Purchaser may reasonably request that are not inconsistent with the terms of this Agreement and are customary for a transaction of this nature and necessary to evidence or consummate the Transactions contemplated by this Agreement.

4.3	**Closing Deliveries by Purchaser**.  At the Closing, Purchaser shall deliver to Sellers:

(a)	the Assignment and Assumption Agreement duly executed by Purchaser;

(b)	written authorization for the unconditional release of the Purchase Deposit to Sellers;

(c)	the Note duly executed by Purchaser;

(d)	the Security Agreement duly executed by Purchaser;

(e)	the Purchaser's Subordination Agreement duly executed by Purchaser;

(f)	a document in a form and content satisfactory to Sellers, by which Purchaser causes the TTB Levied Funds to be released to or for the benefit of Sellers subject to any valid and enforceable competing claim of the TTB senior to the Pre-Petition Financing Obligation, in accordance with the terms and conditions set forth herein;

(g)	a copy of the resolutions adopted by the Board of Directors of Purchaser evidencing the authorization of the execution and delivery of this Agreement and the consummation of the Transactions contemplated hereby, certified by an authorized officer of Purchaser;

(h)	a copy of the Zions Note Purchase Agreement duly executed by Purchaser and Zions; and

(i)      such other Ancillary Documents as Sellers may reasonably request that are not inconsistent with the terms of this Agreement and are customary for a transaction of this nature and necessary to evidence or consummate the Transactions contemplated by this Agreement.

4.4    **Termination of Agreement**.   This Agreement may be terminated only in accordance with the provisions of this Section 4.4. This Agreement may be terminated at any time prior to the Closing, as follows:

(a)      by the mutual written consent of Sellers and Purchaser;

(b)      by written notice from Purchaser to Sellers, if by August 30, 2019, (i) the Settlement Motion seeking approval of the Settlement Agreements, as provided in Section 9.15, authorizing the compromise of any claims that Sellers, Twin River, Big Canyon and David C. Howell may have, against Purchaser, Zions, CFO Solutions LLC dba Advanced CFO, Matthew McKinlay, Valerie Grindle, and Sussman Shank LLP (the "**Advanced CFO Parties**"), and to acknowledge the amount, scope, validity, perfection and enforceability of the Pre-Petition Financing Obligations and Zions' first priority secured claims with respect to the Purchased Assets and Excluded Assets, shall not have been approved by the Bankruptcy Court by entry of the Settlement Order, or (ii) following the entry of the Settlement Order, the Settlement Order shall not be a Final Order, or otherwise fail to be in full force and effect, or shall have been stayed, reversed, modified or amended in any material respect without the prior written consent of Purchaser which consent shall not be unreasonably withheld by Purchaser;

(c)      by written notice from Purchaser to Sellers, if by August 30, 2019, the Bankruptcy Court has not entered a Settlement Order approving and authorizing, pursuant to Section 363(k) of the Bankruptcy Code, Purchaser's right to Credit Bid the full amount of any Pre-Petition Financing Obligations that Purchaser may acquire from Zions pursuant to the Zions Note Purchase Agreement as provided in Section 9.15;

(d)      by written notice from Purchaser to Sellers, if by August 30, 2019, the Bankruptcy Court has not entered a Settlement Order authorizing the compromise of any claims that Sellers, Twin River and Big Canyon may have against David C. Howell;

(e)      by written notice from Purchaser to Sellers, if (i) the Bidding Procedures Motion shall not have been approved by the Bankruptcy Court by September 13, 2019, or (ii) following the entry of the Bidding Procedures Order, the Bidding Procedures Order shall fail to be in full force and effect or shall have been stayed, reversed, modified or amended in any material respect without the prior written consent of Purchaser which consent shall not be unreasonably withheld by Purchaser;

(f)      by written notice from Purchaser to Sellers, if (i) the Sale Hearing has not taken place on or prior to October 15, 2019, (ii) the Bankruptcy Court has not entered the Sale Order on or prior to October 18, 2019, (iii) the Sale Order shall have been stayed (and such stay results in the Closing not being consummated prior to the Outside Closing Date) or vacated, or the Sale Order shall have been modified or supplemented in any material respect without Purchaser's prior written consent which consent shall not be unreasonably withheld by Purchaser;

(g)    by written notice of either Sellers or Purchaser to such other Party or Parties, if the Closing shall not have occurred prior to October 31, 2019 (the **"Outside Closing Date"**); provided, however, that a Party shall not be permitted to terminate this Agreement pursuant to this Section 4.4(g) if such Party is in material breach of this Agreement;

(h)    by written notice from Purchaser to Sellers, if (i) Sellers seek to have the Bankruptcy Court enter an order dismissing the Bankruptcy Cases (including seeking to dismiss any Seller from the Bankruptcy Cases), converting the Bankruptcy Cases into cases under Chapter 7 of the Bankruptcy Code, or appointing a trustee in any of the Bankruptcy Cases, or (ii) an order of dismissal, conversion or trustee appointment is entered for any reason in the Bankruptcy Cases and is not reversed or vacated within fourteen (14) days after entry thereof;

(i)    by written notice from Purchaser to Sellers, if Sellers breach or fail to perform in any material respect any of their representations, warranties or covenants contained in this Agreement (including any failure to execute and deliver to Purchaser the Sellers' Subordination Agreement) and such breach or failure to perform: (i) would give rise to the failure of a condition set forth in Article X, (ii) cannot be or has not been cured within ten (10) Business Days following Purchaser's delivery of notice to Sellers of such breach or failure to perform, and (iii) has not been waived by Purchaser;

(j)    by written notice from either Sellers or Purchaser, if Sellers have entered into an Alternative Transaction and such Alternative Transaction shall have closed;

(k)    by written notice from Sellers to Purchaser, if Purchaser breaches or fails to perform in any material respect any of its representations, warranties or covenants contained in this Agreement (including any failure to execute and deliver to Sellers the Note, the Security Agreement or the Purchaser's Subordination Agreement) and such breach or failure to perform: (i) would give rise to the failure of a condition set forth in Article X, (ii) cannot be or has not been cured within ten (10) Business Days following Sellers' delivery of notice to Purchaser of such breach or failure to perform, and (iii) has not been waived by Sellers; or

(l)    by written notice from Sellers to Purchaser, or from Purchaser to Sellers, if Purchaser fails to acquire from Zions by September 20, 2019, the Pre-Petition Financing Obligations.

Each condition set forth in this Section 4.4, pursuant to which this Agreement may be terminated shall be considered separate and distinct from each other such condition. If more than one of the termination conditions set forth in this Section 4.4 is applicable, the applicable Party shall have the right to choose the termination condition or conditions pursuant to which this Agreement is to be terminated.

4.5    **Effect of Termination**. In the event of any termination of this Agreement as permitted by Section 4.4 hereof, this Agreement shall forthwith become void and no Party shall have any liability or further obligation to any other Party under or by reason of this Agreement or the Transactions contemplated hereby, except for any breach of this Agreement occurring prior to or as a result of a termination of this Agreement and except further that:

(a)     each Party shall return to the other Parties all documents, work papers, and other materials of the other Parties relating to the Transactions contemplated hereby, whether so obtained before or after the execution of this Agreement;

(b)     Sellers shall return to Purchaser the Purchase Deposit (plus any interest accrued thereon) within three (3) Business Days after any date upon which Purchaser or Sellers duly terminate this Agreement; provided, however, that Sellers shall be entitled to retain the Purchase Deposit if Purchaser shall have breached materially its obligations hereunder;

(c)     in the event that this Agreement is terminated by either Purchaser or Sellers solely by reason of an Alternative Transaction pursuant to Section 4.4(j) hereof, and such Alternative Transaction closes, in addition to the return to the Purchaser of the Purchase Deposit as provided herein, Seller shall, within ten (10) Business Days after the closing of such Alternative Transaction, pay to Purchaser the Break-Up Fee;

(d)     in the event that Sellers assert that this Agreement shall have been terminated by reason of a breach by Purchaser of its obligations hereunder, and Purchaser shall dispute such assertion, the Bankruptcy Court shall determine the merits of such dispute, and, based thereon, the disposition of the Purchase Deposit. In the event that the Bankruptcy Court determines that Purchaser shall have breached materially its obligations hereunder, Sellers shall be entitled to retain the Purchase Deposit and to assert any and all other remedies and claims that Sellers may have against Purchaser as a result of such breach, including, if applicable, any defense, offset, counterclaim or objection that Sellers may have with respect to the payment of the Pre-Petition Financing Obligations and any and all objections to the validity, priority or perfection of any Encumbrances that Purchaser may have with respect to Sellers' assets and properties.

(e)     in the event that Purchaser asserts that this Agreement shall have been terminated by reason of a breach by Sellers of their obligations hereunder, and Sellers shall dispute such assertion, the Bankruptcy Court shall determine the merits of such dispute. In the event that the Bankruptcy Court determines that Sellers shall have breached materially their obligations hereunder, except as provided in Sections 4.5(a)-(c) and Section 8.1 hereof, Purchaser's sole and exclusive remedy against Sellers shall be to terminate this Agreement, without any liability whatsoever of Sellers to Purchaser as a result thereof or arising therefrom.

4.6     **Extension; Waiver**. At any time prior to the Closing Date, Purchaser or each Seller may (i) extend the time for the performance for its behalf of any of the obligations or other acts of the other Parties hereto, (ii) waive any inaccuracies in the representations and warranties given for its behalf herein or in any document delivered pursuant hereto, and (iii) waive compliance with any of the agreements or conditions contained for its behalf herein. Any agreement on the part of a Party hereto to any such extension or waiver shall be valid only if set forth in a written instrument signed by such Party.

**ARTICLE V.**
**REPRESENTATIONS AND WARRANTIES OF SELLERS**

Sellers represent and warrant to Purchaser as follows as of the date hereof and as of the Closing Date:

5.1     **Organization and Qualification of Sellers**.  Each Seller is duly incorporated and organized, validly existing and in good standing under the Laws of the jurisdiction of its formation. Each Seller has all requisite power and authority to own, lease and operate its properties and to carry on its Business as it is now being conducted, subject to the provisions of the Bankruptcy Code.  Each Seller is duly qualified or licensed to do business and is in good standing in each jurisdiction where the character of the Business or the nature of its properties makes such qualification or licensing necessary, except for any such failures to be so qualified or licensed as would not, individually or in the aggregate, have a Material Adverse Effect.

5.2     **Authorization of Sellers**.  Subject to the entry of the Sale Order, each Seller has all requisite power and authority to execute and deliver this Agreement and each of the Ancillary Documents to which it is a party, to perform its obligations hereunder and thereunder, and to consummate the Transactions contemplated hereby and thereby.  The execution and delivery of this Agreement and each of the Ancillary Documents to which a Seller is a party, the performance by a Seller of its obligations hereunder and thereunder and the consummation of the Transactions contemplated hereby and thereby have been duly and validly authorized by all necessary action on the part of each Seller.  This Agreement has been, and at or prior to the Closing, each of the Ancillary Documents to which a Seller is a party will be, duly and validly executed and delivered by each Seller.  Assuming the due authorization, execution and delivery of this Agreement and the Ancillary Documents by Purchaser and subject to the entry of the Sale Order, this Agreement constitutes, and each Ancillary Document to which a Seller is a party when so executed and delivered will constitute, legal, valid and binding obligations of Sellers, enforceable against Sellers in accordance with their terms.

5.3     **No Inconsistent Obligations of Sellers**.  Neither the execution and delivery of this Agreement or the Ancillary Documents, nor the consummation of the Transactions contemplated herein or therein in accordance with the Sale Order, will result in a violation or breach of, or constitute a default under (a) the Organizational Documents of Sellers, (b) any applicable ruling or order of any Governmental Body, (c) any term or provision of any contract or agreement to which a Seller is a party, (d) any writ, order, judgment, decree, law, rule, regulation or ordinance or (e) any other commitment or restriction to which a Seller is a party.

5.4     **No Conflicts; No Additional Consents; Sellers' Compliance with Law**.

(a)     The execution, delivery and performance by each Seller of this Agreement or any Ancillary Document to which it is a party, the compliance by each Seller with the provisions hereof or thereof, the consummation of the Transactions contemplated hereby or thereby and the taking by each Seller of any other action contemplated hereby or thereby, do not and will not contravene, violate or conflict with any term or provision of its Organizational Documents.

(b)     Except as set forth in Schedule 5.4(b) hereof, to the Knowledge of Sellers, each Seller is in compliance, in all material respects with all applicable Laws, except as such compliance may be excused by the provisions of the Bankruptcy Code.  No Seller has received any outstanding written notice from any Governmental Body regarding any actual or possible material violation of, or failure to comply in any material respect with, any Law.

(c)    No consent, waiver, approval, order or authorization of, or registration, qualification, designation or filing with any Governmental Body or other Person is required in connection with the execution, delivery and performance by Sellers of this Agreement or the Ancillary Documents to which they are parties, the compliance by Sellers with any of the provisions hereof or thereof, the consummation of the Transactions contemplated hereby or thereby, or the taking by Sellers of any other action contemplated hereby or thereby, other than the entry of the Sale Order and such filings, notices or consents, the failure of which to make or obtain would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on Sellers' ability to perform their obligations under this Agreement and the Ancillary Documents to which they are parties or to consummate on a timely basis the Transactions contemplated hereby or thereby; provided, however, that Sellers make no representation or warranty regarding the assignability of any Permit to Purchaser.

5.5    **No Brokers or Finders by Reason of Sellers' Acts**. No Person has acted, directly or indirectly, as a broker or finder for Sellers in connection with the Transactions contemplated by this Agreement, and Purchaser will not become obligated to pay any fee or commission or like payment to any broker, finder or other Person as a result of the consummation of the Transactions contemplated by this Agreement based upon any arrangement made by or on behalf of Sellers.

5.6    **Title to Purchased Assets**. Other than real property leased by a Seller or personal property leased or licensed by a Seller (including the Assigned Contracts), Sellers have good title to the Purchased Assets and, at the Closing, Purchaser, pursuant to this Agreement and the Sale Order, shall acquire good and marketable title in and to all of such Purchased Assets, in each case free and clear of all Claims, Encumbrances (other than Assumed Liabilities and Permitted Encumbrances) and other interests to the fullest extent permissible under Section 363(f) of the Bankruptcy Code. Except for any Permits which are not transferred to Purchaser hereunder, the Purchased Assets include all of the properties and assets required to operate, in all material respects, the Business in the Ordinary Course of Business. For the sake of clarity, the right to use any assets included in the Purchased Assets in which Sellers have leasehold or non-ownership rights to use shall be assigned to Purchaser only through the assumption and assignment of the Assigned Contracts in accordance with and subject to the terms and conditions of this Agreement.

5.7    **No Litigation Affecting Sellers**. Except as set forth on Schedule 5.7 hereto and other than in connection with the Bankruptcy Cases, there is no suit, action, litigation, arbitration proceeding or governmental proceeding or audit, including appeals and applications for review, in progress or pending against or relating to Sellers or any judgment, decree, injunction, deficiency, rule or order of any court, governmental department, commission, agency, instrumentality or arbitrator which, in any case, might affect materially adversely the ability of Sellers to enter into this Agreement or to consummate the Transactions contemplated hereby.

5.8    **Permits**. To the Knowledge of Sellers, each Seller is in material compliance with the material terms of all material Permits used by Sellers in the Business, and all such Permits are valid and in full force and effect, and no proceeding is pending, the object of which is to revoke, limit or otherwise affect materially any such Permit.

DOCS 127753-000001/3730237.9

5.9    **Labor Matters**.

(a)    No Seller is a party to any labor or collective bargaining agreement with respect to its employees.  No employee of any Seller is represented by any labor organization.

(b)    There are no strikes, lockouts, work          or slowdowns pending involving Sellers.

5.10    **Environmental Matters**.  Except as set forth on Schedule 5.10 hereto and except for facts, circumstances or conditions that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect with respect to the Purchased Assets, to the Knowledge of Sellers, there is no order of any Governmental Body, nor has any Seller received any verbal or written notice, complaint or inquiry from a Governmental Body respecting Environmental Laws, and there is no investigation, action or proceeding pending, that could reasonably be expected to result in Purchaser's incurring any Environmental Liabilities.

5.11    **No Other Representations or Warranties**.  Except for the representations, warranties and covenants of Sellers expressly contained herein, no Seller, any Representative of any Seller, nor any other Person, makes any other express or implied warranty (including, without limitation, any implied warranty of merchantability or fitness for a particular purpose) on behalf of Sellers, including any representations, warranties or covenants regarding (a) the past, present or future profitability of the Businesses or the probable success or profitability of ownership, use or operation of the Purchased Assets by Purchaser after the Closing, (b) the probable success or results in connection with the administration of the Bankruptcy Cases and Sellers' efforts to obtain entry of the Sale Order, or (c) the value, use, condition, quality or quantity of the Purchased Assets. Except as expressly provided in Section 5.6 (Title to Purchased Assets) hereof, the Purchased Assets are being conveyed hereby on an "AS IS," "WHERE IS" condition at the Closing Date, without any warranty of any nature whatsoever (including any implied warranty of merchantability or fitness for a particular purpose).

## ARTICLE VI.
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Sellers as follows as of the date hereof and as of the Closing Date:

6.1    **Organization and Qualification of Purchaser**.  Purchaser is duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization.  Purchaser has all requisite power and authority to own, lease and operate its properties and to carry on its business as it is now being conducted, except as would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on Purchaser's ability to consummate the Transactions contemplated hereby.

6.2    **Authority of Purchaser**.  Purchaser has the requisite power and authority to execute and deliver this Agreement and each of the Ancillary Documents to which it is a party, to perform its obligations hereunder and thereunder, to consummate the Transactions contemplated hereby and thereby and to assume and perform the Assumed Liabilities.  The execution and delivery of this Agreement by Purchaser and each of the Ancillary Documents to which it is a

party, the performance by Purchaser of its obligations hereunder and thereunder, the consummation of the Transactions contemplated hereby and thereby and the assumption and performance of the Assumed Liabilities have been duly and validly authorized by all necessary actions on the part of Purchaser. This Agreement has been, and at or prior to the Closing, each of the Ancillary Documents to which Purchaser is a party will be, duly and validly executed and delivered by Purchaser. Assuming the due authorization, execution and delivery of this Agreement and the Ancillary Documents by Sellers and subject to the entry of the Sale Order, this Agreement constitutes, and each Ancillary Document to which Purchaser is a party when so executed and delivered will constitute, legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with its terms.

6.3     **No Inconsistent Obligations of Purchaser**.  Neither the execution and delivery of this Agreement or the Ancillary Documents, nor the consummation of the Transactions contemplated herein or therein in accordance with the Sale Order, will result in a violation or breach of, or constitute a default under (a) the articles of incorporation, as amended, the bylaws, or other Organizational Documents of Purchaser, (b) any applicable ruling or order of any Governmental Body, (c) any term or provision of any contract or agreement to which Purchaser is a party, (d) any writ, order, judgment, decree, Law, rule, regulation or ordinance, (e) any other commitment or restriction to which Purchaser is a party.

6.4     **No Conflicts; No Additional Consents; Purchaser's Compliance with Law**.

(a)     The execution, delivery and performance by Purchaser of this Agreement or any Ancillary Document to which it is a party, the compliance by Purchaser with the provisions hereof or thereof, the consummation of the Transactions contemplated hereby or thereby and the taking by Purchaser of any other action contemplated hereby or thereby, do not and will not contravene, violate or conflict with any term or provision of its Organizational Documents.

(b)     To Purchaser's Knowledge, Purchaser is in compliance, in all material respects with all applicable Law. Purchaser has received no outstanding written notice from any Governmental Body regarding any actual or possible material violation of, or failure to comply in any material respect with, any Law.

(c)     No consent, waiver, approval, order or authorization of, or registration, qualification, designation or filing with any Governmental Body or other Person is required in connection with the execution, delivery and performance by Purchaser of this Agreement or the Ancillary Documents to which it is a party, the compliance by Purchaser with any of the provisions hereof or thereof, the consummation of the Transactions contemplated hereby or thereby, the assumption and performance of the Assumed Liabilities or the taking by Purchaser of any other action contemplated hereby or thereby, other than the entry of the Settlement Order, Bid Procedures Order, Sale Order and such filings, notices or consents, the failure of which to make or obtain would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on Purchaser's ability to perform its obligations under this Agreement and the Ancillary Documents to which it is a party, to assume and perform the Assumed Liabilities or to consummate on a timely basis the Transactions contemplated hereby or thereby.

6.5    **No Brokers or Finders by Reason of Purchaser's Acts**.  No Person has acted, directly or indirectly, as a broker or finder for Purchaser in connection with the Transactions contemplated by this Agreement and Sellers will not become obligated to pay any fee or commission or like payment to any broker, finder or other Person as a result of the consummation of the Transactions contemplated by this Agreement based upon any arrangement made by or on behalf of Purchaser.

6.6    **Adequate Assurance of Future Performance Regarding Assigned Contracts**. As of the Closing, Purchaser will be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assigned Contracts.

6.7    **No Litigation Affecting Purchaser**.  There is no suit, action, litigation, arbitration proceeding or governmental proceeding or audit, including appeals and applications for review, in progress or pending against or relating to Purchaser or any judgment, decree, injunction, deficiency, rule or order of any court, governmental department, commission, agency, instrumentality or arbitrator which, in any case, might affect materially adversely the ability of Purchaser to enter into this Agreement or to consummate the Transactions contemplated hereby.

6.8    **Investigation**.  Purchaser has made such investigation as it has deemed appropriate in connection with Purchaser's decision to enter into this Agreement.  Purchaser has had the opportunity to inspect the Purchased Assets, visit with Sellers and meet with Sellers' Representatives to discuss the Business.  Purchaser is relying on the results of such investigation and the advice of its own advisors and has not relied upon any statement or representation made by Sellers or any Representative of Sellers other than the covenants, representations and warranties of Sellers set forth expressly in this Agreement.

6.9    **Purchaser's Financial Condition**.  As of the Closing Date and immediately after consummating the Transactions contemplated by this Agreement, Purchaser will not (i) be insolvent (either because its financial condition is such that the sum of its debts is greater than the fair value of its assets or because the fair value of its assets will be less than the amount required to pay its probable liabilities as they become due and payable), (ii) have unreasonably small capital with which to engage in its business, or (iii) have incurred or planned to incur debts beyond its ability to repay such debts as they mature.

6.10    **Not an Insider**.  Neither Purchaser nor any of its Representatives is an "insider" of any of the Sellers, as that term is defined in Section 101(31) of the Bankruptcy Code.

**ARTICLE VII.**
**EMPLOYEES**

Purchaser is neither merging with Sellers nor acquiring all of Sellers' assets and may, but is not required to, extend offers of employment to any of Sellers' employees upon the Closing. Nothing herein, expressed or implied, shall confer upon any employee any rights to employment or continued employment for any specified period of any nature or kind whatsoever, under or by reason of any provision of this Agreement.  Purchaser intends to engage, after the Closing, David C. Howell as a consultant, pursuant to terms and conditions which will be disclosed fully to the Bankruptcy Court and Sellers' creditors in connection with the Sale Hearing.

## ARTICLE VIII.
## BANKRUPTCY COURT MATTERS

8.1    **Approval of Break-Up Fee and Bid Protections**.  Subject to the entry of the Bidding Procedures Order, in consideration for Purchaser's having expended considerable time and expense in connection with this Agreement and the negotiation hereof and the identification and quantification of assets of Sellers, Sellers shall pay to Purchaser promptly upon the effective date of termination of this Agreement in accordance with, and only to the extent provided in, the provisions of Section 4.5(c) hereof, a break-up fee of One Hundred Fifty Thousand Dollars ($150,000) (the "**Break-Up Fee**").  In addition, the Bidding Procedures Order shall provide for an initial overbid in the amount of $100,000 over and above the aggregate of the Purchase Price and the Break-Up Fee, and minimum bid increments thereafter of $50,000 (the "**Bid Protections**").  Purchaser, as part of its right to increase its bid as part of any Auction process, shall be entitled to increase the Credit Bid to preserve fully any and all of its credit bid rights under Section 363(k) of the Bankruptcy Code up to and including the full amount of the Pre-Petition Financing Obligations.  The obligations of Sellers to pay the Break-Up Fee (i) shall be entitled to administrative expense claim status under sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code, (ii) shall not be subordinate to any other administrative expense claim against Sellers, and (iii) shall survive the termination of this Agreement in accordance with Section 4.5(c) hereof.  The Bidding Procedures Order shall approve the Break-Up Fee and the Bid Protections as set forth in this section.

8.2    **Competing Bid and Other Matters**.

(a)    No later than August 30, 2019, Sellers shall file with the Bankruptcy Court a motion seeking entry of the Bidding Procedures Order (the "**Bidding Procedures Motion**") in a form approved by Purchaser and as contemplated by this Article VIII, which approval shall not be unreasonably withheld by Purchaser.  No later than September 17, 2019, Sellers shall file with the Bankruptcy Court a motion seeking entry of the Sale Order ("**Sale Motion**") in a form approved by Purchaser which approval shall not be unreasonably withheld by Purchaser.

(b)    This Agreement and the Transactions contemplated hereby are subject to Sellers' right and ability to consider higher or better competing bids with respect to the Business and the Purchased Assets (whether in component parts or subsets of the Purchased Assets, or a material portion of the Purchased Assets as provided herein) pursuant to the Bidding Procedures Order (each a "**Competing Bid**").

(c)    If an Auction is conducted, and Purchaser is not the prevailing party at the conclusion of such Auction (such prevailing party, the "**Prevailing Bidder**"), Purchaser shall serve as a back-up bidder in the amount of the Purchase Price (as the same may be improved upon at the Auction), and keep Purchaser's bid to consummate the Transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be improved upon in the Auction) open and irrevocable until the earlier of (i) 5:00 p.m. (prevailing Pacific Time) on the date which is thirty (30) days after the date of entry of the Sale Order (the "**Outside Back-up Date**"); provided, however, in no event shall the Outside Back-up Date be later than November 15, 2019, or (ii) the date of closing of an Alternative Transaction with the Prevailing Bidder.

(d)     Sellers shall serve true and correct copies of the Bidding Procedures Motion and the Sale Motion and all related pleadings in accordance with the Bankruptcy Code, the Bankruptcy Rules and any applicable order of the Bankruptcy Court.

8.3     **Sale Order**.  Sellers shall use their commercially reasonable efforts to obtain from the Bankruptcy Court an order (in form and content approved by Purchaser which approval shall not be unreasonably withheld by Purchaser) approving the Sale Motion ("**Sale Order**") in accordance with the provisions of Section 8.2(a) hereof, and as further described below.  If Purchaser is the Prevailing Bidder, the Sale Order shall, among other things (i) approve, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, the execution, delivery and performance by Sellers of this Agreement, the sale of the Purchased Assets to Purchaser on the terms and conditions set forth herein and free and clear of all Claims and Encumbrances (other than Claims and Encumbrances included in the Assumed Liabilities and Permitted Encumbrances), and the performance by Sellers of their obligations under this Agreement; (ii) authorize and empower Sellers to assume and assign to Purchaser the Assigned Contracts; and (iii) find that Purchaser is a "good faith" purchaser within the meaning of Section 363(m) of the Bankruptcy Code, grant to Purchaser the protections of Section 363(m) of the Bankruptcy Code and find that Purchaser is not a successor to any Seller.  Purchaser agrees that it will promptly take such actions as are reasonably requested by Sellers to assist Sellers in obtaining entry of the Sale Order, including live testimony, furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code, and establishing adequate assurance of future performance within the meaning of Section 365 of the Bankruptcy Code.  The Sale Order shall provide that it shall not be subject to Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure.

8.4     **Contracts**.  Sellers shall serve on all non-Seller counterparties to all of the Assigned Contracts a notice stating specifically that Sellers are seeking the assumption and assignment of such Assigned Contracts and shall notify such non-Seller counterparties of the deadline for objecting to the assumption and assignment of the Assigned Contracts and the amount of the Cure Amounts.

8.5     **Bankruptcy Filings**.  Sellers agree to seek diligently the entry of the Bidding Procedures Order and the Sale Order.

8.6     **Sale Free and Clear**.  Sellers acknowledge and agree, and the Sale Order shall provide that, on the Closing Date, the Purchased Assets shall be transferred to Purchaser free and clear of all Claims and Encumbrances, other than Permitted Encumbrances and the Assumed Liabilities, to the fullest extent permitted by Section 363 of the Bankruptcy Code.

## ARTICLE IX.
## COVENANTS AND AGREEMENTS

9.1     **Conduct of Business of Sellers**.  From the Agreement Date until the Closing, Sellers shall use commercially reasonable efforts, except as otherwise required, authorized or restricted pursuant to the Bankruptcy Code or an order of the Bankruptcy Court, to operate the Business in the Ordinary Course of Business, subject to the constraints associated with Sellers'

financial distress. From the Agreement Date until the Closing, Sellers shall make no sale of Purchased Assets other than in the Ordinary Course of Business, absent Purchaser's prior written consent, in Purchaser's sole and absolute discretion. Without limiting the generality of the foregoing, Sellers agree that, from the Agreement Date until the Closing, Sellers shall not do any of the following without Purchaser's prior written consent: (a) sell any Inventory or other Purchased Assets (normally sold to customers in the Ordinary Course of Business) at a discount greater than 12%; (b) accelerate or compromise customer payment terms or Accounts Receivable for discounts or otherwise; or (c) modify vendor payment or credit terms outside the Ordinary Course of Business.

9.2    **Access to Information**.  Sellers agree that, between the Agreement Date and the earlier of the Closing Date and any date on which this Agreement is terminated in accordance with Section 4.4 hereof, Purchaser shall be entitled, through its Representatives, to have such reasonable access to and make such reasonable investigation and examination of the books and records, properties, businesses, assets, and operations of Sellers as Purchaser's Representatives may reasonably request. Any such investigations and examinations shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances. Sellers shall use commercially reasonable efforts to cause their Representatives to reasonably cooperate with Purchaser and Purchaser's Representatives in connection with such investigations and examinations, and Purchaser shall, and use its commercially reasonably efforts to cause its Representatives to, reasonably cooperate with Sellers and their Representatives, and shall use its commercially reasonable efforts to minimize any disruption to the Business. Purchaser hereby acknowledges and agrees that Purchaser's satisfaction with such investigation and examination is not a condition to Purchaser's obligation to consummate the Transactions contemplated by this Agreement.

9.3    **Reasonable Efforts; Cooperation**.

(a)      Subject to the other provisions of this Agreement, each Party shall use its commercially reasonable efforts to perform its obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things necessary, proper or advisable under applicable Law to cause the Transactions contemplated herein to be effected as soon as practicable, but in any event on or prior to the Outside Closing Date, in accordance with the terms hereof, and shall cooperate in a commercially reasonable manner with each other Party and its Representatives in connection with any act required to be taken as a part of its obligations hereunder.

(b)      The obligations of Sellers pursuant to this Section 9.3 shall be subject to any orders entered or approvals or authorizations granted by the Bankruptcy Court, requirements of the Bankruptcy Code and Sellers' obligations as debtors-in-possession to comply with any order of the Bankruptcy Court (including the Bidding Procedures Order and the Sale Order), and Sellers' duty to seek to obtain the highest or otherwise best price for the Business as required by the Bankruptcy Code.

(c)      Subject to the provisions of Section 12.1 hereof, Sellers, on one hand, and Purchaser, on the other hand, will provide each other with such cooperation and information as either of them may reasonably request of the other in connection with filing any tax return, amended tax return or claim for refund, determining a liability for Taxes, or participating in or

conducting any audit or other proceeding in respect of Taxes (such cooperation and information shall include providing copies of relevant tax returns or portions thereof, together with any intercompany schedules, related work papers and documents relating to rulings and other determinations by Tax authorities). In addition, Purchaser shall make available to Sellers, without charge to Sellers, such office space and employee support reasonably necessary to assist Sellers to wind up Sellers' operations following the Closing, resolve the Bankruptcy Cases, dissolve each Seller and prepare and file tax returns. Any information obtained under this Section 9.3(c) shall be kept confidential except as may be otherwise necessary in connection with the filing of tax returns or claims for refund or in conducting any audit or other proceeding.

(d)     Subject to the provisions of Section 12.1 hereof, each Party shall furnish the other Parties with such necessary information and assistance as such other Parties may reasonably request in connection with their preparation of necessary filings, registration or submissions of information to a Governmental Body in connection with this Agreement, the Transactions contemplated hereby and any such filing, notification or request for approval in connection with this Agreement.

9.4     **Further Assurances**. Prior to the Closing, each Party shall execute and cause to be delivered to each other Party such instruments and other documents, and shall take such other actions, as such other Party may reasonably request for the purpose of carrying out or evidencing any of the Transactions contemplated by this Agreement.

9.5     **Notification of Certain Matters**. Sellers shall give prompt notice to Purchaser, and Purchaser shall give prompt notice to Sellers, of (a) any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the Transactions contemplated by this Agreement or the Ancillary Documents and which is not likely to be obtained prior to the Closing, and (b) any written objection or proceeding that challenges the Transactions contemplated hereby or the entry of the Sale Order.

9.6     **Confidentiality**.

(a)     Each Party acknowledges that the confidential information provided to it in connection with this Agreement, including under Section 9.2 hereof, and the consummation of the Transactions contemplated hereby, is subject to such Party's covenant and agreement to maintain the confidentiality thereof.

(b)     Each Party shall use its commercially reasonable efforts to maintain, unless disclosure is required by applicable Law, the confidentiality of any confidential information regarding the Business which is in its possession or of which it is aware; provided, that confidential information shall not include information that becomes generally available to the public other than as a result of the breach of this Section 9.6(b) or information not otherwise known by the Party that becomes available to such Party from a Person other than the Party providing such confidential information, or any of the discussions or negotiations conducted with the Party providing such confidential information in connection with this Agreement. Notwithstanding the foregoing, a Party shall be entitled to disclose (i) any information required to be disclosed by such Party to the Bankruptcy Court, the United States Trustee, parties-in-interest in the Bankruptcy Cases (including the Committee), or other Persons bidding on assets of Sellers, (ii) any information required to be

disclosed by such Party pursuant to any applicable Law (including the Bankruptcy Code and Bankruptcy Rules), any legal proceeding, or requirements of a Governmental Body, or (iii) any information to such Party's counsel and financial advisors; provided, that, in each case, such disclosure shall be limited to the information that is so required to be disclosed and to the Person(s) to whom such disclosure is required.

9.7 **Preservation of Records**. Each Seller (or any subsequently appointed bankruptcy estate representative, including a trustee or plan agent) and Purchaser agree that each of them shall preserve and keep the books and records held by it relating to the pre-Closing Business for a period of four (4) months from the Closing Date and shall make such books and records available to each other Party (and permit such other Party to make extracts and copies of such books and records at its own expense) as may be reasonably requested by such Party. The Parties shall also make available to the Committee, or a post-confirmation trustee or plan agent appointed in the Bankruptcy Cases, any books and records reasonably required to investigate or prosecute claims and causes of action that are Excluded Assets under this Agreement. In the event that a Seller, on one hand, or Purchaser, on the other hand, desires to destroy such books and records after such four (4) month period, such Party first shall give twenty (20) days' prior written notice to the other Party (and (i) the Committee or (ii) any post-confirmation trustee or plan agent appointed in the Bankruptcy Cases) and such other Party (or the Committee or a post-confirmation trustee or plan agent, to the extent necessary to investigate or prosecute excluded claims and causes of action) shall have the right at its option and expense, upon prior written notice given within that twenty (20) day period, to take possession of such books and records, or make extracts and copies of such books and records, within thirty (30) days after the date of such notice.

9.8 **Notice of Material Adverse Effect**. Sellers shall promptly inform Purchaser in writing of the occurrence of any event that has had, or is reasonably expected to have, a Material Adverse Effect on Sellers' ability to consummate the Transactions contemplated hereby.

9.9 **Casualty Loss**. Notwithstanding any provision of this Agreement to the contrary, if, before the Closing, all or any portion of the Purchased Assets is condemned or taken by eminent domain, or is damaged or destroyed by fire, flood or other casualty, Sellers shall notify Purchaser promptly in writing of such fact. In the case of condemnation or taking, whether via eminent domain, condemnation, inverse condemnation or similar action (a "**Government Taking**"), Sellers shall assign or pay, as the case may be, any proceeds thereof to Purchaser at the Closing. In the case of fire, flood or other casualty, Sellers shall assign the insurance proceeds therefrom to Purchaser at the Closing. Notwithstanding the foregoing, the provisions of this Section 9.9 shall in no way modify Purchaser's other rights under this Agreement, including any applicable right to terminate the Agreement.

9.10 **No Successor Liability**. The Parties intend that, except where expressly prohibited under applicable Law, upon the Closing, Purchaser shall not be deemed to: (a) be the successor of Sellers as it is not acquiring Sellers' equity or all of Sellers' assets, (b) have, de facto, or otherwise, merged with or into Sellers, (c) be a mere continuation or substantial continuation of Sellers or the enterprise(s) of Sellers, or (d) be liable for any acts or omissions of Sellers in the conduct of the Business or arising under or related to Sellers' use or ownership of the Purchased Assets other than as set forth in this Agreement. Without limiting the generality of the foregoing, and except as otherwise provided in this Agreement, the Parties intend that Purchaser shall not be liable for any

Encumbrance (other than Assumed Liabilities and Permitted Encumbrances) against Sellers or any of Sellers' predecessors or affiliates, and Purchaser shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Business, the Purchased Assets or any liabilities of Sellers arising prior to the Closing Date. The Parties agree that provisions substantially in the form of this Section 9.10 shall be reflected in the Sale Order.

9.11    **Change of Name**. Promptly following the Closing, each Seller shall discontinue the use of its current name (and any other trade names or "d/b/a" names currently utilized by such Seller) and shall not use or employ any name which includes the words, "Howell Munitions," "Clearwater," "X-Treme," "Ammo Load," "Freedom Munitions," "Lewis-Clark Ammunition," or "Components Exchange," or any derivation thereof, without the prior written consent of Purchaser (which consent shall not be unreasonably withheld by Purchaser), and Sellers shall cause the names of Sellers in the caption of the Bankruptcy Cases to be changed to new names of Sellers which do not include any of the foregoing names.

9.12    **Receivables**. From and after the Closing, if a Seller receives or collects any funds relating to Accounts Receivable, in respect of the Purchased Assets, such Seller shall remit such funds to Purchaser within five Business Days after its receipt thereof.

9.13    **Government Approvals**.

(a)    During the period prior to the Closing Date, Sellers and Purchaser shall use their respective commercially reasonable efforts, and shall cooperate with each other, to do or cause to be done, all things necessary, proper or advisable consistent with Law, to cause the conditions precedent to the Closing to be satisfied and to cause the Closing to occur, including by seeking to obtain any consents and approvals of any Governmental Body required to be obtained by them to permit the consummation of the Transactions contemplated by this Agreement. Purchaser shall act diligently and reasonably to cooperate with Sellers, to the extent commercially reasonable, to obtain the consents and approvals contemplated by this Section 9.13(a); provided, however, Purchaser shall not be required to waive any of the conditions to the Closing set forth in Article X hereof.

(b)    Notwithstanding anything to the contrary in this Agreement, in the event that any administrative or judicial action or proceeding is instituted (or threatened to be instituted) by a Governmental Body or other Person challenging the Transactions hereunder or any other agreement contemplated hereby, each Party shall cooperate in all respects with each other Party and use its respective commercially reasonable efforts to contest and resist any such action or proceeding and to have vacated, lifted, reversed or overturned any decree, judgment, injunction or other order, whether temporary, preliminary or permanent, that is in effect and that prohibits, prevents or restricts consummation of the Transactions contemplated by this Agreement. Notwithstanding the foregoing, in no event shall Purchaser be required to divest any of the Purchased Assets in order to comply with this Section 9.13(b).

9.14    **No Opposition to Foreclosure of Assets of Twin River and Big Canyon**. Sellers shall not oppose, and shall cause Twin River not to oppose, in any manner any acts that may be taken by Purchaser, from and after the Closing Date, to enforce against the assets, properties and

interests of Twin River and Big Canyon Purchaser's rights and remedies as a secured creditor as a result of an acquisition by Purchaser of the Pre-Petition Financing Obligations and related Encumbrances of Zions pursuant to the Zions Note Purchase Agreement, including any foreclosure of such assets, properties and interests or any deed in lieu of foreclosure of such assets, properties and interests by Purchaser (the "**Twin River/Big Canyon Foreclosure**").

9.15    **Compromise of Claims**.  Sellers shall request an order (the "**Settlement Order**"), by motion made pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "**Settlement Motion**"), seeking, among other things, authority to compromise any claims that Sellers may have against Purchaser, Zions Bancorporation, N.A. dba Zions First National Bank ("**Zions**"), or any of the Advanced CFO Parties, and to acknowledge the amount, scope, validity, perfection and enforceability of the Pre-Petition Financing Obligations and Zions' first priority secured claims with the respect to the Purchased Assets and Excluded Assets, on terms and conditions set forth in Settlement Agreements mutually acceptable to Zions, Sellers and Purchaser, as may be necessary to consummate the Transactions contemplated hereby.  The Settlement Motion seeking to approve the Settlement Agreements will request, among other things, Purchaser's right, as the successor-in-interest to Zions, to fully Credit Bid the amount of the Pre-Petition Financing Obligations at any Auction, in accordance with Section 363(k) of the Bankruptcy Code.  The hearing on the Settlement Motion shall be held on or before August 30, 2019, or by such later date as may be acceptable to Zions and Purchaser.

9.16    **Cash Collateral**.  In the event that Purchaser acquires the Pre-Petition Financing Obligations and related Encumbrances of Zions prior to the Closing Date or the Outside Back-Up Date, Purchaser agrees to (a) Sellers' continued use of any "cash collateral" of Purchaser, as such term is defined in Section 363(a) of the Bankruptcy Code, in accordance with the terms and conditions of any cash collateral order of the Bankruptcy Court and the budget(s) attached thereto, in effect as of the date of Purchaser's acquisition of the Pre-Petition Financing Obligations (collectively, the "**Current Cash Collateral Order**"), and (b) negotiate in good faith a further extension of the Current Cash Collateral Order and the Sellers' continued use of cash collateral on agreed terms and conditions (including reasonable modifications to a cash collateral budget) as may be reasonably requested by Sellers.  A true and correct copy of the Current Cash Collateral Order with the current cash collateral budget is attached hereto as Exhibit "1."

9.17    **Determination of No Environmental Liability**.  Purchaser shall use commercially reasonable efforts, at no cost or expense to Purchaser, as Sellers may reasonably request to assist Sellers in any efforts that Sellers may take to obtain a determination, from the Bankruptcy Court or any other Governmental Body, that, as of the Closing Date, Sellers are in material compliance with all Environmental Laws.

9.18    **Adequate Assurance of Future Performance Regarding Assigned Contracts**.  Purchaser shall be responsible for satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assigned Contracts.

9.19    **Purchaser's Acquisition of Pre-Petition Financing Obligations**.  Purchaser shall use its commercially reasonable efforts to consummate the transactions contemplated by the Zions Note Purchase Agreement.

eeeeeeeeeeee

9.20    **Payment of Payables Owed to Sellers**.  Notwithstanding any provision of this Agreement to the contrary, Purchaser, and any affiliate of Purchaser, including Dan Kash, LAX Ammo, LLC and L.A.X. Firing Range, Inc. shall pay timely to Sellers all obligations that they may owe to Sellers ("**Purchaser Party Payables**") strictly in accordance with agreed upon credit terms.  Nothing contained in this Agreement shall affect in any manner the obligation of Purchaser or any affiliate of Purchaser to pay timely any Purchase Party Payables.

9.21    **Cooperation Regarding Disposition of TTB Adversary Action.**  Prior to the Closing, Sellers shall cause to be filed an objection to the TTB Claim seeking a determination by the Bankruptcy Court regarding the allowance of the TTB Claim.  At the request of Purchaser, Sellers shall cooperate with Purchaser and Zions regarding the dismissal or other appropriate disposition of the TTB Adversary Action, without prejudice, upon the filing of the TTB Claim Objection.

## ARTICLE X.
## CONDITIONS TO CLOSING

10.1    **Conditions Precedent to the Obligations of Purchaser and Sellers**.  The respective obligations of each Party to this Agreement to consummate the Transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by each of Sellers and Purchaser) on or prior to the Closing Date, of each of the following conditions:

(a)    there shall not be in effect any order, writ, injunction, judgment or decree entered by a Governmental Body of competent jurisdiction, or any Law preventing, enjoining, restraining, making illegal or otherwise prohibiting the consummation of the Transactions contemplated by this Agreement or the Ancillary Documents; and

(b)    the Bankruptcy Court shall have entered the Bidding Procedures Order and the Sale Order (as provided in Article VIII) and both of such orders shall be in form and substance approved by Sellers and Purchaser (which approval shall not be unreasonably withheld by Sellers or Purchaser), and shall not have been reversed or stayed.  The finality of the Sale Order shall not be a condition to the Closing, provided that (i) the Bankruptcy Court finds that Purchaser is a good faith purchaser in accordance with the provisions of Section 363(m) of the Bankruptcy Code; and (ii) the Sale Order shall not have been stayed (and such stay results in the Closing not being consummated prior to the Outside Closing Date) or vacated, or the Sale Order shall have been modified or supplemented in any material respect without Purchaser's prior written consent which consent shall not be unreasonably withheld by Purchaser.

10.2    **Conditions Precedent to the Obligations of Sellers**.  The obligations of Sellers to consummate the Transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions, any of which may be waived in writing by Sellers in their sole discretion:

(a)    the representations and warranties made by Purchaser in this Agreement or in any Ancillary Document shall be true and correct in all material respects, in each case as of the Agreement Date and as of the Closing Date, with the same force and effect as though all such

representations and warranties had been made as of the Closing Date (other than representations and warranties that by their terms address matters only as of another specified date, which shall be true and correct only as of such other specified date), except where the failure of such representations or warranties to be so true and correct has not had, and would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on Purchaser's ability to consummate the Transactions contemplated hereby;

        (b)    Purchaser shall have performed and complied in all material respects with all obligations, covenants and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date, including the release of the TTB Levied Funds subject to any valid and enforceable competing claim of the TTB senior to the Pre-Petition Financing Obligation;

        (c)    Purchaser shall have delivered, or caused to be delivered, to Sellers all of the documents set forth in Section 4.3 hereof;

        (d)    Purchaser shall have acquired the Pre-Petition Financing Obligations and related Encumbrances pursuant to the Zions Note Purchase Agreement; and

        (e)    Purchaser shall have paid timely the Purchaser Party Payables.

    10.3   **Conditions Precedent to the Obligations of Purchaser**.  The obligations of Purchaser to consummate the Transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions, any of which may be waived in writing by Purchaser in its sole discretion:

        (a)    Purchaser shall have acquired from Zions the Pre-Petition Financing Obligations and related Encumbrances pursuant to the Zions Note Purchase Agreement

        (b)    The Bankruptcy Court shall have entered the Settlement Order approving settlement agreements substantially in the form of Exhibit "2" hereof (collectively, the **"Settlement Agreements"** and each a **"Settlement Agreement"**).

        (c)    Sellers shall have filed the TTB Claim Objection to the TTB Claim as set forth in Section 9.21 hereof.

        (d)    Sellers shall have delivered to Purchaser (i) a file-stamped copy of the Sale Order (which shall contain the terms described in Section 8.3 hereof) and (ii) copies of all affidavits of service of the Sale Motion or notice of such motion filed by or on behalf of Sellers (which service shall comply with Section 8.2(d) hereof);

        (e)    the representations and warranties made by each Seller in this Agreement or in any Ancillary Document shall be true and correct in all material respects, in each case as of the Agreement Date and as of the Closing Date, with the same force and effect as though all such representations and warranties had been made as of the Closing Date (other than representations and warranties that by their terms address matters only as of another specified date, which shall be so true and correct only as of such other specified date), except where the failure of such representations or warranties to be so true and correct has not had and would not reasonably be

expected to have, individually or in the aggregate, a Material Adverse Effect on Sellers' ability to consummate the Transactions contemplated hereby;

   (f) Sellers shall have performed and complied in all material respects with all obligations, covenants and agreements required in this Agreement to be performed or complied with by them on or prior to the Closing Date;

   (g) Sellers shall have delivered, or caused to be delivered, to Purchaser, all of the items set forth in Section 4.2 hereof;

   (h) No Material Adverse Effect shall have occurred between the Agreement Date and the Closing Date; and

   (i) Sellers shall have complied with the sale process deadlines set forth in Section 8.2 hereof, such that the Closing may occur by the Outside Closing Date.

## ARTICLE XI.
## TAXES

  11.1 **Certain Taxes**. Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use or other Taxes and recording charges which may be payable by reason of the sale of the Purchased Assets or the assumption of the Assumed Liabilities under this Agreement or the Transactions contemplated hereby, and that are not exempt under Section 1146(a) of the Bankruptcy Code, shall be borne by Sellers.

  11.2 **Purchase Price Allocation and Withholding Price**. Within one hundred twenty (120) days after the Closing, Purchaser shall deliver to Sellers a schedule allocating the Purchase Price and the Assumed Liabilities (plus any other required items) among the Purchased Assets (the "**Allocation**"). Such Allocation shall be prepared in accordance with Section 1060 of the Internal Revenue Code and the Treasury Regulations promulgated thereunder. Sellers shall have thirty (30) days to review and approve the Allocation (which approval shall not be unreasonably withheld). The Parties agree to: (a) be bound by the Allocation; and (b) act in accordance with the Allocation in the preparation of all financial statements and the filing of all Tax Returns (including by Sellers and Purchaser filing Form 8594 with their respective United States federal income Tax return for the Tax period that includes the Closing Date) and in the course of any Tax audit, Tax review, or Tax litigation relating thereto; provided, however, that (i) the Allocation among Sellers shall be in accordance with Schedule 11.2 hereof, as mutually agreed upon by Purchaser and Sellers.

  11.3 **Cooperation on Tax Matters**. Subject to the provisions of Section 12.1 hereof, Purchaser and Sellers shall provide each other with such information and assistance as is reasonably necessary, including access to books and records, for the preparation of any tax returns or for the defense of any Tax claim or assessment.

## ARTICLE XII.
## POST-CLOSING OBLIGATIONS

12.1    **Sellers' Post-Closing Assurances**.  Within one hundred twenty (120) days after the Closing, Sellers shall cooperate fully with Purchaser in the performance of this Agreement, without material expense to Sellers, and shall execute such additional agreements, documents and instruments as may reasonably be required to carry out the intent of the Parties with respect to this Agreement.  Except as provided in Section 11.2 and notwithstanding any other provision of this Agreement to the contrary, Sellers shall have no further obligations of any nature whatsoever hereunder to Purchaser after one hundred twenty (120) days after the Closing.

12.2    **Proration**.  Purchaser shall pay timely, from and after the Closing Date, all Assumed Liabilities and Purchaser's portion, prorated as of the Closing Date, of Taxes and fees assessed against the Purchased Assets and all other costs, charges and expenses affecting the Purchased Assets arising from and after the Closing.

12.3    **Purchaser's Post-Closing Assurances**.  After the Closing, Purchaser shall cooperate fully with Sellers in the performance of this Agreement, and shall execute such additional agreements, documents or instruments as may be reasonably appropriate to carry out the intent of the Parties with respect to this Agreement

12.4    **Post-Closing Payment of Collections or Recoveries**.  In the event that, after the Closing, a Party receives, or receives payment of, an Account Receivable, refund, rebate, deposit, return, collection, recovery or any other property or asset to which another Party is entitled under the terms of this Agreement, such property or asset shall be remitted to the Party entitled to such property or asset within five (5) Business Days after the Party's receipt of such property or asset.

12.5    **Indemnification Regarding Operating Approvals.**  Purchaser shall indemnify Sellers for any and all losses that may be suffered by Sellers (including for any attorneys' fees or costs that may be incurred by Sellers) arising from or related to Purchaser's use or operation of Sellers' Operating Approvals after the Closing if so requested by Purchaser pursuant to the Interim Operating Agreement.

## ARTICLE XIII.
## MISCELLANEOUS

13.1    **Payment of Expenses**.  Except as otherwise provided in this Agreement (including Sections 4.5(b) and (c) hereof and Section 8.1 hereof) and whether or not the Transactions contemplated hereby are consummated, each Seller and Purchaser shall bear its own expenses incurred or to be incurred in connection with the negotiation and execution of this Agreement and the Ancillary Documents and the consummation of the Transactions contemplated hereby and thereby.

13.2    **No Survival of Representations and Warranties; Survival of Post-Closing Covenants**.  The Parties agree that the representations and warranties contained in this Agreement shall expire upon the Closing Date, except only that, in the case of Sellers, the representations and warranties in Section 5.6 (Title to Purchased Assets) hereof shall survive the Closing commensurate with the statute of limitations applicable thereto.  The Parties agree that the

DOCS 127753-000001/3730237.9

covenants contained in this Agreement to be performed at or after the Closing shall survive in accordance with the terms of the particular covenant or until fully performed.

13.3    **Entire Agreement; Amendments; Waivers**.  This Agreement and the Ancillary Documents represent the entire understanding and agreement between the Parties with respect to the subject matter hereof.  This Agreement may be amended, supplemented or changed, and any provision hereof may be waived, only by written instrument making specific reference to this Agreement signed by the Parties; provided, that the Schedules hereto may be amended in accordance with the provisions of Section 2.6 hereof.  No action taken pursuant to this Agreement shall be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, condition, covenant or agreement contained herein.  The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  All remedies hereunder are cumulative and are not exclusive of any other remedies provided by applicable Law.

13.4    **Execution of Agreement; Counterparts; Electronic Signatures**.

(a)    This Agreement may be executed in several counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument, and shall become effective when counterparts have been signed by each of the Parties and delivered to the other Parties; it being understood that all Parties need not sign the same counterparts.

(b)    The exchange of copies of this Agreement and of signature        by facsimile transmission or by electronic mail shall constitute effective execution and delivery of this Agreement as to the Parties and may be used in lieu of the original Agreement for all purposes.

13.5    **Governing Law**.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND WHERE STATE LAW IS IMPLICATED, THE LAWS OF THE STATE OF IDAHO SHALL GOVERN, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF (EXCEPT FOR ANY LAWS OF THAT STATE WHICH WOULD RENDER SUCH CHOICE OF LAWS INEFFECTIVE), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.

13.6    **Jurisdiction, Waiver of Jury Trial**.

(a)    THE BANKRUPTCY COURT SHALL HAVE SOLE AND EXCLUSIVE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER AT LAW OR IN EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY ANCILLARY DOCUMENT AND EACH PARTY CONSENTS UNCONDITIONALLY TO THE JURISDICTION OF THE BANKRUPTCY COURT; PROVIDED, HOWEVER, THAT, IF THE BANKRUPTCY COURT IS UNWILLING OR UNABLE TO HEAR ANY SUCH DISPUTE, THE COURTS OF THE STATE OF IDAHO AND

THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA LOCATED IN NEZ PERCE COUNTY, IDAHO SHALL HAVE SOLE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER AT LAW OR IN EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY ANCILLARY DOCUMENT.

(b)     EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

13.7    **Notices**. Unless otherwise set forth herein, any notices, consents, waivers and other communications required or permitted by this Agreement shall be in writing and shall be deemed given to a Party when (a) delivered to the appropriate address by hand or by nationally recognized overnight courier service (costs prepaid), or (b) sent by facsimile or e-mail, in each case, if sent during the normal business hours of the recipient, with confirmation of transmission by the transmitting equipment confirmed with a copy delivered as provided in clause (a) hereof.  Notice to a Party shall be given as follows:

If to Purchaser:

> Kash CA, Inc.
> c/o Dan Kash
> 294 Neptune Avenue
> Encinitas, CA  92024
> Tel: 310-692-5775
> *Email: laxrange@yahoo.com*

with a copy to (which shall
not constitute Notice for
purposes of this Section 13.7):

> William C. Belanger, Esq.
> Procopio, Cory, Hargreaves & Savitch LLP
> 525 B Street, Suite 2200
> San Diego, CA 92101
> Tel: 619-515-3245
> Email:  bill.belanger@procopio.com

If to Sellers:

> Howell Munitions & Technology, Inc.
> c/o J. Michael Issa
> GlassRatner Advisory & Capital Group LLC
> 19800 MacArthur Boulevard
> Irvine, CA 92612
> Tel: 949-407-6620
> Email: missa@glassratner.com

with a copy to (which shall

> Robert E.  Opera, Esq.

51

not constitute Notice for
purposes of this <u>Section 13.7</u>):

Winthrop Couchot Golubow Hollander, LLP
1301 Dove Street, Suite 500
Newport Beach, California 92660
Tel: 949-720-4130
Email: ropera@wcghlaw.com

A Party may designate in writing a different address to which any notice, request, demand or other communication is to be given hereunder to such Party.  Telephone numbers are listed for convenience purposes only and not for the purpose of giving notice pursuant to this Agreement.

13.8    **Binding Effect; Assignment**.  This Agreement shall be binding upon Purchaser and Sellers, provided the Closing shall be subject to entry of the Sale Order, and inure to the benefit of the Parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Bankruptcy Cases or any successor Chapter 7 cases.   No assignment of this Agreement or of any rights or obligations hereunder may be made by Sellers or Purchaser without the prior written consent of each other Party and any attempted assignment without such required consents shall be void, provided, however, that Purchaser shall be entitled to assign Purchaser's rights and delegate Purchaser's obligations hereunder to a wholly-owned affiliate of Purchaser, provided that Purchaser shall remain liable for the performance of all obligations of Purchaser hereunder.

13.9    **Severability**.  Whenever possible, each provision or portion of any provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable Law in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision in such jurisdiction and in lieu of such invalid, illegal or unenforceable provision, there will be added automatically as a part of this Agreement a valid, legal and enforceable provision as similar in terms to such invalid, illegal or unenforceable provision as may be possible.

13.10    **Bulk Sales Laws**.  Each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the Transactions contemplated by this Agreement or any Ancillary Document.

13.11    **Access and Right to Use**.  After the Closing, Purchaser shall, upon reasonable advance notice, afford to Sellers' officers, accountants, attorneys, consultants and other Representatives, reasonable access during normal business hours to the Purchased Assets and all books and records pertaining to the Purchased Assets on a cost-free basis solely for the purpose of enabling Sellers to conduct an orderly wind-down of Sellers' operations until such time as the wind-down is completed on or before the one-year anniversary of this Agreement.  Sellers expressly acknowledge that nothing in this <u>Section 13.11</u> is intended to give rise to any contingency to Sellers' obligations to proceed with the Transactions contemplated herein.

13.12    **Authorized Execution**.  Each individual executing this Agreement on behalf of a Party represents and warrants that (a) he is authorized to execute this Agreement for such Party, and (b) such Party shall be bound in all respects hereby.

13.13  **Attorneys' Fees and Costs**.  Each Party shall bear its own attorneys' fees and costs arising from or relating to the negotiation and execution of this Agreement.  In the event of any action or proceeding to enforce, modify, interpret, construe, invalidate, rescind, or set aside any term or provision of this Agreement, however, the prevailing Party shall be entitled to an award of its costs and expenses, including reasonable attorneys' fees and costs, incurred as a result of such action or proceeding, including any appeals resulting therefrom.

13.14  **Free and Voluntary Act**.  The Parties hereby acknowledge and agree that they have read carefully this Agreement, know the contents thereof, have discussed them with legal counsel, and sign the same of their own free and voluntary act with the intent to be legally bound thereby.

13.15  **No Construction against any Party; Headings for Convenience Only**.  The Parties have cooperated in the drafting and preparation of this Agreement.  In any construction of this Agreement, or of any of its terms and provisions, the same shall not be construed against any Party.  All headings in this Agreement are inserted for convenience of reference only, and shall not affect the construction or interpretation hereof.

13.16  **Reliance on Representations**.  Each Party specifically acknowledges that it has not relied on any statement, representation, or promise of any other Party or of any other Party's agents, employees, attorneys or other Representative, in executing this Agreement, except as expressly set forth herein.

13.17  **Solicitation**.  Purchaser hereby acknowledges and agrees that Sellers and their Representatives, consistent with Sellers' duties as debtors-in-possession in the Bankruptcy Cases, shall have the right to enter into, solicit, initiate or continue any discussions or negotiations with, and/or encourage or respond to any inquiries or proposals by, or participate in any negotiations with or provide any information to, or otherwise cooperate in any manner with, any Person other than Purchaser and its Representatives concerning any sale of all or any portion of the Purchased Assets, or of any shares of stock of Sellers, or any merger, consolidation or similar transaction involving Sellers.

[Remainder of      intentionally left blank]

[Signatures Follow Next

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective duly authorized officers or members as of the Agreement Date.

**SELLERS:**

**X-TREME BULLETS, INC.,**

As a Seller and Debtor-in-Possession

By: _____

Name: _____ J. M. ESSA _____

Its: _____ CRO _____

**AMMO LOAD WORLDWIDE, INC.,**

As a Seller and Debtor-in-Possession

By: _____

Name: _____ J. M. ISSA _____

Its: _____ CAO _____

**CLEARWATER BULLET, INC.,**

As a Seller and Debtor-in-Possession

By: _____

Name: _____ J. M. ISSA

Its: _____ CRO


**FREEDOM MUNITIONS, LLC,**

As a Seller and Debtor-in-Possession

By: _____

Name: _____ J. M. ISSA

Its: _____ CRO


**HOWELL MACHINE, INC.,**

As a Seller and Debtor-in-Possession.

By: _____

Name: _____ J. M. ISSA

Its: _____ CRO

*Signature Page to Asset Purchase Agreement*
DOCS 127753-000001/3730237.9

**HOWELL MUNITIONS & TECHNOLOGY, INC.,**

As a Seller and Debtor-in-Possession:

By: _____

Name: _____

Its: _____

**LEWIS-CLARK AMMUNITION COMPONENTS, LLC,**

As a Seller and Debtor-in-Possession

By: _____

Name: _____

Its: _____

**COMPONENTS EXCHANGE, LLC,**

As a Seller and Debtor-in-Possession


By: _____

Name: _____

Its: _____



**PURCHASER:**

**KASH CA, INC.**


By: _____ See Attached Signature _____

Name: _____

Its: _____

**COMPONENTS EXCHANGE, LLC,**

As a Seller and Debtor-in-Possession

By: _____See Attached Signature_____

Name: _____

Its: _____

**PURCHASER:**

**KASH CA, INC.**

By: _____

Name: _____Daniel Kash_____

Its: _____PRESIDENT_____

*Signature Page to Asset Purchase Agreement*
DOCS 127753-000001/3730237.9

| Schedule 1.1(ttt) | — | Permitted Encumbrances |
|---|---|---|
| Schedule 2.1(c) | — | Assigned Contracts |
| Schedule 2.2(m) | — | Any Assets Excluded by Purchaser |
| Schedule 2.3(b) | — | Open Purchase Orders |
| Schedule 2.3(c) | — | Sellers' Obligations to Transferred Employees |
| Schedule 5.4(b) | — | Violation of Laws |
| Schedule 5.7 | — | List of Litigation Pending Against Sellers |
| Schedule 5.10 | — | Environmental Matters |
| Schedule 11.2 | — | Allocation of Purchase Price Among Sellers |
| Exhibit 1 | — | Current Cash Collateral Order |
| Exhibit 2 | — | Settlement Agreements |

*Signature Page to Asset Purchase Agreement*
DOCS 127753-00001/3730237.9

EXHIBIT D

## SCHEDULE 1.1(ttt)

## PERMITTED ENCUMBRANCES

--NONE--

## SCHEDULE 2.1(c)

## ASSIGNED CONTRACTS

| Assigned Contract | Lessor | Lessee | Cure Amount |
|---|---|---|---|
| 4093 Lucky Lane<br>Lewiston, Idaho 83501 | David Howell Rentals | HMT | $-0- |
| 29978 Theissen Road<br>Lewiston, Idaho 83501 | David Howell Rentals | HMT | $-0- |
| 815 D Street<br>Lewiston, Idaho 83501 | David Howell Rentals | HMT | $-0- |
| 805 D Street<br>Lewiston, Idaho 83501 | David Howell Rentals | HMT | $-0- |
| Powder Storage Facility located at<br>424 Burrell Avenue<br>Lewiston, Idaho 83501 | David Howell Rentals | HMT | $-0- |
| 153 Southport<br>Lewiston, Idaho 83501 | David Howell Rentals | HMT | $-0- |
| 829 D Street<br>Lewiston, Idaho 83501 | David Howell Rentals | HMT | $-0- |
| 12 Stokes Drive<br>Moundhouse, NV 89706 | David Howell Rentals | HMT | $-0- |
| 25 Stokes Drive<br>Moundhouse, NV 89706 | David Howell Rentals | HMT | $-0- |
| 31 Stokes Drive<br>Moundhouse, NV 89706 | David Howell Rentals | HMT | $-0- |
| 823 D Street<br>Lewiston, Idaho | 823 D Street, LLC | HMT | $4,829.42 |

## SCHEDULE 2.2(m)

## ASSETS EXCLUDED BY PURCHASER

1.    Any leases or contracts of Sellers, except as set forth expressly in Schedule 2.1(c).

2.    Any forklifts, lift trucks or other equipment financed or leased by a Seller with Wells Fargo Bank.

3.    Any forklifts or other equipment financed or leased by a Seller with Toyota Industries Commercial Finance, Inc.

4.    Any photocopiers or other equipment financed or leased by a Seller with Canon Financial Services, Inc.

5.    A Shortel telephone system with accessories.

MAINDOCS-#241207-v1-Schedules_for_APA.docx

# SCHEDULE 2.3(b)

## Purchase Orders by Order Number

| Purchase order | Supplier | | Due date | Print date | Order date | Memo date | Memo code | Order type | Supplier class | Customer PO number | Customer | Status | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 00010333 | 02000529 | | 05/10/2019 | 03/27/2019 | 03/27/2019 | 03/27/2019 | | L | | | | 4 - Printed | |
| | Motion Industries, Inc | | | | | | | | | | | | |
| Line 0002 | Stock code 1440-1355 GEAR MOTOR | Rew/Rel | Warehouse 7055 | Job | | | | Order quantity 5 | | Received quantity 0 | Price 317.420 | O/s value 1,587.10 | Current o/s value 1,587.10 |
| | Catalogue: 011-348-1170 | | | | | | | | | | | | |
| Buyer - 03 Timothy Norris | | | Hash total of quantities : | | | | | 5.000 | | 0.000 | | | |
| | | | | | | | | | Gross o/s value | : | 1,587.10 | 1,587.10 |
| | | | | | | | | | Plus freight | : | 79.62 | 79.62 |
| | | | | | | | | | Net o/s value | : | 1,666.72 | 1,666.72 |
| 00010748 | 02002151 | | 09/20/2019 | 09/03/2019 | 09/03/2019 | 09/03/2019 | | L | | | | 4 - Printed | |
| | Schwab's Screw Machine Products, Inc | | | | | | | | | | | | |
| Line 0001 | Stock code AS3-01-11-9 STK3 HOLD DOWN DIE BODY 9MM | Rew/Rel | Warehouse ** | Job | | | | Order quantity 15 | | Received quantity 0 | Price 52.320 | O/s value 784.80 | Current o/s value 784.80 |
| 0002 | AS3-01-11-45 STK3 HOLD DOWN DIE BODY < 45 ACP | | ** | | | | | 6 | | 0 | 52.320 | 313.92 | 313.92 |
| Buyer - 03 Timothy Norris | | | Hash total of quantities : | | | | | 21.000 | | 0.000 | | | |
| | | | | | | | | | Net o/s value | : | 1,098.72 | 1,098.72 |
| 00010776 | 02002151 | | 09/18/2019 | 09/18/2019 | 09/18/2019 | 09/18/2019 | | L | | | | 4 - Printed | |
| | Schwab's Screw Machine Products, Inc | | | | | | | | | | | | |
| Line 0001 | Stock code 4-GRIND .2167 GRIND PARTS | Rew/Rel | Warehouse ** | Job | | | | Order quantity 89 | | Received quantity 0 | Price 1.750 | O/s value 155.75 | Current o/s value 155.75 |
| 0002 | 4-GRIND .2177 GRIND PARTS | | ** | | | | | 91 | | 0 | 1.750 | 159.25 | 159.25 |
| 0003 | 4-GRIND .2497 GRIND PARTS | | ** | | | | | 90 | | 0 | 1.750 | 157.50 | 157.50 |
| 0004 | 4-GRIND .2227 GRIND PARTS | | ** | | | | | 90 | | 0 | 1.750 | 157.50 | 157.50 |
| 0005 | 4-GRIND .2997 GRIND PARTS | | ** | | | | | 80 | | 0 | 1.750 | 140.00 | 140.00 |
| Buyer - 03 Timothy Norris | | | Hash total of quantities : | | | | | 440.000 | | 0.000 | | | |
| | | | | | | | | | Net o/s value | : | 770.00 | 770.00 |
| 00010795 | 02000460 | | 11/04/2019 | 09/23/2019 | 09/23/2019 | 09/23/2019 | | L | | | | 4 - Printed | |
| | Leader Tool Co Inc | | | | | | | | | | | | |
| Line 0001 | Stock code 1586-02-358HP NIELSEN .356 HP BULLET DIE | Rew/Rel | Warehouse ** | Job | | | | Order quantity 1 | | Received quantity 0 | Price 1,048.000 | O/s value 1,048.00 | Current o/s value 1,048.00 |
| Buyer - 03 Timothy Norris | | | Hash total of quantities : | | | | | 1.000 | | 0.000 | | | |
| | | | | | | | | | Net o/s value | : | 1,048.00 | 1,048.00 |

# Purchase Orders by Order Number

| Purchase order | Supplier | Due date | Print date | Order date | Memo date | Memo code | Order type | Supplier class | Customer PO number | Customer | Status |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 00010796 | 02001830 | 09/23/2019 | 09/23/2019 | 09/23/2019 | 09/23/2019 | | L | | | | 4 - Printed |
| | Dayton Lamina | | | | | | | | | | |

| Line | Stock code | | | Warehouse | | Order quantity | | Received quantity | | Price | O/s value | Current o/s value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0001 | 1586-04-300HP | Rev/Rel | | ** | Job | 5 | | 0 | | 86.680 | 433.40 | 433.40 |
| | NIELSEN 300 HP NOSE PUNCH | | | | | | | | | | | |
| 0002 | 1586-05-300HP | | | ** | | 5 | | 0 | | 140.700 | 703.50 | 703.50 |
| | NIELSEN 300 HP STRIPPER | | | | | | | | | | | |

Buyer - 03 Timothy Norris          Hash total of quantities :          10.000          0.000

Net o/s value    :    1,136.90    1,136.90

| Purchase order | Supplier | Due date | Print date | Order date | Memo date | | | Order type | | | | Status |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 00010793 | 02000724 | 09/24/2019 | 09/24/2019 | 09/24/2019 | 09/24/2019 | | | L | | | | 4 - Printed |
| | Spokane House of Hose | | | | | | | | | | | |

| Line | Stock code | | | Warehouse | | Order quantity | | Received quantity | | Price | O/s value | Current o/s value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0001 | 1576-0056 | Rev/Rel | | 7055 | Job | 10 | | 0 | | 15.590 | 155.90 | 155.90 |
| | UNION Y - 1/4 DIA | | | | | | | | | | | |
| | Catalogue: 1107-4 | | | | | | | | | | | |
| 0002 | 1440-1451 | | | 7055 | | 25 | | 0 | | 2.860 | 71.50 | 71.50 |
| | 1/4" TEE | | | | | | | | | | | |
| | Catalogue: 3700-4 | | | | | | | | | | | |
| 0003 | 1576-0139 | | | 7055 | | 25 | | 0 | | 1.050 | 26.25 | 26.25 |
| | 1/4" STANDARD NIPPLE | | | | | | | | | | | |
| 0004 | 1440-1469 | | | 7055 | | 5 | | 0 | | 11.050 | 55.25 | 55.25 |
| | AIR PRESSURE GAUGE | | | | | | | | | | | |
| | Catalogue: 20D-B-150 | | | | | | | | | | | |
| 0005 | 1440-1470 | | | 7055 | | 25 | | 0 | | 5.410 | 135.25 | 135.25 |
| | 1-4" TUBE X 1-4" MPT 90 DEGREE SWIVEL | | | | | | | | | | | |
| | Catalogue C1169-4-4S | | | | | | | | | | | |
| 0006 | 1440-1471 | | | 7055 | | 25 | | 0 | | 3.060 | 76.50 | 76.50 |
| | 1-4" TUBE X 1-4" MPT STRAIGHT | | | | | | | | | | | |
| | Catalogue: C1168-4-4 | | | | | | | | | | | |
| 0007 | 1440-1472 | | | 7055 | | 5 | | 0 | | 30.750 | 153.75 | 153.75 |
| | AIR REGULATOR | | | | | | | | | | | |
| 0008 | 1440-1453 | | | 7055 | | 25 | | 0 | | 4.790 | 119.75 | 119.75 |
| | 1-4" TUBE X 1-8" MPT 90 DEGREE SWIVEL | | | | | | | | | | | |
| | Catalogue: C1169-4S | | | | | | | | | | | |

Buyer - 03 Timothy Norris          Hash total of quantities :          145.000          0.000

Net o/s value    :    794.15    794.15

| Purchase order | Supplier | Due date | Print date | Order date | Memo date | | | Order type | | | | Status |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 00010810 | 02002151 | 10/02/2019 | 10/02/2019 | 10/02/2019 | 10/02/2019 | | | L | | | | 4 - Printed |
| | Schwalbe Screw Machine Products, Inc | | | | | | | | | | | |

| Line | Stock code | | | Warehouse | | Order quantity | | Received quantity | | Price | O/s value | Current o/s value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0001 | 1182-BF-41-01 | Rev/Rel | | ** | Job | 32 | | 0 | | 6.500 | 208.00 | 208.00 |
| | .358 SEATING PIN | | | | | | | | | | | |

Buyer - 03 Timothy Norris          Hash total of quantities :          32.000          0.000

Net o/s value    :    208.00    208.00

## Purchase Orders by Order Number

| Purchase order | Supplier | | Due date | Print date | Order date | Memo date | Memo code | Order type | Supplier class | Customer PO number | Customer | Status | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 00010816 | 02000412 | | 10/04/2019 | 10/04/2019 | 10/04/2019 | 10/04/2019 | | L | | | | 4 - Printed | |
| | Inland NW Metallurgical Services | | | | | | | | | | | | |
| Line 0001 | Stock code O1 Punch Blanks | Rev/Rel | | Warehouse ** | Job | | | Order quantity 1 | Received quantity 0 | | Price 115.000 | O/s value 115.00 | Current o/s value 115.00 |
| | HT Nielsen Specialties Heel Punches (1 Lot) | | | | | | | | | | | | |
| Buyer - 03 Timothy Norris | | | | Hash total of quantities : | | | | 1.000 | 0.000 | | | | |
| | | | | | | | | | Net o/s value | | | 115.00 | 115.00 |
| 00010819 | 02000172 | | 10/14/2019 | 10/08/2019 | 10/08/2019 | 10/08/2019 | | L | | | | 4 - Printed | |
| | Century Spring Corp | | | | | | | | | | | | |
| Line 0006 | Stock code 1432-11 | Rev/Rel | | Warehouse 7055 | Job | | | Order quantity 38 | Received quantity 12 | | Price 7.670 | O/s value 199.42 | Current o/s value 199.42 |
| | POWDER TUBE SPRINGS | | Catalogue: 72526S | | | | | | | | | | |
| Buyer - 03 Timothy Norris | | | | Hash total of quantities : | | | | 38.000 | 12.000 | | | | |
| | | | | | | | | | Gross o/s value | | : | 199.42 | 199.42 |
| | | | | | | | | | Plus freight | | : | 22.17 | 22.17 |
| | | | | | | | | | Net o/s value | | : | 221.59 | 221.59 |
| 00010822 | 02002133 | | 10/11/2019 | 10/09/2019 | 10/09/2019 | 10/09/2019 | | L | | | | 4 - Printed | |
| | Fastenal WACOV2418 | | | | | | | | | | | | |
| Line 0003 | Stock code 1334821 | Rev/Rel | | Warehouse ** | Job | | | Order quantity 1,000 | Received quantity 0 | | Price 0.109 | O/s value 109.00 | Current o/s value 109.00 |
| | 6 MIL BLACK NITRILE GLOVES - 2XL | | | | | | | | | | | | |
| Buyer - 03 Timothy Norris | | | | Hash total of quantities : | | | | 1,000.000 | 0.000 | | | | |
| | | | | | | | | | Net o/s value | | : | 109.00 | 109.00 |
| 00010823 | 02000345 | | 10/11/2019 | 10/09/2019 | 10/09/2019 | 10/09/2019 | | L | | | | 4 - Printed | |
| | Grainger | | | | | | | | | | | | |
| Line 0002 | Stock code 06869298 | Rev/Rel | | Warehouse ** | Job | | | Order quantity 2 | Received quantity 0 | | Price 61.750 | O/s value 123.50 | Current o/s value 123.50 |
| | EXTECH PH 105 PROBE | | | | | | | | | | | | |
| Buyer - 03 Timothy Norris | | | | Hash total of quantities : | | | | 2.000 | 0.000 | | | | |
| | | | | | | | | | Gross o/s value | | : | 123.50 | 123.50 |
| | | | | | | | | | Plus freight | | : | 10.98 | 10.98 |
| | | | | | | | | | Net o/s value | | : | 134.48 | 134.48 |
| 00010824 | 02000529 | | 10/15/2019 | 10/09/2019 | 10/09/2019 | 10/09/2019 | | L | | | | 4 - Printed | |
| | Motion Industries, Inc | | | | | | | | | | | | |
| Line 0001 | Stock code 1MN59 | Rev/Rel | | Warehouse ** | Job | | | Order quantity 4 | Received quantity 0 | | Price 8.380 | O/s value 33.52 | Current o/s value 33.52 |
| | 6203-RS TIMKEN BEARING | | | | | | | | | | | | |
| Buyer - 03 Timothy Norris | | | | Hash total of quantities : | | | | 4.000 | 0.000 | | | | |
| | | | | | | | | | Gross o/s value | | : | 33.52 | 33.52 |
| | | | | | | | | | Plus freight | | : | 27.98 | 27.98 |
| | | | | | | | | | Net o/s value | | : | 61.50 | 61.50 |

## Purchase Orders by Order Number

| Purchase order | Supplier | Due date | Print date | Order date | Memo date | Memo code | Order type | Supplier class | Customer PO number | Customer | Status |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 00010825 | 02032611 HS House | 10/21/2019 | 10/09/2019 | 10/09/2019 | 10/09/2019 | | L | | | | 4 - Printed |

| Line | Stock code | Rev/Rel | Warehouse | | | Order quantity | | Received quantity | | Price | O/s value | Current o/s value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0201 | 1440-1285 MOTOR - VAR SPEED, STYLE 1A-120 V | | 7055 | Job | | 3 | | 0 | | 167.000 | 501.00 | 501.00 |
| 0002 | 1440-1446 MOTOR FLANGE | | 7055 | | | 3 | | 0 | | 21.000 | 63.00 | 63.00 |

Buyer - 03 Timothy Norris    Hash total of quantities : 6.000    0.000
Gross o/s value : 564.00    564.00
Plus freight : 40.00    40.00
Plus misc charges : 40.00    75.15
Net o/s value : 679.15    679.15

| 00010826 | 02000345 Grainger | 10/18/2019 | 10/09/2019 | 10/09/2019 | 10/09/2019 | | L | | | | 4 - Printed |

| Line | Stock code | Rev/Rel | Warehouse | | | Order quantity | | Received quantity | | Price | O/s value | Current o/s value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0001 | 1576-0177 DAYTON GEAR BOX | | 7055 | Job | | 1 | | 0 | | 647.000 | 647.00 | 647.00 |

Buyer - 03 Timothy Norris    Hash total of quantities : 1.000    0.000
Gross o/s value : 647.00    647.00
Plus freight : 26.14    26.14
Net o/s value : 673.14    673.14

| 00010828 | 02003264 Standard Crane & Hoist, LLC | 10/09/2019 | 10/09/2019 | 10/09/2019 | 10/09/2019 | | L | | | | 4 - Printed |

| Line | Stock code | Rev/Rel | Warehouse | | | Order quantity | | Received quantity | | Price | O/s value | Current o/s value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0001 | 0808208A WHEEL ASSY FOR CASE MAKING HOIST | | ** | Job | | 1 | | 0 | | 95.200 | 95.20 | 95.20 |

Buyer - 03 Timothy Norris    Hash total of quantities : 1.000    0.000
Gross o/s value : 95.20    95.20
Plus freight : 18.39    18.39
Net o/s value : 113.59    113.59

| 03010833 | 02002229 TechPlate, Inc | 10/11/2019 | 10/11/2019 | 10/11/2019 | 10/11/2019 | | L | | | | 4 - Printed |

| Line | Stock code | Rev/Rel | Warehouse | | | Order quantity | | Received quantity | | Price | O/s value | Current o/s value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0001 | AR2-01-34 DURAPLATE REAR RAIL -9MM | | ** | Job | | 10 | | 0 | | 25.000 | 250.00 | 250.00 |
| 0002 | AR1-01-02 DURAPLATE CASE SLIDE - 9MM | | ** | | | 10 | | 0 | | 25.000 | 250.00 | 250.00 |

Buyer - 03 Timothy Norris    Hash total of quantities : 20.000    0.000
Gross o/s value : 500.00    500.00
Plus misc charges : 500.00    40.00
Net o/s value : 540.00    540.00

## Purchase Orders by Order Number

| Purchase order | Supplier | Due date | Print date | Order date | Memo date | Memo code | Order type | Supplier class | Customer PO number | Customer | Status | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 00010534 | 02000529 | 10/18/2019 | 10/11/2019 | 10/11/2019 | 10/11/2019 | | L | | | | 4 - Printed | |
| | Motion Industries, Inc | | | | | | | | | | | |
| Line 0001 | Stock code 15764179 | Rev/Rel | | Warehouse 7055 | Job | | | Order quantity 4 | Received quantity 0 | | Price 23.630 | O/s value 94.52 | Current o/s value 94.52 |
| | DRIVE SHAFT SUPPORT BEARING | | | | | | | | | | | |
| Buyer - 03 Timothy Norris | | | | Hash total of quantities : | | | | 4.000 | 0.000 | | | |
| | | | | | | | | | Gross o/s value | : | 94.52 | 94.52 |
| | | | | | | | | | Plus freight | : | 13.46 | 13.46 |
| | | | | | | | | | Net o/s value | : | 107.98 | 107.98 |
| 00010536 | 02001047 | 10/22/2019 | 10/15/2019 | 10/15/2019 | 10/15/2019 | | L | | | | 4 - Printed | |
| | Vibco | | | | | | | | | | | |
| Line 0001 | Stock code BK-007 | Rev/Rel | | Warehouse ** | Job | | | Order quantity 2 | Received quantity 0 | | Price 57.210 | O/s value 114.42 | Current o/s value 114.42 |
| | BRUSH KIT FOR SCR-100 VIBRATOR | | | | | | | | | | | |
| Buyer - 03 Timothy Norris | | | | Hash total of quantities : | | | | 2.000 | 0.000 | | | |
| | | | | | | | | | Net o/s value | : | 114.42 | 114.42 |
| 00010537 | 02000830 | 10/15/2019 | 10/15/2019 | 10/15/2019 | 10/15/2019 | | L | | | | 4 - Printed | |
| | Precision Signs | | | | | | | | | | | |
| Line 0001 | Stock code SAFETY SIGN | Rev/Rel | | Warehouse ** | Job | | | Order quantity 1 | Received quantity 0 | | Price 150.000 | O/s value 150.00 | Current o/s value 150.00 |
| | PLATING SAFETY SIGN | | | | | | | | | | | |
| Buyer - 03 Timothy Norris | | | | Hash total of quantities : | | | | 1.000 | 0.000 | | | |
| | | | | | | | | | Net o/s value | : | 150.00 | 150.00 |
| 00010538 | 02001050 | 10/15/2019 | 10/15/2019 | 10/15/2019 | 10/15/2019 | | L | | | | 4 - Printed | |
| | Ebay | | | | | | | | | | | |
| Line 0001 | Stock code DISUL-8 COB81 .5P | Rev/Rel | | Warehouse ** | Job | | | Order quantity 1 | Received quantity 0 | | Price 44.990 | O/s value 44.99 | Current o/s value 44.99 |
| | HOIST CONTROL | | | | | | | | | | | |
| Buyer - 03 Timothy Norris | | | | Hash total of quantities : | | | | 1.000 | 0.000 | | | |
| | | | | | | | | | Gross o/s value | : | 44.99 | 44.99 |
| | | | | | | | | | Plus freight | : | 8.00 | 8.00 |
| | | | | | | | | | Net o/s value | : | 52.99 | 52.99 |

## Purchase Orders by Order Number

| Purchase order | Supplier | Due date | Print date | Order date | Memo date | Memo code | Order type | Supplier class | Customer PO number | Customer | Status |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 00010840 | 02001801 | 10/15/2019 | 10/15/2019 | 10/15/2019 | 10/15/2019 | | L | | | | 4 - Printed |
| | Zoro Tools Inc | | | | | | | | | | |

| Line | Stock code | Rev/Rel | Warehouse | Job | | | Order quantity | Received quantity | | Price | O/s value | Current o/s value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0001 | G7267202 | Rev/Rel | ** | | | | 1 | 0 | | 148.350 | 148.35 | 148.35 |
| | STREAMLIGHT RECHARGEABLE FLASHLIGHT | | | | | | | | | | | |
| 0002 | G0060918 | | ** | | | | 3 | 0 | | 4.190 | 12.57 | 12.57 |
| | HANDHELD FLASHLIGHT | | | | | | | | | | | |
| 0003 | G7080945 | | ** | | | | 1 | 0 | | 35.550 | 35.55 | 35.55 |
| | LOC-LINE ROUND NOZZLE, BLACK, 1/16" (PK 50) | | | | | | | | | | | |

Buyer - 03 Timothy Norris                       Hash total of quantities :      5.000                    0.000

Net o/s value        :       196.47       196.47

| 00010841 | 02000766 | 10/15/2019 | 10/15/2019 | 10/15/2019 | 10/15/2019 | | L | | | | 4 - Printed |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Thermal Modification Tech. | | | | | | | | | | |

| Line | Stock code | Rev/Rel | Warehouse | Job | | | Order quantity | Received quantity | | Price | O/s value | Current o/s value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0001 | 1329-03 | Rev/Rel | ** | | | | 1 | 0 | | 135.000 | 135.00 | 135.00 |
| | HT BARREL LINER | | | | | | | | | | | |

Buyer - 03 Timothy Norris                       Hash total of quantities :      1.000                    0.000

Gross o/s value        :       135.00       135.00
Plus misc charges      :       135.00        75.00
Net o/s value          :       210.00       210.00

| 00010842 | 02000331 | 10/21/2019 | 10/16/2019 | 10/15/2019 | 10/16/2019 | | L | | | | 4 - Printed |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Gateway Materials, Inc | | | | | | | | | | |

| Line | Stock code | Rev/Rel | Warehouse | Job | | | Order quantity | Received quantity | | Price | O/s value | Current o/s value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0001 | FLAT BAR | Rev/Rel | ** | | | | 1 | 0 | | 22.600 | 22.60 | 22.60 |
| | A36 - 3/16" X 1-1/4" FLAT BAR (20' STICK) | | | | | | | | | | | |

Buyer - 03 Timothy Norris                       Hash total of quantities :      1.000                    0.000

Net o/s value        :        22.60        22.60

| 00010843 | 02002911 | 10/23/2019 | 10/16/2019 | 10/16/2019 | 10/16/2019 | | L | | | | 4 - Printed |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Absolute Machine Solutions | | | | | | | | | | |

| Line | Stock code | Rev/Rel | Warehouse | Job | | | Order quantity | Received quantity | | Price | O/s value | Current o/s value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0001 | AB7-01-01 | Rev/Rel | ** | | | | 16 | 0 | | 14.0625 | 225.00 | 225.00 |
| | BLACK OXIDE BELL CRANK ARMS | | | | | | | | | | | |

Buyer - 03 Timothy Norris                       Hash total of quantities :     16.000                    0.000

Net o/s value        :       225.00       225.00

| 00010844 | 02000533 | 10/22/2019 | 10/16/2019 | 10/16/2019 | 10/16/2019 | | L | | | | 4 - Printed |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | MSC Industrial Supply Co | | | | | | | | | | |

| Line | Stock code | Rev/Rel | Warehouse | Job | | | Order quantity | Received quantity | | Price | O/s value | Current o/s value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0001 | 06981238 | Rev/Rel | ** | | | | 20 | 0 | | 1.170 | 23.40 | 23.40 |
| | SIZE 6 | | | | | | | | | | | |

Buyer - 03 Timothy Norris                       Hash total of quantities :     20.000                    0.000

Net o/s value        :        23.40        23.40

## Purchase Orders by Order Number

| Purchase order | Supplier | Due date | Print date | Order date | Memo date | Memo code | Order type | Supplier class | Customer PO number | Customer | Status |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 00010845 | 02000345 | 10/16/2019 | 10/16/2019 | 10/16/2019 | 10/16/2019 | | L | | | | 4 - Printed |
| | Grainger | | | | | | | | | | |

| | Stock code | | Rev/Rel | | Warehouse | Job | Order quantity | Received quantity | | Price | O/s value | Current o/s value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Line 0001 | 1440-1277 | | | | 7055 | | 8 | 0 | | 111.190 | 889.52 | 889.52 |
| | DC SPEED CONTROL | | | | | | | | | | | |
| | | Catalogue: 5JJ58 | | | | | | | | | | |
| Buyer - 03 Timothy Norris | | | | Hash total of quantities: | | | 8.000 | 0.000 | | | | |
| | | | | | | | | Gross o/s value | | : | 889.52 | 889.52 |
| | | | | | | | | Plus freight | | : | 14.38 | 14.38 |
| | | | | | | | | Net o/s value | | : | 903.90 | 903.90 |

| 00010846 | 02000467 | 10/16/2019 | 10/16/2019 | 10/16/2019 | 10/16/2019 | | L | | | | 4 - Printed |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Lewiston Auto Parts | | | | | | | | | | |

| | Stock code | | Rev/Rel | | Warehouse | Job | Order quantity | Received quantity | | Price | O/s value | Current o/s value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Line 0001 | 1576-0135 | | | | 7055 | | 10 | 0 | | 5.030 | 50.30 | 50.30 |
| | V-BELT | | | | | | | | | | | |
| | | Catalogue: 4L230 | | | | | | | | | | |
| Buyer - 03 Timothy Norris | | | | Hash total of quantities: | | | 10.000 | 0.000 | | | | |
| | | | | | | | | Net o/s value | | : | 50.30 | 50.30 |

| 00010847 | 02000862 | 10/16/2019 | 10/16/2019 | 10/16/2019 | 10/16/2019 | | L | | | | 4 - Printed |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | CED - Consolidated Electrical Dist. Inc | | | | | | | | | | |

| | Stock code | | Rev/Rel | | Warehouse | Job | Order quantity | Received quantity | | Price | O/s value | Current o/s value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Line 0001 | 1440-1278 | | | | 7055 | | 5 | 0 | | 105.000 | 525.00 | 525.00 |
| | TUBULAR INDUCTIVE PROX 8MM | | | | | | | | | | | |
| | | Catalogue: E57LBL18A2E | | | | | | | | | | |
| Buyer - 03 Timothy Norris | | | | Hash total of quantities: | | | 5.000 | 0.000 | | | | |
| | | | | | | | | Net o/s value | | : | 525.00 | 525.00 |

| 00010848 | 02000529 | 10/16/2019 | 10/16/2019 | 10/16/2019 | 10/16/2019 | | L | | | | 4 - Printed |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Motion Industries, Inc | | | | | | | | | | |

| | Stock code | | Rev/Rel | | Warehouse | Job | Order quantity | Received quantity | | Price | O/s value | Current o/s value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Line 0002 | 1576-0210 | | | | 7055 | | 4 | 0 | | 49.560 | 198.24 | 198.24 |
| | BEARING WITH COLLAR | | | | | | | | | | | |
| Buyer - 03 Timothy Norris | | | | Hash total of quantities: | | | 4.000 | 0.000 | | | | |
| | | | | | | | | Gross o/s value | | : | 198.24 | 198.24 |
| | | | | | | | | Plus freight | | : | 13.86 | 13.86 |
| | | | | | | | | Net o/s value | | : | 212.10 | 212.10 |

| 00010849 | 02000202 | 10/16/2019 | 10/16/2019 | 10/16/2019 | 10/16/2019 | | L | | | | 4 - Printed |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Columbia Electric Supply | | | | | | | | | | |

| | Stock code | | Rev/Rel | | Warehouse | Job | Order quantity | Received quantity | | Price | O/s value | Current o/s value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Line 0001 | 1576-0137 | | | | 7055 | | 6 | 0 | | 3.750 | 22.50 | 22.50 |
| | 16/3 6FT POWER CORD | | | | | | | | | | | |
| | | Catalogue: 56957601 | | | | | | | | | | |
| Buyer - 03 Timothy Norris | | | | Hash total of quantities: | | | 6.000 | 0.000 | | | | |
| | | | | | | | | Net o/s value | | : | 22.50 | 22.50 |

## Purchase Orders by Order Number

| Purchase order | Supplier | Due date | Print date | Order date | Memo date | Memo code | Order type | Supplier class | Customer PO number | Customer | Status |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 00010850 | 02002133 | 10/18/2019 | 10/16/2019 | 10/16/2019 | 10/16/2019 | | L | | | | 4 - Printed |
| | Fastenal WACOV2418 | | | | | | | | | | |

| Line | Stock code | Rev/Rel | Warehouse | Job | | | Order quantity | Received quantity | | Price | O/s value | Current o/s value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0001 | 70313 | | ** | | | | 25 | 0 | | 1.750 | 43.75 | 43.75 |
| | 5/8"-11 X 2-1/2" ASTM F593 18-8 SS HEX CAP SCREW | | | | | | | | | | |

Buyer - 03 Timothy Norris

| | | Hash total of quantities : | | 25.000 | 0.000 | | |
|---|---|---|---|---|---|---|---|
| | | | | | Gross o/s value | : | 43.75 | 43.75 |
| | | | | | Plus freight | : | 5.04 | 5.04 |
| | | | | | Net o/s value | : | 48.79 | 48.79 |

| 00010852 | 02000024 | 10/16/2019 | 10/16/2019 | 10/16/2019 | 10/16/2019 | | L | | | | 4 - Printed |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Air Electric | | | | | | | | | | |

| Line | Stock code | Rev/Rel | Warehouse | Job | | | Order quantity | Received quantity | | Price | O/s value | Current o/s value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0001 | 7.6238.00010 | | ** | | | | 1 | 0 | | 356.620 | 356.62 | 356.62 |
| | KAESER-NTC TEMP CONTROL | | | | | | | | | | |

Buyer - 03 Timothy Norris

| | | Hash total of quantities : | | 1.000 | 0.000 | | |
|---|---|---|---|---|---|---|---|
| | | | | | Gross o/s value | : | 356.62 | 356.62 |
| | | | | | Plus misc charges | : | 356.62 | 115.00 |
| | | | | | Net o/s value | : | 471.62 | 471.62 |

| 00010853 | 02000782 | 10/17/2019 | 10/17/2019 | 10/17/2019 | 10/17/2019 | | L | | | | 4 - Printed |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Uline | | | | | | | | | | |

| Line | Stock code | Rev/Rel | Warehouse | Job | | | Order quantity | Received quantity | | Price | O/s value | Current o/s value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0001 | S-4500 | | ** | | | | 15 | 0 | | 1.870 | 28.05 | 28.05 |
| | 20 X 20 X 6 CORRUGATED BOX | | | | | | | | | | |
| 0002 | S-4060 | | ** | | | | 50 | 0 | | 0.290 | 14.50 | 14.50 |
| | 6 X 4 X 4 CORRUGATED BOX | | | | | | | | | | |
| 0003 | S-19813 | | ** | | | | 50 | 0 | | 1.360 | 68.00 | 68.00 |
| | 4 X 4 X 32 CORRUGATED BOX | | | | | | | | | | |

Buyer - 03 Timothy Norris

| | | Hash total of quantities : | | 115.000 | 0.000 | | |
|---|---|---|---|---|---|---|---|
| | | | | | Gross o/s value | : | 110.55 | 110.55 |
| | | | | | Plus freight | : | 51.29 | 51.29 |
| | | | | | Net o/s value | : | 161.84 | 161.84 |

| 00010854 | 02000724 | 10/21/2019 | 10/17/2019 | 10/17/2019 | 10/17/2019 | | L | | | | 4 - Printed |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Spokane House of Hose | | | | | | | | | | |

| Line | Stock code | Rev/Rel | Warehouse | Job | | | Order quantity | Received quantity | | Price | O/s value | Current o/s value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0001 | 1440-1472 | | 7055 | | | | 5 | 0 | | 20.750 | 103.75 | 103.75 |
| | AIR REGULATOR | | | | | | | | | | |
| 0002 | 1440-1551 | | 7055 | | | | 5 | 0 | | 6.140 | 30.70 | 30.70 |
| | AIR REGULATOR BRACKET | | | | | | | | | | |

Buyer - 03 Timothy Norris

| | | Hash total of quantities : | | 10.000 | 0.000 | | |
|---|---|---|---|---|---|---|---|
| | | | | | Net o/s value | : | 134.45 | 134.45 |

| | | Hash total of quantities : | | 1,952.000 | 12.000 | | |
|---|---|---|---|---|---|---|---|

## Purchase Orders by Order Number

| Purchase order | Supplier | Due date | Print date | Order date | Memo date | Memo code | Order type | Supplier class | Customer PO number | Customer | Status | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Company gross outstanding value | | : | 12,366.84 | 12,366.84 |
| | | | | | | | | Less total order discount | | : | | |
| | | | | | | | | Plus freight charges | | : | 331.31 | 331.31 |
| | | | | | | | | Plus misc. charges | | : | 305.15 | 305.15 |
| | | | | | | | | Company net outstanding value | | : | 13,003.30 | 13,003.30 |
| | | | | | | | | Total number of outstanding orders | | : | 34 | |

End of report

# SCHEDULE 2.3(c)

## HMT & CE Employee PTO Balances as of 10/17/2019

| Payroll Name | Reports To Name | Regular Pay Rate Amount | PTO Balance in Hours | PTO Balance in $ |
|---|---|---|---|---|
| Acree, Kevin Robert | Chase, James | $21.00 | 11.00 | $ 231.00 |
| Adams, Bryan | Chase, James | $18.00 | 4.90 | $ 88.20 |
| Aguilar, Daniel Manuel | Chase, James | $18.30 | 29.00 | $ 530.70 |
| Anderson, Brenda L | Foshee, Kerry | $18.25 | 8.53 | $ 155.73 |
| Ballard, Jeffrey O | Chase, James | $18.00 | 72.80 | $ 1,310.40 |
| Barclay, Shaun | Smith, Angela | $40.00 | 0.00 | $ - |
| Bjorkquist, Bradley | Chase, James | $17.00 | 33.00 | $ 561.00 |
| Burke, Shawn | Chase, James | $22.50 | 31.98 | $ 719.54 |
| Carr-Nicholson, Veronica | Chase, James | $20.00 | 4.00 | $ 80.00 |
| Chase, James | Howell, David | $38.48 | 59.05 | $ 2,272.24 |
| Coons, Bailey | Chase, James | $13.00 | 0.00 | $ - |
| Cottrell, Diana | Chase, James | $13.00 | 1.00 | $ 13.00 |
| Dean, Brandon | Eaton, Arthur | $30.00 | 11.59 | $ 347.70 |
| Devin, Michael T | Eaton, Arthur | $22.80 | 75.67 | $ 1,725.28 |
| Doxtator, Mike | Chase, James | $16.75 | 7.00 | $ 117.25 |
| Dreadfulwater, Nathan | Chase, James | $18.00 | 6.00 | $ 108.00 |
| Eaton, Arthur W | Foshee, Kerry | $32.49 | 221.81 | $ 7,208.61 |
| Everson, Theresa | Chase, James | $14.50 | 4.04 | $ 58.58 |
| Garai, Curtis | Chase, James | $20.00 | 6.70 | $ 134.01 |
| Gasper, Bradley | Chase, James | $22.15 | 6.70 | $ 148.40 |
| Goffinet, Tammy Jo | Howell, David | $20.20 | 50.15 | $ 1,013.04 |
| Halks, Antony | Chase, James | $17.50 | 8.00 | $ 140.00 |
| Hill, Steven Michael | Chase, James | $19.00 | 4.00 | $ 76.00 |
| Howell, Stephen S | Foshee, Kerry | $31.39 | 214.19 | $ 6,723.42 |
| Howell, Thomas | Chase, James | $16.78 | 27.55 | $ 462.29 |
| Iverson, Benjamen | Chase, Joseph | $18.00 | 130.29 | $ 2,345.22 |
| Jenkins, Jeremy | Chase, James | $20.70 | .60 | $ 12.35 |
| Johnson, Travis | Chase, James | $19.00 | 5.27 | $ 100.13 |
| Karki, Nathan W | Howell, Stephen | $26.10 | .75 | $ 19.58 |
| Kaufmann, Chad M | Eaton, Arthur | $28.26 | 51.70 | $ 1,461.04 |
| Kissler, John | Chase, Joseph | $15.00 | 68.75 | $ 1,031.25 |
| Land, Nicholas | Chase, James | $20.50 | 100.75 | $ 2,065.38 |
| Lathrop, Krista | Smith, Angela | $26.04 | 197.50 | $ 5,142.90 |
| Lohman, Jeff J | Howell, Stephen | $24.46 | 55.23 | $ 1,350.97 |
| Marlon, Kathryn I | Smith, Angela | $29.77 | 203.55 | $ 6,059.68 |
| Martin, Brendon | Chase, Joseph | $17.00 | 25.00 | $ 425.00 |
| Martin, Zachary | Chase, James | $13.50 | 102.00 | $ 1,377.00 |
| McEwen, Lisa | Foshee, Kerry | $32.82 | 27.46 | $ 901.24 |
| Mundy, Michael | Norris, Timothy | $26.00 | 0.00 | $ - |
| Nelson, Karin | Chase, James | $23.00 | 67.64 | $ 1,555.73 |
| Norris, Timothy R | Smith, Angela | $36.78 | 84.11 | $ 3,093.57 |
| Nuxoll, Jessica | Chase, James | $19.00 | 37.90 | $ 720.11 |
| Parot, Reymon Joseph | Chase, James | $15.00 | 5.00 | $ 75.00 |
| Pilant, Garry D | | $21.50 | 82.00 | $ 1,763.00 |
| Pilant, Justin | Chase, James | $25.00 | 122.00 | $ 3,050.00 |
| Porter, Jenell | Chase, James | $14.00 | 69.75 | $ 976.50 |
| Prior, Benjamin | Chase, Joseph | $15.75 | 8.00 | $ 126.00 |
| Roberts, Nelson | Chase, James | $17.00 | 8.00 | $ 136.00 |
| Rogers, Michael | Chase, James | $20.00 | 138.00 | $ 2,760.00 |
| Sanborn, David | Chase, James | $20.40 | 40.73 | $ 830.89 |
| Schaffner, Devon Jordan | Chase, James | $15.00 | 50.00 | $ 750.00 |
| Seideman, Joseph Levi | Chase, James | $21.00 | 94.70 | $ 1,988.69 |
| Shaw, Matthew W | Chase, James | $18.30 | 4.00 | $ 73.20 |
| Shoults, Ryan | Howell, Stephen | $23.00 | 6.50 | $ 149.50 |
| Sloppy, Ruth | Chase, James | $13.00 | 0.00 | $ - |
| Smith, Nicholas | Chase, James | $17.50 | 12.35 | $ 216.13 |
| Smith, Trevor | Chase, James | $19.00 | 68.00 | $ 1,292.00 |
| Stern, Michelle | Howell, David | $24.11 | 71.70 | $ 1,728.69 |
| Stevenson Sr, Timothy B | Chase, James | $27.25 | 46.69 | $ 1,272.30 |
| Stout, Chris A | Howell, Stephen | $23.75 | 14.81 | $ 351.74 |
| Torrez, Trevor TJ | Chase, James | $20.50 | 6.50 | $ 133.25 |
| Town, David | Chase, James | $19.05 | 68.97 | $ 1,313.81 |
| Van Zante, Corey | Chase, James | $22.00 | 14.00 | $ 308.00 |
| Wakefield, Kelsey Dawn | Foshee, Kerry | $21.00 | 40.63 | $ 853.23 |
| Weldon, Cheryl S | Chase, James | $17.00 | 0.00 | $ - |
| Wemlinger, Joshua | Foshee, Kerry | $31.25 | 18.52 | $ 578.75 |
| West, Tashil | Chase, James | $19.50 | 7.00 | $ 136.50 |
| Wolfinger, Tara | Chase, James | $18.50 | 0.00 | $ - |
| Wyse, Paul Daniel | Chase, James | $15.75 | 8.40 | $ 132.30 |
| Young, Donald E. | Chase, Joseph | $15.80 | 20.50 | $ 323.90 |
| Zander, Eric | Chase, James | $20.50 | 40.55 | $ 831.27 |

TOTAL PTO to be assumed by LAX  $  74,034.16

## SCHEDULE 5.4(b)

## VIOLATION OF LAWS

The TTB alleges that Sellers have failed to pay to the TTB excise tax obligations, as disclosed in the proof of claim filed by the TTB in the Bankruptcy Cases. Sellers dispute such allegation.

## SCHEDULE 5.7

### LIST OF LITIGATION PENDING AGAINST SELLERS

1.  TTB — Levy upon $832,000 of funds of HMT on deposit at Zions, and levy upon accounts owed to Sellers by a number of account debtors.

2.  David Curt Pinther — complaint filed on November 8, 2018 in the District Court of the Fifth Judicial District of the State of Idaho, in and for the County of Minidoka, as Case No. CV 34-18-00883 (personal injury claim).

3.  Heath Shelton — personal injury claim asserted on September 18, 2018.

MAINDOCS-#241207-v1-Schedules_for_APA.docx

EXHIBIT D

## SCHEDULE 5.10

## ENVIRONMENTAL MATTERS

Administrative Agreement with Environmental Protection Agency, Matters 11-0181-00A, et al. Concluded matters relating to releases of hazardous waste water without a permit.

There are no other claims of which Sellers have knowledge, but the Sellers store Materials of Environmental Concern at their facilities, including hydrogen peroxide, florobonic acid, sodium cyanide and copper cyanide.

### SCHEDULE 11.2

### ALLOCATION OF PURCHASE PRICE AMONG SELLERS

| Summary of all Entities – Assets Allocated | |
|---|---|
| ALW | 3,369,693.75 |
| BC | 50,189.15 |
| CB | 2,269,416.49 |
| CE | 2,200,000.00 |
| HMT | 927,775.47 |
| LCAC | 43,963.91 |
| TRCL | 201,590.60 |
| XB | 158,401.22 |
| FM | 2,578,969.41 |
| 11,800,000.00 | |

# EXHIBIT 1

**TO APA**

1

2

3    *Bruce T Beesley*

    Honorable Bruce T. Beesley
    United States Bankruptcy Judge

4
Entered on Docket
August 08, 2019

6

7

8    ROBERT E. OPERA – California State Bar No. 101182
     ropera@wcghlaw.com
9    **WINTHROP COUCHOT**
     **GOLUBOW HOLLANDER, LLP**
10   1301 Dove Street, Suite 500
     Newport Beach, CA 92660
11   Telephone: (949) 720-4100
     Facsimile: (949) 720-4111
12

13   STEPHEN R. HARRIS – Nevada State Bar No. 001463
     steve@harrislawreno.com
14   **HARRIS LAW PRACTICE LLC**
     6151 Lakeside Drive, Suite 2100
15   Reno, NV 89511
     Telephone: (775) 786-7600
16

17   General Insolvency Counsel
     for Debtors and Debtors-in-Possession

18

19                **UNITED STATES BANKRUPTCY COURT**

20                        **DISTRICT OF NEVADA**

21   In re:                              | Jointly Administered under
                                          Case No. 18-50609-btb with
22   ☐ X-TREME BULLETS, INC.,
     ☐ AMMO LOAD WORLDWIDE, INC.,        Case Nos. 18-50610-btb; 18-50611-btb;
23   ☐ CLEARWATER BULLET, INC.,          18-50613-btb; 18-50614-btb; 18-50615-btb;
     ☐ FREEDOM MUNITIONS, LLC,           18-50616-btb; and 18-50617-btb
24   ☐ HOWELL MACHINE, INC.,
     ☐ HOWELL MUNITIONS &                Chapter 11 Proceedings
25      TECHNOLOGY, INC.,
     ☐ LEWIS-CLARK AMMUNITION            **ORDER APPROVING STIPULATION TO**
26      COMPONENTS, LLC,                 **CONTINUE HEARING ON MOTION FOR**
     ☐ COMPONENTS EXCHANGE, LLC,         **ORDER AUTHORIZING USE OF ANY CASH**
27   ☒ All Debtors.                      **COLLATERAL OF SECURED CLAIMANTS**
28                Debtors and

EXHIBIT 1
MAINDOCS-#241079-v1-HMT_-_13th_Order_Cash_Collateral.doc

|   | Debtors-in-Possession. | **Current Hearing Date:** |
|---|---|---|
| 1 | | |
| 2 | | DATE:      August 7, 2019 <br> TIME:       2:00 p.m. |
| 3 | | EST. TIME FOR HEARING: 15 minutes |
| 4 | | **Continued Hearing Date:** |
| 5 | | DATE:      September 24, 2019 <br> TIME:       2:00 p.m. |
| 6 | | EST. TIME FOR HEARING: 15 minutes |

7   The Court having reviewed and considered the Stipulation to Continue Hearing on Motion

8   for Order Authorizing Use of Any Cash Collateral of Secured Claimants ("August 2019

9   Stipulation") [Docket No. 569] entered into by and among X-Treme Bullets Inc.; Ammo Load

10  Worldwide, Inc.; Clearwater Bullet, Inc.; Freedom Munitions, LLC; Howell Machine, Inc.;

11  Howell Munitions & Technology, Inc.; Lewis-Clark Ammunition Components, LLC (collectively,

12  the "HMT Debtors"); and Components Exchange, LLC ("Components Exchange" and, together

13  with the HMT Debtors, the "Debtors"), the debtors and debtors-in-possession in the above-

14  captioned bankruptcy cases, on one hand, and Zions Bancorporation, N.A., dba Zions First

15  National Bank ("Zions"), on the other hand, by and through their respective counsel, and good and

16  sufficient cause appearing, it is hereby **ORDERED THAT,**

17       1.       The August 2019 Stipulation is approved in its entirety.[1]

18       2.       The hearing on the Debtors' Motion for Order Authorizing Use of Any Cash

19  Collateral of Secured Claimants ("Cash Collateral Motion") [Docket No. 28] currently set for

20  August 7, 2019 at 2:00 p.m. shall be continued to September 24, 2019 at 2:00 p.m.

21       3.       The Debtors, except for Components Exchange, LLC, are hereby authorized to

22  continue to use Cash Collateral, as defined in the Cash Collateral Motion, through 5:00 p.m. on

23  September 24, 2019 in accordance with the terms of the Stipulation to Continue Hearing on

24  Motion for Order Authorizing use any Cash Collateral of Secured Claimants, entered into by and

25  among the Debtors and Zions on August 6, 2019 ("July 2019 Cash Collateral Stipulation")

26  [Docket No. 508], and the order approving the July 2019 Cash Collateral Stipulation ("July 2019

27

28  ─────────────────────
[1] Except as otherwise defined herein, the definitions of the capitalized terms continued herein are as set forth in the July 2019 Cash Collateral Stipulation.

EXHIBIT 1
MAINDOCS-#241079-v1-HMT_-_13th_Order_Cash_Collateral.doc

1   Cash Collateral Order") [Docket No.510], as amended by the terms of the July 2019 Stipulation

2   and the budget attached hereto as Exhibit "A" and incorporated herein by this reference ("Revised

3   Budget") and as further extended by the July 2019 Stipulation.

4          4.    In addition to the amounts authorized to be paid through September 24, 2019

5   pursuant to the August 2019 Cash Collateral Stipulation, the Debtors, except Components

6   Exchange, LLC, are hereby authorized to pay, from Cash Collateral, the amounts for retained

7   professional fees and costs reflected in the Revised Budget (which amounts are fifty percent (50%)

8   of the Debtors' estimate of the professional fees and costs that will accrue during the indicated

9   time period). The payment of such amounts shall remain subject to objection on any grounds,

10  including, without limitation by Zions, unless and until allowed by order of the Court, and shall

11  remain subject to potential disgorgement pursuant to order of the Court. Each professional

12  reserves the right to seek allowance and payment of the full amount of its fees and costs.

13         5.    The HMT Debtors shall not be required to pay to Zions any adequate protection

14  payment or any other payment in order for the HMT Debtors to use Cash Collateral as set forth in

15  the Revised Budget, including, without limitation, to pay professionals and the HMT Debtors'

16  Chief Restructuring Officer the payments to which they are entitled pursuant to the Revised

17  Budget.

18         6.    Any opposition to the continued use of Cash Collateral by the Debtors shall be filed

19  and served on the Debtors' counsel by 5:00 p.m. on September 10, 2019. Any replies to any such

20  opposition shall be filed and served on the party asserting such opposition by 5:00 p.m. on

21  September 17, 2019.

22         7.    No further notice or hearing shall be necessary to effectuate this Order.

23  Prepared and Submitted by:

24  STEPHEN R. HARRIS, ESQ.
    HARRIS LAW PRACTICE LLC
25

26  -and-

27  [SIGNATURE CONTINUED ON NEXT

28

EXHIBIT 1
MAINDOCS-#241079-v1-HMT_-_13th_Order_Cash_Collateral.doc

1 | ROBERT E. OPERA, ESQ.
WINTHROP COUCHOT
2 | GOLUBOW HOLLANDER, LLP

3 | _____ /s/ Robert E. Opera _____
General Insolvency Counsel
4 | for Debtors and Debtors-in-Possession

5 |                                            ####

6 |

7 |

8 |

9 |

10 |

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

-4-

EXHIBIT 1
MAINDOCS-#241079-v1-HMT_-_13th_Order_Cash_Collateral.doc

**Howell Munitions & Technologies, Inc.**

BUDGET 6/30/19 - 8/10/19

| | Variance Available for Carryforward B/(W) | Week Of: 6/30/2019- 7/6/2019 | Week Of: 7/7/2019- 7/13/2019 | Week Of: 7/14/2019- 7/20/2019 | Week Of: 7/21/2019- 7/27/2019 | Week Of: 7/28/2019- 8/3/2019 | Week Of: 8/4/2019- 8/10/2019 |
|---|---|---|---|---|---|---|---|
| | | Budget | Budget | Budget | Budget | Budget | Budget |
| **BEGINNING CASH** | | 1,587,579 | 1,506,079 | 1,620,079 | 1,473,579 | 1,447,579 | 1,343,579 |
| | | | | | | | |
| **CASH RECEIPTS** | | | | | | | |
| Freedommunitions.com Online | | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 |
| Xtremebullets.com Online | | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 |
| AV.com and RV.com | | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 |
| ALW/HM | | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 |
| OEM/Wholesale | | 150,000 | 150,000 | 150,000 | 150,000 | 150,000 | 150,000 |
| **TOTAL CASH RECEIPTS** | | 242,500 | 242,500 | 242,500 | 242,500 | 242,500 | 242,500 |
| | | | | | | | |
| **CASH DISBURSEMENTS** | | | | | | | |
| **Raw Materials:** | | | | | | | |
| Lead | 222,070 | 65,000 | 65,000 | 65,000 | 65,000 | 65,000 | 65,000 |
| Brass | 302,526 | | | | | | |
| Primer | 123,121 | | | | | | |
| Copper | 7,950 | | | 150,000 | | | |
| Cases | 97,190 | | | | | | |
| Labor and OH Charges from CE for Qtr 1 2019 FB | 118,220 | | | | | | |
| Ammunition | 7,505 | | | | | | |
| ALW Inventory | 87,652 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| Pallets | 16,443 | | | 5,000 | | | |
| Packaging | 8,443 | 5,000 | | 5,000 | | 5,000 | |
| | | | | | | | |
| **Freight** | | | | | | | |
| Freight - UPS & Other Carriers | 33,470 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| | | | | | | | |
| **Office, Financing and Staffing Related:** | | | | | | | |
| Payroll | 157,843 | 115,000 | | 115,000 | | 115,000 | |
| Medical Insurance | 37,805 | 40,000 | | | | 40,000 | |
| 401K | 10,344 | 6,500 | | 6,500 | | 6,500 | |
| Business Insurance | 442,986 | - | 20,000 | | | | 20,000 |
| Sales and Property Taxes | 11,235 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Tax Return Preparation Fees | 28,500 | | | | | | |
| Merchant Fees | 3,281 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 |
| IT Related | 17,269 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| Sales and Marketing | 14,870 | | 5,000 | | 5,000 | | 5,000 |
| Office Supplies | 5,655 | 500 | 500 | 500 | 500 | 500 | 500 |
| Travel | 18,608 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 |
| | | | | | | | |
| **Production Related:** | | | | | | | |
| Chemicals and Testing | 13,323 | 500 | 500 | 500 | 500 | 500 | 500 |
| Environmental Related | 67,879 | | 2,500 | | 2,500 | | 2,500 |
| Rents - D. Howell | 135,287 | 45,000 | | | | 45,000 | |
| Rents - External D Street Only | 1,024 | 5,000 | | | | 5,000 | |
| Property Taxes - Real & Personal | - | | | | | | |
| Repairs and Maintenance and Tooling | 52,293 | 5,000 | 2,500 | 5,000 | 2,500 | 5,000 | 2,500 |
| Shop Supplies | 11,689 | 7,500 | 3,500 | 7,500 | 3,500 | 7,500 | 3,500 |
| Utilities | 47,611 | 2,500 | 2,500 | 2,500 | 2,500 | 25,000 | 2,500 |
| RMA's (Return Merchandise Auth.) | - | | 500 | | 500 | EXHIBIT 1 | 500 |

Howell Munitions & Technologies, Inc.

BUDGET 6/30/19 - 8/10/19

| | Variance Available for Carryforward B/(W) | Week Of: 6/30/2019- 7/6/2019 Budget | Week Of: 7/7/2019- 7/13/2019 Budget | Week Of: 7/14/2019- 7/20/2019 Budget | Week Of: 7/21/2019- 7/27/2019 Budget | Week Of: 7/28/2019- 8/3/2019 Budget | Week Of: 8/4/2019- 8/10/2019 Budget |
|---|---|---|---|---|---|---|---|
| Warranty Payments | 11,970 | 500 | | 500 | | 500 | |
| | | | | | | | |
| **Bankruptcy Related Costs:** | | | | | | | |
| US Trustee Fees | 20,131 | | | | 60,000 | | |
| CRO/GlassRatner | 27,657 | | | | 20,000 | c | |
| Winthrop Couchot Golubow Hollander, LLP | 130,228 | | | | 62,500 | c | |
| Harris Law Practice LLC | 38,069 | | | | 5,000 | c | |
| Creditors Committee | 57,348 | | | | 12,500 | c | |
| Miller Barondess LLP | - | | | | | | |
| | | | | | | | |
| **TOTAL CASH DISBURSEMENTS** | | 324,000 | 128,500 | 389,000 | 268,500 | 346,500 | 128,500 |
| | | | | | | | |
| **WEEKLY NET CASH** | | (81,500) | 114,000 | (146,500) | (26,000) | (104,000) | 114,000 |
| | | | | | | | |
| **ENDING CASH** | | 1,506,079 | 1,620,079 | 1,473,579 | 1,447,579 | 1,343,579 | 1,457,579 |

**c** - Professional fees are shown at 50% of the estimated amount of the professional fees, in light of the Court's prior order authorizing 50% of budgeted fees to be paid.

EXHIBIT 1

# EXHIBIT 2

### TO APA
### ZIONS SETTLEMENT, KASH SETTLEMENT AGREEMENT, HOWELL SETTLEMENT AGREEMENT

# ZIONS SETTLEMENT AGREEMENT

SETTLEMENT AGREEMENT AND RELEASE

THIS SETTLEMENT AGREEMENT AND MUTUAL RELEASE ("Agreement") is entered into this 21st day of August 2019 ("Execution Date"), by and among Zions Bancorporation, N.A. dba Zions First National Bank ("Zions") and CFO Solutions LLC dba Advanced CFO, Matthew McKinlay, Valerie Grindle, and Sussman Shank LLP (collectively, "Advanced CFO Parties", and with Zions, the "Bank Parties"), on one hand, and Howell Munitions & Technology, Inc.; Twin River Contract Loading, Inc.; X-Treme Bullets, Inc; Ammo Load Worldwide, Inc.; Big Canyon Environmental, LLC; Lewis-Clark Ammo Components, LLC; Freedom Munitions, LLC; Clearwater Bullet, Inc.; Howell Machine, Inc.; Components Exchange, LLC (collectively the "Borrower Entity Parties"); and David C. Howell ("Howell") (Howell, collectively along with the Borrower Entity Parties, the "Borrower Parties"), on the other hand. The Bank Parties and the Borrower Parties are referred to herein collectively, as the "Parties").

RECITALS

A.    The Borrower Parties entered into a series of loans with Zions as set forth in the allegations of Adversary Proceeding, Case No. 18-05010-BTB [DKT #1, pages 2-5], United States Bankruptcy Court for the District of Nevada (the "Adversary Proceeding"), and are incorporated herein by reference. The Borrower Parties in turn granted to Zions security interests in the Borrower Parties' assets which Zions asserts are duly perfected pursuant to applicable non-bankruptcy law.

B.    The Borrower Parties, Zions and the Advanced CFO Parties (except for Sussman Shank) entered into a Chief Restructuring Officer Agreement, engaging Mr. McKinlay and Ms. Grindle to manage the affairs of the Borrower Entity Parties. Howell unilaterally announced the termination of the Advanced CFO Parties on June 7, 2018, and bankruptcy petitions were filed as noted in Recital C.

C.    On June 8, 2018, Howell Munitions & Technology, Inc. ("HMT"), X-Treme Bullets, Inc, Ammo Load Worldwide, Inc., Lewis-Clark Ammo Components, LLC, Freedom Munitions, LLC, Clearwater Bullet, Inc., Howell Machine, Inc., and Components Exchange, LLC, filed bankruptcy petitions with the United States Bankruptcy Court for the District of Nevada ("Bankruptcy Court") which are jointly administered under Case No. 18-50609-BTB (the "Debtor Borrower Entities")

D.    Advanced CFO filed proofs of claim in the Chapter 11 cases for the Debtor Borrower Entities, including additional claims based on the announced termination of Mr. McKinlay and Ms. Grindle. Mr. McKinlay and Ms. Grindle moved for approval of its custodian report, including their work and payment of its fees without regard to timing of payment "Motion," DKT #99 in Case No. 18-50609-BTB. Zions joined in the Motion. The Debtor Borrower Entities opposed the Motion, including challenges both to the substance of the work performed and the allegedly post-petition timing of the last payments of $128,503.83 ("Disputed Payments") made to Advanced CFO and Sussman Shank LLP on the date of the filing of the petition [DKT #135]. The Official Committee of Unsecured Creditors ("Committee") filed a joinder in support of the Debtor Borrower Entities' opposition to the Motion [DKT #271]. The U.S. Department of Treasury, Alcohol and Tobacco Tax and Trade Bureau also opposed the Motion. The parties have continued the hearing on the Motion, as they have discussed settlement of their disputes; the Debtor Borrower Entities have not brought claims against the Advanced CFO Parties.

- 1 -

E.     The Debtor Borrower Entities listed unspecified claims against Zions and Advanced CFO on Schedule A/B of their respective Schedules of Assets and Liabilities.

F.     The Debtor Borrower Entities assert that the Disputed Payments are avoidable as unauthorized post-petition payments pursuant to Section 549 of the Bankruptcy Code. The Advanced CFO Parties dispute such assertion.

G.     On July 19, 2018, Zions filed its scheduled proof of claim (together with any accrued interest, "Zions Secured Claim") in each Debtor Borrower Entities' bankruptcy case in the amount of $17,529,219.09. Zions has made no additional claims against the Borrower Parties, but it has reserved rights to seek recovery of its fees and costs in protecting its interests under those documents including but not limited under Section 506(b) and applicable non-bankruptcy law.

H.     Advanced CFO has filed proofs of claims in the Debtor Borrower Entities' respective bankruptcy cases reserving all rights against the Debtor Borrower Entities as indicated therein.

I.     Zions has entered into an agreement to sell and transfer the Zions Secured Claim and all of its interests as described in the Adversary Proceeding to Kash CA, Inc. ("Buyer") ("Loan Sale Agreement"). Buyer and the Debtor Borrower Entities have concurrently entered into an agreement by which Buyer will purchase from the Debtor Borrower Entities, and the Debtor Borrower Entities will sell to Buyer, substantially all of the Debtor Borrower Entities' assets, conditioned, in part, upon the settlement and release of any and all claims whatsoever that the Borrower Parties allege against Zions and the Advanced CFO Parties ("Asset Purchase Agreement").

J.     The Borrower Parties, on one hand, and the Bank Parties, on the other hand, agree to resolve any and all of their differences, including, without limitation, any objections that the Debtor Borrower Entities may have with respect to the Zions Secured Claim, Advanced CFO's proofs of claims, the Motion, and the opposition to the Motion asserted by the Debtor Borrower Entities, and the claims asserted by the Debtor Borrower Entities to avoid and to recover the Disputed Payments, all in accordance with the terms and conditions set forth herein. Such resolution constitutes a full and mutual release among the Borrower Parties, on one hand, and the Advanced CFO Parties, on the other hand, of all claims that have been or could be brought against either side, whether known or unknown at this point, in accordance with the terms and conditions set forth in Sections 2-3 hereof.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual promises, conditions and covenants in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.     <u>Loan and Loan Documents Valid and Binding On Borrower Parties.</u> The Borrower Parties confirm, and waive any challenges whatsoever to, the validity of the Zions Secured Claim and Zions's liens as set forth in the Proofs of Claims filed by Zions.

2.     <u>Release by Bank Parties</u>. Except for the Zions Secured Claims and security interests referenced in Section 1 above (including any deficiency claims related thereto if subsequently applicable) but exclusive of post-petition attorneys' fees and costs related thereto which are hereby waived through the date of the hearing to approve this Agreement by the Bankruptcy Court (see Section 7, below), the Bank Parties and their respective associates, affiliates, predecessors, successors, heirs, assigns, agents and the employees, officers, directors, members, agents, attorneys, guarantors, representatives, predecessors, successors and assigns thereof shall release and forever

236971.10

discharge the Borrower Parties and each of their respective associates, affiliates, predecessors, successors, heirs, assigns, agents and the employees, members, officers (including J. Michael Issa), directors, shareholders, agents, attorneys, representatives, predecessors, successors and assigns thereof (collectively, the "Borrowers' Releasees") from any and all manner of action or actions, cause or causes of action in law or in equity, suits, debts, liens, contracts, agreements, promises, liabilities, claims, demands, damages, losses, costs or expenses, of any nature whatsoever, known or unknown, fixed or contingent, which Bank Parties now have, from the beginning of time to the date hereof. Without limiting the generality of the foregoing, Advanced CFO shall cause to be withdrawn the proofs of claim filed by it, and the Advanced CFO Parties each acknowledge and agree that it has no other claim of any nature whatsoever against any Debtor Borrower Entity or any other Borrower Releasee.

3.      Release by Borrower Parties.

3.1      Except only for the rights, remedies and interests reserved hereunder by the Borrower Parties, the Borrower Parties and their respective associates, affiliates, predecessors, successors, heirs, assigns, agents and the employees, officers, directors, members, agents, attorneys, guarantors, representatives, predecessors, successors and assigns thereof shall release and forever discharge the Bank Parties, together with each of their respective associates, affiliates, predecessors, successors, heirs, assigns, agents and the employees, agents, attorneys, representatives, predecessors, successors and assigns thereof (collectively, the "Bank Parties' Releasees") from any and all manner of action or actions, cause or causes of action in law or in equity, suits, debts, liens, contracts, agreements, promises, liabilities, claims, demands, damages, losses, costs or expenses, including the Disputed Payments of any nature whatsoever, known or unknown, fixed or contingent, which Borrower Parties now have, from the beginning of time to the date hereof.

3.2      Notwithstanding anything to the contrary contained in Section 3.1 hereof, the Borrower Parties do not waive or release, but reserve fully and completely, the following claims, rights, interests and remedies:

3.2.1      All claims, rights, interests and remedies that the Debtor Borrower Entities have pursuant to the Asset Purchase Agreement. This reservation of rights shall not include any claims against the Advanced CFO Parties, as this Agreement constitutes a full and mutual resolution of any such claims.

3.2.2      The Borrower Parties do not waive or release any claims which they may have against each other. Without limiting the generality of the foregoing, the Debtor Borrower Entities do not waive or release, and Howell does not waive or release, but reserve fully and completely, all claims, rights and remedies which they may have against each other, except only as such claims, rights and remedies may be affected by the terms and conditions of the Asset Purchase Agreement.

4.      [Intentionally Omitted.]

5.      Withdrawal of Motion. Within seven (7) days after the Settlement Order becomes a final and non-appealable order, the Advanced CFO Parties shall cause the Motion to be withdrawn and taken off the calendar of the Bankruptcy Court. The Advanced CFO Parties shall be deemed to

- 3 -

have complied with any and all obligations imposed upon a "custodian" (as such term is defined in 11 U.S.C. § 101(11)) of the Bankruptcy Code.

6.   <u>Notices</u>.   Notices and other communications required or contemplated by this Agreement shall be in writing and shall be given by (a) personal delivery, (b) deposit in the United States mail by certified mail, return receipt requested (which receipt shall be preserved as evidence of delivery), postage prepaid, (c) overnight express delivery service, or (d) electronic mail, addressed or transmitted to the Parties at the following mailing or email addresses, or to such other addresses as a Party may designate to the other in a writing delivered in accordance with the provisions of this paragraph:

If to Zions:

Mark Siegel
Senior Vice President
SAG – INERMOUNTAIN
one South Main Street, Suite #1400
Salt Lake City, UT 84133-1109
(801) 844-8201

with a copy to:

Holland & Hart LLP
c/o Timothy A. Lukas, Esq.
5441 Kietzke Lane, 2nd Floor
Reno, NV 89511
tlukas@hollandhart.com

If to the Debtor Borrower Entities
and Twin River Contract Loading
Inc.:

Howell Munitions & Technology, Inc.
c/o J. Michael Issa
GlassRatner Advisory & Capital Group LLC
19800 MacArthur Boulevard
Irvine, CA 92612
Tel: 949-407-6620
Email: missa@glassratner.com

as to the Debtor Borrower Entities, a copy to:

Robert E. Opera, Esq.
Winthrop Couchot Golubow Hollander, LLP
1301 Dove Street, Suite 500
Newport Beach, California 92660
Tel: 949-720-4130
Email: ropera@wcghlaw.com

236971.10

If to Howell and Big
Canyon Environmental, LLC:

David C. Howell
29978 Thiessen Road
Lewiston, Idaho 83501

with a copy to:

Todd C. Ringstad, Esq.
Ringstad & Sanders
4343 Von Karman Avenue, Suite 300
Newport Beach, California 92660
Tel: 949-851-7450
Email: todd@ringstadlaw.com

If to the Advanced CFO Parties:

Matthew McKinlay
c/o CFO Solutions, LLC dba Advanced CFO
13601 W. McMillan Rd., #102
PMB 320
Boise, ID 83713

CFO Solutions, LLC dba Advanced CFO
Attn: Matthew McKinlay
13601 W. McMillan Rd., #102
PMB 320
Boise, ID 83713

Valerie Grindle
c/o CFO Solutions, LLC dba Advanced CFO
13601 W. McMillan Rd., #102
Boise, ID 83713

Jeffrey C. Misley, Esq.
Sussman Shank, LLP
1000 SW Broadway, Suite 1400
Portland, Oregon 92705
Tel: 503-243-1643
Email: jmisley@sussmanshank.com

236971.10

with a copy to:

Louis M. Bubala III
Kaempfer Crowell
50 W. Liberty St., Ste. 700
Reno, NV 89501
Tel: 775-398-4741
Email: lbubala@kcnvlaw.com

7.    <u>Bankruptcy Court Approval.</u>

      7.1    The Debtor Borrower Entities shall seek from the Bankruptcy Court approval of this Agreement, by motion ("Compromise Motion") made upon shortened notice to the parties in interest pursuant to the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Rules of the Bankruptcy Court and order of the Bankruptcy Court.  Pursuant to the Compromise Motion, the Debtor Borrower Entities shall request that the Bankruptcy Court enter a Settlement Order approving the Compromise Motion by August 30, 2019.

      7.2    The Bank Parties and the Borrower Parties consent to the Bankruptcy Court's approval of this Agreement and the entry of a Settlement Order granting the Compromise Motion.

8.    <u>Effective Date of Agreement.</u>  The terms and conditions of this Agreement, including, without limitation, the releases provided herein, shall be effective and binding upon the Parties upon the first business day after the occurrence of <u>each</u> of the following events ("Effective Date"):

      8.1    The execution and delivery of this Agreement by each of the Parties.

      8.2    The execution of the Loan Sale Agreement between Buyer and Zions, and Buyer's unconditional and irrevocable acquisition of the Zions Secured Claim and all of Zions's interests and liens against the Borrower Parties.

      8.3    Buyer's execution of the Asset Purchase Agreement, in accordance with terms and conditions satisfactory to the Borrower Entity Parties.

      8.4    The entry of the Settlement Order on terms and conditions satisfactory to the Borrower Parties.

      8.5    The entry of an order of the Bankruptcy Court authorizing the Debtor Borrower Entities' continued use of any cash collateral of Zions (or Buyer, upon the closing of the Loan Purchase Agreement, as the case may be), in accordance with the budget attached as Exhibit "1" hereto and incorporated herein by this reference and in accordance with other terms and conditions satisfactory to the Debtor Borrower Entities, through September 24, 2019.

9.    <u>Acknowledgments.</u>  Each Party expressly warrants and represents to the other Parties the following:

      9.1    That each Party believes it to be in its best interests to settle the matters encompassed by this Agreement and on the terms provided in this Agreement;

236971.10

9.2     That the making of this Agreement is reasonable under the circumstances;

9.3     That no promise or inducement has been offered except as expressly provided in this Agreement;

9.4     That each Party executes this Agreement as its own free and voluntary act;

9.5     That each Party acknowledges that it intends to grant the mutual releases described herein; and

9.6     That each Party has knowingly and voluntarily entered into the Agreement without any duress or coercion from anyone.

10.     **Denial of Liability**. It is understood and agreed by the Parties that the settlement contained in this Agreement is made solely for the purpose of avoiding the expense and inconvenience of further litigation among the Parties and to facilitate the Debtor Borrower Entities' completion of a sale of substantially all of their assets and is the result of a compromise of disputed claims and is not, and is not to be construed as, an admission of liability, except as set forth in Section 1, on the part of any Party and that the Parties expressly deny any liability otherwise or wrongdoing.

11.     **Assignment of Claims**. Each Party represents and warrants to the other Parties that, except as may be expressly set forth in this Agreement, it has not assigned or transferred, or purported to assign or transfer, to any person or entity, any claim such party might have against the other.

12.     **Effect of Agreement on Third Parties**. The covenants of the Parties undertaken through this Agreement are not intended to nor do they create any right or benefit for any person or entity not a party to this Agreement, except in connection with the releases set forth in Sections 2 and 3 hereof.

13.     **Amendment to Agreement**. Any amendment to this Agreement must be in writing signed by duly authorized representatives of the Parties or their respective successors and/or assigns and stating the intent of the Parties to amend this Agreement.

14.     **Binding Effect**. This Agreement shall be binding upon, and shall inure to the benefit of, the Parties hereto, their predecessors, successors-in-interest, heirs, assigns, officers, employees, members, attorneys, agents, devisees, legatees, personal representatives, trustees, directors and shareholders.

15.     **Construction of Agreement**. The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as a whole in accordance with its fair meaning and in accordance with the laws of the State of Nevada and, where applicable, the Bankruptcy Code.

16.     **Severability**. If any provision of this Agreement is held to be invalid or unenforceable on any occasion or in any circumstance, such holding shall not be deemed to render the Agreement invalid or unenforceable, to that extent the provisions of this Agreement are severable; provided, however, that this provision shall not preclude a court of competent jurisdiction from refusing to sever any provision if severance would be inequitable to one or more of the Parties.

236971.10

17.    No Representations or Warranties. Except as expressly set forth in this Agreement, none of the Parties hereto makes any representation or warranty, written or oral, express or implied.

18.    Governing Law and Disputes. Nevada law and, where applicable, the Bankruptcy Code, govern this Agreement and the Parties' performance under this Agreement. Claims or causes of action, both legal and equitable, arising out of or based upon this Agreement or related documents shall be commenced in the Bankruptcy Court, and each Party to this Agreement hereby consents to the jurisdiction, venue and process of the Bankruptcy Court; provided, however, that, if the Debtor Borrower Entities' bankruptcy cases should be closed or dismissed, or the Bankruptcy Court declines to exercise jurisdiction over any action or proceeding arising out of or based upon this Agreement, such action of proceeding shall be brought only in the United States District Court for the District of Nevada.

19.    Authority to Execute. By execution of this Agreement, each signatory warrants and represents that it has full authority or has been given full authority by the Parties represented by that signatory to enter into and execute this Agreement.

20.    Counterparts and Originals. This Agreement may be executed in any number of counterparts and by different Parties in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same document. Delivery by a Party of an executed counterpart of a signature page to this Agreement by electronic mail shall be effective as delivery of an original executed counterpart.

21.    Representation by Counsel. Each of the Parties to this Agreement has been represented by independent counsel or has had the opportunity to consult with independent counsel.

22.    Captions and Headings. The captions and headings in this Agreement are included for the convenience of the Parties and the Bankruptcy Court and have no legal effect and may not be used to contradict or otherwise interpret the language and provisions of this Agreement.

23.    Other. A single number in this Agreement shall include the plural, and the plural shall include the singular, as the context may require. References to masculine, feminine and neuter gender shall include such other genders as are appropriate.

24.    Attorneys' Fees and Costs. Each Party shall bear its own attorneys' fees and costs arising from or relating to the negotiation and execution of this Agreement. In the event of any action or proceeding to enforce, modify, interpret, construe, invalidate, rescind, or set aside any term or provision of this Agreement, however, the prevailing Party shall be entitled to an award of its costs and expenses, including reasonable attorneys' fees and costs, incurred as a result of such action or proceeding, including any appeals resulting therefrom.

25.    Termination of Agreement. This Agreement may be terminated by any Party in the event that the Settlement Order has not been entered by the Bankruptcy Court by August 30, 2019, or the Effective Date of this Agreement has not occurred by September 25, 2019.

26.    Effect of Termination. In the event of any termination of this Agreement as permitted by Section 25 hereof, this Agreement and all of the provisions of this Agreement, including, without limitation, the releases provided by Sections 2 and 3 hereof, shall be null and void ab initio, of no

force or effect, and shall not be binding upon the Parties, and the Parties shall be restored to the same respective positions that they were in as of the Execution Date, without any prejudice to such positions. Upon any such termination of this Agreement, each Party shall reserve all rights and remedies that it may have as a matter of law.

27.    Entire Agreement; Waivers. This Agreement represents the entire understanding and agreement among the Parties with respect to the subject matter hereof; provided, however, that the Debtor Borrower Entities reserve all of their rights, claims, interests and remedies pursuant to the Asset Purchase Agreement. No action taken pursuant to this Agreement shall be deemed to constitute a waiver by the Party taking such action of compliance with any condition, covenant or agreement contained herein. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by applicable law.

28.    Further Assurances. Each Party shall execute any and all documents, and shall take any and all acts, reasonably requested by any other Party as may be reasonably appropriate in order to confirm or carry out the provisions of this Agreement. Without limiting the generality of the foregoing, each Party shall cooperate with the Debtor Borrower Entities in the efforts which they will make in order to obtain from the Bankruptcy Court entry of the Settlement Order approving this Agreement.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Execution Date.

BORROWER PARTIES:

X-TREME BULLETS, INC.,
As a Debtor and Debtor-in-Possession

By: _____
Name:    J. M. ISSA
Its:    CRO

AMMO LOAD WORLDWIDE, INC.,
As a Debtor and Debtor-in-Possession

By: _____
Name:    J. M. ISSA
Its:    CRO

236971.10

**CLEARWATER BULLET, INC.,**
As a Debtor and Debtor-in-Possession

By: _____

Name: _____

Its: _____

**FREEDOM MUNITIONS, LLC,**
As a Debtor and Debtor-in-Possession

By: _____

Name: _____

Its: _____

**HOWELL MACHINE, INC.,**
As a Debtor and Debtor-in-Possession

By: _____

Name: _____

Its: _____

**HOWELL MUNITIONS & TECHNOLOGY, INC.,**
As a Debtor and Debtor-in-Possession

By: _____

Name: _____

Its: _____

**LEWIS-CLARK AMMUNITION COMPONENTS, LLC,**
As a Debtor and Debtor-in-Possession

By: _____

Name: _____

Its: _____

- 10 -

23697L.10

**COMPONENTS EXCHANGE, LLC,**
As a Debtor and Debtor-in-Possession

By: _____

Name: _____J. n, ISSA_____

Its: _____CRO_____

**TWIN RIVER CONTRACT LOADING, INC.**

By: _____

Name: _____J. n. ISSA_____

Its: CRO OF THE SHAREHOLDER OF TWINRIVER

**BIG CANYON ENVIRONMENTAL, LLC.**

By: _____

Name: _____J. n. ISSA_____

Its: _____CRO_____

**DAVID C. HOWELL, individually**

SEE ATTACHED SIGNATURE PAGE
_____

Name: _____

**ZIONS:**

**ZIONS BANCORPORATION, N.A.**
**dba Zions First National Bank**

By: ___SEE ATTACHED SIGNATURE PAGE__

Name: _____

Its: _____

236971.10

As a Debtor and Debtor-in-Possession

By:    SEE ATTACHED SIGNATURE PAGE

Name:

Its:


TWIN RIVER CONTRACT LOADING, INC.

By:    SEE ATTACHED SIGNATURE PAGE

Name:

Its:


BIG CANYON ENVIRONMENTAL, LLC.

By:

Name:

Its:


DAVID C. HOWELL, Individually

Name:


ZIONS:

ZIONS BANCORPORATION, N.A.
dba Zions First National Bank

By:    SEE ATTACHED SIGNATURE PAGE
Name:
Its:

**COMPONENTS EXCHANGE, LLC,**
As a Debtor and Debtor-in-Possession

By: _____SEE ATTACHED SIGNATURE PAGE_____

Name: _____

Its: _____

**TWIN RIVER CONTRACT LOADING, INC.**

By: _____SEE ATTACHED SIGNATURE PAGE_____

Name: _____

Its: _____

**BIG CANYON ENVIRONMENTAL, LLC.**

By: _____SEE ATTACHED SIGNATURE PAGE_____

Name: _____

Its: _____

**DAVID C. HOWELL, individually**

_____SEE ATTACHED SIGNATURE PAGE_____

Name: _____

**ZIONS:**

**ZIONS BANCORPORATION, N.A.**
dba Zions First National Bank

By: _____
Name: Mark Siegel
Its:  Senior Vice President

- 11 -

236971.10

ADVANCED CFO:

CFO SOLUTIONS, LLC
dba Advanced CFO

By: _____

Name:   Matt McKinlay

Its:   Member

SUSSMAN SHANK LLP

By: _____

Name: _____

Its: _____

MATTHEW MCKINLAY, individually

_____

Name: _____ Matthew McKinlay _____

VALERIE GRINDLE, individually

SEE ATTACHED SIGNATURE PAGE

Name: _____

13381757_yt

- 12 -

236971.10

**ADVANCED CFO:**

**CFO SOLUTIONS, LLC**
**dba Advanced CFO**

By: _____ SEE ATTACHED SIGNATURE PAGE _____
Name: _____
Its: _____

**SUSSMAN SHANK LLP**

By: _____ SEE ATTACHED SIGNATURE PAGE _____

Name: _____

Its: _____

**MATTHEW MCKINLAY, individually**

_____ SEE ATTACHED SIGNATURE PAGE _____

Name: _____

**VALERIE GRINDLE, individually**

_____
Name: _____ Valerie Grindle _____

13381757_v1

- 12 -

236971.10

EXHIBIT 1

**Howell Munitions & Technologies, Inc.**
BUDGET 6/30/19 - 8/10/19

| | Variance Available for Carryforward B/(W) | Week Of: 6/30/2019-7/6/2019 Budget | Week Of: 7/7/2019-7/13/2019 Budget | Week Of: 7/14/2019-7/20/2019 Budget | Week Of: 7/21/2019-7/27/2019 Budget | Week Of: 7/28/2019-8/3/2019 Budget | Week Of: 8/4/2019-8/10/2019 Budget |
|---|---|---|---|---|---|---|---|
| BEGINNING CASH | | 1,587,579 | 1,506,079 | 1,620,079 | 1,473,579 | 1,447,579 | 1,343,579 |
| **CASH RECEIPTS** | | | | | | | |
| Freedommunitions.com Online | | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 |
| Xtremebullets.com Online | | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 |
| AV.com and RV.com | | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 |
| ALW/HM | | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 |
| OEM/Wholesale | | 150,000 | 150,000 | 150,000 | 150,000 | 150,000 | 150,000 |
| TOTAL CASH RECEIPTS | | 242,500 | 242,500 | 242,500 | 242,500 | 242,500 | 242,500 |
| **CASH DISBURSEMENTS** | | | | | | | |
| **Raw Materials:** | | | | | | | |
| Lead | 222,070 | 65,000 | 65,000 | 65,000 | 65,000 | 65,000 | 65,000 |
| Brass | 302,526 | | | | | | |
| Primer | 123,121 | | | | | | |
| Copper | 7,950 | | | 150,000 | | | |
| Cases | 97,190 | | | | | | |
| Labor and OH Charges from CE for Qtr 1 2019 FE | 118,220 | | | | | | |
| Ammunition | 7,505 | | | | | | |
| ALW Inventory | 87,652 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| Pallets | 16,443 | | | 5,000 | | | |
| Packaging | 8,443 | 5,000 | | 5,000 | | 5,000 | |
| **Freight** | | | | | | | |
| Freight - UPS & Other Carriers | 33,470 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| **Office, Financing and Staffing Related:** | | | | | | | |
| Payroll | 157,843 | 115,000 | | 115,000 | | 115,000 | |
| Medical Insurance | 37,805 | 40,000 | | | | 40,000 | |
| 401K | 10,344 | 6,500 | | 6,500 | | 6,500 | |
| Business Insurance | 442,986 | - | 20,000 | | | | 20,000 |
| Sales and Property Taxes | 11,235 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Tax Return Preparation Fees | 28,500 | | | | | | |
| Merchant Fees | 3,281 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 |
| IT Related | 17,269 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| Sales and Marketing | 14,870 | | 5,000 | | 5,000 | 5,000 | |
| Office Supplies | 5,655 | 500 | 500 | 500 | 500 | 500 | 500 |
| Travel | 18,608 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 |
| **Production Related:** | | | | | | | |
| Chemicals and Testing | 13,323 | 500 | 500 | 500 | 500 | 500 | 500 |
| Environmental Related | 67,879 | | 2,500 | | 2,500 | | 2,500 |
| Rents - D. Howell | 135,287 | 45,000 | | | | 45,000 | |
| Rents - External D Street Only | 1,024 | 5,000 | | | | 5,000 | |
| Property Taxes - Real & Personal | - | | | | | | |
| Repairs and Maintenance and Tooling | 52,293 | 5,000 | 2,500 | 5,000 | 2,500 | 5,000 | 2,500 |
| Shop Supplies | 11,689 | 7,500 | 3,500 | 7,500 | 3,500 | 7,500 | 3,500 |
| Utilities | 47,611 | 2,500 | 2,500 | 2,500 | 2,500 | 25,000 | 2,500 |
| RMA's (Return Merchandise Auth.) | - | | | 500 | | 500 | 500 |

**Howell Munitions & Technologies, Inc.**
BUDGET 6/30/19 - 8/10/19

| | Variance Available for Carryforward B/(W) | Week Of: 6/30/2019-7/6/2019 Budget | Week Of: 7/7/2019-7/13/2019 Budget | Week Of: 7/14/2019-7/20/2019 Budget | Week Of: 7/21/2019-7/27/2019 Budget | Week Of: 7/28/2019-8/3/2019 Budget | Week Of: 8/4/2019-8/10/2019 Budget |
|---|---|---|---|---|---|---|---|
| Warranty Payments | 11,970 | 500 | | 500 | | 500 | |
| | | | | | | | |
| **Bankruptcy Related Costs:** | | | | | | | |
| US Trustee Fees | 20,131 | | | | 60,000 | | |
| CRO/GlassRatner | 27,657 | | | | 20,000 | c | |
| Winthrop Couchot Golubow Hollander, LLP | 130,228 | | | | 62,500 | c | |
| Harris Law Practice LLC | 38,069 | | | | 5,000 | c | |
| Creditors Committee | 57,348 | | | | 12,500 | c | |
| Miller Barondess LLP | - | | | | | | |
| | | | | | | | |
| TOTAL CASH DISBURSEMENTS | | 324,000 | 128,500 | 389,000 | 268,500 | 346,500 | 128,500 |
| WEEKLY NET CASH | | (81,500) | 114,000 | (146,500) | (26,000) | (104,000) | 114,000 |
| ENDING CASH | | 1,506,079 | 1,620,079 | 1,473,579 | 1,447,579 | 1,343,579 | 1,457,579 |

c - Professional fees are shown at 50% of the estimated amount of the professional fees, in light of the Court's prior order authorizing 50% of budgeted fees to be paid.

# KASH SETTLEMENT AGREEMENT

## SETTLEMENT AND RELEASE AGREEMENT

THIS SETTLEMENT AND RELEASE AGREEMENT ("Agreement") is entered into as of August 21, 2019 (*"Execution Date"*) by and among Kash CA, Inc. (*"Kash CA"*), on one hand, and Howell Munitions & Technology, Inc., Twin River Contract Loading, Inc., X-Treme Bullets, Inc., Ammo Load Worldwide, Inc., Big Canyon Environmental, LLC, Lewis-Clark Ammunition Components, LLC, Freedom Munitions, LLC, Clearwater Bullet, Inc., Howell Machine, Inc., Components Exchange, LLC, and David C. Howell (*"Mr. Howell"*) (collectively, the *"Borrower Parties"* and each, individually, a *"Borrower Party"*), on the other hand. Kash CA and the Borrower Parties shall be collectively referred to herein as the "Parties," and each, individually, a "Party."

### RECITALS

A.    The Borrower Parties entered into a series of loans with Zions Bancorporation, N.A. dba Zions First National Bank (*"Zions"*) pursuant to certain loan documents (such loan documents, the **"Loan Documents"**, and such loans, the **"Loans"**). Kash CA asserts that the Borrower Parties granted to Zions first priority security interests in assets of the Borrower Parties and that Zions duly perfected such security interests pursuant to applicable law and that such security interests secure the Loans and all other obligations of the Borrower Parties under the Loan Documents (the *"Obligations"*). The Loan Documents are described on Exhibit "A" attached hereto and incorporated herein by this reference.

B.    On June 8, 2018, (*"Petition Date")*, X-Treme Bullets, Inc., Ammo Load Worldwide, Inc., Lewis-Clark Ammunition Components, Inc., Freedom Munitions, LLC, Clearwater Bullet, Inc., Howell Munitions & Technology, Inc., Howell Machine, Inc., and Components Exchange, LLC (the *"Debtor Borrower Entities"*) filed bankruptcy petitions with the United States Bankruptcy Court for the District of Nevada (*"Bankruptcy Court"*) which are jointly administered under Case No. 18-50609-BTB. Such cases are referred to herein, collectively, as the *"Howell Bankruptcy Cases."*

C.    On the amended Schedule A/B of the Debtor Borrower Entities' Schedules of Assets and Liabilities filed in the Howell Bankruptcy Cases (such schedules, individually and collectively, *"Schedule A/B"*), each Debtor Borrower Entity listed unspecified claims against Zions.

D.    On July 19, 2018, Zions filed against each Debtor Borrower Entity a proof of claim in the amount of $17,529,219.09 (collectively, *"Proofs of Claim"*).

E.    In connection with the Howell Bankruptcy Cases, Zions filed an adversary proceeding, Case No. 18-05010-BTB, in the Bankruptcy Court (the *"Adversary Proceeding"*).

F.    Zions has entered into an agreement with Kash CA (the *"Loan Sale Agreement"*) to sell and transfer all of Zions's right, title and interests in and to the Assigned Assets. As used herein *"Assigned Assets"* means Loans, the Obligations, all rights and interests of Zions under the Loan Documents, including, without limitation, the security interests in the assets of the Borrower Parties, and all causes of action under the Adversary Proceeding.

G.    Kash CA and the Debtor Borrower Entities have concurrently entered into an agreement, pursuant to which Kash CA will purchase from the Debtor Borrower Entities, and the Debtor Borrower Entities will sell to Kash CA, substantially all of the Debtor Borrower Entities'

241186.3

assets, conditioned upon the settlement and release of any and all claims whatsoever that the Borrower Parties allege against Kash CA, individually and as assignee of the Assigned Assets ("*Asset Purchase Agreement*"), and upon the Borrower Parties' providing the affirmations and other accommodations provided by this Agreement, all in accordance with the terms and conditions of this Agreement.

## AGREEMENT

NOW, THEREFORE, based upon the above Recitals and in consideration of the mutual promises, conditions and covenants in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the Parties, the Parties agree as follows.

1.    **Consent to Assignment of Assigned Assets.**    Each Borrower Party hereby consents to the assignment of the Assigned Assets to Kash CA.

2.    **Affirmations.**    Each Borrower Party acknowledges and agrees that:   (a) the outstanding amount owed under the Loan Documents as of the Petition Date was $17,529,219.09 and each of the Borrower Parties is unconditionally liable, without defense, counterclaim, offset or setoff of any kind with respect to the Obligations, except only as the amount of the Obligations have been reduced by payments made after the Petition Date; (b) after giving effect to the Loan Sale Agreement, Kash CA, as assignee of the Assigned Assets from Zions, has all right, title and interest in, to and under the Obligations and other Assigned Assets, and a valid, enforceable, non-avoidable, perfected first-priority security interest in all property of the Borrower Parties constituting Zions's collateral under the Loan Documents; (c) no Borrower Party has knowledge, or has received notice, of any assignment by Zions of any Assigned Asset except pursuant to the Loan Sale Agreement; and (d) that the Obligations are valid, enforceable and binding obligations of the Borrower Parties and that, except as may be provided expressly to the contrary in this Agreement or in the Asset Purchase Agreement, nothing contained in any settlement agreement or other agreement with Zions has affected or will affect such Obligations or Kash CA's rights under the Loan Documents.

3.    **Obligations and Loan Documents Valid and Binding on Borrower Parties.**  The Borrower Parties confirm, and waive any and all challenges to, the validity of the Loans, the Obligations, the Loan Documents and the other debts, liens and claims set forth in the Proofs of Claims filed by Zions in the Howell Bankruptcy Cases.   Each of the Borrower Parties acknowledges and agrees that Events of Default (as defined in the Loan Documents) under the Loan Documents have occurred, which entitles Kash CA, as assignee of Zions, to exercise all of the rights and remedies contained in the Loan Documents or otherwise permitted under applicable law, except as stayed by the Chapter 11 filings by the Debtor Borrower Entities.  Notwithstanding anything alleged by any Borrower Party in any pleading filed in the Howell Bankruptcy Cases, no Borrower Party has any defenses, counterclaims, or rights of setoff with respect to any Event of Default, or any obligation under the Loan Documents or otherwise owed to Lender, and each Borrower Party hereby waives to the fullest extent permitted by law any and all defenses to the enforcement of its contractual obligations under the Loan Documents, including, without limitation, avoidance, reduction, offset, attachment, disallowance, disgorgement, recharacterization, surcharge, recovery or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law.

241186.3

**4.    Kash CA's Rights Hereunder Subject to Provisions of Asset Purchase Agreement.** Notwithstanding any provisions to the contrary contained in this Agreement, including, without limitation, the provisions of paragraph 3 hereof, Kash CA's exercise of any rights and remedies under the Loan Documents shall be subject to the provisions of the Asset Purchase Agreement, and Kash CA shall take no act contrary to or inconsistent with the terms and conditions of the Asset Purchase Agreement, subject to any termination of the Asset Purchase Agreement in accordance with the provisions of Section 4.4 thereof.

**5.    Releases.**

    (a)    **Mutual Release of Claims.**

        (i)    **Releases by the Borrower Parties in Favor of Kash CA.** Effective as of the Effective Date of this Agreement, subject to the provisions of paragraph 5(a)(iii) hereof, except only for the obligations imposed upon Kash CA by this Agreement and the rights reserved by the Borrower Parties by this Agreement, the Borrower Parties, for themselves and their respective predecessors, spouses, successors and assigns, and each of them, hereby absolutely, fully and forever, release, relieve, waive, relinquish and discharge Kash CA and its former and current affiliates, related entities, principals, members, shareholders, directors, officers, employees (including, without limitation, Dan Kash), contractors, administrators, trustees, representatives, agents, attorneys, accountants, financial advisors, partners, heirs, predecessors, successors and assigns, and each of them, of and from any and all manner of actions, causes of action, suits, debts, deficiencies, liabilities, demands, claims, obligations, costs, interest charges, expenses (including attorneys' fees and costs), sums of money, controversies, damages, injuries, losses, accounts, reckonings, security interests and liens of every kind or nature whatsoever, whether known or unknown, suspected or unsuspected, fixed or contingent, matured or unmatured, liquidated or unliquidated, legal or equitable, in tort, in contract or otherwise (including, without limitation, all punitive and exemplary damages), occurring or arising prior to the date of this Agreement, including, without limitation, any claims relating to or arising in any manner out of the matters set forth in the Recitals hereof.

        (ii)    **Releases by Kash CA in Favor of the Borrower Parties.** Effective as of the Effective Date of this Agreement, subject to the provisions of paragraph 5(a)(iv) hereof, except only for the obligations imposed upon the Borrower Parties by this Agreement and the rights reserved by Kash CA by this Agreement, Kash CA for itself and for its predecessors, successors and assigns, and each of them, hereby absolutely, fully and forever, releases, relieves, waives, relinquishes and discharges the Borrower Parties and their respective former and current affiliates, related entities, principals, members, shareholders, directors, officers (including, without limitation, J. Michael Issa, Angela Smith and David Foshee), employees, contractors, administrators, trustees, representatives, agents, attorneys, accountants, financial advisors, partners, heirs, predecessors, successors and assigns, and each of them, of and from any and all manner

- 3 -

of actions, causes of action, suits, debts, deficiencies, liabilities, demands, claims, obligations, costs, interest charges, expenses (including attorneys' fees and costs), sums of money, controversies, damages, injuries, losses, accounts, reckonings, security interests and liens of every kind or nature whatsoever, whether known or unknown, suspected or unsuspected, fixed or contingent, matured or unmatured, liquidated or unliquidated, legal or equitable, in tort, in contract or otherwise (including, without limitation, all punitive and exemplary damages), occurring or arising prior to the date of this Agreement, including, without limitation, any claims relating to or arising in any manner out of the matters set forth in the Recitals hereof.

(iii)    **Exceptions to the Releases Given by the Borrower Parties.** Nothing contained in this Agreement shall constitute a waiver or release by any Borrower Party of, and the Borrower Parties shall retain without any impairment of any nature, the following rights, remedies and claims:

    (A)    The Borrower Parties shall retain any and all rights, remedies or claims which they may have against each other.  Without limiting the generality of the foregoing, the Debtor Borrower Entities do not waive or release, and Mr. Howell does not waive or release, but reserve, fully and completely, all rights, remedies or claims which they may have against each other, only as such rights, remedies and claims may be affected by the terms and conditions of the Asset Purchase Agreement and any settlement agreement among the Borrower Parties.

    (B)    The Debtor Borrower Entities shall retain any and all rights, remedies and claims which they may have under the Asset Purchase Agreement and any Ancillary Document (as such term is defined in the Asset Purchase Agreement).

    (C)    Each Borrower Party shall retain any and all rights, remedies and claims which such Borrower Party may have against Kash CA, and any affiliate of Kash CA (including, without limitation, Dan Kash (*"Mr. Kash"*), LAX Ammo, LLC and L.A.X. Firing Range, Inc.) (collectively, *"Kash Parties"*) arising from or related to any purchase order or other written agreement by which a Kash Party agrees to purchase ammunition or other goods from such Borrower Party, including, without limitation, the right to obtain payment of any amounts owed to the Borrower Party by the Kash Party stemming therefrom in accordance with agreed upon credit terms.

(iv)    **Exceptions to the Releases Given by Kash CA.**  Kash CA shall retain any and all rights, remedies and claims which Kash CA may have against the Borrower Parties arising from or relating to the Obligations and the security interests related to the Obligations which Kash CA may acquire from Zions in connection with the Loan Purchase Agreement, subject to the terms and conditions of the Asset Purchase Agreement.

- 4 -

241186.3

(b)    <u>Scope of Releases</u>.  Each Party acknowledges the fact that it is its intention that, as of the Effective Date of this Agreement, this Agreement shall be effective as a full and final accord and satisfaction and settlement of and as a bar to each such manner of action, cause of action, suit, debt, deficiency, liability, demand, claim, obligation, cost, expense, sum of money, controversy, damage, injury, loss, account, reckoning, security interest and lien of every kind or nature whatsoever, heretofore referred to and released, which any of the Borrower Parties, on one hand, and Kash CA, on the other hand, has had, has, or may have against each other.  In connection with such waiver and relinquishment, each Party acknowledges that it is aware that it or its attorneys may hereafter discover facts different from or in addition to the facts which it or its attorneys now know or believe to be true with respect to the subject matters of this Agreement and that it may have sustained or may yet sustain damages, costs or expenses that are presently unknown and that relate to those claims, but that it is its intention hereby to fully, finally, absolutely and forever settle all such claims which do now exist, may exist or heretofore have existed among the Parties, in accordance with the terms of this Agreement and that, in furtherance of such intention, the releases herein given shall be and shall remain in effect for all time as full and complete releases, in accordance with the terms and conditions hereof, notwithstanding the discovery of any such different or additional facts or of any such additional damages, costs or expenses.  Therefore, each Party acknowledges that it is familiar with Section 1542 of the Civil Code of the State of California, which provides as follows:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

Except only for the rights expressly reserved by each Party pursuant to this Agreement, each Party hereby waives and relinquishes fully, as of the Effective Date of this Agreement, all rights and benefits which it has or may have under Section 1542 of the Civil Code of the State of California, and any comparable federal statutes, statutes of any other states in the United States, and common law principles pertaining to the subject matters of this Agreement.

(c)    <u>No Rescission of Releases</u>.  As a part of the foregoing releases, each Party acknowledges that it understands and accepts the risk that the facts with respect to which the releases provided by this Agreement are entered into may be different from the facts now known or believed by it to be true.  The releases provided by this Agreement shall not be subject to termination or rescission by virtue of any such differences in fact.  In entering into this Agreement, and the releases provided by this Agreement, each Party acknowledges that it has conducted its own independent investigation, has consulted with, or has had the opportunity to consult with, legal counsel of its own choice, and has not relied on any statement,

representation, promise, inducement or agreement not expressly contained within this Agreement.

(d)     **Covenants Not to Sue.**

(i)     **No Commencement of Actions or Proceedings.**  The Parties hereby covenant and agree not to commence against each other any action or proceeding of any nature whatsoever with respect to any of the claims released by this Agreement.  The Parties hereby further covenant and agree not to join in or to participate in any action or proceeding based upon, arising out of or relating to any of the claims released by this Agreement, unless such participation is compelled by an order of a court of competent jurisdiction; provided, however, that the foregoing shall not preclude a Party from initiating an action to enforce the terms of this Agreement or, if a Party has been named as a defendant in such action or proceeding,  the foregoing shall not preclude the Party from  defending itself in the litigation.

(ii)     **No Inconsistent Acts.**  The Parties hereby covenant and agree not to take any acts inconsistent with the intent and purposes of the releases provided by this Agreement.

(e)     **No Assignment of Released Claims.**  Each Party represents and warrants to the other Parties that it has not assigned or transferred, and will not assign or transfer, to any person or entity any of the claims released by this Agreement.

6.     **No Reliance; No Fraud.**  In executing this Agreement, each Party represents that neither it nor its attorneys have relied upon any statement, promise or representation of any Party, or of any other Party's agents, employees, attorneys or other representatives in executing this Agreement, other than those expressly contained in this Agreement.  Each Party acknowledges that it has been represented by counsel or has had the opportunity to consult with counsel, that it has read this entire Agreement, that this Agreement has been explained to it by its counsel, and that it agrees to the terms contained in this Agreement.  Except only for the representations and statements made expressly in this Agreement, each Party specifically covenants and agrees to waive and release any and all claims or defenses, with respect to or related to this Agreement, that arise from any type or manner of fraud or misrepresentation, whether known or unknown, whether intentional or negligent, including but not limited to misrepresentation, fraudulent inducement, fraudulent concealment, fraud by non-disclosure, common-law fraud, or statutory fraud.  Each Party assumes the risk of any misrepresentation, concealment or mistake by another Party, except only for the representations and statements made expressly in this Agreement.  Except only for the representations and statements made expressly in this Agreement, if any Party should subsequently discover that any matter relied upon by it in entering into this Agreement is untrue, or that the law presently in effect has changed in a manner which would affect negatively such Party's rights hereunder, such Party shall not be entitled to any relief in such connection or otherwise, including, without limitation, any alleged right or claim to set aside or rescind this Agreement.  This Agreement is intended to be and is final and binding among the Parties regardless of any claims for fraud, misrepresentation, promise made without the intention of performing, concealment of fact, mistake or fact or law or any other circumstance whatsoever.

7.     **Acknowledgment of Right to Credit Bid.**  In the event that Kash CA obtains the Assigned Assets pursuant to the Loan Sale Agreement, Kash CA, as the assignee of the Obligations

241186.3

and all other rights, remedies and interests of Zions under the Loan Documents, shall have the right, pursuant to Section 363(k) of the Bankruptcy Code, to make a credit bid, up to the full amount of the Obligations, to acquire substantially all of the assets and properties of the Debtor Borrower Entities pursuant to the Asset Purchase Agreement and at any auction of such assets and properties that may be conducted in the Howell Bankruptcy Cases.

        **8.**    **Bankruptcy Court Approval.**  Promptly following the execution of this Agreement, the Debtor Borrower Parties shall file in the Bankruptcy Court, pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure, a motion seeking entry of an order ("*Settlement Order*") authorizing the Debtor Borrower Entities to enter into and to perform their obligations under this Agreement and a settlement agreement with Mr. Howell and certain affiliates of Mr. Howell ("*Howell Settlement Agreement*"). The Settlement Order shall contain terms and conditions approved by Kash CA, which approval shall not be unreasonably withheld by Kash CA.

        **9.**    **Representations and Warranties.**  Each Party expressly warrants and represents to the other Parties the following:

        (a)    That each Party believes it to be in its best interests to settle the matters encompassed by this Agreement and on the terms provided in this Agreement;

        (b)    That the making of this Agreement is reasonable under the circumstances;

        (c)    That no promise or inducement has been offered except as expressly provided in this Agreement;

        (d)    That each Party executes this Agreement as its own free and voluntary act;

        (e)    That each Borrower Party acknowledges that it intends to grant the mutual releases described herein; and

        (f)    That each Party has knowingly and voluntarily entered into the Agreement without any duress or coercion from anyone.

        **10.**    **Denial of Liability.**  It is understood and agreed by the Parties that the settlement contained in this Agreement is made solely for the purposes of avoiding the expense and inconvenience of litigation between or among the Parties and facilitating the Debtor Borrower Entities' completion of a sale to Kash CA of substantially all of the assets of the Debtor Borrower Parties, and is the result of a compromise of disputed claims and is not, and is not to be construed as, an admission of liability by any Party, except only for those admissions set forth in paragraphs 1 through 3 hereof, and that the Parties expressly deny any liability or wrongdoing.

        **11.**    **Effective Date of Agreement.**  The terms and conditions of this Agreement, including, without limitation, the releases provided herein, shall be effective and binding upon the Parties upon the first business day after the occurrence of each of the following events ("*Effective Date*"):

        (a)    The execution and delivery of this Agreement by each of the Parties.

        (b)    The execution of the Loan Sale Agreement between Kash CA and Zions, and Kash CA's acquisition of the Assigned Assets and all of Zions's interests and liens against the Borrower Parties in accordance with the terms and conditions of the Loan Sale Agreement.

- 7 -

(c)    Kash CA's and the Debtor Borrower Entities' execution of the Asset Purchase Agreement, in accordance with terms and conditions satisfactory to Kash CA and the Debtor Borrower Entities.

(d)    The Debtor Borrower Entities' and Mr. Howell's execution of the Howell Settlement Agreement.

(e)    The entry of the Settlement Order on terms and conditions satisfactory to the Borrower Parties and Kash CA.

**12.**      **Termination of Agreement.** This Agreement may be terminated by any Party in the event that the Settlement Order is not entered by the Bankruptcy Court by August 30, 2019, or the Effective Date of this Agreement has not occurred by October 31, 2019.

**13.**      **Effect of Termination.** In the event of any termination of this Agreement as permitted by paragraph 12 of this Agreement, this Agreement and all of the provisions of this Agreement, including, without limitation, the releases provided by paragraph 5 hereof, shall be null and void ab initio, of no force or effect, and shall not be binding upon the Parties, and the Parties shall be restored to the same respective positions that they were in as of the Execution Date, without any prejudice to such positions. Upon any such termination of this Agreement, each Party shall reserve all rights and remedies that it may have as a matter of law.

**14.**      **Revocation of Releases.** The Borrower Parties hereby reserve the right, in the exercise of their sole and absolute discretion, to revoke the releases provided to Kash CA, and the waivers and other agreements provided by the Borrower Parties pursuant to paragraphs 1 through 3 hereof, and reserve the right to assert any and all remedies and claims that the Borrower Parties may have against Kash CA as a result of any material breach by Kash CA of the Asset Purchase Agreement, including, without limitation, any defense, offset, counterclaim or objection that any Borrower Parties may have with respect to the payment of any claims of Kash CA (including, without limitation, the Assigned Assets acquired by Kash CA pursuant to the Loan Sale Agreement) and any and all objections to the validity, priority or perfection of any liens or encumbrances that Kash CA may have with respect to the properties and assets of the Borrower Parties that may be acquired by Kash CA pursuant to the Loan Sale Agreement. Kash CA hereby reserves the right, in the exercise of its sole and absolute discretion, to revoke the releases provided hereunder to the Borrower Parties, and reserves the right to assert any and all remedies and claims that Kash CA may have against the Borrower Parties as a result of any material breach by the Borrower Parties of the Asset Purchase Agreement.

**15.**      **Entire Agreement; Amendments; Waivers.** This Agreement, the Asset Purchase Agreement and the Ancillary Documents, represent the entire understanding and agreement among the Parties with respect to the subject matter hereof. This Agreement may be amended, supplemented or changed, and any provision hereof may be waived, only by written instrument, making specific reference to this Agreement, signed by the Parties. No action taken pursuant to this Agreement shall be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, condition, covenant or agreement contained herein. The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the

4813-7284-4930.2

241186.3

exercise of any other right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by applicable law.

16.    **Execution of Agreement; Counterparts; Electronic Signatures.**

(a)    This Agreement may be executed in several counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument, and shall become effective when counterparts have been signed by each of the Parties and delivered to the other Parties; it being understood that all Parties need not sign the same counterparts.

(b)    The exchange of copies of this Agreement and of signature pages by facsimile transmission or by electronic mail shall constitute effective execution and delivery of this Agreement as to the Parties and may be used in lieu of the original Agreement for all purposes.

17.    **Governing Law.**  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND WHERE STATE LAW IS IMPLICATED, THE LAWS OF THE STATE OF IDAHO SHALL GOVERN, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF (EXCEPT FOR ANY LAWS OF THAT STATE WHICH WOULD RENDER SUCH CHOICE OF LAWS INEFFECTIVE), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.

18.    **Jurisdiction, Waiver of Jury Trial.**

(a)    THE BANKRUPTCY COURT SHALL HAVE SOLE AND EXCLUSIVE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER AT LAW OR IN EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT AND EACH PARTY CONSENTS UNCONDITIONALLY TO THE JURISDICTION OF THE BANKRUPTCY COURT; PROVIDED, HOWEVER, THAT, IF THE BANKRUPTCY COURT IS UNWILLING OR UNABLE TO HEAR ANY SUCH DISPUTE, THE COURTS OF THE STATE OF IDAHO AND THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA LOCATED IN NEZ PERCE COUNTY, IDAHO SHALL HAVE SOLE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER AT LAW OR IN EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT.

(b)    EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

19.    **Notices.**  Unless otherwise set forth herein, any notices, consents, waivers and other communications required or permitted by this Agreement shall be in writing and shall be deemed given to a Party when (a) delivered to the appropriate address by hand or by nationally recognized overnight courier service (costs prepaid), or (b) sent by facsimile or e-mail, in each case, if sent

241186.3

during the normal business hours of the recipient, with confirmation of transmission by the transmitting equipment confirmed with a copy delivered as provided in clause (a) hereof. Notice to a Party shall be given as follows:

If to Kash CA:

Kash CA, Inc.
c/o Dan Kash
294 Neptune Avenue
Encinitas, CA 92024
Tel: 310-692-5775
*Email: laxrange@yahoo.com*

with a copy to (which shall
not constitute Notice for
purposes of this paragraph 19):

William C. Belanger, Esq.
Procopio, Cory, Hargreaves & Savitch LLP
525 B Street, Suite 2200
San Diego, CA 92101
Tel: 619-515-3245
Email: bill.belanger@procopio.com

If to the Debtor Borrower Entities
or Twin River Contract Loading,
Inc.:

Howell Munitions & Technology, Inc.
c/o J. Michael Issa
GlassRatner Advisory & Capital Group LLC
19800 MacArthur Boulevard
Irvine, CA 92612
Tel: 949-407-6620
Email: missa@glassratner.com

as to Debtors, a copy to (which shall
not constitute Notice for
purposes of this paragraph 19):

Robert E. Opera, Esq.
Winthrop Couchot Golubow Hollander, LLP
1301 Dove Street, Suite 500
Newport Beach, California 92660
Tel: 949-720-4130
Email: ropera@wcghlaw.com

If to Mr. Howell
or Big Canyon Environmental, LLC:

David C. Howell
29978 Thiessen Road
Lewiston, Idaho 83501

with a copy to
(which shall not constitute
Notice for purposes of this
paragraph 19):

Todd C. Ringstad, Esq.
Ringstad & Sanders
4343 Von Karman Avenue, Suite 300
Newport Beach, California 92660
Tel: 949-851-7450
Email: todd@ringstadlaw.com

- 10 -

241186.3

A Party may designate in writing a different address to which any notice, request, demand or other communication is to be given hereunder to such Party. Telephone numbers are listed for convenience purposes only and not for the purpose of giving notice pursuant to this Agreement.

20. **Binding Effect; Assignment.** On the Effective Date, this Agreement shall be binding upon the Parties and shall inure to the benefit of the Parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Howell Bankruptcy Cases or any successor Chapter 7 cases. No assignment of this Agreement or of any rights or obligations hereunder may be made by a Party without the prior written consent of each other Party and any attempted assignment without such required consents shall be void.

21. **Severability.** Whenever possible, each provision or portion of any provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision in such jurisdiction and in lieu of such invalid, illegal or unenforceable provision, there will be added automatically as a part of this Agreement a valid, legal and enforceable provision as similar in terms to such invalid, illegal or unenforceable provision as may be possible.

22. **Authorized Execution.** Each individual executing this Agreement on behalf of a Party represents and warrants that (a) he is authorized to execute this Agreement for such Party, and (b) such Party shall be bound in all respects hereby.

23. **Attorneys' Fees and Costs.** Each Party shall bear its own attorneys' fees and costs arising from or relating to the negotiation and execution of this Agreement. In the event of any action or proceeding to enforce, modify, interpret, construe, invalidate, rescind, or set aside any term or provision of this Agreement, however, the prevailing Party shall be entitled to an award of its costs and expenses, including reasonable attorneys' fees and costs, incurred as a result of such action or proceeding, including any appeals resulting therefrom.

24. **No Construction against any Party; Headings for Convenience Only.** The Parties have cooperated in the drafting and preparation of this Agreement. In any construction of this Agreement, or of any of its terms and provisions, the same shall not be construed against any Party. All headings in this Agreement are inserted for convenience of reference only, and shall not affect the construction or interpretation hereof.

25. **Interpretation.** Wherever in this Agreement the context so requires, reference to the neuter, masculine or feminine shall be deemed to include each of the others, and reference to either the singular or the plural shall be deemed to include the other.

26. **Further Assurances.** Each Party, at the request of another Party, shall execute and deliver to the requesting Party all such further documents, and shall take such further acts, as may be reasonably necessary or appropriate in order to confirm or carry out the provisions of this Agreement.

27. **Parties in Interest.** Other than as provided in paragraph 5 hereof, nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by

- 11 -

reason of this Agreement on any persons other than the Parties and any of their respective successors and assigns, nor is anything in this Agreement intended to relieve or discharge the obligation of any third persons to a Party.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective duly authorized officers or members as of the Execution Date.

**BORROWER PARTIES:**

**X-TREME BULLETS, INC.,**
As a Debtor-in-Possession

By: _____

Name: _____ J. h . ISSA _____

Its: _____ CRO _____

**AMMO LOAD WORLDWIDE, INC.,**
As a Debtor-in-Possession

By: _____

Name: _____ J. M. ISSA _____

Its: _____ CRO _____

**CLEARWATER BULLET, INC.,**
As a Debtor-in-Possession

By: _____

Name: _____ J. M. ISSA _____

Its: _____ CRO _____

**FREEDOM MUNITIONS, LLC,**
As a Debtor-in-Possession

By: _____

Name: _____ J.M. ISSA _____

- 12 -

Its: _____CEO_____

**HOWELL MACHINE, INC.,**
As a Debtor-in-Possession

By: _____

Name: ___J.M. ISSA___

Its: ___CEO___


**HOWELL MUNITIONS & TECHNOLOGY, INC.,**
As a Debtor-in-Possession:

By: _____

Name: ___J.M. ISSA___

Its: ___CRO___


**LEWIS-CLARK AMMUNITION COMPONENTS, LLC,**
As a Debtor-in-Possession

By: _____

Name: ___J.M. ISSA___

Its: ___CRO.___


**COMPONENTS EXCHANGE, LLC,**
As a Debtor-in-Possession

By: _____

Name: ___J.M. ISSA___

- 13 -

Its: _____ CRO

**TWIN RIVER CONTRACT LOADING, INC.,**

By: _____

Name: _____ J. M. ISSA

In my capacity as CRO of Howell Munitions &
Technology Inc. sole shareholder

Its: _____

**BIG CANYON ENVIRONMENTAL, LLC,**

By: _____

Name: _____ J.M. ISSA

Its: _____ CRO

**DAVID C. HOWELL**

SEE ATTACHED SIGNATURE PAGE
_____

**KASH CA:**

**KASH CA, INC.**

By: _____ SEE ATTACHED SIGNATURE PAGE

Name: _____

Its: _____

241186.3

4813-7284-6930.2

**COMPONENTS EXCHANGE, LLC,**
As a Debtor-in-Possession

By:    SEE ATTACHED SIGNATURE PAGE

Name:

Its:


**TWIN RIVER CONTRACT LOADING, INC.,**

By:    SEE ATTACHED SIGNATURE PAGE

Name:

Its:


**BIG CANYON ENVIRONMENTAL, LLC,**

By:

Name:

Its:


**DAVID C. HOWELL**


**KASH CA:**


**KASH CA, INC.**

By:    SEE ATTACHED SIGNATURE PAGE

Name:

**DAVID C. HOWELL**

SEE ATTACHED SIGNATURE PAGE

**KASH CA:**

**KASH CA, INC.**

By: _____

Name: ___Daniel   Kash___

Its: ___President___

- 15 -

**Exhibit A**

**Loan Documents**

1.  Business Loan Agreement (Asset Based) dated May 22, 2014 by and among Ammo Load Worldwide, Inc., Big Canyon Environmental, LLC, Clearwater Bullet, Inc., Freedom Munitions, LLC, Howell Machine, Inc., Lewis-Clark Ammunition Components, LLC, Twin River Contract Loading, Inc., Howell Munitions & Technology, Inc., X-Treme Bullets, Inc. and Zions Bancorporation, N.A. dba Zions First National Bank (f/k/a Zions First National Bank)

2.  Promissory Note dated May 22, 2014 in the original principal sum of $3,500,000 by and among Ammo Load Worldwide, Inc., Big Canyon Environmental, LLC, Clearwater Bullet, Inc., Freedom Munitions, LLC, Howell Machine, Inc., Lewis-Clark Ammunition Components, LLC, Twin River Contract Loading, Inc., Howell Munitions & Technology, Inc., X-Treme Bullets, Inc. in favor of Zions Bancorporation, N.A. dba Zions First National Bank (f/k/a Zions First National Bank)

3.  Loan Agreement dated November 19, 2014 by and among Ammo Load Worldwide, Inc., Big Canyon Environmental, LLC, Clearwater Bullet, Inc., Freedom Munitions, LLC, Howell Machine, Inc., Lewis-Clark Ammunition Components, LLC, Twin River Contract Loading, Inc., Howell Munitions & Technology, Inc., David C. Howell, X-Treme Bullets, Inc. and Zions Bancorporation, N.A. dba Zions First National Bank (f/k/a Zions First National Bank), as amended by that (i) certain First Loan Modification Agreement dated July 27, 2015 by and among the abovementioned parties and (ii) that Second Loan Modification Agreement dated August 31, 2016 by and among the abovementioned parties and Components Exchange, LLC

4.  Promissory Note (Loan 1) dated November 19, 2014 in the original principal sum of $8,000,000 by and among Ammo Load Worldwide, Inc., Big Canyon Environmental, LLC, Clearwater Bullet, Inc., Freedom Munitions, LLC, Howell Machine, Inc., Lewis-Clark Ammunition Components, LLC, Twin River Contract Loading, Inc., Howell Munitions & Technology, Inc., X-Treme Bullets, Inc., and David C. Howell in favor of Zions Bancorporation, N.A. dba Zions First National Bank (f/k/a Zions First National Bank), as amended and restated by that certain (i) First Amended and Restated Promissory Note (Loan 1) dated July 27, 2015 by and among the abovementioned parties in the original principal sum of $9,000,000, (ii) Second Amended and Restated Promissory Note (Loan 1) dated August 31, 2016 by and among the abovementioned parties and Components Exchange, LLC in the original principal sum of $9,000,000 and (iii) Third Amended and Restated Promissory Note (Loan 1) dated October 17, 2016 by and among the abovementioned parties and Components Exchange, LLC in the original principal sum of $9,000,000

5.  Promissory Note (Loan 2) dated November 19, 2014 in the original principal sum of $1,640,000 by and among Ammo Load Worldwide, Inc., Big Canyon Environmental, LLC, Clearwater Bullet, Inc., Freedom Munitions, LLC, Howell Machine, Inc., Lewis-Clark Ammunition Components, LLC, Twin River Contract Loading, Inc., Howell Munitions & Technology, Inc., X-Treme Bullets, Inc., and David C. Howell in favor of Zions Bancorporation, N.A. dba Zions First National Bank (f/k/a Zions First National Bank), as amended and restated by that certain Amended and Restated Promissory Note (Loan 2)

dated August 31, 2016 by and among the abovementioned parties and Components Exchange, LLC in the original principal sum of $1,640,000

6.   Promissory Note (Loan 3) dated November 19, 2014 in the original principal sum of $545,000 by and among Ammo Load Worldwide, Inc., Big Canyon Environmental, LLC, Clearwater Bullet, Inc., Freedom Munitions, LLC, Howell Machine, Inc., Lewis-Clark Ammunition Components, LLC, Twin River Contract Loading, Inc., Howell Munitions & Technology, Inc., X-Treme Bullets, Inc., and David C. Howell in favor of Zions Bancorporation, N.A. dba Zions First National Bank (f/k/a Zions First National Bank), as amended and restated by that certain Amended and Restated Promissory Note (Loan 3) dated August 31, 2016 by and among the abovementioned parties and Components Exchange, LLC in the original principal sum of $545,000

7.   Promissory Note (Loan 4) dated November 19, 2014 in the original principal sum of $4,815,000 by and among Ammo Load Worldwide, Inc., Big Canyon Environmental, LLC, Clearwater Bullet, Inc., Freedom Munitions, LLC, Howell Machine, Inc., Lewis-Clark Ammunition Components, LLC, Twin River Contract Loading, Inc., Howell Munitions & Technology, Inc., X-Treme Bullets, Inc., and David C. Howell in favor of Zions Bancorporation, N.A. dba Zions First National Bank (f/k/a Zions First National Bank), as amended and restated by that certain Amended and Restated Promissory Note (Loan 4) dated August 31, 2016 by and among the abovementioned parties and Components Exchange, LLC in the original principal sum of $4,815,000

8.   Promissory Note (Loan 5) dated November 19, 2014 in the original principal sum of $2,000,000 by and among Ammo Load Worldwide, Inc., Big Canyon Environmental, LLC, Clearwater Bullet, Inc., Freedom Munitions, LLC, Howell Machine, Inc., Lewis-Clark Ammo Components, LLC, Twin River Contract Loading, Inc., Howell Munitions & Technology, Inc., X-Treme Bullets, Inc., and David C. Howell in favor of Zions Bancorporation, N.A. dba Zions First National Bank (f/k/a Zions First National Bank), as amended and restated by that certain Amended and Restated Promissory Note (Loan 5) dated August 31, 2016 by and among the abovementioned parties and Components Exchange, LLC in the original principal sum of $2,000,000

9.   Promissory Note (Loan 6) dated July 27, 2015 in the original principal sum of $5,000,000 by and among Ammo Load Worldwide, Inc., Big Canyon Environmental, LLC, Clearwater Bullet, Inc., Freedom Munitions, LLC, Howell Machine, Inc., Lewis-Clark Ammo Components, LLC, Twin River Contract Loading, Inc., Howell Munitions & Technology, Inc., X-Treme Bullets, Inc., and David C. Howell in favor of Zions Bancorporation, N.A. dba Zions First National Bank (f/k/a Zions First National Bank), as amended and restated by that certain Amended and Restated Promissory Note (Loan 6) dated August 31, 2016 by and among the abovementioned parties and Components Exchange, LLC in the original principal sum of $5,000,000

10.  Commercial Guaranty executed by David C. Howell dated May 22, 2014 in favor of Zions Bancorporation, N.A. dba Zions First National Bank (f/k/a Zions First National Bank)

11.  Commercial Security Agreement dated May 22, 2014 by and among Ammo Load Worldwide, Inc., Big Canyon Environmental, LLC, Clearwater Bullet, Inc., Freedom Munitions, LLC, Howell Machine, Inc., Lewis-Clark Ammunition Components, LLC, Twin River Contract Loading, Inc., Howell Munitions & Technology, Inc., X-Treme

- 16 -

241186.3

Bullets, Inc. and Zions Bancorporation, N.A. dba Zions First National Bank (f/k/a Zions First National Bank)

12. Security Agreement dated November 19, 2014 by and among Ammo Load Worldwide, Inc., Big Canyon Environmental, LLC, Clearwater Bullet, Inc., Freedom Munitions, LLC, Howell Machine, Inc., Lewis-Clark Ammunition Components, LLC, Twin River Contract Loading, Inc., Howell Munitions & Technology, Inc., X-Treme Bullets, Inc. and Zions Bancorporation, N.A. dba Zions First National Bank (f/k/a Zions First National Bank), as amended by the Second Loan Modification Agreement dated August 31, 2016 by and among the abovementioned parties and Components Exchange, LLC to add Components Exchange, LLC as a party to such Security Agreement.

13. UCC-1 Financing Statement filed with the Idaho Secretary of State on May 23, 2014 under filing number B2014-1140406-8

14. Trust Deed, Assignment of Rents, Security Agreement and Fixture Filing dated November 19, 2014 by David C. Howell to Land Title of Nez Perce County, Inc. for the benefit of Zions Bancorporation, N.A. dba Zions First National Bank (f/k/a Zions First National Bank) as recorded with the Nez Perce County Recorder on (i) November 20, 2014 as instrument 826445 and (ii) January 20, 2015 as instrument 827690

15. UCC-1 Financing Statement filed with the Idaho Secretary of State on August 31, 2016 under Filing number B2016-1181176-3

16. Security Agreement and Consent (Howell Munitions & Technologies, Inc. Stock) dated January 1, 2016 among David C. Howell, Howell Munitions & Technology, Inc. and Zions Bancorporation, N.A. dba Zions First National Bank (f/k/a ZB, N.A. dba Zions First National Bank), and the Stock Power from David C. Howell in favor of ZB, N.A. dba Zions First National Bank.

17. Security Agreement and Consent (Howell Munitions & Technologies, Inc. Stock) dated January 1, 2016 among Rudolph Zaruba III, Howell Munitions & Technology, Inc. and Zions Bancorporation, N.A. dba Zions First National Bank (f/k/a ZB, N.A. dba Zions First National Bank), and the Stock Power from Rudolph Zaruba III in favor of ZB, N.A. dba Zions First National Bank.

18. Landlord Estoppel, Consent and Waiver dated February 20, 2014 by David C. Howell in favor of Zions Bancorporation, N.A. dba Zions First National Bank (f/k/a Zions First National Bank), with respect to the real property located at 29978 Thiesson Road, Lewiston, Idaho 83501.

19. Landlord Estoppel, Consent and Waiver dated February 20, 2014 by David Howell Rentals in favor of Zions Bancorporation, N.A. dba Zions First National Bank (f/k/a Zions First National Bank), with respect to the real property located at 805 D Street, Lewiston, Idaho 83501.

20. Landlord Estoppel, Consent and Waiver dated February 20, 2014 by David Howell Rentals in favor of Zions Bancorporation, N.A. dba Zions First National Bank (f/k/a Zions First National Bank), with respect to the real property located at 815 D Street, Lewiston, Idaho 83501.

241186.3

4813-7284-4930.2

21. Landlord Estoppel, Consent and Waiver dated February 20, 2014 by David Howell Rentals in favor of Zions Bancorporation, N.A. dba Zions First National Bank (f/k/a Zions First National Bank), with respect to the real property located at the intersection of 8th Street and D Street, Lewiston, Idaho 83501.

22. Landlord Estoppel, Consent and Waiver dated February 20, 2014 by David Howell Rentals in favor of Zions Bancorporation, N.A. dba Zions First National Bank (f/k/a Zions First National Bank), with respect to the real property located at 21112 Big Canyon Road, Peck, Idaho 83545.

23. Landlord Estoppel, Consent and Waiver dated February 20, 2014 by David Howell Rentals in favor of Zions Bancorporation, N.A. dba Zions First National Bank (f/k/a Zions First National Bank), with respect to the real property located at 4093 Lucky Lane, Lewiston, Idaho 83501.

24. Landlord Estoppel, Consent and Waiver dated February 20, 2014 by David Howell Rentals in favor of Zions Bancorporation, N.A. dba Zions First National Bank (f/k/a Zions First National Bank), with respect to the real property located at 153 Southport Avenue, Lewiston, Idaho 83501.

241186.3

4813-7284-4930.2

# HOWELL SETTLEMENT AGREEMENT

## SETTLEMENT AND RELEASE AGREEMENT

THIS SETTLEMENT AND RELEASE AGREEMENT (*"Agreement"*) is entered into as of August __, 2019 (*"Execution Date"*) by and among David C. Howell (*"Mr. Howell"*), David Howell Rentals(*"DHR"*), Howell Construction, LLC (*"Howell Construction"*), DaJo Trucking, Inc. (*"DaJo"*), Big Canyon Environmental, LLC (*"Big Canyon"*), Lolo Sporting Goods, LLC (*"Lolo"*), Steve Howell, Robert Stephen Howell and Thomas Howell (collectively, *"Howell Parties"*), on one hand, and Howell Munitions & Technology, Inc. (*"HMT"*), X-Treme Bullets, Inc. (*"X-Treme"*), Ammo Load Worldwide, Inc. (*"ALW"*), Lewis-Clark Ammunition Components, LLC (*"LCAC"*), Freedom Munitions, LLC (*"Freedom"*), Clearwater Bullet, Inc. (*"Clearwater"*), Howell Machine, Inc. (*"Howell Machine"*), Components Exchange, LLC (*"Components Exchange"*) (collectively, the *"Debtors"*) and Twin River Contract Loading, Inc. (*"Twin River"*) (the Debtors and Twin River are referred to herein, collectively, as the *"Debtor-Related Parties"*), on the other hand.  The Howell Parties and the Debtor-Related Parties are referred to herein, collectively, as the *"Parties."*

## RECITALS

A.    On June 8, 2018, (*"Petition Date"*), the Debtors filed Chapter 11 petitions for relief in the United States Bankruptcy Court for the District of Nevada (*"Bankruptcy Court"*) which are jointly administered under Case No. 18-50609-BTB (collectively, the *"Bankruptcy Cases"*).

B.    X-Treme is an Idaho corporation.  X-Treme was in the business of manufacturing bullets, but has suspended such operations.

C.    Clearwater is an Idaho corporation.  Clearwater is in the business of manufacturing bullets.

D.    ALW is an Idaho corporation.  ALW is in the business of manufacturing ammoload machines and other machines for resale to third-party customers.

E.    Howell Machine is an Idaho corporation.  Howell Machine is in the business of fabricating parts that are used to build the ammoload machines manufactured by ALW and maintaining the other machinery and equipment owned by the other Debtors.

F.    Freedom is an Idaho limited liability company.  Freedom is in the business of selling ammunition.

G.    LCAC is an Idaho limited liability company.  LCAC was in the business of manufacturing shell cases, but no longer conducts business operations.

H.    Components Exchange is an Idaho limited liability company.  Components Exchange is in the business of manufacturing and assembling ammunition.

I.    HMT is the sole shareholder of X-Treme, Clearwater, ALW and Howell Machine. HMT is the sole member of Freedom.

J.    Twin River is an Idaho corporation.  Twin River is a wholly-owned subsidiary of HMT.  Twin River was in the business of assembling and manufacturing ammunition, but ceased conducting business operations in or about May 2018.

K.    Mr. Howell is an individual who is a resident of the State of Idaho.  Mr. Howell owns ninety-five percent (95%) of the issued and outstanding shares of stock in HMT.

- 1 -

Mr. Howell owns one hundred percent (100%) of the membership interests in LCAC, and owns ninety percent (90%) of the membership interests in Components Exchange.

L.    Big Canyon is an Idaho limited liability company. Big Canyon is owned wholly by Mr. Howell. Big Canyon was in the business of demilling ammunition, but ceased conducting business operations in or about May 2018.

M.    DHR is a fictitious business name for Mr. Howell. DHR is the named lessor under ten (10) real property leases ("*Leases*") pursuant to which HMT is the lessee. HMT has paid to DHR and/or Mr. Howell payments pursuant to the Leases.

N.    DaJo is a Nebraska corporation, and is an affiliate of Mr. Howell. HMT and Components Exchange have paid to DaJo payments for trucking services rendered to them by DaJo.

O.    Lolo is an Idaho limited liability company and is an affiliate of Mr. Howell. HMT and Components Exchange have paid to Lolo pre-petition payments for goods sold to them by Lolo.

P.    Howell Construction is an Idaho limited liability company, and is an affiliate of Mr. Howell. HMT and Components Exchange have paid to Howell Construction payments for construction and maintenance services rendered to them by Howell Construction.

Q.    Steve Howell is an individual residing in the State of Idaho, and is the brother of Mr. Howell. HMT has paid to Steve Howell payments as and for payroll and benefits for services rendered to the Debtors by Steve Howell as a manager of ALW.

R.    Robert Stephen Howell is an individual residing in the State of Idaho, and is Mr. Howell's father. HMT and Components Exchange have paid to Robert Stephen Howell payments as and for payroll and reimbursement of expenses for services rendered to them by Robert Stephen Howell as a project manager for them.

S.    Thomas Howell is a resident of the State of Idaho, and is Mr. Howell's son. HMT and Components Exchange have paid to Thomas Howell payments as and for payroll and benefits for services rendered to them by Thomas Howell as a machine technician.

T.    Mr. Howell has filed in each of the Bankruptcy Cases a proof of claim (collectively, "*Proofs of Claim*"), asserting against each Debtor a claim in the amount of approximately $436,310 ("*Howell Claim*"). The Debtors dispute the Howell Claim.

U.    The Debtors and the duly acting Official Committee of Unsecured Creditors ("*Committee*") appointed in the Bankruptcy Cases have evaluated pre-petition transfers that the Debtors made to the Howell Parties, and assert that certain of such transfers may be avoidable under Chapter 5 of the Bankruptcy Code, including as fraudulent transfers under Section 548 of the Bankruptcy Code ("*Avoidance Claims*"). The Howell Parties dispute such assertion, contending that the Debtors have no material Avoidance Claims against the Howell Parties and specifically deny that the Debtors have made any fraudulent transfers to them.

V.    The Debtors and the Committee have evaluated pre-petition acts taken by Mr. Howell as an officer, director, manager or principal, as the case may be, of the Debtor-Related Parties and assert that certain of such acts were wrongful and that the Debtor-Related Parties have claims against Mr. Howell for wrongful acts taken by him in such capacities, including, without limitation, breach of his fiduciary duties to the Debtor-Related Parties ("*D&O Claims*").

- 2 -

241192.3

Mr. Howell disputes such assertion, contending that he has not acted wrongfully as an officer, director, manager or principal of the Debtor-Related Parties.

W.    The Debtor-Related Parties' primary pre-petition lender, Zions Bancorporation, N.A., dba Zions First National Bank (**"Zions"**), has filed in each of the Bankruptcy Cases a proof of claim in the amount of approximately $17,529,219 (that amount has been reduced by a $200,000 post-petition payment made by the Debtors) (**"Obligations"**). Zions asserts that the Obligations are secured by duly-perfected, unavoidable first-priority liens encumbering substantially all of the assets of the Debtors, Twin River and Big Canyon and by deeds of trust encumbering two real properties pledged by Mr. Howell. Zions has entered into an agreement (**"Loan Sale Agreement"**) with Kash CA, Inc. (**"Kash CA"**) to sell and transfer to Kash CA all of Zions's right, title and interest under its secured loans with the Debtor-Related Parties, Big Canyon and Mr. Howell.

X.    Kash CA and the Debtors have entered into an agreement pursuant to which Kash CA will purchase from the Debtors, and the Debtors will sell and assign to Kash CA, substantially all of the Debtors' assets and properties (**"Asset Purchase Agreement"**). Pursuant to the Asset Purchase Agreement, the Debtors will assign to Kash CA, and Cash CA will assume, the Debtors' rights, interests and obligations, as lessee, under each Lease.

Y.    Zions has conditioned its entering into the Loan Sale Agreement upon the Debtor-Related Parties', Big Canyon's and Mr. Howell's agreeing to waive and release any and all claims which they may have against Zions, in accordance with the terms and conditions of a settlement agreement acceptable to Zions.

Z.    Kash CA has conditioned its entering into the Loan Sale Agreement with Zions and its entering into the Asset Purchase Agreement with the Debtors upon the Debtor-Related Parties', Big Canyon's and Mr. Howell's agreeing to waive and release any and all claims which they may have against Kash CA, in accordance with the terms and conditions of a settlement agreement acceptable to Kash.

AA.    The Debtor-Related Parties are willing to provide to Zions and to Kash CA the waivers and releases required by them. Mr. Howell and Big Canyon are prepared to provide to Zions and to Kash CA the waivers and releases required by them, subject to the terms and conditions of this Agreement.

BB.    The Parties desire to resolve any and all differences which may exist among them, including, without limitation, the disposition of the Howell Claim, the Avoidance Claims, and the D&O Claims, in accordance with the terms and conditions of this Agreement.

## AGREEMENT

NOW, THEREFORE, based upon the above Recitals and in consideration of the mutual promises, conditions and covenants in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the Parties, the Parties agree as follows:

1.    **Waiver of Howell Claim.** Effective as of the Effective Date of this Agreement (as such term is defined in paragraph 9 hereof), the Proofs of Claim shall be deemed to be withdrawn by Mr. Howell and the Howell Claim shall be deemed to be fully and completely, waived, released, discharged and extinguished and Mr. Howell shall have no claim against any of the Debtors on account of the Howell Claim. In addition, in the event that Debtor Components Exchange has a

- 3 -

surplus estate, Mr. Howell shall contribute any distribution to which Mr. Howell otherwise would be entitled on account of his equity interest in Components Exchange to designated creditors of the other Debtors, as determined by such other Debtors in the exercise of their sole and absolute discretion, solely to the extent necessary to pay in full the allowed claims of such creditors; provided, however, that Mr. Howell shall be entitled to retain any and all equity distributions to which he would be entitled if all allowed claims of the Debtors' creditors are paid in full in the Bankruptcy Cases. At the request of the Debtors, Mr. Howell shall take any and all acts, and execute any and all documents, reasonably requested by the Debtors for the purpose of confirming the waiver, release, discharge and extinguishment of the Howell Claim.

2.    **Waiver of Claim Regarding Segregated Rents.** Effective as of the Effective Date of this Agreement, DHR and Mr. Howell waive and release any and all claims of any nature whatsoever which they may have regarding the cash that will be on deposit as of the Effective Date in a segregated account (account no. 979309242) at Zions, constituting rent payments made by the Debtors and subject to an assignment of rents claim asserted by Zions.

3.    **Waivers and Releases of Claims against Kash CA and Zions.** The Howell Parties shall waive and release any and all claims which they may have against Kash CA in accordance with the terms and conditions of a settlement agreement mutually acceptable to Kash CA, the Howell Parties and the Debtor-Related Parties, and shall waive and release any and all claims which they may have against Zions in accordance with the terms and conditions of a settlement agreement mutually acceptable to Zions, the Howell Parties and the Debtor-Related Parties.

4.    **Releases.**

    (a)    **Mutual Release of Claims.**

        (i)    **Releases by the Debtor-Related Parties in Favor of the Howell Parties.** Effective as of the Effective Date of this Agreement, subject to the provisions of paragraph 4(a)(iii) hereof, except only for the obligations imposed upon the Howell Parties by this Agreement and the rights reserved by the Debtor-Related Parties by this Agreement, the Debtor-Related Parties, for themselves and their respective predecessors, successors and assigns, and each of them, hereby absolutely, fully and forever, release, relieve, waive, relinquish and discharge the Howell-Related Parties and their respective former and current affiliates, related entities, principals, members, shareholders, directors, officers, employees, contractors, administrators, trustees, representatives, agents, attorneys, accountants, financial advisors, partners, heirs, spouses, predecessors, successors and assigns, and each of them, of and from any and all manner of actions, causes of action, suits, debts, deficiencies, liabilities, demands, claims, obligations, costs, interest charges, expenses (including attorneys' fees and costs), sums of money, controversies, damages, injuries, losses, accounts, reckonings, security interests and liens of every kind or nature whatsoever, whether known or unknown, suspected or unsuspected, fixed or contingent, matured or unmatured, liquidated or unliquidated, legal or equitable, in tort, in contract or otherwise (including, without limitation, all punitive and exemplary damages), occurring or arising prior to the date of this Agreement, including, without limitation, the Avoidance Claims and any other claims relating to or arising in any manner out of the matters set forth in the Recitals hereof.

- 4 -

241192.3

(ii)  **Releases by Howell Parties in Favor of the Debtor-Related Parties.**
Effective as of the Effective Date of this Agreement, subject to the provisions of
paragraph 4(a)(iv) hereof, except only for the obligations imposed upon the Debtor-
Related Parties by this Agreement and the rights reserved by the Howell Parties by
this Agreement, the Howell Parties for themselves and for respective spouses,
predecessors, successors, and assigns, and each of them, hereby absolutely, fully
and forever, release, relieve, waive, relinquish and discharge the Debtor-Related
Parties and their respective former and current affiliates, related entities, principals,
members, shareholders, directors, officers (including, without limitation, J. Michael
Issa, Angela Smith and David Foshee), employees, contractors, administrators,
trustees, representatives, agents, attorneys, accountants, financial advisors,
partners, predecessors, successors and assigns, and each of them, of and from any
and all manner of actions, causes of action, suits, debts, deficiencies, liabilities,
demands, claims, obligations, costs, interest charges, expenses (including attorneys'
fees and costs), sums of money, controversies, damages, injuries, losses, accounts,
reckonings, security interests and liens of every kind or nature whatsoever, whether
known or unknown, suspected or unsuspected, fixed or contingent, matured or
unmatured, liquidated or unliquidated, legal or equitable, in tort, in contract or
otherwise (including, without limitation, all punitive and exemplary damages),
occurring or arising prior to the date of this Agreement, including, without
limitation, the Howell Claim and any other claims relating to or arising in any
manner out of the matters set forth in the Recitals hereof.

(iii)  **Exceptions to the Releases Given by the Debtor-Related Parties.**
Nothing contained in this Agreement shall constitute a waiver or release by any
Debtor-Related Party of, and the Debtor-Related Parties shall retain without any
impairment of any nature, the following rights, remedies and claims:

(A)  The Debtor-Related Parties shall retain any and all rights, remedies
or claims which they may have against each other.

(B)  Each Debtor shall retain any and all rights, remedies and claims
which such Debtor may have against Kash CA, Dan Kash ("*Mr. Kash*") and
any affiliate of Mr. Kash (including, without limitation, LAX Ammo, Inc.
and L.A.X. Firing Range, Inc.) (collectively, "*Kash Parties*") arising from
or related to the Asset Purchase Agreement, any purchase order, contract,
or other agreement by which a Kash Party agrees to purchase ammunition
or other goods from such Debtor, including, without limitation, the right to
obtain payment of any amounts owed to the Debtor by the Kash Party.

(C)  The Debtor-Related Parties shall retain any and all rights, remedies
and claims which they may have against Mr. Howell for any alleged acts or
omissions by Mr. Howell as an officer, director, member or principal of a
Debtor-Related Party(the "Reserved Claims"); provided, however, that the
Debtor-Related Parties (and anyone acting on their behalf, including
without limitation any trustee, creditor's committee, plan agent or post-
confirmation committee, as well as all successors and assigns (collectively
"the Claimants")) shall not (i) pursue such Reserved Claims in an amount
greater than $2 million (minus any and all defense costs and expenses), and

(ii) pursue such Reserved Claims if and to the extent not covered and paid for by any and all potentially applicable directors and officers liability insurance policies (the "D&O policies"). The Debtor-Related Parties (on behalf of themselves and all of the other Claimants) agree that under no circumstances will Mr. Howell pay or be required to pay any amounts in excess of the applicable, available and remaining limits of the D&O policies. Mr. Howell shall cooperate as required under the terms of any and all D&O policies applicable to the Reserved Claims. Should one or more insurers under the D&O policies dispute coverage for or bring a coverage action against Mr. Howell with respect to the Reserved Claims, Mr. Howell shall have no obligation to defend himself in said dispute or action; but, Mr. Howell agrees to provide notice to the Claimants of any such coverage dispute or coverage action and to cooperate with the Claimants in connection with any such coverage dispute or coverage action, subject to and so as not to be inconsistent with any duty to cooperate that Mr. Howell may have under the subject D&O Policies. In the event of any judgment obtained against Mr. Howell on the Reserved Claims, upon request by the Claimants that obtained said judgment, Mr. Howell shall cooperate with and authorize said Claimants to pursue an action against any or all insurers under the D&O policies (at said Claimants' sole risk, cost and expense), and shall assign to said Claimants the right to retain all proceeds, if any, from such action against said insurer(s). The Claimants shall defend, indemnify and hold Howell harmless from any and all loss, damage, claim or liability arising out of said Claimants' pursuit of said action against the insurer(s) under the D&O policies. The Claimants shall defend and indemnify Mr. Howell from and against any and all demands, claims and suits brought by any persons or entities against Mr. Howell that (i) are not otherwise covered by the D&O policies, and (ii) arise out of, in whole or in part, the Claimants' pursuit of the Reserved Claims.

(D)    Except only for a waiver of the Avoidance Claims, each Debtor-Related Party shall retain any and all rights, remedies and claims which such Debtor-Related Party may have against a Howell Party arising from or related to any obligation owed by the Howell Party to such Debtor-Related Party (i) that was incurred in the ordinary course of post-petition transactions between the Howell Party and such Debtor-Related Party, and (ii) that was outstanding as of the Execution Date of this Agreement or that arises or becomes due after the Execution Date of this Agreement.

(iv)    **Exceptions to the Releases Given by the Howell Parties.** Each Howell Party shall retain any and all rights, remedies and claims which such Howell Party may have against a Debtor-Related Party arising from or relating to any obligation owed by the Debtor-Related Party to such Howell Party (A) that was incurred in the ordinary course of post-petition transactions between such Howell Party and the Debtor-Related Party (including, without limitation, a claim for post-petition rent, payroll, cost reimbursement or benefits), and (B) that was outstanding as of the Execution Date of this Agreement, or that arises or becomes due after the Execution Date of this Agreement.

- 6 -

(b)    <u>Scope of Releases</u>. Each Party acknowledges the fact that it is its intention that, as of the Effective Date of this Agreement, this Agreement shall be effective as a full and final accord and satisfaction and settlement of and as a bar to each such manner of action, cause of action, suit, debt, deficiency, liability, demand, claim, obligation, cost, expense, sum of money, controversy, damage, injury, loss, account, reckoning, security interest and lien of every kind or nature whatsoever, heretofore referred to and released, which any of the Debtor-Related Parties, on one hand, and any of the Howell Parties, on the other hand, has had, has, or may have against each other. In connection with such waiver and relinquishment, each Party acknowledges that it is aware that it or its attorneys may hereafter discover facts different from or in addition to the facts which it or its attorneys now know or believe to be true with respect to the subject matters of this Agreement and that it may have sustained or may yet sustain damages, costs or expenses that are presently unknown and that relate to those claims, but that it is its intention hereby to fully, finally, absolutely and forever settle all such claims which do now exist, may exist or heretofore have existed among the Parties, in accordance with the terms of this Agreement and that, in furtherance of such intention, the releases herein given shall be and shall remain in effect for all time as full and complete releases, in accordance with the terms and conditions hereof, notwithstanding the discovery of any such different or additional facts or of any such additional damages, costs or expenses. Therefore, each Party acknowledges that it is familiar with Section 1542 of the Civil Code of the State of California, which provides as follows:

> **"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."**

Except only for the rights expressly reserved by each Party pursuant to this Agreement, each Party hereby waives and relinquishes fully, as of the Effective Date of this Agreement, all rights and benefits which it has or may have under Section 1542 of the Civil Code of the State of California, and any comparable federal statutes, statutes of any other states in the United States, and common law principles pertaining to the subject matters of this Agreement.

(c)    <u>No Rescission of Releases</u>. As a part of the foregoing releases, each Party acknowledges that it understands and accepts the risk that the facts with respect to which the releases provided by this Agreement are entered into may be different from the facts now known or believed by it to be true. The releases provided by this Agreement shall not be subject to termination or rescission by virtue of any such differences in fact. In entering into this Agreement, and the releases provided by this Agreement, each Party acknowledges that it has conducted its own independent investigation, has consulted with or has had the opportunity to consult with legal counsel of its own choice, and has not relied on any statement, representation, promise, inducement or agreement not expressly contained within this Agreement.

- 7 -

(d)    **Covenants Not to Sue.**

(i)    **No Commencement of Actions or Proceedings.** The Parties hereby covenant and agree not to commence against each other any action or proceeding of any nature whatsoever with respect to any of the claims released by this Agreement. The Parties hereby further covenant and agree not to join in or to participate in any action or proceeding based upon, arising out of or relating to any of the claims released by this Agreement, unless such participation is compelled by an order of a court of competent jurisdiction; provided, however, that the foregoing shall not preclude a Party from initiating an action to enforce the terms of this Agreement or, if a Party has been named as a defendant in such action or proceeding, the foregoing shall not preclude the Party from defending itself in the litigation.

(ii)    **No Inconsistent Acts.** The Parties hereby covenant and agree not to take any acts inconsistent with the intent and purposes of the releases provided by this Agreement.

(e)    **No Assignment of Released Claims.** Each Party represents and warrants to the other Parties that it has not assigned or transferred, and will not assign or transfer, to any person or entity any of the claims released by this Agreement.

5.    **No Reliance; No Fraud.** In executing this Agreement, each Party represents that neither it nor its attorneys have relied upon any statement, promise or representation of any Party, or of any other Party's agents, employees, attorneys or other representatives in executing this Agreement, other than those expressly contained in this Agreement. Each Party acknowledges that it has been represented by counsel or has had the opportunity to consult with counsel, that it has read and understands this entire Agreement, and that it agrees to the terms contained in this Agreement. Except only for the representations and statements made expressly in this Agreement, each Party specifically covenants and agrees to waive and release any and all claims or defenses, with respect to or related to this Agreement, that arise from any type or manner of fraud or misrepresentation, whether known or unknown, whether intentional or negligent, including but not limited to misrepresentation, fraudulent inducement, fraudulent concealment, fraud by non-disclosure, common-law fraud, or statutory fraud. Each Party assumes the risk of any misrepresentation, concealment or mistake by another Party, except only for the representations and statements made expressly in this Agreement. Except only for the representations and statements made expressly in this Agreement, if any Party should subsequently discover that any matter relied upon by it in entering into this Agreement is untrue, or that the law presently in effect has changed in a manner which would affect negatively such Party's rights hereunder, such Party shall not be entitled to any relief in such connection or otherwise, including, without limitation, any alleged right or claim to set aside or rescind this Agreement. This Agreement is intended to be and is final and binding among the Parties regardless of any claims for fraud, misrepresentation, promise made without the intention of performing, concealment of fact, mistake or fact or law or any other circumstance whatsoever.

6.    **Bankruptcy Court Approval.** Promptly following the execution of this Agreement, the Debtors shall file in the Bankruptcy Court, pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure, a motion seeking entry of an order (*"Settlement Order"*) authorizing the Debtors to enter into and to perform their obligations under this Agreement. The Settlement Order

- 8 -

shall contain terms and conditions approved by the Howell Parties, which approval shall not be unreasonably withheld by the Howell Parties.

7. **Representations and Warranties**. Each Party expressly warrants and represents to the other Parties the following:

      (a)    That each Party believes it to be in its best interests to settle the matters encompassed by this Agreement and on the terms provided in this Agreement;

      (b)    That the making of this Agreement is reasonable under the circumstances;

      (c)    That no promise or inducement has been offered except as expressly provided in this Agreement;

      (d)    That each Party executes this Agreement as its own free and voluntary act;

      (e)    That each Party acknowledges that it intends to grant the mutual releases described herein; and

      (f)    That each Party has knowingly and voluntarily entered into the Agreement without any duress or coercion from anyone.

8. **Denial of Liability**. It is understood and agreed by each of the Parties that each and all of the Parties are receiving good and valuable consideration in return for the agreements, releases, compromises, promises and obligations made herein, including but not limited to the avoidance of the expense and inconvenience of litigation between or among the Parties and the facilitation of the Debtors' completion of a sale to Kash CA of substantially all of the assets of the Debtors, and is the result of an exchange of mutual consideration and a compromise of disputed claims and is not, and is not to be construed as, an admission of liability by any Party, and that the Parties expressly deny any liability or wrongdoing.

9. **Effective Date of Agreement**. The terms and conditions of this Agreement, including, without limitation, the releases provided herein, shall be effective and binding upon the Parties upon the first business day after the occurrence of <u>each</u> of the following events ("***Effective Date***"):

      (a)    The execution and delivery of this Agreement by each of the Parties.

      (b)    The execution of the Loan Sale Agreement between Kash CA and Zions, and Kash CA's unconditional and irrevocable acquisition of the Assigned Assets and all of Zions's interests and liens under the Loan Documents.

      (c)    Kash CA's and the Debtors' execution of the Asset Purchase Agreement, in accordance with terms and conditions satisfactory to Kash CA and the Debtors and the occurrence of the "Closing" of the Asset Purchase Agreement (as such term is defined in the Asset Purchase Agreement).

      (d)    The entry of the Settlement Order on terms and conditions satisfactory to the Debtor-Related Parties and the Howell Parties.

10. **Termination of Agreement**. This Agreement may be terminated by any Party in the event that the Settlement Order is not entered by the Bankruptcy Court by August 30, 2019, or the Effective Date of this Agreement has not occurred by October 31, 2019.

11. **Effect of Termination**. In the event of any termination of this Agreement as permitted by paragraph 10 of this Agreement, this Agreement and all of the provisions of this Agreement,

       241192.3

including, without limitation, the releases provided by paragraph 4 hereof, shall be null and void ab initio, of no force or effect, and shall not be binding upon the Parties, and the Parties shall be restored to the same respective positions that they were in as of the Execution Date, without any prejudice to such positions. Upon any such termination of this Agreement, each Party shall reserve all rights and remedies that it may have as a matter of law.

12.    **Entire Agreement; Amendments; Waivers.**    This Agreement represents the entire understanding and agreement among the Parties with respect to the subject matter hereof. This Agreement may be amended, supplemented or changed, and any provision hereof may be waived, only by written instrument, making specific reference to this Agreement, signed by the Parties. No action taken pursuant to this Agreement shall be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, condition, covenant or agreement contained herein. The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by applicable law.

13.    **Execution of Agreement; Counterparts; Electronic Signatures.**

    (a)    This Agreement may be executed in several counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument, and shall become effective when counterparts have been signed by each of the Parties and delivered to the other Parties; it being understood that all Parties need not sign the same counterparts.

    (b)    The exchange of copies of this Agreement and of signature pages by facsimile transmission or by electronic mail shall constitute effective execution and delivery of this Agreement as to the Parties and may be used in lieu of the original Agreement for all purposes.

14.    **Governing Law.** THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND WHERE STATE LAW IS IMPLICATED, THE LAWS OF THE STATE OF IDAHO SHALL GOVERN, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF (EXCEPT FOR ANY LAWS OF THAT STATE WHICH WOULD RENDER SUCH CHOICE OF LAWS INEFFECTIVE), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.

15.    **Jurisdiction, Waiver of Jury Trial.**

    (a)    THE BANKRUPTCY COURT SHALL HAVE SOLE AND EXCLUSIVE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER AT LAW OR IN EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT AND EACH PARTY CONSENTS UNCONDITIONALLY TO THE JURISDICTION OF THE BANKRUPTCY COURT; PROVIDED, HOWEVER, THAT, IF THE BANKRUPTCY COURT IS UNWILLING OR UNABLE TO HEAR ANY SUCH DISPUTE, THE COURTS

- 10 -

241192.3

OF THE STATE OF IDAHO AND THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA LOCATED IN NEZ PERCE COUNTY, IDAHO SHALL HAVE SOLE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER AT LAW OR IN EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT.

(b)     EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

16.     **Notices.**  Unless otherwise set forth herein, any notices, consents, waivers and other communications required or permitted by this Agreement shall be in writing and shall be deemed given to a Party when (a) delivered to the appropriate address by hand or by nationally recognized overnight courier service (costs prepaid), or (b) sent by facsimile or e-mail, in each case, if sent during the normal business hours of the recipient, with confirmation of transmission by the transmitting equipment confirmed with a copy delivered as provided in clause (a) hereof.  Notice to a Party shall be given as follows:

| | |
|---|---|
| If to the Debtor-Related Parties: | Howell Munitions & Technology, Inc. c/o J. Michael Issa GlassRatner Advisory & Capital Group LLC 19800 MacArthur Boulevard Irvine, CA 92612 Tel: 949-407-6620 Email:  missa@glassratner.com |
| As to the Debtors, a copy to (which shall not constitute Notice for purposes of this paragraph 16): | Robert E. Opera, Esq. Winthrop Couchot Golubow Hollander, LLP 1301 Dove Street, Suite 500 Newport Beach, California 92660 Tel: 949-720-4130 Email: ropera@wcghlaw.com |
| If to Mr. Howell, DHR, Big Canyon, Howell Construction, DaJo or Lolo: | David C. Howell 29978 Thiessen Road Lewiston, Idaho 83501 |
| with a copy to (which shall not constitute Notice for purposes of this paragraph 16): | Todd C. Ringstad, Esq. Ringstad & Sanders 4343 Von Karman Avenue, Suite 300 Newport Beach, California 92660 Tel:  949-851-7450 Email: todd@ringstadlaw.com |

- 11 -

2411923

| | |
|---|---|
| If to Steve Howell: | Steve Howell<br>836 Frost Lane<br>Clarkston, WA 99403 |
| If to Robert Stephen Howell: | Robert Stephen Howell<br>1237 Airway Avenue<br>Lewiston, ID 83501 |
| If to Thomas Howell: | Thomas Howell<br>22112 Webb Road<br>Lewiston, ID 83501 |

A Party may designate in writing a different address to which any notice, request, demand or other communication is to be given hereunder to such Party. Telephone numbers are listed for convenience purposes only and not for the purpose of giving notice pursuant to this Agreement.

17.    **Binding Effect; Assignment.**  On the Effective Date, this Agreement shall be binding upon the Parties and shall inure to the benefit of the Parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Howell Bankruptcy Cases or any successor Chapter 7 cases.  No assignment of this Agreement or of any rights or obligations hereunder may be made by a Party without the prior written consent of each other Party and any attempted assignment without such required consents shall be void.

18.    **Severability.**  Whenever possible, each provision or portion of any provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision in such jurisdiction and in lieu of such invalid, illegal or unenforceable provision, there will be added automatically as a part of this Agreement a valid, legal and enforceable provision as similar in terms to such invalid, illegal or unenforceable provision as may be possible.

19.    **Authorized Execution.**  Each individual executing this Agreement on behalf of a Party represents and warrants that (a) he is authorized to execute this Agreement for such Party, and (b) such Party shall be bound in all respects hereby.

20.    **Attorneys' Fees and Costs.**  Each Party shall bear its own attorneys' fees and costs arising from or relating to the negotiation and execution of this Agreement.  In the event of any action or proceeding to enforce, modify, interpret, construe, invalidate, rescind, or set aside any term or provision of this Agreement, however, the prevailing Party shall be entitled to an award of its costs and expenses, including reasonable attorneys' fees and costs, incurred as a result of such action or proceeding, including any appeals resulting therefrom.

21.    **No Construction against any Party; Headings for Convenience Only.**  The Parties have cooperated in the drafting and preparation of this Agreement.  In any construction of this Agreement, or of any of its terms and provisions, the same shall not be construed against any Party. All headings in this Agreement are inserted for convenience of reference only, and shall not affect the construction or interpretation hereof.

- 12 -

4813-7284-4930.2

241192.3

22.    **Interpretation.**    Wherever in this Agreement the context so requires, reference to the neuter, masculine or feminine shall be deemed to include each of the others, and reference to either the singular or the plural shall be deemed to include the other.

23.    **Further Assurances.** Each Party, at the request of another Party, shall execute and deliver to the requesting Party all such further documents, and shall take such further acts, as may be reasonably necessary or appropriate in order to confirm or carry out the provisions of this Agreement.

24.    **Parties in Interest.**    Other than as provided in paragraph 4 hereof, nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the Parties and any of their respective successors and assigns, nor is anything in this Agreement intended to relieve or discharge the obligation of any third persons to a Party.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the Execution Date.

**DEBTOR-RELATED PARTIES:**

**X-TREME BULLETS, INC.,**
As a Debtor-in-Possession

By: _____

Name: _____J. n. ISSA_____

Its: _____CRO_____

**AMMO LOAD WORLDWIDE, INC.,**
As a Debtor-in-Possession

By: _____

Name: _____J. h. ISSA_____

Its: _____CRO_____

**CLEARWATER BULLET, INC.,**
As a Debtor-in-Possession

By: _____

Name: _____J. n. ISSA_____

Its: _____CRO_____

- 13 -

**FREEDOM MUNITIONS, LLC,**
As a Debtor-in-Possession

By:

Name: J.m. ISSA

Its: CRO

**HOWELL MACHINE, INC.,**
As a Debtor-in-Possession

By:

Name: J.m. ISSA

Its: CRO

**HOWELL MUNITIONS & TECHNOLOGY, INC.,**
As a Debtor-in-Possession:

By:

Name: J.m. ISSA

Its: CRO

**LEWIS-CLARK AMMUNITION COMPONENTS, LLC,**
As a Debtor-in-Possession

By:

Name: J.m. ISSA

Its: CRO

- 14 -

**COMPONENTS EXCHANGE, LLC,**
As a Debtor-in-Possession

By: _____

Name: _____ J.M.ISSA

Its: _____ CRO

**TWIN RIVER CONTRACT LOADING, INC.,**
CRO OF SOLE SHAREHOLDER

By: _____

Name: _____ J.M.ISSA

Its: _____

**HOWELL PARTIES:**

**BIG CANYON ENVIRONMENTAL, LLC**

By: _____

Name: _____

Its: _____

**DAVID C. HOWELL**

_____

**DAVID HOWELL RENTALS**

By: _____

Name: _____

Its: _____

4813-7284-4930.2

241192.3

**COMPONENTS EXCHANGE, LLC,**
As a Debtor-in-Possession

By: _____

Name: _____

Its: _____

**TWIN RIVER CONTRACT LOADING, INC.,**

By: _____

Name: _____

Its: President

**HOWELL PARTIES:**

**BIG CANYON ENVIRONMENTAL, LLC,**

By: _____

Name: _____

Its: Managing Member

**DAVID C. HOWELL**

**DAVID HOWELL RENTALS**

By: _____

Name: _____ (dba)

- 15 -

4813-7284-4930.2                                                    2411192.3

**DAJO TRUCKING, INC.**

By: _____

Name: _____

Its: _____

**LOLO SPORTING GOODS, INC.**

By: _____

Name: _____

Its: _____

**HOWELL CONSTRUCTION, LLC**

By: _____

Name: _____

Its: _____

STEVE HOWELL

_____

ROBERT STEPHEN HOWELL

_____

THOMAS HOWELL

_____

- 16 -

# EXHIBIT 2

# TO  SALE ORDER

| Item | Qty | Asset ID | Year | Description | Manufacturer | Model Number | Serial Number | QLV | Entity | Mtg Area |
|---|---|---|---|---|---|---|---|---|---|---|
| 53 | 1 | BC0001 | | HYSTER H50 FORTIS FORKLIFT | HYSTER | H50 | 431724 | $5.25 | BC | Demill |
| 54 | 1 | BC0002 | | CARDBOARD BAILER, VERTICAL HYDRAULIC TYPE, APPROX. 24" X 36"W X 24"H BALE SIZE, PRODUCTS, INC. | SELCO | V-3 VERTICAL BAILER | 03841447 | $3.50 | BC | Demill |
| 55 | 1 | BC0003 | | WATERBURY TRANSFER PRESS, MACHINE RECONFIGURED AS AN INLINE DE-MILL MACHINE, WATERBURY FARREL [NOTE: NOT IN SERVICE AT TIME OF INSPECTION] | | CAL-60 | 144141-9 | $14.55 | BC | Demill |
| 56 | 1 | BC0005 | | FLOOR SCALE | | TI-500E | | VALUED W/ LOT | BC | Demill |
| 57 | 1 | BC0007 | | SINGLE AMMO SEPARATOR (BARREL SORT) | HOWELL | | BC0007 | $5.00 | BC | Demill |
| 58 | 1 | BC0008 | | KELLOGG AMERICAN AIR COMPRESSOR, 5 HP RECIPROCATING TYPE, MOUNTED ON APPROX. 80 GAL. VERTICAL STORAGE TANK, KELLOGG AMERICAN | | 335TV | V3E9GE7PFD | VALUED W/ LOT | BC | Demill |
| 59 | 1 | BC0009 | | CHOMPER (DEMILL) SHOTGUN SHELL DECONSTRUCTION AND RECYCLING SYSTEM, EQUIPPED W/ APPROX. 36" VIBRATORY BOWL FEEDER, W/ CUSTOM SHELL SHEAR AND SEPARATION UNIT, SHOT GUN POWDER AND PLASTIC CARTRIDGE, ROTARY AND VIBRATORY SEPARATION UNIT, BRASS RECLAIM SECTION [NOTE: NOT IN SERVICE AT TIME OF INSPECTION] | HOWELL | SYNTRON FMC | | $5.00 | BC | Demill |
| 60 | 1 | BC0009-GRNDR | | APSCO SHOTSHELL CHOMPER (DEMILL) [NOT PHYSICALLY INSPECTED, BASED ON COMPANY PROVIDED INFO] | APSCO | 30001-1810 | | $1.50 | BC | Demill |
| 61 | 1 | BC0010 | | RIMFIRE DEMILL MACHINE, INLINE CARTRIDGE DECONSTRUCTION RECLAIM MACHINE, DUPLEX TYPE, APPROX. 200 PART/MIN. OUTPUT CAP., EQUIPPED W/ (3) TOP MOUNTED ROTARY COLLATOR BOWL FEEDERS | HOWELL | DEMIL | BC0010 | $10.00 | BC | Demill |
| 62 | 1 | BC0012 | | PISTOL, DEMILL MACHINE, INLINE CARTRIDGE DECONSTRUCTION RECLAIM MACHINE, DUPLEX TYPE, APPROX. 200 PART/MIN. OUTPUT CAP., EQUIPPED W/ (3) TOP MOUNTED ROTARY COLLATOR BOWL FEEDERS | HOWELL | DEMIL | BC0012 | $10.00 | BC | Demill |
| 63 | 1 | BC0013 | | FORKLIFT - TOWMOTOR, [NOT PHYSICALLY INSPECTED] | TOMOTOR | | | NO VALUE ASSIGNED | BC | Demill |
| 64 | 1 | BC0014 | | FORKLIFT - NAMCO, [NOT PHYSICALLY INSPECTED, NOT ENOUGH INFO TO VALUE] | NAMCO | | | NO VALUE ASSIGNED | BC | Demill |
| 65 | 1 | BC0015 | | AIR COMPRESSOR - SULLIVAN PALATEK, 20 HP ROTARY SCREW TYPE, 31,437 HRS. INDICATED W/ APPROX. 200 GAL. VERTICAL STORAGE RECEIVER TANK | SULLIVAN | 200T | D4F045 | $1.50 | BC | Demill |
| | | BC0016 | | AIR COMPRESSOR - KAESER TB19, REFRIGERATED AIR DRYER | KAESER | TB19 | | VALUED W/ ABOVE ITEM | BC | Demill |
| | | BC0017 | | BVAC BELT SORTER | | | | VALUED W/ ABOVE ITEM | BC | Demill |
| 66 | 1 | BC0018 | | BELT INSPECTION TABLE | HOWELL | | BC0018 | VALUED W/ LOT | BC | Demill |

| Item | Qty | Description | Mfr | | Lot # | Valued | Price | | |
|---|---|---|---|---|---|---|---|---|---|
| 67 | 1 | BELT INSPECTION TABLE | HOWELL | | BCD019 | | | BC | Demill |
| | | | | | | | | BC | Demill |
| 68 | 1 | BELT INSPECTION TABLE HOWELL | HOWELL | | BCD020 | VALUED W/ LOT | | BC | Demill |
| 69 | 1 | CENTERFIRE RIFLE DEMILL MACHINE, INLINE CARTRIDGE | HOWELL | DEMIL | BCD021 | | $8.50 | BC | Demill |
| | | DECONSTRUCTION RECLAIM MACHINE, APPROX. 10 | | | | | | BC | Demill |
| | | PART/MIN. OUTPUT CAP., EQUIPPED | | | | | | BC | Demill |
| | | W/ TOP MOUNTED ROTARY COLLATOR BOWL FEEDER | | | | | | BC | Demill |
| 70 | 1 | CENTERFIRE PISTOL DEMILL MACHINE, INLINE CARTRIDGE | HOWELL | DEMIL | BCD024 | | $10.00 | BC | Demill |
| | | DECONSTRUCTION RECLAIM MACHINE, DUPLEX TYPE, APPROX. | | | | | | BC | Demill |
| | | 200 PART/MIN. OUTPUT CAP., EQUIPPED W/ (2) TOP | | | | | | BC | Demill |
| | | MOUNTED ROTARY COLLATOR BOWL FEEDERS | | | | | | BC | Demill |
| 71 | 1 | DEMIL MACHINE, INLINE CARTRIDGE | HOWELL | DEMIL | BCD025 | | $10.00 | BC | Demill |
| | | DECONSTRUCTION RECLAIM MACHINE, DUPLEX TYPE, APPROX. 200 | | | | | | | |
| | | PART/MIN. OUTPUT CAP., EQUIPPED | | | | | | | |
| | | W/ (2) TOP MOUNTED ROTARY COLLATOR BOWL FEEDERS | | | | | | | |
| 72 | 1 | CENTERFIRE RIFLE DEMILL MACHINE, INLINE CARTRIDGE | HOWELL | DEMIL | BCD026 | | | BC | Demill |
| | | DECONSTRUCTION RECLAIM MACHINE, DUPLEX TYPE, APPROX. | | | | | | BC | Demill |
| | | 200 PART/MIN. OUTPUT CAP., EQUIPPED W/ (2) TOP | | | | | | BC | Demill |
| | | MOUNTED ROTARY COLLATOR BOWL FEEDERS | | | | | | BC | Demill |
| 73 | 1 | CENTERFIRE PISTOL DEMILL MACHINE, INLINE CARTRIDGE | HOWELL | DEMIL | BCD027 | | $10.00 | BC | Demill |
| | | DECONSTRUCTION RECLAIM MACHINE, DUPLEX TYPE, APPROX. | | | | | | BC | Demill |
| | | 120 PART/MIN. OUTPUT CAP., EQUIPPED W/ (2) TOP | | | | | | BC | Demill |
| | | MOUNTED ROTARY COLLATOR BOWL FEEDERS | | | | | | BC | Demill |
| 74 | 1 | SINGLE AMMO SEPARATOR (BARREL SORTER), | HOWELL | | BCD028 | | $4.50 | BC | Demill |
| | | 16" DIA. X 33"L BARREL DIMENSION | | | | | | BC | Demill |
| | | W/ END MOUNTED FEED HOPPER | | | | | | BC | Demill |
| 75 | 1 | POWDER SIFTER, VIBRATORY POWDER CLASSIFIER, SCREEN | SWECO | 2530 $665 | BCD029 | | $3.50 | BC | Demill |
| | | TYPE, 24" BOWL DIA. | | | | | | | |
| 76 | 1 | BELT INSPECTION TABLE | HOWELL | | BCD031 | VALUED W/ LOT | | BC | Demill |
| | | W/ APPROX. 24"W X 60"L MOTORIZED CONVEYOR BELT, END | | | | | | BC | Demill |
| | | MOUNTED INFEED HOPPER AND DUAL VIBRATORY DOWNFEED | | | | | | BC | Demill |
| | | CHUTES | | | | | | BC | Demill |
| 77 | 1 | BELT INSPECTION TABLE | HOWELL | | BCD032 | VALUED W/ LOT | | BC | Demill |
| | | W/ APPROX. 24"W X 60"L MOTORIZED CONVEYOR BELT, END | | | | | | BC | Demill |
| | | MOUNTED DIFEED HOPPER AND DUAL VIBRATORY DOWNFEED | | | | | | BC | Demill |
| | | CHUTES | | | | | | BC | Demill |
| 78 | 1 | BELT INSPECTION TABLE | HOWELL | | BCD033 | | | BC | Demill |
| | | | | | | | | BC | Demill |
| 79 | 1 | (1) BRIDGE CRANE - 3C SHAKER LINE #1 | HOWELL HARRINGTON | | BCD034 | VALUED W/ LOT | | BC | Demill |
| | | W/ 1/2 TON ELECTRIC CHAIN HOIST | | | | | | BC | Demill |
| | | W/ PENDANT CONTROL, MATERIAL FEED HOPPER AND | | | | | | BC | Demill |
| | | VIBRATORY TROUGHS | | | | | | BC | Demill |

| # | ID | Qty | Description | Manufacturer | Serial/VIN | Value | Loc | Owner |
|---|----|-----|-------------|--------------|------------|-------|-----|-------|
| 60 | BCO035 | 1 | LINE #1 SHAKER TABLE, EQUIPPED W/ APPROX. 24"L X 16"W VIBRATORY ORIENTATION TABLE, VARIOUS CARTRIDGE GAUGING RACKS, SECTIONS OF 12"W STATIC ROLLER CONVEYOR, VARIOUS INSPECTION TABLES | HOWELL | BCO035 | VALUED W/ LOT | BC | Demill |
| 61 | NTRXCON16 | 1 | 10FT CONTAINER | QINGDAO XINHUACHANG INT'L CONTAINERS CO, LTD | QDX 118169/ECIHU 203280 | $1.75 | BC | Demill |
| 62 | NTRCB1T1 | 1 | BELT INSPECTION TABLE | HOWELL | | VALUED W/ LOT | BC | Demill |
| 63 | NTFRTLNER | 1 | FREIGHTLINER TRUCK | FREIGHTLINER | TRUCK | NO VALUE ASSIGNED | BC | Vehicles |
| 64 | NTLFIALL | 1 | 1978 LIFTALL, LIFT TRUCK, PROPANE POWERED, APPROX. 8,000 LB. CAP., 3-STAGE MAST, APPROX. 180" MAX. LIFT, PNEUMATIC TIRES, 8,353 HRS. INDICATED | | | $3.00 | BC | Vehicles |
| 65 | NTMAXI | 1 | 1951 VINTAGE MAXI FIRE TRUCK | MAXI | 23710 SM 1777/HIN | $13.50 | BC | Vehicles |
| 66 | NTPORT1 | 1 | EVAPORATIVE AIR CONDITIONER W/36" DIA. FAN | PORT-A-COOL | PAC163155 303353-12 | VALUED W/ LOT | BC | Demill |
| 67 | NTPORT4 | 1 | EVAPORATIVE AIR CONDITIONER W/36" DIA. FAN | PORT-A-COOL | PAC163SVT 159537-11 | VALUED W/ LOT | BC | Demill |
| 68 | NTTRLR1 | 1 | 2011 14FT ENCLOSED TRAILER, TRAILER, SINGLE-AXLE BOX TYPE, TAG-ALONG HITCH, APPROX. 6'L X 5'W X 5'H OVERALL BOX DIMENSION W/ SWING-AWAY REAR DOOR | CONTINENTAL CARGO | SHRUDM0108T 613781 | $4.00 | BC | Vehicles |
| 69 | NTTRLR2 | 1 | 2011 20FT ENCLOSED TRAILER, TAG-ALONG TYPE HITCH, TANDEM-AXLE, SWING-AWAY SIDE DOORS AND FOLD-DOWN REAR DOOR | FOREST RIVER, INC | SNHUTWV26BT 614278 | $55.00 | BC | Vehicles |
| 70 | TR0011 | 1 | EVAPORATIVE AIR CONDITIONER, 48" DIA. FAN | PORT-A-COOL | PAC3K4825 383372-12 | VALUED W/ LOT | BC | Demill |
| 71 | TR0041 | 1 | 4-SECTION AMAGO SEPARATOR (BARREL SORT) | HOWELL | TR0041 | | BC | Demill |
| 72 | | 1 | 2009 BOBCAT SKID STEEL, (NOT PHYSICALLY INSPECTED, BASED ON COMPANY PROVIDED INFO) | BOBCAT | S185 530322886 | $5.50 $10.00 | BC | vehicles |
| 73 | | 1 | 3M TAPE MACHINE CASE SEALING SYSTEM, PASS-THRU TYPE | 3M COMPANY | 800R 50119 | $3.00 | BC | Demill |
| 74 | | 1 | AIR COMPRESSOR TANK | | | VALUED W/ LOT | BC | Demill |
| 75 | | 1 | DEFRAME RM ROLLING TOOL CHEST | | | VALUED W/ LOT | BC | Demill |
| 76 | | 1 | FORKLIFT, (NOT PHYSICALLY INSPECTED, BASED ON COMPANY PROVIDED INFO) | HYSTER | 50HT A67251501 | $4.00 | BC | Demill |
| 77 | | 1 | FORKLIFT BARREL ATTACHMENTS AND BARREL SORT CASE | HOWELL | | VALUED W/ LOT | BC | Demill |
| 78 | | 1 | FORKLIFT RECYCLING DUMPSTER | ULINE | D-320-LD | VALUED W/ LOT | BC | Demill |
| 79 | | 1 | LOADING SMALL PARTS BINS AND TOOL CABINETS | | | VALUED W/ LOT | BC | Demill |

| Item | Qty | Description | Model / Mfr | No. | Value | Price | BC | Status |
|---|---|---|---|---|---|---|---|---|
| | | | | | LOT | | BC | Demill |
| | | | | | VALUED W/ | | BC | Demill |
| | | | | | LOT | | BC | Demill |
| 60 | 1 | LOADING SMALL ROLLING STEPS | | | | | | Loading |
| 61 | 1 | MARK X-HL PISTOL LOADER #05 - 9MM, PISTOL CARTRIDGE | NOWELL | MARK X-HL | | $13.50 | BC | |
| | | ASSEMBLY MACHINE, APPROX. 65 PART/ASSN. OUTPUT CAP., | | | | | BC | |
| | | INLINE CONFIGURATION, CASE PLACEMENT/PRIMER | | | | | BC | |
| | | INSERTION/POWDER FILL/BULLET INSERTION/CASE | | | | | BC | |
| | | CRIMP/CHECK AND EXITING STATIONS, [2] ROTARY COLLATOR | | | | | BC | |
| | | BOWL, | | | | | BC | |
| | | FEEDS, EACH W/ TOP MOUNTED VIBRATORY HOPPER FEEDER, | | | | | BC | |
| | | HMI AND PLC CONTROLS | | | | | BC | |
| 62 | 1 | ROTARY POLISHER | | GMM165850 | 146859 | 50 | BC | Demill |
| 63 | 1 | SPC STATION (1 OF 3), INSPECTION STATION | MARK-10 | ESA303 | VALUED W/ | | BC | Demill |
| | | | | | LOT | | BC | Loading |
| | | W/ FORCE GAUGE | | M5-500 | | | BC | |
| | | W/ DIGITAL CONTROL PANEL | | DC4050 | | | BC | |
| | | W/ ANALYTICAL DIGITAL SCALE | OHAUS | | | | BC | |
| | | W/ VARIOUS DIGITAL HEIGHT GAUGE AND MICROMETERS | | | | | BC | |
| 64 | 1 | SPC STATION (2 OF 3), INSPECTION STATION | MARK-10 | ESA303 | VALUED W/ | | BC | Loading |
| | | | | | LOT | | BC | |
| | | W/ FORCE GAUGE | | M5-500 | | | BC | |
| | | W/ DIGITAL CONTROL PANEL | | DC4050 | | | BC | |
| | | W/ ANALYTICAL DIGITAL SCALE | OHAUS | | | | BC | |
| | | W/ VARIOUS DIGITAL HEIGHT GAUGE AND MICROMETERS | | | | | BC | |
| 65 | 1 | TRAVERSING BRIDGE CRANE - BC BAY DOOR | | | VALUED W/ | | BC | Demill |
| | | | | | LOT | | BC | Demill |
| 66 | 1 | VINTAGE FIRE ENGINE PUMP | DETROIT DIESEL, ALLISON | PTA-31D-5G | 490360 | $4.00 | BC | Demill |
| | | W/ 4-CYLINDER INLINE DIESEL ENGINE | DETROIT DIESEL | | | | BC | Demill |
| 668 | 1 | SHREDDER/PULVERIZER, 5 HP DRIVE MOTOR, APPROX. 6" X 16" SHRED BOX, APPROX. 12" X 12" TOP MOUNTED OPENING W/ TAPERED CONE INFEED, BOTTOM MATERIAL EXITING W/ INTEGRATED 20"W X 6'L MOTORIZED BELT CONVEYOR | FMC ENVIRONMENTAL | MUFFIN MONSTER FC2200 | 109719-2-1 | | $3.50 | BC | Demill |
| 669 | 1 | CHOPPER (DIESEL), SHOTGUN SHELL DECONSTRUCTION AND RECYCLING SYSTEM, EQUIPPED W/ APPROX. 16" VIBRATORY BOWL FEEDER W/ CUSTOM SHELL SHEAR AND SEPARATION UNIT, SHOT GUN POWDER AND PLASTIC CARTRIDGE, ROTARY AND VIBRATORY SEPARATION UNIT, BRASS RECLAIM SECTION (NOTE: NOT IN SERVICE AT TIME OF INSPECTION) | NOWELL FMC | SYNTRON | | | $5.00 | BC | Demill |
| 672 | 1 | 2014 POWDER FILLER, VERTICAL METERED TYPE, STAINLESS STEEL CONSTRUCTION, EXPLOSION PROOF ELECTRICAL CONSTRUCTION, EQUIPPED W/ APPROX. 1.8 CU. FT. TAPERED STAINLESS STEEL DOWNFEED HOPPER, PROGRAMMABLE CONTROL W/ TOUCH PANEL MONITOR | ALLFILL | 85-SV-600 | 45521 | | $15.00 | BC | ???? |

| Item | Qty | Asset ID | Year | Description | Manufacturer | Model Number | Serial Number | OLV | Entity | Mfg Area |
|---|---|---|---|---|---|---|---|---|---|---|
| 8 | 1 | LC0011 | | MARK X PISTOL LOADER #97, PISTOL CARTRIDGE ASSEMBLY MACHINE, APPROX. 85 PART/MIN. OUTPUT CAP., INLINE CONFIGURATION, CASE PLACEMENT/ PRIMER INSERTION/POWDER FILL/BULLET INSERTION/CASE CRIMP/CHECK AND EXITING STATIONS, (2) ROTARY COLLATOR BOWL FEEDS, EACH W/ TOP MOUNTED VIBRATORY HOPPER FEEDER, HMI AND PLC CONTROLS. | HOWELL | MARK X | | $12.50 | TRCL | Loading |
| 03 | 1 | TR0100 | | JOLLY LOADING MACHINE, SINGLE STATION CARTRIDGE ASSEMBLY MACHINE, EQUIPPED W/ SINGLE CASE PLACEMENT STATION, SINGLE PRIMER INSERTION STATION, SINGLE POWDER LOADING STATION, SINGLE BULLET INSERTION PRESS STATION, SINGLE CASE CRIMPING STATION, SINGLE EJECT, TOP MOUNTED ROTARY COLLATOR BOWL FEEDER, POLYCARBONATE SURROUND W/ PLC CONTROL | RSN ALLEN-BRADLEY | JOLLY | | $8.50 | TRCL | ALW |
| 84 | 1 | NTALMKL1 | | MARK L RIFLE LOADER (1 OF 2) | HOWELL | MARK L | MKL017 | $20.00 | TRCL | Loading |
| 85 | 1 | NTALMKL2 | | MARK L RIFLE LOADER (2 OF 2), PROGRESSING INLINE | HOWELL | MARK L | MKL112 | $20.00 | TRCL | Loading |
| | | | | CARTRIDGE ASSEMBLY MACHINE, EQUIPPED | | | | | TRCL | |
| | | | | W/ SINGLE CASE PLACEMENT/PRIMER INSERTION/ POWDER | | | | | TRCL | |
| | | | | FILL/BULLET INSERTION/CASE CRIMP STATIONS, EQUIPPED W/ | | | | | TRCL | |
| | | | | (2) ROTARY COLLATOR BOWL FEEDERS, EACH W/ TOP | | | | | TRCL | |
| | | | | MOUNTED INFEED HOPPER AND VIBRATORY FEEDER, ANALOG | | | | | TRCL | |
| | | | | CONTROL | | | | | TRCL | |
| 88 | 1 | NTDBLPRLD2 | | AMMOLOAD SINGLE LOADING MACHINE #02, SINGLE STATION | EGE | | | $10.00 | TRCL | Loading |
| | | | | CARTRIDGE ASSEMBLY MACHINE, EQUIPPED | | | | | TRCL | |
| | | | | W/ SINGLE CASE PLACEMENT STATION, SINGLE PRIMER | | | | | TRCL | |
| | | | | INSERTION STATION, SINGLE POWDER LOADING STATION, | | | | | TRCL | |
| | | | | SINGLE BULLET INSERTION PRESS STATION, SINGLE CASE | | | | | TRCL | |
| | | | | CRIMPING STATION, SINGLE EJECT, | | | | | TRCL | |
| | | | | (2) TOP MOUNTED ROTARY COLLATOR BOWL FEEDERS | | | | | TRCL | |
| | | | | W/ TOP MOUNTED INFEED HOPPERS, | | | | | TRCL | |
| | | | | POLYCARBONATE SURROUND | | | | | TRCL | |
| | | | | W/ PLC CONTROL | ALLEN-BRADLEY | | | | TRCL | |
| 91 | 1 | NTEGE2 | | AMMOLOAD SINGLE LOADING MACHINE #02 | EGE | | | $10.00 | TRCL | ALW |
| 03 | 1 | TR0185 | | MARK X PISTOL LOADER - 9MM, PISTOL CARTRIDGE ASSEMBLY | HOWELL | MARK X | ALW016HL | $12.50 | TRCL | Loading |
| 11 | 1 | TR0006 | | MARK L RIFLE LOADER #17 - 223, LONG GUN | HOWELL | MARK L | MKL045 | $20.00 | TRCL | Loading |
| | | | | CARTRIDGE ASSEMBLY MACHINE, APPROX. 85 PART/MIN. | | | | | TRCL | Loading |
| | | | | OUTPUT CAP., INLINE CONFIGURATION, CASE | | | | | TRCL | Loading |
| | | | | PLACEMENT/PRIMER INSERTION/POWDER FILL/BULLET | | | | | TRCL | Loading |
| | | | | INSERTION/CASE CRIMP/CHECK AND EXITING STATIONS, (2) | | | | | TRCL | Loading |
| | | | | ROTARY COLLATOR BOWL | | | | | TRCL | Loading |

| # | Qty | Tag | Description | Make | Model | Serial/Note | Value | Loc. | |
|---|---|---|---|---|---|---|---|---|---|
| | | | FEEDS, EACH W/ TOP MOUNTED VIBRATORY HOPPER FEEDER, | | | | | TRCL | Loading |
| | | | HMI AND PLC CONTROLS | | | | | TRCL | Loading |
| 14 | 1 | TR0007 | MARK L RIFLE LOADER #13 - 300BLK, LONG GUN CARTRIDGE | HOWELL | MARK L | M0L041 | $2000 | TRCL | Loading |
| | | | ASSEMBLY MACHINE, APPROX. 85 PART/MIN. OUTPUT CAP., | | | | | TRCL | Loading |
| | | | INLINE CONFIGURATION, CASE PLACEMENT/PRIMER | | | | | TRCL | Loading |
| | | | INSERTION/POWDER FILL/BULLET INSERTION/CASE | | | | | TRCL | Loading |
| | | | CRIMP/CHECK AND EXITING STATIONS, (2) ROTARY COLLATOR | | | | | TRCL | Loading |
| | | | BOWL, | | | | | TRCL | Loading |
| | | | FEEDS, EACH W/ TOP MOUNTED VIBRATORY HOPPER FEEDER, | | | | | TRCL | Loading |
| | | | HMI AND PLC CONTROLS | | | | | TRCL | Loading |
| 15 | 1 | TR0045 | BRIDGE CRANE ASSEMBLY - SP 81 LOADING, | HOWELL | | VALUED W/ LOT | | TRCL | Loading |
| | | | CUSTOM FREE-STANDING BRIDGE CRANE SYSTEM, EQUIPPED | | | | | TRCL | Loading |
| | | | W/ 1/4 TON X 20' UNDER RAIL | | | | | TRCL | Loading |
| | | | MOUNTED BRIDGE CRANE | | | | | TRCL | Loading |
| | | | W/ 575 LB. ELECTRIC CHAIN HOIST | HARRINGTON | | | | TRCL | Loading |
| | | | W/ PENDANT CONTROL, | | | | | TRCL | Loading |
| | | | MOUNTED ON APPROX. 80' OF I-BEAM RUN, | | | | | TRCL | Loading |
| | | | APPROX. 1/4 TON X 5' SPAN UNDER RAIL | | | | | TRCL | Loading |
| | | | MOUNTED BRIDGE CRANE | | | | | TRCL | Loading |
| | | | W/ 575 LB. UNDERSLUNG ELECTRIC CHAIN HOIST | HARRINGTON | | | | TRCL | Loading |
| | | | W/ PENDANT CONTROL, | | | | | TRCL | Loading |
| | | | MOUNTED ON APPROX. 80' OF I-BEAM RUN, | | | | | TRCL | Loading |
| | | | FREE-STANDING FRAMEWORK, APPROX. 13' | | | | | TRCL | Loading |
| | | | UNDER BRIDGE CLEARANCE | | | | | TRCL | Loading |
| 16 | 1 | TR0046 | MARK X PISTOL LOADER, PISTOL CARTRIDGE ASSEMBLY | HOWELL | MARK X | | $12.50 | TRCL | Loading |
| | | | MACHINE, APPROX. 85 PART/MIN. OUTPUT CAP., | | | | | TRCL | Loading |
| | | | INLINE CONFIGURATION, CASE PLACEMENT/PRIMER | | | | | TRCL | Loading |
| | | | INSERTION/POWDER FILL/BULLET INSERTION/CASE | | | | | TRCL | Loading |
| | | | CRIMP/CHECK AND EXITING STATIONS, (2) ROTARY COLLATOR | | | | | TRCL | Loading |
| | | | BOWL, FEEDS, EACH W/ TOP MOUNTED VIBRATION HOPPER | | | | | TRCL | Loading |
| | | | FEEDER, HMI AND PLC CONTROLS | | | | | TRCL | Loading |
| 17 | 1 | TR0047 | MARK X PISTOL LOADER | HOWELL | MARK X | | $12.50 | TRCL | Loading |
| 18 | 1 | TR0048 | MARK X PISTOL LOADER #3 - 44, PISTOL | HOWELL | MARK X | 839 | $12.50 | TRCL | Loading |
| | | | CARTRIDGE ASSEMBLY MACHINE, APPROX. 85 PART/MIN. | | | | | TRCL | Loading |
| | | | OUTPUT CAP., INLINE CONFIGURATION, CASE | | | | | TRCL | Loading |
| | | | PLACEMENT/PRIMER INSERTION/POWDER FILL/BULLET | | | | | TRCL | Loading |
| | | | INSERTION/CASE CRIMP/CHECK AND EXITING STATIONS, (2) | | | | | TRCL | Loading |
| | | | ROTARY COLLATOR BOWL, | | | | | TRCL | Loading |
| | | | FEEDS, EACH W/ TOP MOUNTED VIBRATORY HOPPER FEEDER, | | | | | TRCL | Loading |
| | | | HMI AND PLC CONTROLS | | | | | TRCL | Loading |
| 19 | 1 | TR0049 | MARK X PISTOL LOADER | HOWELL | MARK X | | $12.50 | TRCL | Loading |
| 20 | 1 | TR0050 | MARK X PISTOL LOADER #20 - 10MM, PISTOL | HOWELL | MARK X | 831 | $12.50 | TRCL | Loading |
| | | | CARTRIDGE ASSEMBLY MACHINE, APPROX. 85 PART/MIN. | | | | | TRCL | Loading |

| # | Qty | Item | Description | Brand | Model | Code | Price | | |
|---|-----|------|-------------|-------|-------|------|-------|---|---|
| | | | OUTPUT CAP., INLINE CONFIGURATION, CASE PLACEMENT/PRIMER INSERTION/POWDER FILL/BULLET INSERTION/CASE CRIMP/CHECK AND EXITING STATIONS, (2) ROTARY COLLATOR BOWL, FEEDS, EACH W/ TOP MOUNTED VIBRATORY HOPPER FEEDER, HMI AND PLC CONTROLS | | | | | TRCL | Loading |
| 21 | 1 | TR0051 | MARK X PISTOL LOADER | HOWELL | MARK X | | $13.50 | TRCL | Loading |
| 22 | 1 | TR0052 | MARK X PISTOL LOADER | HOWELL | MARK X | | $13.50 | TRCL | Loading |
| 23 | 1 | TR0053 | MARK X PISTOL LOADER #15 - 9MM | HOWELL | MARK X | | $13.50 | TRCL | Loading |
| 24 | 1 | TR0054 | MARK X PISTOL LOADER, PISTOL CARTRIDGE ASSEMBLY | HOWELL | MARK X | A1W077 | $13.50 | TRCL | Loading |
| | | | MACHINE, APPROX. 85 PART/MIN. OUTPUT CAP., INLINE CONFIGURATION, CASE PLACEMENT/PRIMER INSERTION/POWDER FILL/BULLET INSERTION/CASE CRIMP/CHECK AND EXITING STATIONS, (3) ROTARY COLLATOR BOWL, FEEDS, EACH W/ TOP MOUNTED VIBRATORY HOPPER FEEDER, HMI AND PLC CONTROLS | | | | | TRCL | Loading |
| 25 | 1 | TR0055 | MARK X PISTOL LOADER | HOWELL | MARK X | | $13.50 | TRCL | Loading |
| 26 | 1 | TR0056 | MARK X PISTOL LOADER - 9MM | HOWELL | MARK X | A1W055 | $13.50 | TRCL | Loading |
| 27 | 1 | TR0057 | PISTOL LOADING MACHINE, [NOT PHYSICALLY INSPECTED] | HOWELL | | TR0057 | $13.50 | TRCL | Loading |
| 28 | 1 | TR0058 | MARK L RIFLE LOADER - 308, LONG GUN CARTRIDGE ASSEMBLY | HOWELL | MARK L | MRL103 | $20.00 | TRCL | Loading |
| | | | MACHINE, APPROX. 85 PART/MIN. OUTPUT CAP., INLINE CONFIGURATION, CASE PLACEMENT/PRIMER INSERTION/POWDER FILL/BULLET INSERTION/CASE CRIMP/CHECK AND EXITING STATIONS, (3) ROTARY COLLATOR BOWL, FEEDS, EACH W/ TOP MOUNTED VIBRATORY HOPPER FEEDER, HMI AND PLC CONTROLS | | | | | TRCL | Loading |
| 29 | 1 | TR0059 | MARK L RIFLE LOADER - 223, LONG GUN CARTRIDGE ASSEMBLY | HOWELL | MARK L | | $20.00 | TRCL | Loading |
| | | | MACHINE, APPROX. 85 PART/MIN. OUTPUT CAP., INLINE CONFIGURATION, CASE PLACEMENT/PRIMER INSERTION/POWDER FILL/BULLET INSERTION/CASE CRIMP/CHECK AND EXITING STATIONS, (3) ROTARY COLLATOR BOWL, FEEDS, EACH W/ TOP MOUNTED VIBRATORY HOPPER FEEDER, HMI AND PLC CONTROLS | | | | | TRCL | Loading |
| 30 | 1 | TR0060 | MARK L RIFLE LOADER #5, LONG GUN CARTRIDGE ASSEMBLY | HOWELL | MARK L | MRL04210 | $30.00 | TRCL | Loading |
| | | | MACHINE, APPROX. 85 PART/MIN. OUTPUT CAP., INLINE CONFIGURATION, CASE PLACEMENT/PRIMER INSERTION/POWDER FILL/BULLET INSERTION/CASE CRIMP/CHECK AND EXITING STATIONS, (3) ROTARY COLLATOR BOWL, FEEDS, EACH W/ TOP MOUNTED VIBRATORY HOPPER FEEDER, HMI AND PLC CONTROLS | | | | | TRCL | Loading |

| # | Qty | Description | Manufacturer | Model | Serial/Notes | | Price | | |
|---|---|---|---|---|---|---|---|---|---|
| 31 | 1 | MARK 1 RIFLE LOADER #15 - 211, LONG GUN CARTRIDGE ASSEMBLY MACHINE, APPROX. 85 PART/MIN. OUTPUT CAP., INLINE CONFIGURATION, CASE PLACEMENT/PRIMER INSERTION/POWDER FILL/BULLET INSERTION/CASE CRIMP/CHECK AND EXITING STATIONS, (2) ROTARY COLLATOR BOWL FEEDS, EACH W/ TOP MOUNTED VIBRATORY HOPPER FEEDER, HMI AND PLC CONTROLS | HOWELL | MARK 1 | M81093 | | $20.00 | TRCL | Loading |
| 32 | 1 | WORK STATION | | | VALUED W/ LOT | | | TRCL | Loading |
| 33 | 1 | WORK STATION | | | VALUED W/ LOT | | | TRCL | Loading |
| 34 | 1 | BULLET STORAGE TRAILER, [NOT PHYSICALLY INSPECTED] | | | NO VALUE | | | TRCL | Loading |
| 35 | 1 | MARK X PISTOL LOADER - SMALL PISTOL CARTRIDGE ASSEMBLY MACHINE, APPROX. 85 PART/MIN. OUTPUT CAP., INLINE CONFIGURATION, CASE PLACEMENT/ PRIMER INSERTION/POWDER FILL/BULLET INSERTION/CASE CRIMP/CHECK AND EXITING STATIONS, (2) ROTARY COLLATOR BOWL FEEDS, EACH W/ TOP MOUNTED VIBRATORY HOPPER FEEDER, HMI AND PLC CONTROLS | HOWELL | MARK X | ASSIGNED | | $12.50 | TRCL | Loading |
| 36 | 1 | MARK X PISTOL LOADER - 38SPECIAL | HOWELL | MARK X | | | $12.50 | TRCL | Loading |
| 37 | 1 | MARK III PISTOL LOADER, [NOT PHYSICALLY INSPECTED] | HOWELL | MARK III | 268 | | $13.00 | TRCL | Loading |
| 38 | 1 | MARK X-HL PISTOL LOADER #22 - SMALL PISTOL CARTRIDGE ASSEMBLY MACHINE, APPROX. 85 PART/MIN. OUTPUT CAP., INLINE CONFIGURATION, CASE PLACEMENT/PRIMER INSERTION/POWDER FILL/BULLET INSERTION/CASE CRIMP/CHECK AND EXITING STATIONS, (2) ROTARY COLLATOR BOWL FEEDS, EACH W/ TOP MOUNTED VIBRATORY HOPPER FEEDER, HMI AND PLC CONTROLS | HOWELL | MARK X-HL | A1W0150 | | $12.50 | TRCL | Loading |
| 39 | 1 | AIR COMPRESSOR - KAESER SK15, AIR COMPRESSOR, ROTARY SCREW TYPE, 15 HP DRIVE MOTOR, 125 PSI OPERATING PRESSURE, 7,328 HRS. INDICATED | KAESER | SK15 | 1245-1084 | | $9.00 | TRCL | Loading |
| 40 | 1 | HYSTER H60 FORTIS FORKLIFT, FORKLIFT, PROPANE POWERED TYPE, 5,700 LB. CAP., 3-STAGE MAST, 181.5" MAX. LIFT, 3-STAGE MAST, CUSHION TIRES, SIDESHIFTER, 2,049 HRS. INDICATED | HYSTER | H60FT | N17VN8152SA | | $6.50 | TRCL | Loading |
| 41 | 1 | MARK X-HL PISTOL LOADER #50 - 45, PISTOL CARTRIDGE ASSEMBLY MACHINE, APPROX. 85 PART/MIN. OUTPUT CAP., INLINE CONFIGURATION, CASE PLACEMENT/ | HOWELL | MARK X-HL | A1W0050L | | $11.50 | TRCL | Loading |

| Qty | Item | Description | Mfr | Model | Price | Loc | Status |
|---|---|---|---|---|---|---|---|
| 1 | TR0142 | MARK X-HL PISTOL LOADER #32 - 9MM — PRIMER INSERTION/POWDER FILL/BULLET INSERTION/CASE CRIMP/CHECK AND EXITING STATIONS, (7) ROTARY COLLATOR BOWL, FEEDS, EACH W/ TOP MOUNTED VIBRATORY HOPPER FEEDS, HMI AND PLC CONTROLS | HOWELL | MARK X-HL | $12.50 | TRCL | Loading |
| 1 | TR0143 | MARK X-HL PISTOL LOADER #33 - 9MM, PISTOL CARTRIDGE ASSEMBLY MACHINE, APPROX. 85 PART/MIN. OUTPUT CAP., INLINE CONFIGURATION, CASE PLACEMENT/PRIMER INSERTION/POWDER FILL/BULLET INSERTION/CASE CRIMP/CHECK AND EXITING STATIONS, (7) ROTARY COLLATOR BOWL, FEEDS, EACH W/ TOP MOUNTED VIBRATORY HOPPER FEEDER, HMI AND PLC CONTROLS | HOWELL | MARK X-HL | $12.50 | TRCL | Loading |
| 1 | TR0150 | POWDER STORAGE BOX — VALUED W/ LOT | | | | TRCL | Loading |
| 1 | TR0154 | MARK 1 RIFLE LOADER #04 - 223, LONG GUN CARTRIDGE ASSEMBLY MACHINE, APPROX. 85 PART/MIN. OUTPUT CAP., INLINE CONFIGURATION, CASE PLACEMENT/PRIMER INSERTION/POWDER FILL/BULLET INSERTION/CASE CRIMP/CHECK AND EXITING STATIONS, (7) ROTARY COLLATOR BOWL, FEEDS, EACH W/ TOP MOUNTED VIBRATORY HOPPER FEEDER, HMI AND PLC CONTROLS | HOWELL | MARK 1 | $20.00 | TRCL | Loading |
| 1 | TR0155 | MARK 1 RIFLE LOADER - 223 | HOWELL | MARK 1 / MK0110 | $20.00 | TRCL | Loading |
| 1 | TR0175 | MARK X-HL PISTOL LOADER #08 - 40 CAL, PISTOL CARTRIDGE ASSEMBLY MACHINE, APPROX. 85 PART/MIN. OUTPUT CAP., INLINE CONFIGURATION, CASE PLACEMENT/PRIMER INSERTION/POWDER FILL/BULLET INSERTION/CASE CRIMP/CHECK AND EXITING STATIONS, (7) ROTARY COLLATOR BOWL, FEEDS, EACH W/ TOP MOUNTED VIBRATORY HOPPER FEEDER, HMI AND PLC CONTROLS | HOWELL | MARK X-HL / ALW011HL | $12.50 | TRCL | Loading |
| 1 | TR0176 | MARK X-HL PISTOL LOADER #34 - 45, PISTOL CARTRIDGE ASSEMBLY MACHINE, APPROX. 85 PART/MIN. OUTPUT CAP., INLINE CONFIGURATION, CASE PLACEMENT/ PRIMER INSERTION/POWDER FILL/BULLET INSERTION/CASE CRIMP/CHECK AND EXITING STATIONS, (7) ROTARY COLLATOR BOWL, FEEDS, EACH W/ TOP MOUNTED VIBRATORY HOPPER FEEDS, HMI AND PLC CONTROLS | HOWELL | MARK X-HL / ALW012HL | $12.50 | TRCL | Loading |
| 1 | TR0177 | MARK X-HL PISTOL LOADER - 9MM, PISTOL CARTRIDGE | HOWELL | MARK X-HL / ALW013HL | $12.50 | TRCL | Loading |

| # | Qty | Code | Description | Mfr | Model | Model 2 | Price | Loc | Status |
|---|---|---|---|---|---|---|---|---|---|
| | | | ASSEMBLY MACHINE, APPROX. 85 PART/MIN, OUTPUT CAP., | | | | | TRCL | Loading |
| | | | INLINE CONFIGURATION, CASE PLACEMENT/ | | | | | TRCL | Loading |
| | | | PRIMER INSERTION/POWDER FILL/BULLET INSERTION/CASE | | | | | TRCL | Loading |
| | | | CRIMP/CHECK AND EXITING STATIONS, (2) ROTARY COLLATOR | | | | | TRCL | Loading |
| | | | BOWL | | | | | TRCL | Loading |
| | | | FEEDS, EACH W/ TOP MOUNTED VIBRATORY HOPPER FEEDER, | | | | | TRCL | Loading |
| | | | HMI AND PLC CONTROLS | | | | | TRCL | Loading |
| 50 | 1 | TR0178 | MARK X-HL PISTOL LOADER #32 - 9MM, PISTOL | HOWELL | MARK X-HL | ALW01.6HL | $12.50 | TRCL | Loading |
| | | | CARTRIDGE ASSEMBLY MACHINE, APPROX. 85 PART/MIN. | | | | | TRCL | Loading |
| | | | OUTPUT CAP., INLINE CONFIGURATION, CASE | | | | | TRCL | Loading |
| | | | PLACEMENT/PRIMER INSERTION/POWDER FILL/BULLET | | | | | TRCL | Loading |
| | | | INSERTION/CASE CRIMP/CHECK AND EXITING STATIONS, (3) | | | | | TRCL | Loading |
| | | | ROTARY COLLATOR BOWL | | | | | TRCL | Loading |
| | | | FEEDS, EACH W/ TOP MOUNTED VIBRATORY HOPPER FEEDER, | | | | | TRCL | Loading |
| | | | HMI AND PLC CONTROLS | | | | | TRCL | Loading |
| 51 | 1 | TR0179 | MARK X-HL PISTOL LOADER NO2 - 40 CAL, PISTOL | HOWELL | MARK X-HL | ALW01SHL | $12.50 | TRCL | Loading |
| | | | CARTRIDGE ASSEMBLY MACHINE, APPROX. 85 PART/MIN. | | | | | TRCL | Loading |
| | | | OUTPUT CAP., INLINE CONFIGURATION, CASE | | | | | TRCL | Loading |
| | | | PLACEMENT/PRIMER INSERTION/POWDER FILL/BULLET | | | | | TRCL | Loading |
| | | | INSERTION/CASE CRIMP/CHECK AND EXITING STATIONS, (3) | | | | | TRCL | Loading |
| | | | ROTARY COLLATOR BOWL | | | | | TRCL | Loading |
| | | | FEEDS, EACH W/ TOP MOUNTED VIBRATORY HOPPER FEEDER, | | | | | TRCL | Loading |
| | | | HMI AND PLC CONTROLS | | | | | TRCL | Loading |
| 52 | 1 | TR0184 | MARK L RIFLE LOADER #14 - 308, LONG GUN | HOWELL | MARK L | MRL114 | $20.00 | TRCL | Loading |
| | | | CARTRIDGE ASSEMBLY MACHINE, APPROX. 85 PART/MIN. | | | | | TRCL | Loading |
| | | | OUTPUT CAP., INLINE CONFIGURATION, CASE | | | | | TRCL | Loading |
| | | | PLACEMENT/PRIMER INSERTION/POWDER FILL/BULLET | | | | | TRCL | Loading |
| | | | INSERTION/CASE CRIMP/CHECK AND EXITING STATIONS, (3) | | | | | TRCL | Loading |
| | | | ROTARY COLLATOR BOWL | | | | | TRCL | Loading |
| | | | FEEDS, EACH W/ TOP MOUNTED VIBRATORY HOPPER FEEDER, | | | | | TRCL | Loading |
| | | | HMI AND PLC CONTROLS | | | | | TRCL | Loading |
| 53 | 1 | TR0194 | MARK L RIFLE LOADER #40 - 223, LONG GUN | HOWELL | MARK L | MRL119 | $20.00 | TRCL | Loading |
| | | | CARTRIDGE ASSEMBLY MACHINE, APPROX. 85 PART/MIN. | | | | | TRCL | Loading |
| | | | OUTPUT CAP., INLINE CONFIGURATION, CASE | | | | | TRCL | Loading |
| | | | PLACEMENT/PRIMER INSERTION/POWDER FILL/BULLET | | | | | TRCL | Loading |
| | | | INSERTION/CASE CRIMP/CHECK AND EXITING STATIONS, (3) | | | | | TRCL | Loading |
| | | | ROTARY COLLATOR BOWL | | | | | TRCL | Loading |
| | | | FEEDS, EACH W/ TOP MOUNTED VIBRATORY HOPPER FEEDER, | | | | | TRCL | Loading |
| | | | HMI AND PLC CONTROLS | | | | | TRCL | Loading |

| # | Qty | Description | Make | Model | Serial/Tag | Value | | |
|---|---|---|---|---|---|---|---|---|
| 54 | 1 | MARK X PISTOL LOADER #11 - 9MM, PISTOL CARTRIDGE ASSEMBLY MACHINE, APPROX. 85 PART/MIN. OUTPUT CAP., INLINE CONFIGURATION, CASE PLACEMENT/ PRIMER INSERTION/POWDER FILL/BULLET INSERTION/CASE CRIMP/CHECK AND EXITING STATIONS, (2) ROTARY COLLATOR BOWL FEEDS, EACH W/ TOP MOUNTED VIBRATORY HOPPER FEEDER, HMI AND PLC CONTROLS | HOWELL | MARK X | 679 | $11.50 | TRCL | Loading |
| 55 | TR0217 | 1 | MARK X PISTOL LOADER #18 - 38SPECIAL, PISTOL CARTRIDGE ASSEMBLY MACHINE, APPROX. 85 PART/MIN. OUTPUT CAP., INLINE CONFIGURATION, CASE PLACEMENT/PRIMER INSERTION/POWDER FILL/BULLET INSERTION/CASE CRIMP/CHECK AND EXITING STATIONS, (2) ROTARY COLLATOR BOWL FEEDS, EACH W/ TOP MOUNTED VIBRATORY HOPPER FEEDER, HMI AND PLC CONTROLS | HOWELL | MARK X | ALW0151 | $11.50 TRCL | Loading |
| 56 | 1 | SP LOADING SPC STATION 3 | | | NO VALUE ASSIGNED | TRCL | | Loading |
| 57 | 1 | SP LOADING SPC STATION 4 | | | NO VALUE ASSIGNED | TRCL | | Loading |
| 653 | 1 | MARK L RIFLE LOADER #8, LONG GUN CARTRIDGE ASSEMBLY MACHINE, APPROX. 85 PART/MIN. OUTPUT CAP., INLINE CONFIGURATION, CASE PLACEMENT/ PRIMER INSERTION/POWDER FILL/BULLET INSERTION/CASE CRIMP/CHECK AND EXITING STATIONS, (2) ROTARY COLLATOR BOWL FEEDS, EACH W/ TOP MOUNTED VIBRATORY HOPPER FEEDER, HMI AND PLC CONTROLS | HOWELL | MARK L | | $20.00 TRCL | Loading |
| 654 | 1 | MARK L RIFLE LOADER #13, LONG GUN CARTRIDGE ASSEMBLY MACHINE, APPROX. 85 PART/MIN. OUTPUT CAP., INLINE CONFIGURATION, CASE PLACEMENT/ PRIMER INSERTION/POWDER FILL/BULLET INSERTION/CASE CRIMP/CHECK AND EXITING STATIONS, (2) ROTARY COLLATOR BOWL FEEDS, EACH W/ TOP MOUNTED VIBRATORY HOPPER FEEDER, HMI AND PLC CONTROLS | HOWELL | MARK L | MRL097 | $20.00 TRCL | Loading |
| 655 | TR0173 | 1 | MARK L RIFLE LOADER, LONG GUN CARTRIDGE ASSEMBLY MACHINE, APPROX. 85 PART/MIN. OUTPUT CAP., INLINE CONFIGURATION, CASE PLACEMENT/ PRIMER INSERTION/POWDER FILL/BULLET INSERTION/CASE CRIMP/CHECK AND EXITING STATIONS, (1) ROTARY COLLATOR BOWL FEEDS, EACH W/ TOP MOUNTED VIBRATORY HOPPER FEEDER, HMI AND PLC CONTROLS | HOWELL | MARK L | MRL110 | $20.00 TRCL | Loading |
| 656 | TR0174 | 1 | MARK L RIFLE LOADER, LONG GUN CARTRIDGE ASSEMBLY MACHINE, APPROX. 85 PART/MIN. OUTPUT CAP., INLINE CONFIGURATION, CASE PLACEMENT/ PRIMER INSERTION/POWDER FILL/BULLET INSERTION/CASE CRIMP/CHECK AND EXITING STATIONS, (1) ROTARY COLLATOR BOWL FEEDS, EACH W/ TOP MOUNTED VIBRATORY HOPPER FEEDER, HMI AND PLC CONTROLS | HOWELL | MARK L | | $20.00 TRCL | Loading |
| 657 | 5 | POWER CARTRIDGE ASSEMBLY MACHINES, BENCH MOUNTED TYPE | DILLON | SUPER 1050 | | $5.00 TRCL | Loading |
| 658 | 4 | MANUAL CARTRIDGE ASSEMBLY MACHINES, BENCH MOUNTED TYPE [NOTE: VERY GOOD CONDITION] | DILLON | XL650 | | $1.00 TRCL | Loading |

| Item | Qty | Tag | Description | Loc | Model | Part | Price | Code | Status |
|---|---|---|---|---|---|---|---|---|---|
| 671 | 1 | 6C0037 | MARK X PISTOL LOADER, PISTOL CARTRIDGE ASSEMBLY MACHINE, APPROX. 85 PART/MIN. OUTPUT CAP., INLINE CONFIGURATION, CASE PLACEMENT/PRIMER INSERTION/POWDER FILL/BULLET INSERTION/CASE CRIMP/CHECK AND EXITING STATIONS, (2) ROTARY COLLATOR BOWL FEEDS, EACH W/ TOP MOUNTED VIBRATORY HOPPER FEEDER, HMI AND PLC CONTROLS | HOWELL | MARK X | | $12.50 | TRCL | Loading |
| 76 | 1 | TR0192 | MARK X PISTOL LOADER, PISTOL CARTRIDGE ASSEMBLY MACHINE, APPROX. 85 PART/MIN. OUTPUT CAP., INLINE CONFIGURATION, CASE PLACEMENT/PRIMER INSERTION/POWDER FILL/BULLET INSERTION/CASE CRIMP/CHECK AND EXITING STATIONS, (2) ROTARY COLLATOR BOWL FEEDS, EACH W/ TOP MOUNTED VIBRATORY HOPPER FEEDER, HMI AND PLC CONTROLS | HOWELL | MARK X | ALW020A | $12.50 | TRCL | Loading |
| 79 | 1 | TR0185 | MARK X PISTOL LOADER, PISTOL CARTRIDGE ASSEMBLY MACHINE, APPROX. 85 PART/MIN. OUTPUT CAP., INLINE CONFIGURATION, CASE PLACEMENT/PRIMER INSERTION/POWDER FILL/BULLET INSERTION/CASE CRIMP/CHECK AND EXITING STATIONS, (2) ROTARY COLLATOR BOWL FEEDS, EACH W/ TOP MOUNTED VIBRATORY HOPPER FEEDER, HMI AND PLC CONTROLS | HOWELL | MARK X | ALW017 | $12.50 | TRCL | Loading |
| 80 | 1 | TR0162 | MARK X PISTOL LOADER, PISTOL CARTRIDGE ASSEMBLY MACHINE, APPROX. 85 PART/MIN. OUTPUT CAP., INLINE CONFIGURATION, CASE PLACEMENT/PRIMER INSERTION/POWDER FILL/BULLET INSERTION/CASE CRIMP/CHECK AND EXITING STATIONS, (2) ROTARY COLLATOR BOWL FEEDS, EACH W/ TOP MOUNTED VIBRATORY HOPPER FEEDER, HMI AND PLC CONTROLS | HOWELL | MARK X | 557 | $12.50 | TRCL | Loading |
| 81 | 1 | TR0164 | MARK X PISTOL LOADER, PISTOL CARTRIDGE ASSEMBLY MACHINE, APPROX. 85 PART/MIN. OUTPUT CAP., INLINE CONFIGURATION, CASE PLACEMENT/PRIMER INSERTION/POWDER FILL/BULLET INSERTION/CASE CRIMP/CHECK AND EXITING STATIONS, (2) ROTARY COLLATOR BOWL FEEDS, EACH W/ TOP MOUNTED VIBRATORY HOPPER FEEDER, HMI AND PLC CONTROLS | HOWELL | MARK X | 6007 | $12.50 | TRCL | Loading |
| 82 | 1 | TR0159 | MARK X-HL PISTOL LOADER - SMALL PISTOL CARTRIDGE ASSEMBLY MACHINE, APPROX. 85 PART/MIN. OUTPUT CAP., INLINE CONFIGURATION, CASE PLACEMENT/PRIMER INSERTION/POWDER FILL/BULLET INSERTION/CASE CRIMP/CHECK AND EXITING STATIONS, (2) ROTARY COLLATOR BOWL FEEDS, EACH W/ TOP MOUNTED VIBRATORY HOPPER FEEDER, HMI AND PLC CONTROLS | HOWELL | MARK X-HL | ALW013HL | $12.50 | TRCL | Loading |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 63 | 1 | MARK X-HL PISTOL LOADER - SMALL PISTOL CARTRIDGE ASSEMBLY MACHINE, APPROX. 85 PART/MIN. OUTPUT CAP., INLINE CONFIGURATION, CASE PLACEMENT/PRIMER INSERTION/POWDER FILL/BULLET INSERTION/CASE CRIMP/CHECK AND EXITING STATIONS, (2) ROTARY COLLATOR BOWL, FEEDS, EACH W/ TOP MOUNTED VIBRATORY HOPPER FEEDER, HMI AND PLC CONTROLS | HOWELL | MARK X-HL | ALW0290L | $12.50 | TRCL | Loading |
| 64 | 1 | MARK X-HL PISTOL LOADER - SMALL PISTOL CARTRIDGE ASSEMBLY MACHINE, APPROX. 85 PART/MIN. OUTPUT CAP., INLINE CONFIGURATION, CASE PLACEMENT/PRIMER INSERTION/POWDER FILL/BULLET INSERTION/CASE CRIMP/CHECK AND EXITING STATIONS, (2) ROTARY COLLATOR BOWL, FEEDS, EACH W/ TOP MOUNTED VIBRATORY HOPPER FEEDER, HMI AND PLC CONTROLS | HOWELL | MARK X-HL | ALW0189L | $12.50 | TRCL | Loading |
| 65 | 1 | MARK X-HL PISTOL LOADER - SMALL PISTOL CARTRIDGE | HOWELL | MARK X-HL | ALW01HL | | TRCL | Loading |
| | | ASSEMBLY MACHINE, APPROX. 85 PART/MIN. OUTPUT CAP., | | | | | TRCL | Loading |
| | | INLINE CONFIGURATION, CASE PLACEMENT/PRIMER | | | | | TRCL | Loading |
| | | INSERTION/POWDER FILL/BULLET INSERTION/CASE | | | | | TRCL | Loading |
| | | CRIMP/CHECK AND EXITING STATIONS, (2) ROTARY COLLATOR | | | | | TRCL | Loading |
| | | BOWL, | | | | | TRCL | Loading |
| | | FEEDS, EACH W/ TOP MOUNTED VIBRATORY HOPPER FEEDER, | | | | | TRCL | Loading |
| | | HMI AND PLC CONTROLS | | | | $12.50 | TRCL | Loading |
| 66 | 1 | MARK X-HL PISTOL LOADER - SMALL PISTOL CARTRIDGE | HOWELL | MARK X-HL | ALW02HL | | TRCL | Loading |
| | | ASSEMBLY MACHINE, APPROX. 85 PART/MIN. OUTPUT CAP., | | | | | TRCL | Loading |
| | | INLINE CONFIGURATION, CASE PLACEMENT/PRIMER | | | | | TRCL | Loading |
| | | INSERTION/POWDER FILL/BULLET INSERTION/CASE | | | | | TRCL | Loading |
| | | CRIMP/CHECK AND EXITING STATIONS, (2) ROTARY COLLATOR | | | | | TRCL | Loading |
| | | BOWL, | | | | | TRCL | Loading |
| | | FEEDS, EACH W/ TOP MOUNTED VIBRATORY HOPPER FEEDER, | | | | | TRCL | Loading |
| | | HMI AND PLC CONTROLS | | | | | TRCL | Loading |